UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34  - KSF

UNITED STATES OF AMERICA

PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.

DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

UNITED STATES' MEMORANDUM IN SUPPORT OF ITS CROSS MOTION FOR
PROTECTIVE ORDER AND IN RESPONSE TO EAST KENTUCKY'S
MEMORANDUM  REGARDING THE DELIBERATIVE PROCESS PRIVILEGE

The United States submits this Memorandum in Support of its Cross Motion for a

Protective Order and Response to East Kentucky Power's Memorandum in Support of its Motion

to Compel the production of thirty-five (35) documents that the United States has withheld on

the basis of deliberative process and other privileges as applicable.

INTRODUCTION

The proper focus of the pending discovery dispute is whether the United States has

correctly asserted the deliberative process privilege over the disputed documents, and thus

whether these documents should be shielded from disclosure.  Indeed, the parties proposed and

this Court ordered briefing on the scope and applicability of the deliberative process privilege to

assist the Court's in camera review of the disputed documents.  The applicable mandatory

authority and rulings in the parallel utility enforcement cases all lead to the conclusion that the

United States has appropriately invoked the deliberative process and other privileges regarding

many of the same and similar documents to those challenged by defendant.[1]

Perhaps because the United States has prevailed in protecting EPA's deliberative process in the parallel cases, East Kentucky Power has attempted to refocus the pending dispute. The defendant argues that the United States should not prevail in its underlying enforcement action. However, this is neither the appropriate time for such argument, nor relevant to the discovery dispute at issue.[2]

The defendant also argues that it did not have "fair notice" of the United States' interpretation of the Clean Air Act ("Act") regulations applicable to this enforcement action. Despite defendant's claims, none of the courts in the parallel power plant cases that have ruled on the fair notice issue have found that a utility defendant could prevail on a fair notice defense.[3] Moreover, East Kentucky Power's efforts are self-defeating. The defendant, attempting to

---

[1] See Plaintiff's Memorandum Ex. 10 (United States v. Ohio Edison Co., No. C2-99-1181, at 7 (S.D. Ohio, July 25, 2002); Ex. 11 (United States v. Duke Energy Corp., No. 1:00CV1262, at 5-6 (M.D. N.C. December 20, 2002); Ex. 12 (United States v. Illinois Power Co., No. 99-833-MJR, at 1 (S.D. Ill. May 23, 2003); Ex. 13 (United States v. American Electric Power, No. C2-99-1182, at 7 (S.D. Ohio, September 23, 2003); Ex. 14 (United States v. American Electric Power, No. C2-99-1182 (S.D. Ohio, June 6, 2003); and Ex. 15 (United States v. Cinergy Corp, et al, No. 1:99-cv-1693-LJM, July 27, 2005).

[2] Certain courts have found in favor of the United States' interpretation of the regulations at issue.  See Wisconsin Elec. Power Co. v. Reilly ("WEPCO"), 893 F. 2d 901, 901-912 (7th Cir. 1990); United States v. Ohio Edison Company, 276 F. Supp. 2d 829, 884-889 (S.D. Ohio 2003); United States v. Southern Indiana Gas and Electric Company ("SIGECO"), 245 F. Supp. 2d 994, 1010-1023 (S.D. Ind 2003); United States v. Cinergy Corporation,___ F. Supp. 2d ___, 2005 WL 2098269 (S.D. Ind.); while others have not.  See United States v. Duke Energy, 278 F. Supp. 2d 619 (M.D. N.C. 2003), aff'd on other grounds, 411 F. 3d 539 (4th Cir. 2005); United States v. Alabama Power Company, 372 F. Supp. 2d 1283 (N.D. Ala. 2005).  In addition, the United States has reached consent decrees with a number of the coal-fired electric utilities resulting in agreements to eliminate hundreds of thousands of tons of air pollutants and thereby provide greater protection of human health and the environment.

[3] See e.g. Ohio Edison Company, 276 F. Supp. 2d at 884-889 (no defense); SIGECO, 245 F. Supp. 2d at 1010-1023 (no defense); United States v. Duke Energy, 278 F. Supp. 2d at 631 n. 10 (no opinion); Ex. 1 (National Parks Conservation Association, Inc. v. Tennessee Valley Authority, C.A. No. 01-403, August 29, 2005 ("the court is not going to permit TVA to argue 'fair notice'").

demonstrate its alleged substantial need for the privileged documents at issue, undercuts its own argument by citing to numerous publicly available final agency documents which it claims support its fair notice defense.  Defendant's Memorandum at 3-10.

As set forth in the United States' initial Memorandum and as further shown below, based on a document-by-document review of the 35 disputed documents, the plaintiff has shown that the challenged documents are subject to the deliberative process privilege, and that the defendant has not shown a substantial need for such documents.  In addition, certain documents also are protected by the attorney client privilege, which is an absolute privilege not subject to any balancing claims.  Thus, the disputed documents should be protected from disclosure.

## BACKGROUND

The United States brought this action to obtain injunctive relief and civil penalties, alleging that East Kentucky Power has continued to violate the Act by constructing major modifications at two coal-fired electricity generating plants in Kentucky.  As a result, these two plants have emitted and continue to emit excessive amounts of air pollution, including sulfur dioxide, nitrogen oxides, and/or particulates, which adversely affect public health and the environment over a wide area, as described in the Complaint.  The plaintiff seeks to require the defendant to install the required pollution control devices as soon as possible.[4]

---

[4]Defendant's obligation to obtain permits for the modifications made to the plants at issue arises under the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act, 42 U.S.C. §§ 7470-7492.  The PSD program applies to areas designated as attaining NAAQS or as unclassified, and requires, inter alia, modeling and monitoring efforts directed at preserving ambient air quality, as well as installation of pollution controls that are considered the "best available control technology."  42 U.S.C. 7471.  Under the PSD provisions, regulated sources are required to obtain permits from the EPA or an authorized state before they undertake modifications.  Defendant incorrectly refers to the PSD regulations and the separate NSPS collectively as being part of the overall New Source Review ("NSR") program.  Defendant's Memorandum, at 2 n.2.  The separate New Source Performance Standards ("NSPS") program, which sets forth standards of performance for certain types of sources, is set forth at 42 U.S.C. §

3

As set forth in the United States' Complaint in this action, at various times, the defendant commenced construction of one or more modifications, as defined in the Act and the Kentucky State Implementation Plan ("SIP") at the Spurlock and Dale Plants.  These modifications included physical and operational changes related to the defendant's decision to generate and sell additional steam from the Spurlock Plant to the Inland Container Corporation, including a required uprating of the Spurlock Unit 2 boiler.  In addition, the defendant commenced construction of modifications at Units Nos. 3 and 4 of its Dale Plant involving upgrades, replacements and renovations of major components of the boiler and turbine at the units.

A.     **The Defendant Has Raised Its Alleged Fair Notice Defense Based Almost Entirely on Publicly Available Information and Has Received Actual Notice of Violations at Issue in This Case**

At a later date, the Court will be asked to determine whether the EPA's interpretation of the applicable PSD regulations is entitled to deference and whether the defendant received fair notice.  However, the documents cited in East Kentucky's initial Memorandum clearly support the United States' position that the defendant can and should make whatever arguments it has on these issues based on the final and official statements of the EPA.  Nearly all of the documents relied on by the defendant are final agency statements excerpted, paraphrased, or characterized from the federal register and other publicly available sources.  Defendant's Memorandum at 3-9.

Although a full refutation of defendant's claims in support of its fair notice defense would not be appropriate at this juncture, a sufficient response is in order to clarify certain mischaracterizations by the defendant.  East Kentucky Power concedes that the Act requires regulated entities such as the defendant to obtain preconstruction permits for modifications (i.e.,

---

7411.

physical or operational "changes" that would result in increased emissions at existing sources).[5] Defendant's Memorandum, at 2 n.3.  The defendant, however, asserts that prior to initiation of this and related litigation against the owners and operators of coal-fired power plants, EPA and state regulators had interpreted this requirement to exclude the types of modifications undertaken at defendant's plants.  For instance, defendant argues that EPA has implemented in this litigation a wholly new interpretation of "modification" that includes so-called "life extension" projects. Defendant's Memorandum at 3, 6, 9.

The Court, however, need only look to the Seventh Circuit's affirmance of EPA's 1988 "WEPCo" applicability determination to see that EPA has long held that life extension projects could be considered "changes."  See WEPCO, 893 F.2d at 912 ("The EPA concluded that the proposed project will increase the life expectancy of the Port Washington facility, and this conclusion was a factor in the finding that the work was not routine.  These determinations were not arbitrary and capricious.").  Significantly, the interpretation of the EPA's regulations upheld by the Seventh Circuit confirmed that EPA broadly interpreted the PSD regulations in the specific context of an electric utility life extension project:

> The clear intent of the PSD regulations is to construe the term 'physical change' very broadly, to cover virtually any significant alteration to an existing plant. This wide reach is demonstrated by the very narrow exclusion provided in the regulations: other than certain uses of alternate fuels not relevant here, only

---

[5]In its regulations implementing the NSR program, EPA limited the modifications that would trigger the permitting and pollution control requirements of the statute to "major modifications," defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 C.F.R. § 52.21.  The regulations also contain a list of exclusions that will not be considered physical or operational changes, including, notably for this action, "routine maintenance, repair and replacement." *Id.* §52.21(b)(2).  EPA has explained that the "common-sense" exclusion for "routine maintenance" was needed to prevent the modification rule from being applied to such everyday situations as "leaky pipes". *See* 57 Fed. Reg. 32314, 32316 (Jul. 21, 1992).

'routine maintenance, repair, and replacement' is excluded from the definition of physical change.

In determining whether proposed work at an existing facility is 'routine,' EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding.[6/]

EPA is asserting the same interpretation in this action.

Defendant also argues that EPA is applying a different interpretation to the Spurlock Steam Supply Project at issue in this case than it applied to a Rochester Public Utilities Project. Defendant's Memorandum, at 15.[7/] Defendant attempts to use this argument to assert that it had no fair notice that the Spurlock Project would trigger PSD. This claim fails for an even more fundamental reason – defendant *specifically knew* that the Spurlock Steam Supply Project raised PSD concerns.  Actual notice of an agency interpretation will always defeat a defendant's claim that it lacked fair notice.[8/]

---

[6/] See Ex. 2 (WEPCo Determination, September 9, 1988).

[7/] Defendant is presumably referring to a PSD determination for a steam supply project undertaken at a Rochester Public Utilities ("RPU") plant.  See In re Rochester Public Utilities, 2004 WL 3214482,  PSD Appeal No. 03-03 (Envt'l Appeals Bd., U.S. EPA Aug. 3, 2004) ("RPU" Order).  As a preliminary matter, defendant grossly misrepresents the RPU case by stating that it involved a decision "not to require a PSD permit."  Defendant's Memorandum at 15, 27.  As is clear from the decision itself, the RPU steam supply project *did* require a PSD permit and *was* considered a modification (i.e., a physical or operational change that would be expected to result in increased actual annual emissions).  Rather, the issue in the RPU case was where and whether best available control technology ("BACT") should be installed once it was determined that PSD applied.  See id.  Because the present enforcement action has been bifurcated into separate liability and remedy phases, questions related to BACT must await this Court's determination of PSD liability.  In any case, defendant's mischaracterization of the RPU case is indicative of its mischaracterization of the other public EPA pronouncements set forth in its "Preliminary Statement."

[8/] See United States v. Hoechst Celanese Corp., 128 F.3d 216, 227-29 (4th Cir. 1997).  Similarly, when a defendant "deliberately goes perilously close to an area of proscribed conduct [it] shall take the risk of crossing the line."  Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 (1952); United States v. Midwest Fireworks Mfg. Co., 248 F.3d 563, 568  (6th Cir. 2001). "[B]usinesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."

Here, there is no question that defendant was put on notice of the PSD risks posed by the

Spurlock Steam Supply Project.  On December 15, 1993, defendant wrote to the Kentucky

Division for Air Quality ("KDAQ") concerning the project.  Defendant informed KDAQ of its

joint venture with the Inland Container Corporation, and asked KDAQ to raise the maximum

permitted heat input for Spurlock Unit 2, because supplying steam to Inland while also meeting

electricity demands could cause the unit to exceed its permitted heat input.[9]

The KDAQ did not grant defendant's request.  Instead, the KDAQ informed defendant

that its proposal would be a "major modification," thus triggering PSD requirements, if it would

result in a significant net emissions increase.[10]  Accordingly, the KDAQ requested that defendant

submit emissions calculations to determine if PSD would be triggered:

> [I]f the proposed increase in the heat input rate results in a significant net emissions
> increase, then your proposal would be a major modification, as defined in 401 KAR
> 51:017.  Therefore, you are required to quantify the emissions from your proposal in
> order to demonstrate the applicability or non-applicability of Regulation 401 KAR
> 51:017, Prevention of significant deterioration of air quality.

Defendant did not submit the requested information.  Instead, defendant proceeded to

"uprate" Spurlock Unit 2 even *before* receiving any response from the KDAQ.[11]  Having

received no written response from defendant, on December 20, 1994, the KDAQ sent a follow-

---

Village of Hoffman Estates, et al. v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct.
1186, 1193, 71 L.Ed.2d 362 (1982).  Thus, fair notice concerns are lessened where a company is provided
an opportunity to seek clarification of a regulation's applicability.  See, e.g. Hoechst Celanese Corp., 128
F.3d at 224 (4th Cir. 1997); Texas Eastern Prods. Pipeline Co. v. OSHRECOM, 827 F.2d 46. 50 (7th Cir.
1987) (fair notice defense rejected where "major pipeline company" should "have taken the safer
position," but declined to inquire of regulators.

[9]  See Ex. 3 (Letter from Robert Hughes to John Hornback, December 15, 1993).

[10]  See Ex. 4 (Letter from Gerald Goebel, February 3, 1994).

[11] See Ex. 5 (Memo from B. Hensley, January 13, 1994).

up letter stating that it would discontinue the review process if defendant did not respond within

15 days.[12]

    Defendant responded to the KDAQ's December 20, 1994 letter on January 16, 1995.

Defendant stated that it was reevaluating its plans, and requested that its proposal be withdrawn:

> *We are currently reviewing the operating status of our units* and would request
> that our proposal to increase the permitted heat input be withdrawn at this time.
> We will review the facility operation *and its future planned use* and will evaluate
> the need to continue this process at a later time.

[Emphasis added].[13] In response, KDAQ "ceased its review of the proposed request."[14] Although

East Kentucky Power stated that it was reviewing the operating status of Spurlock Unit 2 and its

future use, the defendant in fact had already uprated Spurlock Unit 2 as of January 1994, as

noted above.  At the very least, the defendant should have sought a PSD determination or

otherwise submitted emissions calculations to the KDAQ.  Instead, defendant continued without

undergoing PSD review.  Defendant's awareness of the risks raised by its actions are fatal to its

fair notice defense and its post-hoc claim of substantial need.

---

[12]See Ex. 6 (Letter from Gerald Goebel, December 20, 1994).

[13]See Ex. 7 (Letter from Robert Hughes, January 16, 1995).

[14]See Ex. 8 (Letter from Gerald Goebel, March 13, 1995).

## B.    The EPA Has Not Repudiated It's Interpretation of the Applicable Regulations in this Case

Contrary to the defendant's contentions, the EPA has not "repudiated the enforcement initiative definition of 'modification'."  Defendant's Memorandum at 7.  The proposed Equipment Replacement Provision ("ERP") rule relied on by the defendant is prospective and not at issue here.  It clearly specifies that the EPA will continue to pursue all PSD cases involving conduct (i.e. modifications undertaken) before October 27, 2003, the date of the proposed rule:

> Today's rule provides revisions to the major NSR program to specify categories of equipment replacement activities that we will consider RMRR in the future. As recognized by the U.S. Supreme Court, an agency may not promulgate retroactive rules absent express congressional authority. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, *61264, 208, 102 L. Ed. 2d 493, 109 S. Ct. 468 (1988). The CAA contains no such expressed grant of authority, and we do not intend by our actions today to create retroactive applicability for today's rule. 42 U.S.C. 7401 et seq. Today's rule applies only to conduct that occurs after the rule's effective date.
> None of today's rule revisions apply to any changes that are the subject of existing enforcement actions that the Agency has brought and none constitute a defense thereto. Furthermore, prior applicability determinations on major modifications that result in control requirements in an NSR permit that currently applies to a source remain valid and enforceable as to that source.
> As noted above, today we are changing the scope of the RMRR exclusion from the major NSR program by taking final action on the ERP. If you subsequently undertake an activity that does not meet the applicable provisions of these new alternatives and do not obtain a preconstruction permit if you are required to do so, you will be subject to any applicable enforcement provisions (including the possibility of citizens' suits) under the applicable sections of the CAA.

68 Fed. Reg. 61248, 61263 (October 27, 2003).

Moreover, the ERP rule is not in effect because it was stayed by the Court of Appeals for the District of Columbia Circuit.  In its reconsideration of the proposed rule EPA emphasized that "we are, and have been, pursuing all filed cases and will continue to file new cases as appropriate.  Our decisions on which cases to file are guided by a myriad of factors, including

9

available resources and environmental protection.  We acknowledge that the ERP is stayed and not currently effective in any jurisdiction.  We continue to request information and put violators on notice when they violate our rules and policies.  We note that none of the ERP rule revisions apply to any changes that are the subject of existing enforcement actions that the Agency has brought and none constitute a defense thereto." 70 Fed. Reg. 338838, 33847 (June 10, 2005). In sum, the stayed 2003 proposed ERP rule has no bearing on whether the defendant's projects undertaken in the mid 1990s violated the applicable PSD regulations, let alone on whether the defendant had fair notice of those regulations.

## ARGUMENT

### I.   THE UNITED STATES HAS SHOWN THAT THE DELIBERATIVE PROCESS PRIVILEGE APPLIES TO THE DISPUTED DOCUMENTS

The defendant's selective presentation of deliberative process decisions does not further its argument that the 35 disputed documents should be released.  Defendant's Memorandum at 11-14. The parties agree that the deliberative process privilege protects against the disclosure of inter-agency and intra-agency information if information is (1) pre-decisional and (2) deliberative in nature, containing opinions, recommendations, or advice about agency decisions. As Judge Magistrate Kemp stated in the American Electric Power case, the deliberative process privilege applies to "documents [that] represent deliberations or discussions either of changes in EPA policy or the application of settled policy to specific situations where the facts and the interpretation are being debated."[15]

East Kentucky Power has mischaracterized the ruling in Schell v. United Department of

---

[15]See Plaintiff's Memorandum, Ex. 14 (United States v. AEP, C2-99-1182, at 16).

<u>Health and Human Services</u>, 843 F. 2d 933, 940-942 (6th Cir. 1988).  In <u>Schell</u>, the Sixth Circuit held that the courts should look at several factors to determine whether a document is pre-decisional, not only whether the document is from a subordinate to a superior.  The identity of the parties is only one of the factors to be considered.  As the Court stated, "[e]qually informative is whether the document is recommendatory in nature, perhaps containing evaluations or opinions."  <u>Id.</u> at 942.  In addition, the Court ruled that a document may be pre-decisional even if a specific decision to which it relates cannot be identified.

Further, whether a document is handwritten or the author is unknown is not necessarily significant.  For instance, in the American Electric Power decision cited by the defendant, the court did not rule that handwritten notes were *per se* not protected, but only that the contents of the particular notes in question did not appear pre-decisional.[16]  In contrast, in the Ohio Edison decision, the same court held that "if the notes in question were notes taken at a meeting and reflected comments by the author and others in the course of debating a policy decision, the notes, although not themselves part of the communication process, would reflect that process and would be shielded by the privilege."[17]

Defendant also contends that the disputed documents should be disclosed because the United States allegedly has committed a subject matter waiver related to the contents of certain documents.  Defendant's Memorandum at 13, 14, 20-21, 26.[18]  Defendant cites little case law for

---

[16]<u>See</u> Plaintiff's Memorandum, Ex. 14 (<u>United States v. AEP</u>, C2-99-1182, at 9).

[17]<u>See</u> Plaintiff's Memorandum, Ex. 10 (<u>United States v. Ohio Edison</u>, C2-99-1181, at 17).

[18]To the extent East Kentucky is claiming that publishing information on final agency positions somehow waives the privilege as to internal discussions regarding those final positions, defendant's position also holds no merit.  If a party could waive attorney-client, attorney work product, or deliberative process privilege simply by making a public statement on the same subject matter, no privilege would ever

this proposition.  In fact, the case law is clear that subject matter waiver does not apply to the

deliberative process privilege.  For example, referring to the concept of subject matter waiver,

the District of Columbia Circuit has held:

> But this all or nothing approach has not been adopted with regard to executive
> privileges generally, or to the deliberative process privilege in particular.  Instead,
> courts have said that release of a document only waives these privileges for the
> document or information specifically released, and not for related materials.

In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir. 1997) (citing cases).  See also e.g., Mobil Oil

Corp. v. EPA, 879 F.2d 698, 701 (9th Cir. 1989) ("the release of certain documents waives FOIA

exemptions *only for those documents released*.") (emphasis in original); Utah Medical Prods. v.

McClellan, No. 2:03-CV-00525, 2004 WL 988877, *1 (D. Utah Mar. 31, 2004) ("[R]elease of a

document does not release all 'related materials'"); Allstate Ins. Co. v. Serio, Nos. 97-Civ-0620,

0023, 1998 WL 477961, *1 (S.D.N.Y. Aug. 13, 1998) (waiver with respect to an individual

document "did not constitute a subject-matter waiver, nor did it open the door to further

production of related documents").  The Ninth Circuit has explained the policy reasons for not

applying the concept of subject matter waiver in cases such as this:

> Implying such a waiver [as to other documents] could tend to inhibit agencies
> from making any disclosures other than those explicitly required by law because
> voluntary release of documents exempt from disclosure requirements would
> expose other documents in the litigation to risk of disclosure.  An agency would
> have an incentive to refuse to release all exempt documents if it wished to retain
> an exemption for any documents.

Mobil Oil, 879 F.2d at 701.  Even in Florida House of Representatives v. U.S. Dept. of

---

survive.  For instance, an attorney's work product is privileged if it is developed in anticipation of
litigation.  If East Kentucky's argument that merely making public statements on the same subject matter
waives the privilege were to prevail, the attorney's notes and analysis regarding the subject matter of the
litigation would become public the moment he or she filed a brief on the same subject matter.  Clearly,
that is not and should not be the law.

Commerce, 961 F. 2d 941, 947 (11 Cir. 1992), the case cited by the defendant, the Court held

that the United States had not waived its deliberative process privilege based on a release of

related documents.  Accordingly, even if the plaintiff has waived any privilege over certain other

documents obtained by defendant, such waiver does not effect a subject matter waiver over the

disputed documents.[19]

## II.     EAST KENTUCKY DOES NOT HAVE A SUBSTANTIAL NEED FOR THE DISPUTED DOCUMENTS

East Kentucky Power has not shown any need, let alone a substantial need, for the

contested documents.  To show a substantial need, the requesting party must establish "the

importance of the documents to [its] defense, and the unavailability elsewhere of the information

contained in the documents." See e.g. United States v. Leggett & Platt, Inc., 542 F.2d 655, 659

(6th Cir. 1976), cert. denied, 531 U.S. 924 (1977); United States v. Farley, 11 F.3d 1385, 1388

(7th Cir. 1993).

Contrary to the defendant's assertions, the courts do not "particularly restrict the use of

the deliberative process privilege by government agency plaintiffs that are seeking affirmative

judicial relief."  Defendant's Memorandum at 15.  See e.g. United States v. Farley, 11 F.3d 1385

(deliberative process privilege applied to documents in a proceeding filed by the United States

alleging that defendant violated the reporting requirements of the Clayton Act); United States v.

---

[19] Whether the individual "example" documents attached to defendant's brief in support of its subject matter waiver argument are themselves privileged, and whether EPA has waived any claim of deliberative process privilege over such individual documents, is not before the court.  In any case, plaintiff does not concede that it has waived any applicable privilege over these individual documents.  See, e.g., In re Sealed Case, 121 F.3d at 741 ("Since executive privilege exists to aid the governmental decision making process, a waiver should not be lightly inferred."); see also Dipace v. Goord, 218 F.R.D. 399, 407-07 (S.D.N.Y. 2003) ("no waiver will be found unless that disclosure was 'authorized' by the governmental agency and 'voluntary.'); General Elec. Co. v. EPA, 18 F.Supp.2d 138, 142 (D. Mass. 1998) (finding no waiver of deliberative process privilege where privileged documents were sent to state agencies).

Hooker Chemicals, 114 F.R.D. 100 (W.D.N.Y. 1987) ("this court finds that the State does not waive its right to withhold privileged deliberative documents simply because it is a plaintiff in a given action").  Unlike the documents in the two cases relied on by the defendant, the documents sought by East Kentucky here are not "case-specific."[20] None of the 35 impasse documents or even the 334 initially challenged documents mention East Kentucky Power.

### A.    The Disputed Documents Are Not Relevant to the Defendant's Fair Notice Defense

The defendant claims that "[b]y suing East Kentucky, the United States has placed the consistency of its interpretation of the PSD and NSPS regulations at issue in this lawsuit." Defendant's Memorandum at 16.  Although the defendant may raise a fair notice defense, the courts are clear that any evaluation of that defense must be based on final agency positions, not unofficial and non-public agency communications that reflect how individual employees understand or interpret the applicable regulations.

Under the relevant precedent, such material can shed no light on the interpretation of the regulatory provisions herein as a matter of law and is beyond the scope of legitimate discovery. See Farley, 11 F.3d 1385; SIGECO, 245 F. Supp. 2d at 1011 (finding the fair notice defense is reviewed by evaluating the "the regulations and other *public statements issued by the Agency*" (emphasis added)); and the Ohio Edison, Duke Energy Corp. Illinois Power Co., American Electric Power, Cinergy Corp deliberative process decisions, attached as Exhibits 10-15 to the United States' Memorandum.

Under the "fair notice doctrine," the United States may not obtain civil penalties from

---

[20]See Federal Deposit Insurance Corp. v. Hatziyannis, 180 F.R.D. 292, 294 (D. Md. 1998); EEOC v. Citizens Bank and Trust, 117 F.R.D. 360, 366 (D. Md. 1987).

East Kentucky unless the defendant had "fair notice" of the Agency's interpretation. The interpretation must be fairly ascertainable from the regulations themselves and an agency's official public statements regarding their meaning. See, e.g., SIGECO, 245 F. Supp. 2d at 1011 (quoting General Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).

The other side of the fair notice coin applies with equal force: a defendant may not rely upon the unofficial or internal statements of an agency to demonstrate that the meaning of the regulation was not fairly ascertainable. Thus, a defendant has no right to demand, through document production, deposition, or otherwise, the unofficial, informal, or nonpublic views of EPA or its employees, as they are irrelevant to establishing whether or not the regulations apply to the defendant's conduct. To determine whether adequate notice has been provided, a "court need only look to the language of the regulation and any official, public interpretations of it." Farley, 11 F.3d at 1391; see also General Electric Co., 53 F.3d at 1329 (court examines adequacy of notice "in the most obvious way of all: by reading the regulations" and "other public statements issued by the agency" to determine whether "a regulated party acting in good faith would be able to identify with 'ascertainable certainty'" the conduct required or prohibited).

The meaning and application of terms under the Act and its implementing regulations may be clarified by official EPA interpretations, but cannot be clarified by internal, unofficial staff discussions. Just as the United States could not enforce the law on the basis of unofficial, nonpublic interpretations of the Act or regulations promulgated thereunder, the defendant cannot rely on such interpretations. As Farley and other precedent make clear, the disputed documents reveal nothing about the adequacy of notice or the consistent application of the law, because they were for "intra-agency use and not general distribution." Id. The defendant therefore cannot

15

rely on unofficial or internal agency statements for any reason.  The defendant's inquiry into these matters is not relevant to any issue in this case.

B.  **East Kentucky Does Not Have a Substantial Need for Documents That Reflect Alleged "Internal Confusion" at the EPA**

Under certain circumstances, alleged confusion within an enforcing agency as to the proper interpretation of a regulation may be relevant to show a fair notice defense.  See Ohio Edison Company, 276 F. Supp. 2d at 886; SIGECO, 245 F. Supp. at 1011.  Like other elements of the fair notice defense, however, the evaluation of any such conflicting statements must be based on the final, not the deliberative and pre-decisional, statements of the agency.

None of the cases relied on by the defendant support the argument that alleged "internal confusion" may be proved by documents that are subject to the deliberative process privilege. For instance, in General Electric Co. v. EPA, 53 F.3d at 1329-1330, although the Court found that the EPA did not provide the company with fair warning of its interpretation of certain regulations, the Court looked only to the public statements of the agency (an OSHA review commission decision and two administrative law judge decisions).  Likewise in Rollins v. EPA, 937 F.2d 649, 653, 655 n.3 (D.C. Cir. 1991), it appears that the Court relied on a public one page summary of an internal report to conclude that various EPA offices had been giving conflicting guidance on a particular issue.  Finally, in United States v. Hoechst Celanese Corp., 128 F.3d 216 (4th Cir. 1997), the Fourth Circuit held that after actual notice, inconsistent interpretations of the regulations in the public rulemaking record were irrelevant.  In reaching its conclusion that for a limited period the defendant did not have fair notice, the Fourth Circuit relied on the published preamble to the proposed regulations, not any internal conflicting statements in the public rulemaking record.  Hoechst Celanese, 128 F.3d at 225-26, 228.

16

East Kentucky Power also alleges that the disputed documents contain evidence that is highly relevant to its defenses that is not available elsewhere.  This argument is inconsistent with the defendant's claim in other sections of its Memorandum that it can show lack of fair notice based almost entirely on documents that already are in the public domain.  Defendant's Memorandum at 3-10.  Defendant's argument also is contradicted by its claim that the United States has voluntarily released to the public certain documents that are similar to those withheld by the plaintiff.  Defendant's Memorandum at 13-14, 20.  Finally, the defendant incorrectly maintains that the disclosure of the challenged documents will not hinder the frank and candid internal discussion regarding the regulations and policies at this in this case.  Id. at 19.

### III.   THE COURT SHOULD NOT ORDER THE UNITED STATES TO DISCLOSE THE DISPUTED DOCUMENTS

As set forth in the following document-by-document rebuttal to the defendant's claims, the United States has properly asserted the deliberative process and other privileges in this case, and the defendant has not shown a substantial need for such documents.

1.   **EPAOGC 023715**.  Defendant states that no court has upheld the privilege for this draft document.  This document has only been challenged by one other defendant, Alabama Power, in a parallel case.  That defendant withdrew its challenge after reviewing the document.

Defendant observes that this document does not reflect a communication from a subordinate to a superior and argues that this should negate the deliberative process privilege. However, in Schell, 843 F. 2d at 942, the case cited by defendant, the Sixth Circuit merely observed that a document moving from a subordinate to a superior official is "more likely to be pre-decisional."  While this observation may be helpful to district courts in certain instances, it hardly endorses a de facto rule about the applicability of the deliberative process privilege.

17

Moreover, Document EPAOGC 023715 reflects a peer-to-peer communication within EPA, a fact pattern upon which the Schell Court is silent.  Finally, defendant argues that much of the draft document's content is factual.  Even purely factual material may so expose the deliberative process within an agency that it must be protected.  Schell, 843 F.2d at 940.  Here, the author's opinion about the correct interpretation of a regulatory provision is so intertwined with the facts of the underlying case that it would be inappropriate to disclose the content of this document.

Defendant cannot show a substantial need for this document because it is an unofficial and internal agency statement.  See Plaintiff's Memorandum, Ex. 11( Duke Energy Corp., 1:00CV1262 at 10) ("Government agencies such as plaintiff express changes in policy through final decisions, not predecisional decisions.").

2.      **EPA1OEP002387-89**.  Defendant asserts that "there is no evidence that a court looked at this document and found it to be privileged."  In fact, Magistrate Judge Eliason reviewed this document and upheld the United States' privilege claim in a hearing held February 13, 2003.[21]  Although, obviously no court has considered the alleged particular substantial need that East Kentucky claims for this document, courts in related litigation have generally held that only final, public documents are relevant to the claims and defenses at issue in this case.

Defendant also argues that there would be no chilling effect following disclosure of this document because it was created 11 years ago, and because neither the author nor the recipient(s) of the document are identified on the face of the document.  However, there is no time limit on the deliberative process privilege.  Moreover, the agency employee providing his understanding

---

[21] See Ex. 9 (Transcript of Hearing in United States v. Duke Energy Corp., February 13, 2003, at 133-135.

of a proposed rule is identified on the document as Dennis Crumpler.  Mr. Crumpler remains an

employee of EPA's Office of Air Quality Planning and Standards, and therefore could be chilled

from future frank intra-agency deliberation if documents bearing his name were released in

litigation.  In any event, the disclosure of an individual employee's deliberations has a chilling

effect on the entire agency, not just on the individual whose name and opinions may have been

publicized.  The "'key question' in identifying 'deliberative' material is whether disclosure of

the information would discourage candid discussion within the agency."  Access Reports v.

Dept. of Justice, 926 F. 2d 1192, 1194 (D.C. Cir. 1992).

3.  **EPA3GEN 002090-95, EPA3GEN005194-98.**  Documents EPA3GEN005194-98

EPA3GEN002090-95 are the same document. Defendant again complains that other courts may

not have reviewed the document at issue here.  However, the fact that two other courts were able

to uphold the deliberative process privilege over this document based solely on the description in

the United States' privilege log is indicative of the document's privileged nature.

The privileged document was authored by EPA attorney James Jackson.  The attached

electronic mail message that has been produced to defendant makes it clear that the only

recipients of this document were employees of EPA working on the NSR enforcement cases.

Moreover, the document is a draft in which Mr. Jackson attempted to reflect views he had heard

at meetings with EPA personnel and an EPA contractor.  In fact, Mr. Jackson invites members of

the "noxlist" to provide him "with any changes, corrections, deletions or modifications you deem

appropriate."  Moreover, it is clear from the electronic mail transmission that the purpose of the

document will be to "identify[ ] issues to consider when evaluating power plants for possible

NSR/PSD violations."  The draft nature of the document, and its planned use (to guide decision-

makers in enforcement decisions) make this a classic example of deliberative process.  Given

that this document is a working draft by an agency attorney of guidelines to follow in

anticipation of litigation against power plants for NSR/PSD violations, it is also appropriately

identified as work product.

Finally, defendant argues that the United States has waived its deliberative process

privilege over this document because it has released other documents related to the NSR

enforcement initiative against power plants.  As discussed above, there is no subject matter

waiver applied to the deliberative process privilege. See supra, at 11 n. 18.

**4.  EPA3GEN004321-31; EPAOGC 032355**.  These bates numbers reflect nearly identical

documents.  The document provides insight, opinion, and legal strategy regarding the power

plant NSR/PSD enforcement initiative.  As such, it bears the same hallmarks of the deliberative

process privilege and work product doctrine as document EPA3GEN2090-95, discussed above.

Defendant's waiver argument fails for the same reason, as well.

5.  **EPA3GEN025391.**  EPA has agreed to produce this electronic mail message, since its author

is a staff member of a third party state environmental agency.  However, the handwritten notes

on the electronic mail message are protected by the deliberative process privilege.  They were

made by an EPA employee and reflect her personal opinion, not that of the Agency.  Whether the

notes were actually used in the deliberative process is not relevant to the question of privilege.

See Greenberg v. Dept. of Treasury, 10 F. Supp. 2d 316 (D.D.C. 1998).

6.  **EPA3GEN028863-66.**  Two other defendants in related cases withdrew their challenge to

this document upon review.  Defendant concedes this is a draft document.  Protection of draft

agency documents from disclosure squarely supports two policy reasons for the deliberative

process privilege - "prevent[ing] public confusion from premature disclosure of agency

opinions" and "protect[ing] the integrity of an agency's decision." Judicial Watch v. Clinton,

880 F. Supp. 1, 12 (D.D.C. 1995).   Although defendant asserts that the draft document is merely

"an explanation of the then-existing law," the document clearly reflects internal agency

deliberations and the author's opinion on the relevant law.  Therefore, this document should not

be disclosed.

7.  **EPA3GEN030115-16.**  No court has questioned or rejected the privileged nature of this

document, notes of Patrick Foley, an EPA Region 3 engineer.  Even if Mr. Foley's notes may not

have been disseminated to agency decision-makers, they reflect a "give-and-take" process that

took place on an NSR conference call in 1997.  The defendant cannot show a substantial need for

this internal, unpublished document.  Internal debate is a necessary part of the deliberative

process; indeed, the need for internal debate to reach solid, well-reasoned decisions is a primary

reason for the deliberative process privilege.  If the defendant can point to conflicting public

pronouncements by EPA on the debottlenecking policy, it may present those to the Court in

support of its fair notice defense.  Intra-agency deliberations are not relevant to the fair notice

defense.

8.  **EPA3GEN 051720-21.**  At least one other power plant defendant withdrew its challenge of

the document upon review.  This electronic mail reflects a communication from a subordinate to

a superior official who requested the subordinate's input on an hypothetical PSD case.

Defendant argued throughout its Motion that communications from subordinates "are more

likely to be predecisional."  See, e.g., Defendant's Memorandum at 12.  The author did not

purport to be speaking for the agency, and did not provide a final, public decision through this

electronic mail.  Although defendant also argues that it has a substantial need for this document, a subordinate's musings on a hypothetical applicability determination are not relevant to the issue of fair notice.

9.  **EPA4ENF023810-31, EPA4ENF23906-33.**  As noted in the United States' initial Memorandum, EPA contractors to the federal government are covered by the deliberative process privilege.  See Plaintiff's Memorandum at 22.  Given that EPA and other federal agencies often rely on the expertise and technical acumen of independent contractors, disclosure of documents authored by such contractors would chill future analyses undertaken by these contractors, and dissuade agencies from seeking expertise from outside the agency.  Moreover, Document EPA4ENF023810-31 is a draft memorandum listing potential violations of the Clean Air Act by a source.  Such a document typically is used to determine which violations to pursue against the source in question, and is therefore protected by the deliberative process privilege.

10.  **EPA4ENF023903.**  No court has questioned or rejected the privileged nature of this document.  This document reflects notes taken by Wendell Reed, the EPA engineer working with EPA contractors on the potential enforcement action described in Documents EPA4ENF023810 and EPA4ENF23906-33.

11.  **EPA4ENF023983-84.**  EPA has agreed to release all but the final two paragraphs of this document.  The final two paragraphs reflect one person's inferences why production increased at a facility in the early 1990s.  Any factual material is inextricably linked to the judgments involved.  See Schell, 843 F. 2d at 940.

12.  **EPA4ORC001819-20; EPA4ORC004783-85.**  The Illinois Power Court upheld the privileged as to document EPA4ORC001819-20 based on its description in the United States'

22

privilege log, and Alabama Power withdrew its challenge of this document upon review.  The

self-entitled "Draft Enforcement Guidance" document was found in the files of an EPA Region 4

attorney.  Given the document's internal draft status, it is clear that this document cannot be

relied upon to illustrate the agency's authoritative interpretation of the regulation in question at

the time of the document's creation.  Instead, defendant should rely on final, public documents

issued by EPA Region 4 to determine what the office's prevailing view of the regulations were

and are.  See Plaintiff's Memorandum, Ex. 11 (Duke Energy Corp., 1:00CV1262, at 10).

Document EPA4ORC004783-85 is a duplicate document, except that it includes a transmittal

electronic mail message that identifies the author as EPA attorney James Jackson, and identifies

the attached document as a draft that in the future may become a public guidance document in its

final form.  Documents EPA4ORC001819-20 and EPA4ORC004783-85 are protected by the

deliberative process privilege.

13.  **EPA4ORC018519-22.**  Three courts in related cases have upheld the privilege over this

document.  In at least one of these cases, Magistrate Judge Kemp personally reviewed this

document before confirming its privileged status.  See Plaintiff's Memorandum, Ex. 13 (United

States v. Amer. Elec. Power, C2-99-1182, at 7).  Moreover, another power plant defendant, Duke

Energy, withdrew its challenge to this document upon review.  Nevertheless, defendant mounts a

fifth challenge to this internal document that only contains one employee's opinions on the law.

14.  **EPA4PER051054-59.**  The Illinois Power Court found that this document was privileged,

and another power plant defendant withdrew its challenge to this document upon review.  The

document begins with an agenda which includes topics needing to be resolved within the agency,

and plans for future regulatory action.  Most of the document is comprised of handwritten and

typewritten notes, presumably by the Chief of the EPA Region 4 Air Permits Section, since the document was found in Mr. Worley's files.  The notes discuss, inter alia, plans for future regulatory action, and steps to take to bring state and local permitting authorities in line with EPA policy.  These notes reflect precisely the pre-decisional "give and take" associated with the deliberative process.  The document therefore should be protected from disclosure.

Finally, defendant argues that the United States has waived its deliberative process privilege over this document because it has released other documents related to NSR conference calls.  This is a grossly overbroad definition of "subject matter," given that these calls span dozens of topics over a decade.  In any event, as discussed above, there is no subject matter waiver applied to the deliberative process privilege.

15.  **EPA5EA002842.**   No court has questioned or rejected the privileged nature of this document.  Defendant argues that the United States has not met its burden with respect to Document EPA5EA002842, because at the parties' meet and confer process, EPA did not provide defendant with additional reasoning for its assertion of the deliberative process privilege over this document. However, the United States has already made out its prima facie case for the deliberative process privilege.  See Plaintiff's Memorandum 8-9, 12-13.  The document reflects a conversation between EPA employees discussing a position to be taken in a future "regulatory applicability decision."  The input is provided with the caveat that these are not the author's "formal comments," which are being prepared at the time.  Production of this document, and of documents of this type, undermines two important policies behind the deliberative process privilege -  "prevent[ing] public confusion from premature disclosure of agency opinions" and "protect[ing] the integrity of an agency's decision."  Judicial Watch, 880 F. Supp. at 12.  The

24

document is privileged and should be protected.

16. **EPA5EC025252-53.**  Two power plant defendants in related litigation withdrew their challenge to this document upon review.  The document is an issue paper prepared for an EPA division director by a subordinate, to assist the division director in an applicability determination for a source undergoing the Title 5 permit application process.  Moreover, as noted in the United States' initial Memorandum, EPA Region 5 is seeking concurrence from EPA Headquarters for the position it takes in this paper.  This is a deliberative, predecisional document and should not be disclosed.

17. **EPA5ORCA02170-74.**  Contrary to defendant's assertions, it is irrelevant whether the document itself was disseminated throughout EPA.  See Greenberg, 10 F. Supp. 2d at 16. The document is privileged because it reflects "give and take" communications among different offices of EPA who are assisting a regional office as it grapples with a pending applicability determination.  The defendant argues that it has a substantial need for this document, as well as any document relating to the Rochester Public Utilities' Silver Lake project, because it claims the Silver Lake Project is similar to the Spurlock Steam Extraction Project at issue in this case. However, as set forth above, the Silver Lake Project was different than the Spurlock Project. Privileged documents related to this project are not relevant to defendant's fair notice argument. Government agencies express policy through final not pre-decisional decisions.  See, supra, at 6 n.7.  In addition, because East Kentucky received actual notice that increasing Spurlock 2's heat input rate above permitted levels to accommodate the steam extraction project could trigger PSD, East Kentucky does not have a fair notice argument with respect to this project.  See e.g. Hoechst Celanese, 128 F.3d at 229.

18. **EPA8PER1676-91, EPA8SIP00741723, EPAOGC 032359.**  The <u>Illinois Power</u> Court found that document EPA8PER1676-91 was privileged.  This document is actually two documents, which are substantially the same as those described above at items 3 (EPA3GEN002090-95, EPA3GEN005194-98) and 4 (EPA3GEN004321-31, EPAOGC032355). Documents EPA8SIP00741723 and EPAOGC 032359 are identical, and they are substantially the same document as EPA3GEN002090-95 and EPA3GEN005194-98.  The only difference is that documents EPA8PER1676-91, EPA8SIP00741723, and EPAOGC 032359 bear the heading, "Enforcement Sensitive - Not Releasable Under FOIA," and are stamped "DRAFT" on each page.  For the reasons stated above at items 3 and 4, these documents are privileged and should be protected from disclosure.

19. **EPACAMD009270-71.**  At least one other power plant defendant withdrew its challenge upon review.  Defendant only appears to be seeking disclosure of the first page.  After personally reviewing the document, the <u>AEP</u> Court ordered disclosure of the top two-thirds of the first page, but agreed with EPA that the bottom one-third contained privileged deliberations.  Given that an <u>in camera</u> review has previously protected the bottom one-third of page EPACAMD009270, that portion of the document should continue to be shielded from disclosure.

20. **EPAOAQ002867-70.**  This memorandum, which was created to brief the White House on potential actions EPA could take to respond to the Seventh Circuit's ruling in <u>WEPCO</u>, is a classic example of deliberative process.  The memorandum weighs options for future agency action, and was created to brief decision-makers at the highest levels of government. Defendant's strenuous argument for the disclosure of this document underscores the purpose of the deliberative process privilege.  It is not important what options EPA considered before a

26

decision was made.  Only the final decision, published as the 1992 PSD regulations, is relevant

to the issues here - that is, whether EPA's interpretation of the regulations is reasonable, and

entitled to deference, and whether the defendant had fair notice of this interpretation.  This

document should not be produced.

21. **EPAOAQ 0005921-36; EPAOAQ 0007220.**  These two documents are the same,

consisting of a transmittal memorandum and an options paper.  The Illinois Power Court upheld

the privilege asserted over this document based on its description in the privilege log.  It was

written by an EPA attorney, and provides that attorney's insight into the WEPCO case and

options for future agency action in response to the case.  Even where facts are recited in the

document, they are so intertwined with the author's opinion that producing those facts would

expose a part of EPA's deliberative process in the wake of the WEPCO case.  Schell, 843 F.2d at

940.  Moreover, the options paper is protected by the work product doctrine, in that it reflects an

attorney's thoughts about the direction EPA should take in at least two litigation contexts.

Finally, as noted in the United States' initial Memorandum, the options paper also is subject to

the attorney-client privilege.  Defendant's substantial need argument fails, for the same reasons

articulated in item 17, above.

22. **EPAOAQ0007222-25.**  The Illinois Power Court upheld the privilege asserted over this

document based on its description in the privilege log.  As noted in the United States' initial

Memorandum, several pages associated with this bates range have been produced.  The bates

range reflects agency deliberations on possible steps EPA could take within the WEPCO

litigation and in the regulatory context in response to the WEPCO decision.  The opinions in this

document are not the official policy position of the agency but reflect options the agency has in

response to the <u>WEPCO</u> decision.

23. **EPAOAQ 0007237-42.**  The <u>Illinois Power</u> Court upheld the privilege asserted over this document based on its description in the privilege log.  Several of the pages are identical to the pages described in item 22.  The two additional pages also are clearly protected by the deliberative process, in that they reflect the opinion of two legal offices at EPA regarding next steps to take in the <u>WEPCO</u> litigation.  These additional pages are likewise a privileged attorney-client communication.

24. **EPAOAQ 082035-43.**  The communication from the Minnesota State agency to which the defendant refers already has been produced to the defendant (082040-43).[22]   Therefore, this dispute appears moot.  The remaining pages of this document clearly reflect the agency's pre-decisional deliberations.  <u>See</u> <u>General Elec. Co.</u>, 18 F. Supp. 2d at 142.

25. **EPAOGC 031633.**  This document is a detailed agenda of an NSR telephone conference among EPA employees.  The document includes questions relating to, <u>inter alia</u>, PSD applicability determination issues and their possible resolution.  The document is protected from disclosure under the deliberative process privilege for many of the same reasons described above in item 14.

26. **EPAOGC 032017.**   No court has questioned or rejected the privileged nature of this document.  This document discusses issues implicated in a pending applicability determination for Rochester Public Utilities' Silver Lake facility, and presents options for the decision makers to consider.  These pages not only "deal with EPA's decision on the RPU project," as defendant asserts, but precede EPA's decision on that project.  Therefore, the document is protected by the

---

[22]<u>See</u> Ex.10 (Bates No. EPA0AQ 082040-43).

28

deliberative process privilege.

27. **EPAOGC 032148.**  No court has questioned or rejected the privileged nature of this document.  The document discusses whether a change in approach is warranted on a particular PSD issue.  However, the document warns that it "would be very risky to change [our] position without going through rulemaking."  The document reflects internal opinions that cannot be considered final or authoritative.  Although the defendant has suggested redactions, the disclosure of even this material would expose the deliberative process within EPA.  <u>Schell</u>, 843 F.2d at 940.

28. **023726.01.02.01A.02A.**

East Kentucky apparently has conceded that these four pages contain deliberative material.  Therefore, the defendant only argues that it has a "substantial need" for this internal pre-decisional draft document.  However, as set forth above, only final, public documents may be relied upon by the defendant for its fair notice defense.

## <u>CONCLUSION</u>

For the foregoing reasons and for those set forth in the United States' initial Memorandum, the disputed documents should be protected from disclosure.

Dated: September 22, 2005

29

Respectfully Submitted,


KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources
 Division

_____/s/_____
JASON A. DUNN
KATHERINE E. KONSCHNIK
RICHARD M. GLADSTEIN
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111



GREGORY F. VAN TATENHOVE
United States Attorney
Eastern District of Kentucky

ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661

OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Response Memorandum was served on September 22, 2005, on the persons listed below:

John M. Holloway III                    By U.S. Mail
Angela L. Jenkins
Hunton and Williams LLP
951 East Byrd St.
Richmond, Virginia 23219-4074
(804) 788-8200

T. Thomas Cottingham, III              By U.S. Mail
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: (704) 378-4700


_____/s/_____
Richard M. Gladstein