UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34 - KSF

UNITED STATES OF AMERICA

PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.                    DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF ITS
SECOND MOTION FOR SUMMARY JUDGMENT:**

**THE APPLICABLE LEGAL TEST FOR
<u>DETERMINING EMISSIONS INCREASES</u>**

**<u>ELECTRONICALLY FILED</u>**

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.     The 1970 Clean Air Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.     The 1977 Clean Air Act Amendments And The New Source Review Program.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      C.     The Statutory Two-Step Modification Tests Under PSD and NSPS. . . . . . . . . . 7
      D.     EPA's Emissions Increase Tests Under the PSD and NSPS Programs. . . . . . . 9
      E.     The Wisconsin Electric Power Company (WEPCo) Case. . . . . . . . . . . . . . . . . 11
      F.     EPA's 1992 WEPCo Rulemaking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      G.     The Kentucky PSD Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.     Baseline Emissions for Determining PSD Applicability Must Be Based On the
     Historical Annual Emissions from EKPC's Plants, Not the Allowable Emissions. . . . . 15
      A.     The PSD Program Focuses on Increases in Actual Emissions, Not
           Potential or Allowable Emissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      B.     EKPC May Not Rely on Source-Specific Allowable Emissions to
           Establish its Baseline Pre-Project Emissions Under the PSD Regulations. . . . 18
      C.     EPA's Interpretation is Consistently Reflected in Agency Guidance. . . . . . . . 20

II.    Post-Change Emissions Must Be Determined Based On the *Projected*
     Emissions from EKPC's Plants, Not the Emissions that Happened to Occur
     Immediately Following the Projects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      A.     The Clean Air Act Requires a Projection of Post-Change Emissions for
           Purposes of Assessing PSD and NSPS Applicability. . . . . . . . . . . . . . . . . . . . 21
      B.     EPA's Regulations Likewise Require a Projection of Post-Change Emissions.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      C.     Caselaw Confirms That Projections are Required. . . . . . . . . . . . . . . . . . . . . . . 24

III.   PSD Emissions Calculations Are Based on Increases in Actual Annual Emissions,
     And Require Consideration of Hours of Operation and Hourly Emissions Rates. . . . . . 26
      A.     Congress Did Not Incorporate the NSPS Hourly Rate Test for PSD. . . . . . . . . 26
      B.     Congress Left EPA Discretion to Define the Component Term
           "Increases" Differently For PSD and NSPS Purposes. . . . . . . . . . . . . . . . . . . . 28
      C.     The PSD Regulations Require Consideration Of Actual Annual Emissions,
           Not Just Hourly Rates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      D.     EKPC Misreads the Production Rate/Hours of Operation Exclusion. . . . . . . . . 34
      E.     EPA's Authoritative Interpretation of the Production Rate/Hours of

Operation Exclusion is Long-Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

F.     Even if the Regulations Were Not Clear, EPA's Interpretation Is
       Entitled to Substantial Deference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Alabama Power Co. v. Costle*, 636 F.2d 332 (D.C. Cir. 1979) . . . . . . . . 4-6, 8, 13, 17, 21,28, 30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*ASARCO Inc. v. EPA*, 578 F.2d 319 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Auer v. Robbins*, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chevron U.S.A. v. NRDC*, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 27, 29, 30

*Contaminacion v. EPA*, 202 F.3d 443 (1st Cir 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Tennessee Valley Auth.*, 2000 WL 1358648 (Envtl. Appeals Bd. Sept. 15, 2000) . . . . . . . . 9

*LaFleur v. Whitman*, 300 F.3d 256 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . 3

*Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*New York v, EPA*, 413 F.3d 3 (D.C. Cir. 2005), . . . . . . . . . . . . . . 7, 10, 17-19, 26-28, 30, 31, 33

Northern Plains Res. Council v. EPA, 645 F.2d 1349, 1355-57 (9th Cir. 1981) . . . . . . . . 6, 29, 30

*Paralyzed Veterans of Am. v. D.C. Arena, L.P.*, 117 F.3d 579 (D.C. Cir. 1997) . . . . . . . . . . . 38

*Potomac Elec. Power Co. v. EPA*, 650 F.2d 509 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . 4

*Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989) . . . . . . 11, 13, 18, 25, 30, 33, 37

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Union Elec. Co. v. EPA*, 515 F.2d 206 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Alabama Power Co.*, 372 F. Supp. 2d 1283 (N.D. Ala. 2005) . . . . . . . . . 27, 33

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005) . . . . . . . . 11, 25, 29, 33, 35, 39

*United States v. Duke Energy*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) . . . . . . . . . . 27, 33, 34, 37

*United States v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 29, 30, 33

*United States v. Louisana-Pacific Corp.*, 682 F. Supp. 1141 (D. Colo. 1988) . . . . . . . . . . . . . 25

*United States v. Ohio Edison*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) . . . . . . . 24, 25, 33, 35, 37, 39

*United States v. Southern Ind. Gas & Elec. Co.* (SIGECO II), 2002 WL 1629817 (S.D. Ind. Jul 18, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-26

*United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25, 33

*United States v. Weber Aircraft Corp.*, 465 U.S. 792 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Wisconsin Elec. Co. v. Reilly*, 893 F.2d 901, (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 11-13, 18, 22, 23, 25, 29, 33, 35, 37

## FEDERAL STATUTES

42 U.S.C §§ 7470-7479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

42 U.S.C. § 7401(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6, 8, 13, 17, 20, 22, 28, 30

42 U.S.C. § 7409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 7411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 25, 39

42 U.S.C. § 7413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 39

42 U.S.C. § 7470(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

42 U.S.C. § 7475(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20, 27, 30

42 U.S.C. §§ 7471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42 U.S.C. §§ 7501-7515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17

42 U.S.C. § 7607(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20, 30

## FEDERAL REGULATIONS

40 C.F.R. § 51.166 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 10, 11, 15, 22, 27, 29, 30, 32-34

40 C.F.R. § 52.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27, 33, 34, 37

40 C.F.R. § 60.14(b), (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 23,30

43 Fed. Reg. 26388, 26394 (June 19, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

45 Fed. Reg. 52676, 52729 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . 10,11,16-19, 22, 32, 35, 38

56 Fed. Reg. 27630, 27633  (June 14, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 32, 34

57 Fed. Reg. 32314, 32316, 32330-31 (July 21, 1992) . . . . . . 9, 10, 14, 15, 21, 22, 32, 34, 36, 39

63 Fed. Reg. 39857, 39858, 39859 (July 24, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

## STATE REGULATIONS

401 Ky. Admin. Regs. 51:017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## INTRODUCTION

East Kentucky Power Cooperative (EKPC) constructed and is operating multi-million dollar capital improvements to its coal-fired power plants that constitute illegal "modifications" under the applicable Prevention of Significant Deterioration (PSD) regulations established by EPA pursuant to the 1977 Clean Air Act Amendments, 42 U.S.C. §§ 7470-92, and the separate New Source Performance Standards (NSPS) program established pursuant to the 1970 Clean Air Act, 42 U.S.C. § 7411.  These "modifications" include the substantial addition and redesign of major power plant components, and the addition of new steam production and electricity generating capacity, at its Spurlock and Dale plants.

Under both the PSD and NSPS programs, the term "modification" is defined by the Clean Air Act (Act) to mean any physical or operational "change" that will result in an "increase" in air pollution.  42 U.S.C. § 7411(a)(4).  The term "increase" is not defined by the Act, and EPA has promulgated separate regulations implementing these two programs that measure emissions "increases" in fundamentally different ways.[1]  The present motion addresses the second part of the "modification" test: the standard for determining whether a change will result in an emissions "increase" as defined by EPA's different PSD and NSPS regulations.

## SUMMARY OF ARGUMENT

The PSD provisions of the Act focus on actual ambient air quality, and apply to sources that have the potential to adversely impact such air quality.  42 U.S.C. §§ 7471, 7479(1).  EPA promulgated implementing regulations in 1980 that apply PSD requirements to changes that are expected to significantly increase total actual annual emissions on a tons per year basis.  The

---

[1] EPA is currently taking comments on proposals to make the definitions of "increase" for electricity generating units similar under the New Source Review and NSPS programs.  No such regulations have been issued, and these proposals explicitly reiterate EPA's judgment that the existing regulatory definitions are consistent with the Act.  70 Fed. Reg. 61081, 61083 n.3, 61088-89, 61099 (Oct. 20, 2005).

total amount of emissions actually emitted from a source during a year is a function of two factor: (1) the hourly rate of emissions (*i.e.*, pounds of pollution per hour), and (2) the annual hours of operation (*i.e.*, how much (or long) the source is utilized during the year).  EPA's interpretation of the applicable PSD regulations reasonably holds that increases in actual annual emissions may result from changes that affect either, or both, of these components.  Thus, a change that allows a source to increase its hourly rate of emissions may increase total annual emissions even if expected annual utilization of the source is constant.  Similarly, a change that allows a source to operate more hours than it would otherwise be able to operate can increases the source's total annual emissions, even if the change might not increase the hourly emissions rate.

A source planning to undertake a non-excluded physical or operational change under the applicable regulations[2] is required to project the expected impact of that change on total annual emissions.  This requires a comparison of a unit's historical annual emissions before the change (baseline actual emissions) to the expected annual emissions following the change (post-change emissions).  Where reliable evidence of historical emissions is available, baseline actual emissions must be based on the average annual amount of pollution that was *actually emitted* during a representative two-year period, not the amount of emissions that the unit hypothetically could have emitted before the change if the source had operated at its full "potential" or "allowable" emissions.

---

[2] The PSD regulations applicable to the claims in this case contain several narrow exclusions that exempt certain limited activities from being considered a "change," *e.g.*, "routine maintenance, repair and replacement" and certain increases in the "hours of operation or the production rate."  The application of these exclusions to the projects at issue in this case is the subject of the United States' Third and Fourth Motions for Summary Judgment.

If post-change emissions are expected to significantly increase over baseline emissions, then the source must obtain a permit that requires it to install pollution controls, operate in compliance with stringent emissions limits tailored for that plant, and perform air quality analyses and monitoring. EPA's long-standing interpretation of the applicable PSD emissions test, which requires a comparison of average annual baseline actual emissions to expected post-change annual emissions, is consistent with the statute, reasonable, and entitled to deference.

Unlike the ambient air quality focused PSD program, the separate NSPS program applies to certain physical or operational changes that are expected to increase the maximum achievable hourly rate of emissions from a source, as measured in kilograms per hour. The relevant inquiry under the NSPS regulations requires a source to compare its pre-change, maximum achievable hourly emissions at its actual maximum capacity with the expected maximum achievable hourly emissions after the change. If NSPS is triggered, the source must comply with any performance standards that have been promulgated by EPA for the overall source category. EPA's interpretation of the NSPS regulations is similarly reasonable and entitled to deference.

## STANDARD FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is proper where the court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although evidence must be viewed in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), the non-moving party must go beyond pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *see also Matsushita Elec. Indus. Co.*

3

*v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). "When the moving party has met the standard of Rule 56, summary judgment is mandatory." *United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1006-07 (S.D. Ind. 2003) (*SIGECO I*) (citing *Celotex*, 477 U.S. at 322-23).

## STATUTORY AND REGULATORY BACKGROUND

**A.    The 1970 Clean Air Act.**

The Clean Air Act of 1970 established a comprehensive Federal program to protect the public health and welfare from the harmful effects of air pollution.  42 U.S.C. § 7401(b)(1). The foundation of the 1970 Act was the provision for National Ambient Air Quality Standards (NAAQS), together with state-adopted plans to implement those standards.  *Alabama Power Co. v. Costle*, 636 F.2d 332, 346 (D.C. Cir. 1979). Section 109 of the Act, 42 U.S.C. § 7409, directs EPA to promulgate NAAQS, which set forth maximum concentrations of certain specified pollutants permitted in the air.  Section 110 requires states to develop plans, known as State Implementation Plans (SIPs), to achieve and maintain those air quality standards.  *Id.*

At the same time, Congress also created the separate federal NSPS program to ensure that pollution from new and modified emissions sources that were significant sources of air pollution would be controlled.  Section 111 requires EPA to develop broadly-applicable, uniform, technology-based emissions standards for new or modified sources in specific industrial source categories, such as electric utilities.  42 U.S.C. § 7411.  These standards are based on application of the best demonstrated system of emission reduction for the source category as a whole, and apply regardless of the actual effect that a source's emissions has on local air quality.  *Id.*; *Potomac Elec. Power Co. v. EPA*, 650 F.2d 509, 518 (4th Cir. 1981) (*PEPCo*).

**B.      The 1977 Clean Air Act Amendments And The New Source Review Program.**

The 1977 Amendments added the New Source Review (NSR) provisions, which focus on ambient air quality and apply, through a permitting program, to sources that have the potential to adversely impact such air quality.  The PSD program, a part of the NSR program, imposes requirements to protect local air quality when sources are "constructed" or "modified."  42 U.S.C §§ 7470-7479, 7491-7492.  The Act succinctly sets forth the purposes of PSD: to "protect public health and welfare from any actual or potential adverse effect" of air pollutants "notwithstanding attainment and maintenance of" NAAQS; "insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;" and "assure" that decisions "to permit increased air pollution" follow "careful evaluation of all the consequences" and "adequate procedural opportunities for informed public participation."  42 U.S.C. § 7470(1), (3), (5).

The PSD program is thus designed to prevent new and modified sources of emissions from causing a significant decline of air quality in areas where ambient air quality standards are already being met.  *Id.* § 7470; *see Alabama Power*, 636 F.2d at 346–51.[3]  Accordingly, the PSD provisions of the Act and EPA's implementing regulations require that companies obtain permits *before* they undertake construction of new major sources or make modifications to existing major sources that will increase pollution.  The permitting authority identifies emission limitations for the source and requires other emissions monitoring and control measures.  42 U.S.C. § 7475(a).  The most significant requirements are to install and operate the best available

---

[3] The NSR program is composed of the parallel PSD and Nonattainment NSR programs.  The PSD program governs in areas where, as in the present case, air quality has attained NAAQS or has not been classified.  The Nonattainment NSR provisions of the Act, also added in 1977, apply in areas that are not currently meeting the NAAQS.  42 U.S.C. §§ 7501-7515.

control technology for controlling emissions that can be identified for that particular plant, commonly called "BACT," and to perform comprehensive air quality analyses and monitoring. *Id.*

Whereas the 1970 NSPS program is "equipment oriented" and applies regardless of effects on overall air quality, the "site-oriented" PSD provisions "cover[] the whole stationary source, and focus[] on where the plant will be located and its potential effect on its environs." *N. Plains Res. Council v. EPA*, 645 F.2d 1349, 1356 (9th Cir. 1981). Thus, rather than focus on technology-based performance standards like the NSPS, Congress focused PSD directly on the threatened effects of new and modified sources on actual ambient air quality. 42 U.S.C. § 7475(a)(3). In short, Congress enacted PSD in 1977 to regulate sources that might degrade local air quality irrespective of already applicable NSPS. 42 U.S.C. § 7470(1); *Alabama Power*, 636 F.2d at 346–51; 123 Cong. Rec. 18,022 (June 8, 1977) (statement by Senator Muskie that "[o]ne purpose of the committee provision to prevent significant deterioration is to try to reverse the current trend in air pollution. . . .  The record to date under the new source performance standards approach has been disappointing.").

In order to ease initial compliance burdens, Congress did not automatically impose the requirements of the PSD program on existing sources. To strike a balance between cleaner air and economic growth, Congress require instead that PSD requirements be undertaken at the time of new construction or when an existing major source undergoes a "modification." *Wisconsin Elec. Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990).

C.      **The Statutory Two-Step Modification Tests Under PSD and NSPS.**

The PSD program and the NSPS program both use the same statutory inquiry in determining whether the owner or operator of an existing source must obtain a permit or install pollution controls before making a change to the source: whether the contemplated change fits within the statutory definition of the term "modification." The Act defines "modification" as "any *physical change in, or change in the method of operation of*, a stationary source which *increases the amount of any air pollutant emitted* by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4) (emphasis added). The PSD provisions define "construction" to include "modification," which is defined in turn by cross-reference to the statutory definition of modification for the separate NSPS program. *Id.* § 7479(2)(C). Thus, whether PSD or NSPS applies is evaluated based on a two-part test: there must be both (1) a change (either physical or operational) and (2) a resulting emissions increase.

Congress did not further define the component terms of the definition of modification, including the crucial term "*increases* the amount of any air pollutant." *Id.* § 7411(a)(4) (emphasis added). Rather, Congress left EPA discretion to promulgate appropriate regulations that interpret component terms of the definition of modification such as "increases":

> While the CAA defines a "modification" as any physical or operational change that "increases" emissions, it is silent on how to calculate such "increases" in emissions. 42 U.S.C. 7411(a)(4). . . . In enacting the NSR program, Congress did not specify how to calculate "increases" in emissions, leaving EPA to fill in that gap while balancing the economic and environmental goals of the statute. *See Chevron*, 467 U.S. at 843-44.

*New York v, EPA*, 413 F.3d 3, 22, 27 (D.C. Cir. 2005), *reh'g denied*, -- F.3d. --, 2005 WL 3334349 (D.C. Cir. Dec. 9, 2005).[4]

Despite the use of identical statutory language, EPA has long concluded that the statutory term "modification" can be interpreted differently in the PSD and NSPS contexts.  For example, EPA interpreted "modification" to include a plant-wide approach for PSD purposes, even though that very approach had been found unlawful as applied to the NSPS program in *ASARCO Inc. v. EPA*, 578 F.2d 319 (D.C. Cir. 1978).  *See* 43 Fed. Reg. 26388, 26394 (June 19, 1978) (Appendix A) ("Since the PSD program is ultimately concerned with effects on air quality, EPA does not feel bound to apply mechanically the pre-<u>ASARCO</u> case definition of 'modification' in section 111, a section directed toward technology, so to frustrate the air quality protection purpose of PSD."). The D.C. Circuit later confirmed that EPA retained discretion to define identical statutory terms differently for PSD and NSPS purposes, even in cases where Congress defined such terms for one program with reference to a definition in another program, as it did with the term "modification."  *See Alabama Power*, 636 F.2d at 400-02 (holding that the term "increase" in the statutory definition of "modification" can be interpreted differently for PSD and NSPS purposes); *see also id.* at 396-98 (EPA retains discretion to define "component terms" of the statutory definition of "source" differently for PSD and NSPS purposes, even though Congress "indirectly incorporated" the pre-existing NSPS statutory definition of "source" into the PSD provisions of the Act).

---

[4] The D.C. Circuit has exclusive jurisdiction to rule on the validity of "nationally applicable regulations" such as the PSD regulations, and to resolve challenges to specific provisions of the regulations.  42 U.S.C. §7607(b)(1).

**D.    EPA's Emissions Increase Tests Under the PSD and NSPS Programs.**

Pursuant to the separate rulemaking authority provided by Congress when it independently enacted the PSD and NSPS programs, EPA promulgated different regulations that describe how to measure emissions "increases" for purposes of PSD and NSPS.  These regulations measure such increases in fundamentally different manners.

Under the NSPS program, emissions are determined on the basis of the *maximum hourly* emissions from a piece of equipment, while it is operating at its maximum capacity.  *See* 40 C.F.R. § 60.14(b) and (h); *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 913 (7th Cir. 1990) (*WEPCo*).  The NSPS emissions test compares the hourly emissions at maximum capacity prior to the change to emissions at maximum capacity after the change.  *See, e.g.,* Memorandum from Don Clay, Acting Assistant Administrator of EPA, to David Kee, EPA (Sept. 9, 1988) (Clay Memo) (Ex. 1), at 9.  Since 1992, EPA's NSPS rules have allowed an electric utility to look back five years to determine its pre-project maximum hourly emission rate.  *See* 40 C.F.R. § 60.14(h); 57 Fed. Reg. 32314, 32330-31 (July 21, 1992) (Appendix E).  The unit's maximum *design* capacity is disregarded because "this factor often sheds little light on the unit's *actual current* capacity to produce emissions."  *WEPCo*, 893 F.2d at 913; *see* 57 Fed. Reg. at 32330 (Appendix E).  The predicted post-change hourly rate can be determined using several sources of data including "emission factors . . . material balances, continuous monitor data, or manual emission tests."  40 C.F.R. § 60.14(b).

A source that undertakes a change that will increase maximum achievable hourly emissions from an affected facility must comply with any NSPS requirements that have been promulgated for the source category.  EPA has explained that the hourly emissions rate measure

of the NSPS test reflects the technology-based purpose of the NSPS program, under which EPA sets equipment-oriented emissions standards that must be met by all new and modified units in a particular source category.  *See* 57 Fed. Reg. at 32316 (Appendix E); Letter from David Kee, EPA to Timothy Method, Indiana Dept of Envtl Management (Jan. 30, 1990) (1990 Method Letter) (Ex. 2), at 4.[5]

In contrast, the PSD provisions of the Act focus on actual ambient air quality, and apply to sources that have the potential to cause a decline in air quality.  Such deterioration can occur when the addition of new sources or modification of existing sources threatens to increase the amount of pollutants emitted to the air.  Accordingly, when EPA promulgated the applicable PSD regulations in 1980, it set forth an emissions "increase" test that measures whether a physical or operational change would result in a a "net emissions increase" in annual "actual emissions," measured in "tons per year."  *See* 40 C.F.R. § 51.166(b)(2), (3), (21) (1987) (Appendix F); 45 Fed. Reg. 52676, 52729 (Aug. 7, 1980) (Appendix B); *New York*, 413 F.3d at 14, 18.[6]

EPA specifically emphasized that its 1980 PSD regulations were designed to focus on increases in *actual annual* emissions so as to capture impacts of source activities on the ambient air.  *See* 45 Fed. Reg. at 52699-700, 52701 (Appendix B); *see also* 57 Fed. Reg. at 32331 (Appendix E).  A source's pre-change baseline emissions are calculated based on average actual

---

[5] *See also In re Tennessee Valley Auth.*, CAA Docket No. 00-6, 2000 WL 1358648 at 37 (Envtl. Appeals Bd. Sept. 15, 2000) (citing 42 U.S.C. § 7411(a)) (TVA Order) (Ex. 3).

[6] EPA's PSD regulations setting forth the minimum requirements for EPA-approved PSD programs contained in SIPs were promulgated at 40 C.F.R. § 51.24 and were later redesignated as 40 C.F.R. § 51.166 (1987) (Appendix F). Regulatory PSD requirements for sources in states without approved PSD programs in their SIPS are set forth at 40 C.F.R. § 52.21.

annual emissions during a two-year period before the project that is "representative of normal source operation" and that uses "the unit's actual operating hours, production rates," and other pertinent information.  40 C.F.R. § 51.166(b)(21) (1987).  PSD review is triggered if a change is expected to cause post-change emissions to significantly increase over such "representative" "actual emissions."  *Id.* § 51.166(b)(2), (3), (21), (23).[7]  Thus, unlike NSPS, the question whether there has been an emissions increase under the applicable PSD regulations depends on the *total amount* of pollution actually sent into the air on an annual, tons per year basis, regardless of whether there is an increase in maximum hourly emissions under NSPS.  *WEPCo*, 893 F.2d at 915; *United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1275-78 (S.D. Ind. 2005); *compare* 40 C.F.R. § 51.166(b)(2), (3), (21) (1987) *with* 40 C.F.R. § 60.14(b).[8]

**E.    The Wisconsin Electric Power Company (WEPCo) Case.**

Post-change emissions are determined by estimating expected future emissions that will result from a change.  Where a unit has "not begun normal operations," EPA's 1980 regulations conservatively presume that post-change emissions will be equal to the potential to emit of the new or modified unit (the so-called "actual-to-potential" test).  *See* 40 C.F.R. § 51.166(b)(21)(iv) (1987); 45 Fed. Reg. at 52677, 52699 (Appendix B); 63 Fed. Reg. 39857, 39858, 39859 n.4 (July 24, 1998); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 296-98 (1st Cir. 1989) (upholding EPA's application of the "actual-to-potential" concept to "modified" units as consistent with the

---

[7] A "significant" increase is defined in the regulations for each regulated pollutant.  For example, an increase of 40 tons per year of sulfur dioxide ($SO_2$) and oxides of nitrogen ($NO_x$), and 25 tons per year for particulate matter (PM).  40 C.F.R. § 51.166(b)(23) (1987).

[8] The *Cinergy* decision is currently on interlocutory appeal to the Seventh Circuit.

expressed intent of the 1980 regulations).[9]  In *WEPCo*, 893 F.2d at 901, the Seventh Circuit addressed the application of the "actual-to-potential" test for existing utility units undertaking "like-kind" replacements.  In that case, the utility sought a determination from EPA as to whether planned renovations would be subject to PSD and NSPS.  As to PSD, EPA specifically rejected WEPCo's contention that review was only triggered by increases in a source's maximum hourly emissions rate.  EPA explained that "hourly capacity demonstration for NSPS purposes is not relevant to the PSD analysis."  Letter from Don Clay, EPA to John Boston, WEPCo (Feb. 15, 1989) (Ex. 4), at 10.  Instead, EPA confirmed that *actual* pre-project annual emissions under the PSD regulations are a function of *both* hourly emissions rate (*i.e.*, the hourly production rate and the emissions per unit of production) and the "hours of operation."   *Id.* at 9-10.  Because EPA considered WEPCo's units as having "not begun normal operations" in their modified state, EPA applied the "actual-to-potential" test and presumed that post-change emissions would equal the potential to emit of the refurbished units (*i.e.*, EPA assumed WEPCo would operate its units at their full capacity, 24 hours a day, 365 days per year).  *Id.*; *see also* Clay Memo (Ex. 1), at 8.

WEPCo challenged EPA's determination in the Seventh Circuit.  As a preliminary matter, the court approved of EPA's reliance on a total actual annual emissions test for PSD, and examined the "fundamentally distinct manner" in which the different NSPS and PSD regulations measure emissions increases.  *WEPCo*, 893 F.2d at 905, 913.  The court explained that among the "important differences" between PSD and NSPS is that NSPS "is concerned primarily with increases in emissions rates, expressed in kilograms per hour" while "PSD is concerned with

---

[9] This is known as the "actual-to-potential test" because it presumes that expected future emissions after the project will be equal to the unit's maximum potential annual emissions.

changes in *total annual emissions*, expressed in tons per year." *Id.* at 913, 915. The court then evaluated the reasonableness of EPA's decision that WEPCo's modified units had "not begun normal operations" for purposes of PSD, which meant that post-change emissions would be measured under the actual-to-potential test. *Id.* at 916. The Seventh Circuit concluded on the facts before it that WEPCo's units had "begun normal operations" where a history of operations was available and where the changes involved only "like-kind" replacements, and therefore rejected EPA's projection of round-the-clock operation following the physical changes. *Id.* at 916-18. Accordingly, the court remanded the case back to EPA for "a more realistic" projection of emissions increases that did not simply assume "continuous operations." *Id.* at 917-918 (citing Alabama Power, 636 F.2d at 379).[10] At the same time, the court also held that a source could not simply rely on "unenforceable estimates of its annual emissions" to avoid PSD review through unrealistic projections of future emissions. *Id.* at 917. The court thus confirmed that a projection of future actual annual emissions was required, but rejected EPA's presumption in that case that such future emissions would be equal to the full potential to emit of the units.

As instructed by the court, EPA reconsidered whether there would be an increase in emissions from WEPCo's proposed project using data that were representative of actual expected future operations. EPA explained that while it would not be consistent with the *WEPCo* opinion to assume continuous operation, it would be equally inconsistent to ignore the projected increased

---

[10] The court noted that WEPCo had failed to give EPA enough information to determine whether an emissions increase would occur if the unit was operated under "present hours and conditions." 893 F.2d at 918 n.14. However, the court agreed with EPA that the future emissions from the increased hours and production made possible by WEPCo's renovations were not excluded from PSD review by the so-called "production rate/hours of operation exclusion." *See id.* at 916 n.11. That exclusion "was provided to allow facilities to take advantage of fluctuating market conditions, not construction or modification activity." *Id.*; *see also Puerto Rican Cement*, 889 F.2d at 298 (upholding EPA's interpretation of exclusion as allowing sources "simply to increase their output" through "*increased use of existing facilities*" as opposed to increases resulting from construction or modification acitivity). *See also infra* at Section III.D.

usage and megawatt capacity from WEPCo's projects and their resulting impact on air quality. Letter from William Rosenberg, EPA, to John Boston, WEPCo (June 8, 1990) (WEPCo Remand Determination) (Ex. 5), at 6-8.  On remand, EPA therefore compared baseline actual annual emissions to a more realistic projection of actual annual emissions following the change.  Rather than simply presuming operation at full capacity in the future, EPA considered how much each unit at issue was likely to be used, as represented by WEPCo's actual history of operating that unit in the past.  *Id.* at 2, 7-10.  This test is referred to as an "actual-to-future-actual" test because it does not simply presume that future emissions will equal potential emissions, but instead attempts to project future representative emissions.  *Id.* at 6-8; 57 Fed. Reg. at 32317 & n.10 (Appendix E); 56 Fed. Reg. 27630, 27633 & n.10 (June 14, 1991) (Appendix D).[11]

**F.      EPA's 1992 WEPCo Rulemaking.**

In 1992 EPA promulgated the so-called "WEPCo Rule," 57 Fed. Reg. at 32314, to apply to certain changes at electric utility steam generating units.  The WEPCo Rule largely eliminated the threshold question of whether a utility has "begun normal operations" from the emissions calculus.  57 Fed. Reg. at 32317 (Appendix E).  Instead, most existing utility units subject to the WEPCo Rule are simply assumed to be eligible to project future emissions without presuming full utilization, as would be required under the actual-to-potential test for units that have not begun normal operations.  *See id.* at 32317.  The preamble to the WEPCo Rule also "clarif[ied]" the methodology for projecting emissions from utility units that *have* begun normal operations, and made clear that the actual-to-future-actual test applied by EPA on remand from the Seventh

---

[11] Both the "actual-to-potential" and the "actual-to-future-actual" tests determine emissions based on a projection of hourly rate and annual hours of operation.  The actual-to-future-actual test is more favorable to a source than the actual-to-potential test because it does not presume full utilization for the entire year, but instead allows for a projection of actual lower utilization.

14

Circuit would continue to apply to such units under pre-existing PSD rules.  57 Fed. Reg. at

32323 (Appendix E); 56 Fed. Reg. at 27633 & n.10 (Appendix D).  EPA further confirmed that

the examination of actual emissions based upon normal operations over a period of time is

necessary to determine a source's actual impact on ambient air under PSD, and that the

divergence of the measures of emission increases under the NSPS and PSD programs reflects

"the fundamental distinctions between the technology-based provisions of NSPS and the air

quality-based provisions of NSR."  57 Fed. Reg. at 32316, 32331 (Appendix E).

**G.**      **The Kentucky PSD Regulations.**

EPA first approved Kentucky's SIP provisions for PSD on September 1, 1989.  *See* 54

Fed. Reg. 36307 (Sept. 1, 1989) (Appendix C).  The PSD provisions that were applicable at the

time of each of the alleged modifications in this case are substantively the same as the

regulations approved in 1989.  These PSD regulations, which are found in Kentucky's approved

SIP at 401 Ky. Admin. Regs. 51:017, and which must be at least as stringent as EPA's 1980 PSD

regulations, are enforceable by EPA as federal law.  *See id.;* 42 U.S.C. § 7413; *Union Elec. Co.*

*v. EPA*, 515 F.2d 206, 211 (8th Cir. 1975), *aff'd* 427 U.S. 246 (1976).  Kentucky's PSD

regulations at 401 Ky. Admin Regs. 51:017 are attached hereto as Appendix G.

Because the WEPCo Rule was not approved into the Kentucky SIP until 1998, after

construction of EKPC's modifications, *see* 63 Fed. Reg. 39741 (July 24, 1998), the specific

regulatory changes to the PSD program under the WEPCo Rule do not apply in this case.

Instead, the 1980 PSD rules, as reflected in the Kentucky SIP and as clarified by EPA on remand

in the WEPCo case and in the preambles to the WEPCo Rule, apply to EKPC's modifications.

Thus, applicability of the "actual-to-potential" test versus the "actual-to-future-actual" test

15

continues to depend on whether or not EKPC's units have "begun normal operations" for

purposes of PSD. *See*, *e.g.*, 57 Fed. Reg. at 32317 (Appendix E); 56 Fed. Reg. at 27,633 & n.10

(Appendix D). Accordingly, any projection of future emissions at EKPC units that have begun

normal operations must follow the approach set forth in EPA's WEPCo Remand Determination.

## ARGUMENT

**I.    Baseline Emissions for Determining PSD Applicability Must Be Based On the Historical Annual Emissions from EKPC's Plants, Not the Allowable Emissions.**

EKPC seeks to artificially inflate its baseline emissions by ignoring evidence of the

actual annual emissions prior to its projects, and instead using the hypothetical amount of

pollution that could have been emitted by its units if they had been operated up to their full

"allowable" emissions.[12] Against this inflated and hypothetical measure of baseline emissions,

EKPC's experts conclude that no emissions increases could have occurred as a result of the

projects at issue in this case. EKPC's "allowable-to-actual" test is contrary to the Act, the plain

language of the regulations, and long-standing EPA interpretations, and should be rejected.

### A.    The PSD Program Focuses on Increases in Actual Emissions, Not Potential or Allowable Emissions.

The PSD regulations define "actual emissions" as "the average rate, in tons per year, at

which the unit *actually emitted* the pollutant during a two-year period." 40 C.F.R. §

51.166(b)(21) (1987) (emphasis added) (Appendix F). When it promulgated the PSD

regulations, EPA explained that the intent of the regulations is to focus on increases in the *actual*

*amount* of pollution emitted to the atmosphere, so as to capture the *actual* impacts of source

---

[12] *See*, *e.g.*, Aug. 15, 2005 Expert Report of Kenneth Weiss, at 42 ("Properly identifying the actual emissions baseline as equivalent to the source-specific allowable emissions means that the steam line did not cause any emissions increase, and hence, PSD could not apply.") (Ex. 6).

activities on the ambient air. *See* 45 Fed. Reg. at 52699-700, 52701 (emphasis added) (Appendix B). EPA further explained that the baseline for determining whether a significant net emissions increase was generally *not* to be measured by a source's "potential" or "allowable" emissions. EPA explained that annual emissions increases instead "will be quantitatively assessed *on the basis of an 'actual emissions' baseline, rather than a 'potential to emit' baseline*, as was proposed." 45 Fed. Reg. at 52680 (emphasis added) (Appendix B). EPA explained that while *post-change* emissions would "be the potential to emit of the new or modified unit" when a unit had not begun normal operations, that figure must be compared with "the old level of actual emissions." *Id.* at 52677. The preamble explained that EPA was "[f]ollowing the lead" of the D.C. Circuit's *Alabama Power* decision in "shift[ing] the focus of its regulatory definitions from 'potential to emit' to 'actual emissions'" so as to focus on *actual* impacts on ambient air. *Id.* at 52700.

EPA's focus on the total annual amount of a pollutant expected to be *actually emitted* after a change, as opposed to the amount that hypothetically could have been emitted, reflects the purpose of the PSD program to prevent deterioration of air quality in attainment areas. This focus is consistent with the D.C. Circuit's repeated instructions that the PSD provisions of the Act require that pre-project emissions be measured based on "actual emissions," not "potential" or "allowable" emissions. *New York*, 413 F.3d. at 38-40 ("the plain language of the CAA indicates that Congress intended to apply NSR to changes that increase actual emissions instead of potential or allowable emissions"); *New York v. EPA*, -- F.3d. --, 2005 WL 3334349, at *1 (D.C. Cir. Dec. 9, 2005) (denying rehearing of holding that Act prohibits measuring increases based on allowable emissions, and noting that "the 1977 amendments required a comparison of

17

actual (or projected actual) emissions before and after the change in question.") (Williams, J.,

concurring); *Alabama Power*, 636 F.2d at 353 (citing 42 U.S.C. § 7479(1) as requiring an "actual

emissions" standard for PSD).

B.    **EKPC May Not Rely on Source-Specific Allowable Emissions to Establish its Baseline Pre-Project Emissions Under the PSD Regulations.**

The touchstone of PSD emissions calculations under the applicable regulations is a

comparison of expected post-change emissions to the *actual* annual average amount of pollution

emitted during a two year period prior to a project.  In some cases, however, actual emissions for

this baseline period may not be known (for instance, because a modification occurs shortly after

a source begins operating).  In such limited circumstances, the regulations sensibly contain a

provision allowing the *permitting authority* to *presume* in certain circumstances that allowable

emissions for a unit are equivalent to the actual emissions from the unit.  *See* 40 C.F.R. §

51.166(b)(21)(iii) (1987).  However, this presumption by its plain terms applies *only* if the

permitting authority approves a source's request to use allowable emissions as a substitute for

actual emissions.[13]  Moreover, such allowable emissions serve only "as proxies for actual

emissions" and thus do not trump the requirement that PSD focus on increases in actual

emissions.  *New York*, 413 F.3d at 18.  In fact, EPA explained in the preamble to the 1980

---

[13] Despite this clear requirement, EKPC declined to seek permission to use source-specific allowable emissions as its baseline, even after it was told by the Kentucky Division for Air Quality (KDAQ) to submit emissions calculations for its change at Spurlock Unit 2.  *See* Letter from Robert Hughes, EKPC, to John Hornback, KDAQ (December 15, 1993) (advising DAQ of steam supply project and requesting permit adjustment) (Ex. 7); Letter from Gerald Goebel, KDAQ, to Robert Hughes, EKPC (February 3, 1994) (requiring PSD emissions calculations for proposed change) (Ex. 8); Letter from Gerald Goebel, KDAQ, to Robert Hughes, EKPC (Dec. 20, 1994) (noting failure to submit calculations) (Ex. 9); Letter from Robert Hughes, EKPC, to Gerald Goebel, KDAQ (Jan. 16, 1995) (purporting to withdraw proposal rather than submit calculations) (Ex. 10).  Instead, EKPC forged ahead with its plans, effectively precluding any judicially reviewable agency determination.  This failure provides an additional justification for refusing to allow EKPC to rely on its allowable emissions in this case.  *Compare with WEPCo*, 893 F.2d at 901 and *Puerto Rican Cement*, 889 F.2d at 292 (judicial review issued *after* companies sought pre-project agency determination of applicability of PSD and NSPS regulations).

regulations that allowable emissions should *not* be used as a proxy for actual baseline emissions

if reliable evidence shows that actual emissions differ from the source-specific emissions:

> The presumption that federally enforceable source-specific requirements correctly
> reflect actual operating conditions should be rejected by EPA or a state, if reliable
> evidence is available which shows that actual emissions differ from the level
> established in the SIP or the permit. . . . EPA, a state or source remains free to
> rebut the presumption by demonstrating that the source-specific requirement is
> not representative of actual emissions.

45 Fed. Reg. at 52718; *see also id.* at 52705 (Appendix B) ("the definition of actual emissions

allows the reviewing authority to presume that the allowable emissions in Source A's PSD

permit reflects its actual emissions, *unless the reviewing authority or source applicant has*

*reason to believe that allowable emissions are not representative of actual source emissions*.")

(emphasis added).

Thus, while the regulations provide that source-specific allowable emissions may be used

to make reasonable approximations of actual emissions where real data are unavailable, EPA's

interpretation of the regulations is that this provision applies in only limited circumstances. The

presumption that EKPC's allowable emissions equal actual emissions *must* yield to real data

establishing that the amount of pollution actually emitted during the baseline period is lower than

the allowable emissions. This interpretation is mandated by the overall statutory and regulatory

context, which requires that "actual" emissions be used in determining applicability of PSD to

modifications, not "allowable" emissions. *New York*, 413 F.3d. at 38-40.[14]

---

[14] That actual emissions data must trump any "presumption" of higher hypothetical baseline emissions is also
mandated by common sense and the plain meaning of the term "presume," which, in this context, is defined as "to
suppose to be true without proof." http://www.m-w.com/dictionary/presume. In the law, presumptions are widely
used, but their use strongly implies that facts may be presented to overcome the presumption in reaching an ultimate
conclusion. *See, e.g.,* Black's Law Dictionary (defining "presumption" as "[a] legal device which operates in the
absence of other proof to require that certain inferences be drawn from the available evidence.").

## C.    EPA's Interpretation is Consistently Reflected in Agency Guidance.

In addition to EPA's authoritative explanations in the preamble to the 1980 regulations, EPA has consistently interpreted the applicable PSD regulations as allowing the use of source-specific allowable emissions only in the absence of reliable data on historical actual emissions. For instance, in a 1983 determination for the Puerto Rico Electric Power Authority (PREPA), EPA rejected the use of allowable emissions where data showed "that PREPA has consistently operated well below its allowable emission rates." Letter from Charles Elkins, EPA, to Alberto Vega, PREPA (July 14, 1983) (ADI Control No. NB15) (PREPA Determination) (Ex. 11), at 4; *see also* Memorandum from Edward Reich, EPA, to Michael M. Johnston, EPA Region X (July 28, 1983), at 2-3 (Ex. 12). In EPA's 1990 NSR Workshop Manual, EPA stated:

> For an existing unit, actual emissions just prior to either a physical or operational change are based on the *lower* of the actual or allowable emissions levels. This "old" emissions level equals the average rate (in tons per year) at which the unit actually emitted the pollutant during the 2-year period just prior to the change which resulted in the emissions increase. These emissions are calculated using the <u>actual</u> hours of operation, capacity, fuel combusted and other parameters which affected the unit's emissions over the 2-year averaging period. *In certain limited circumstances, where sufficient representative operating data do not exist to determine historic actual emissions and the reviewing agency has reason to believe that the source is operating at or near its allowable emissions level, the reviewing agency may presume that source-specific allowable emissions [or a fraction thereof] are equivalent to (and therefore are used in place of) actual emissions at the unit.*

NSR Workshop Manual at A-41 (October 1990 Draft) (emphasis in italics added) (Ex. 13).[15]

---

[15] The Draft NSR Workshop Manual was revised and published by EPA in 1990 to assist the regulated community in complying with NSR requirements. It has been cited as authoritative by several courts. *LaFleur v. Whitman*, 300 F.3d 256, 262 (2d Cir. 2002) (citing Workshop Manual as authoritative source of EPA policy on PSD issue); *Sur Contra la Contaminacion v. EPA*, 202 F.3d 443 (1st Cir 2000) (same).

In sum, given the clear nature of the statute, regulations, and EPA's long-standing interpretations, this court should hold as a matter of law that historical actual emissions data will be used to establish EKPC's baseline emissions, not its higher hypothetical allowable emissions.

II.    **Post-Change Emissions Must Be Determined Based On the *Projected* Emissions from EKPC's Plants, Not the Emissions that Happened to Occur Immediately Following the Projects.**

After advocating a hypothetical and artificially inflated "allowable" emissions baseline, EKPC seeks to artificially *deflate* its post-change emissions by measuring future emissions based on the amount of pollution that EKPC's plants happened to emit immediately following its projects.[16]  Of course, this analysis cannot take place until *after* the project is complete and the modified unit has begun operations.  This is essentially a "wait and see" approach under which a source owner could avoid *projecting* emissions increases prior to construction, as required by the regulations, so long as the post-change emissions from the source happen not to increase.  This "wait and see" approach would defeat the very purpose of requiring that review be conducted *prior* to construction and operation -- to prevent harmful excess emissions in the first place.[17]

A.    **The Clean Air Act Requires a Projection of Post-Change Emissions for Purposes of Assessing PSD and NSPS Applicability.**

One of the purposes of the Clean Air Act is to "protect and enhance the quality of the Nation's air resources" 42 U.S.C. § 7401(b).  Consistent with this intent to "protect and enhance" air quality, Congress required that existing sources of air pollution that plan to undergo a "modification" meet pre-construction and operation permitting and pollution control

---

[16] *See, e.g.*, Aug. 15, 2005 Expert Report of Kenneth Weiss (Ex. 6), at 39-40.

[17] The United States recognizes that post-change actual emissions may be relevant in certain circumstances.  The WEPCo Rule provides that an owner or operator of a source may be liable for violations of the NSR regulations where the actual post-change emissions increase.  *See* 57 Fed. Reg. at 32336.

requirements.  Congress mandated that, under PSD, construction cannot begin until after "a permit has been issued for such proposed facility."  *Id*. § 7475(a)(1); *see also id.* § 7470(5) (PSD is intended to "assure that any decision to permit increased air pollution . . .  is made only *after* careful evaluation of . . . consequences") (emphasis added); *id.* § 7475(a)(3) (requiring demonstration prior to construction "that emissions from construction or operation of such facility *will not* cause, or contribute to, air pollution in excess" of the NAAQS) (emphasis added).  Similarly, the NSPS program prohibits operation of new and modified sources unless they first comply with NSPS.  *Id.* § 7411(a)(2), (e).  Such *pre*-construction and operation requirements by definition contemplate that emissions increases must be determined by a prediction of – not a look back at – resulting emissions.

**B.    EPA's Regulations Likewise Require a Projection of Post-Change Emissions.**

The statutory emphasis on the protection of air quality, and the requirement that a source *predict* the effect of a change on emissions rather than take an after-the-fact, wait-and-see approach, is embodied in EPA's PSD and NSPS regulations.  The PSD regulations require, prior to modification, that a source comply with extensive requirements, including control technology reviews, air quality modeling, and air quality analyses.  *See* 40 C.F.R. § 51.166(i)-(l) (1987).  A wait-and-see approach is flatly inconsistent with these pre-construction permitting requirements.  Similarly, 40 C.F.R. § 51.166 (b)(2)(i) focuses on whether a significant net increase in emissions "would result" from the physical change.  *See also* 57 Fed. Reg. at 32316, n.8 (PSD "requires a pollutant-by-pollutant *projection* of the emissions increases") (emphasis added) (Appendix E); 45 Fed. Reg. at 52677 ("First, the source owner must quantify the amount of the *proposed* emissions increase") (emphasis added) (Appendix B).

Similarly, the NSPS regulations do not measure future emissions based on the maximum amount of hourly emissions that happen to be actually achieved following the project. Rather, future emissions are estimated based on a unit's expected maximum capacity after the change. *See WEPCo*, 893 F.2d at 913 (emphasis added). The NSPS regulations call for a prediction of the expected effect on the hourly emissions of a unit at maximum capacity using several sources of data. *See* 40 C.F.R. § 60.14(b). Where emissions factors are not sufficient to demonstrate to EPA's satisfaction that emissions "*will* either clearly increase or clearly not increase," the rules allow for the use of material balances, continuous monitor data, or manual emission tests to make the prediction. *Id.* (emphasis added). The NSPS regulations require notification of the Administrator "*before* the change is commenced" and call for confirmatory performance tests after the change. *Id.* § 60.7(a)(4), 60.8(a) (emphasis added). The regulations also provide a specific mechanism for a source to seek an "applicability determination" prior to operating a new or modified source. *See id.* § 60.5. As demonstrated by the WEPCo matter, in the normal course such a determination takes place *before* a source undertakes a project, and involves testing to demonstrate maximum *pre*-project emissions to predict if there "*would be*" an increase in future emissions. *WEPCo*, 893 F.2d at 913 (emphasis added).

In a case brought to enforce the PSD and NSPS modification provisions, it is particularly critical that emissions be calculated on a *prospective* basis, using the *actual* information that was available *before* the modification concerning how the source expects to operate in the future. Otherwise, under EKPC's "wait-and-see" theory, sources could refuse to do any projections and still avoid PSD requirements or penalties if, fortuitously, unforeseen and unenforceable emission reductions occur for reasons unrelated to the modification. Similarly, a source would be able to

avoid PSD requirements if emissions increases from the change do not materialize in the years immediately following the project, even though such emissions increases are likely to occur in the future as a result of the project.  Such short-term emissions may not be at all representative of how a source actually expects to operate in the long-term as a result of the project.  This is why post-change projections must be representative of expected normal source operation.[18]

In the case of NSPS, a unit's actual emissions following a change may not be at all relevant to the *maximum achievable* hourly emissions that were expected to result from the project, as required by the NSPS test.  Similarly, a source owner could refuse to notify EPA prior to a change, as required by the regulations, and then simply attempt to explain away any capacity increase by claiming that it could have demonstrated the ability to operate at higher capacities in the baseline period all along, even though it never actually did operate at such levels.  These possibilities are avoided by requiring NSPS emissions calculations in an enforcement action to be based on a comparison of emissions at the maximum capacity actually attained prior to a change with future emissions at the maximum hourly capacity *expected* to result from the change.

### C.     Caselaw Confirms That Projections are Required.

The caselaw has consistently recognized the requirement that sources predict emissions to determine if a modification will occur.  Otherwise, a  wait-and-see approach "would 'turn the preconstruction permitting program on its head and would allow sources to construct without a permit while they wait to see if it would be proven that emissions would increase.'"  *United*

---

[18] A touchstone of PSD emissions calculations is that increases in actual annual emissions be based on "representative" time periods.  *See* 40 C.F.R. § 51.166(b)(21)(ii) (1987); WEPCo Remand Determination (Ex. 5), at 8-9 ("representative" future emissions projected in part based on expectations concerning long-term operations).

*States v. Ohio Edison*, 276 F. Supp. 2d 829, 881 (S.D. Ohio 2003) (quoting United States v.

Southern Ind. Gas & Elec. Co. *(SIGECO II)*, No. IP-99-1692, 2002 WL 1629817 at *3 (S.D. Ind.

Jul 18, 2002).  In *United States v. Louisiana-Pacific Corp.*, the court held that:

> the regulatory framework . . . requires a source to guess what its emissions will be
> prior to construction and the commencement of operations.  Nonetheless, there
> must be no question that the burden of guessing correctly remains with the source,
> and that a mistake in this process can indeed result in a penalty. Otherwise, future
> sources that are unsure of whether they will qualify as a major source will have
> no incentive to apply for PSD permits. . . .  Rather, they will build first and wait
> for the issuance of a[] [Notice of Violation] before initiating the permit
> application process.

682 F. Supp. 1141, 1166 (D. Colo. 1988); *see Puerto Rican Cement*, 889 F.2d at 297-98 (quoting

PSD preamble as requiring a projection, and confirming applicability of PSD where "EPA could

plausibly fear an increase in actual emissions."); *WEPCo*, 893 F.2d at 913-15, 917-18 (upholding

EPA methodology for predicting NSPS emissions increases, but remanding PSD projections for

a "more realistic" assessment); *Cinergy*, 384 F. Supp. 2d at 1276; (PSD requires a pre-

construction projection of future emissions); *Ohio Edison*, 276 F. Supp. 2d at 865, 881 ("PSD

applicability is to be determined prior to the commencement of a project."); *SIGECO I*, 245 F.

Supp. 2d at 1022 n.20 ("NSR requirements are preconstruction requirements"); *SIGECO II*, 2002

WL 1629817, at *3 (requiring evaluation of projected emissions, not post-change evidence).

   Given the language of the Act, EPA's regulations, and this clear authority, this court

should hold as a matter of law that post-change emissions will be calculated in this case based on

the information that was available to EKPC *before* its modifications concerning how it *expected*

to operate its units in future.

III.   **PSD Emissions Calculations Are Based on Increases in Actual Annual Emissions, And Require Consideration of Hours of Operation and Hourly Emissions Rates.**

In addition to artificially inflating its pre-project baseline emissions and deflating its post-change emissions, EKPC also seeks to avoid PSD requirements by contending that PSD may only be triggered if a change increases the *hourly* rate of emissions, regardless of its impact on total actual *annual* emissions.  *See* EKPC's March 25, 2005 Supplemental Interrogatory Responses (Ex. 14), at 36.  EKPC bases this argument on a recent Fourth Circuit decision holding that Congress intended that the term "modification" be defined identically for PSD purposes, as well as a discredited assertion that Congress intended to incorporate the NSPS *regulatory* definition of "modification," including the "hourly rate" test for emission increases, into the PSD program when it cross-referenced the NSPS *statutory* definition of "modification" to define that term in the PSD statute in 1977.  *See id.*  EKPC's argument is inconsistent with the language, structure, and intent of EPA's implementing regulations, which provide fundamentally different methods for measuring emissions increases under the PSD and NSPS programs.

A.   **Congress Did Not Incorporate the NSPS Hourly Rate Test for PSD.**

Exercising its exclusive jurisdiction to rule on challenges to the PSD regulations, the D.C. Circuit recently rejected the precise statutory incorporation argument EKPC is asserting here:

> First, industry petitioners attack the 2002 rule's definition of "modification" for NSR purposes on the ground that it unlawfully differs from its definition for NSPS purposes.  While the NSPS regulatory definition of modification allegedly focuses on the hourly rate of emissions, the NSR definition focuses on net emissions increases measured in tons per year. Industry claims that this divergence is unlawful because Congress intended to adopt for NSR purposes the NSPS regulatory definition in existence at the time of the 1977 amendments. (Industry petitioners also challenge the 1980 rule's definition of modification in

26

the NSR context to the extent that it differs from the NSPS definition.) *We are not convinced.*

*New York*, 413 F.3d at 18 (emphasis added, citations omitted).

The D.C. Circuit went on to explain why the statutory cross-reference in the PSD statute to the NSPS statutory definition of "modification" does not incorporate an hourly NSPS test:

> Industry rests its claim that modification must have the same regulatory meaning for NSR as prevailed for NSPS in 1977 on the fact that Congress, by a cross-reference, used the same language in both statutory contexts . . . . So far as appears, then, these incorporations by reference are the equivalent of Congress's having simply repeated in the NSR context the definitional language used before in the NSPS context.
>
>     We have (naturally) required indications in the statutory language or history to infer that Congress intended to incorporate into a statute a preexisting regulatory definition. Industry suggests there is "abundant indication" of such intent, pointing to Congress's having said that modification (in the NNSR portion of the statute) has the meaning of the same word "*as used in*" the NSPS portion of the statute. It also cites a conference committee report that explains agreement to cover modification as well as construction in Part C of the Act (PSD) (a point apparently originally excluded unintentionally) by saying that construction is being defined "to conform to *usage* in other parts of the Act." But the phrases "usage" and "used in" refer not to regulatory usage, but only to usage in the statute itself. They tell us no more than if Congress had used a little more ink and repeated the NSPS definitions verbatim.

*Id. at 19* (citations omitted); *see also id.* at 41 ("nothing indicates that Congress intended to incorporate preexisting NSPS regulations into the NSR program."); *but see United States v. Duke Energy*, 278 F. Supp. 2d 619, 642-43 (M.D.N.C. 2003) (holding, prior to *New York*, that NSPS regulations were incorporated into PSD by statutory cross reference); *United States v. Alabama Power Co.*, 372 F. Supp. 2d 1283, 1298 (N.D. Ala. 2005) (same).

In light of the D.C. Circuit's recent authoritative ruling, this Court should reject EKPC's contention that Congress intended to require EPA to incorporate the NSPS maximum hourly rate test for emission increases into the PSD program.

**B.     Congress Left EPA Discretion to Define the Component Term "Increases" Differently For PSD and NSPS Purposes.**

Under the *Chevron* analysis, courts ask "whether Congress has directly spoken to the precise question at issue" and, where Congress has been "silent or ambiguous," whether "the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 842–43 (1984). While Congress defined the term "modification" identically in the NSPS and PSD statutory provisions, Congress did not define the component term "increases" under either NSPS or PSD. Thus, nothing in the Act addresses the "precise question at issue" in this case: *how* "increases" in emissions are to be measured for either the NSPS or PSD programs. Instead, Congress left EPA discretion to apply its expertise to promulgate regulations setting forth appropriate emissions "increase" tests to effectuate the goals of the two programs. *New York*, 413 F.3d at 22, 27.

The D.C. Circuit's recent confirmation that Congress left EPA discretion to interpret the term "increases" follows naturally from its seminal decision in *Alabama Power*, which established that the important differences between the NSPS and PSD programs justify different regulatory interpretations of component terms of common statutory terms. In *Alabama Power*, the court held that the *same* statutory cross-reference to the term "modification" involved in this case imported the NSPS statutory definition of "source" into the PSD statute as well. 636 F.2d at 396. Although this cross-reference meant that the term "source" had to be read to have the same meaning in both NSPS and PSD, the D.C. Circuit confirmed that "EPA has latitude to adopt definitions of the *component terms* of 'source' [for PSD purposes] that are different in scope from those that may be employed for NSPS and other clean air programs, due to differences in the purpose and structure of the two programs." *Id.* at 397-98 (emphasis added).

28

The D.C. Circuit went on to hold that the very same component term in the statutory definition of "modification" at issue in this case – "increases" – could be interpreted differently for PSD and NSPS purposes.  *Id.* at 400-02.

EPA's discretion to interpret component terms such as "increases" differently for purposes of PSD and NSPS is well supported by a long line of cases in addition to the *Alabama Power* and *New York* decisions.  *See*, *e.g.*, *Chevron*, 467 U.S. at 845 (EPA has discretion to interpret the term "source" differently in the NSPS and PSD regulations, despite the identical statutory definitions of "source" for the two programs); *Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1358 (D.C. Cir. 1995) ("Different programs have different objectives and structures.  EPA is not bound to any one definition of 'major source.'"); *WEPCo*, 893 F.2d at 905, 913 (recognizing "fundamentally distinct" applicability tests despite noting that Congress had "adopted its NSPS definition of 'modification' for the PSD program."); *Northern Plains*, 645 F.2d at 1355-57 (EPA has discretion to interpret the Clean Air Act statutory term "commenced [construction]" differently in the NSPS and PSD regulations); *Cinergy*, 384 F. Supp. 2d at 1276 ("Congress did not limit the EPA's authority to further define 'modification' in the regulations as it deemed fit to serve the purposes of the PSD program.").  Given Congress' decision not to define the ambiguous term "increase," it is clear that EPA is left with discretion to interpret that term differently to serve the different purposes and structure of the two programs.

EKPC will undoubtedly cite the Fourth Circuit's decision in *United States v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005), for the proposition that Congress' decision to cross-reference the definition of the statutory term "modification" in NSPS means that EPA must apply an hourly rate test for purposes of PSD.  This decision, which is not binding on this court,

29

is in conflict with the clear weight of authority establishing that EPA may interpret the *component term* "increase" differently for NSPS and PSD purposes. In coming to its conclusion that the NSPS hourly rate test must apply for purposes of PSD, the *Duke* court improperly framed the "precise question at issue" under the *Chevron* test as whether the term "modification" must be construed identically for both the NSPS and PSD programs, rather than whether the *component term* "increase" could be interpreted differently in the regulations. In fact, the NSPS and PSD regulations *do* define "modification" in virtually identical terms, repeating the statutory definition (*see* 40 C.F.R. §§ 52.21(b)(2), 60.14, 60.2). The real question is thus whether EPA can interpret component terms of that definition differently to suit the differing purposes of the PSD and NSPS programs. As discussed above, EPA clearly does, as confirmed by the Supreme Court in *Chevron*, 467 U.S. at 845, the D.C. Circuit in *Alabama Power*, 636 F.2d at 396, 397-98, 400-02, and the Ninth Circuit in *Northern Plains*, 645 F.2d at 1355-57.

The Fourth Circuit also read the PSD statutory provision defining "modification" in a way that sharply contrasts with the D.C. Circuit's authoritative reading: while the D.C. Circuit found the statutory cross-reference for the definition of "modification" to be insignificant, *New York*, 413 F.3d at 19, the Fourth Circuit found it to be an express mandate that EPA must interpret "modification" (as well as its component term "emission increases") in the same way in the PSD and NSPS regulations. *See Duke*, 411 F.3d at 547 and n.3.[19] This reading of the statute

---

[19] The Duke court also cited legislative history to support its conclusion. *See* 411 F.3d at 548-49 (holding that congressional record indicated an intent to conform the PSD *regulations* "to usage in other parts of the Act") (internal quotations and citations omitted). After the *Duke* decision, however, the D.C. Circuit confirmed that the legislative history cited by the Duke court has *no* significance for the NSPS and PSD *regulations*. New York, 413 F.3d at 19.

goes to the very heart of the validity of EPA's NSPS and PSD regulations for "modifications," which the D.C. Circuit alone has jurisdiction to review under 42 U.S.C. § 7607(b).

As neither the statute nor the legislative history answers the question of whether the PSD regulations must define "modification" and its component term emission "increase" in the same way as the NSPS regulations, the Fourth Circuit should have proceeded to "Step 2" of the *Chevron* analysis, which requires courts to defer to an agency's reasonable interpretation of a statute it is charged with administering.  467 U.S. at 842-43.  In this case, that interpretation is embodied in EPA's PSD regulations, which plainly set forth an emissions test designed to capture total annual pollutant loading to the ambient air by measuring increases in actual annual emissions.  Appropriately applying *Chevron* Step 2 deference, the D.C. Circuit recognized that EPA's PSD and NSPS regulations measure emissions increases in different ways, and rejected industry's argument that such "divergence" was unlawful.  *New York*, 413 F.3d at 18-20; *see also id.* at 15 (illustrating, by reference to *Puerto Rican Cement*, 889 F.2d at 293, 296-99, the practical difference between the PSD actual annual emissions test and an hourly rate test).  Because the D.C. Circuit has exclusive jurisdiction to review EPA's 1980 regulations, *see* 42 U.S.C. § 7607(b), and because the D.C. Circuit has now expressly upheld those rules' divergence from the NSPS hourly rate emissions test, this court must reject EKPC's statutory argument that PSD may apply only to changes that increase a unit's hourly rate of emissions.

### C.   The PSD Regulations Require Consideration Of Actual Annual Emissions, Not Just Hourly Rates.

EKPC also challenges EPA's interpretation of the PSD regulations themselves, arguing that EPA intended the regulations to apply only to changes that increase hourly emissions rates. The PSD regulations at issue in this case never mention an hourly rate test.  Instead, the PSD

31

regulations clearly requires a comparison of actual annual emissions which considers both hourly rates and hours of operation.

The starting point for regulatory analysis is the plain language of the regulations. *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 798 (1984). Consistent with congressional intent to focus PSD on actual ambient air quality, EPA promulgated PSD regulations that address total annual emissions (measured in tons per year). A change that is expected to cause a significant increase over average "actual" annual "tons per year" emissions from a representative two-year period prior to the change will trigger PSD review. 40 C.F.R. § 51.166(b)(2), (3), (21) (1987). The regulations on their face thus refer to "[a]ny increase in actual emissions" and incorporate a "tons-per-year" standard, as opposed to the "kilograms per hour" standard of the NSPS test.

EPA has repeatedly explained this divergence between the PSD and NSPS tests:

> In the first step, which is largely the same for NSPS and NSR, the reviewing authority determines whether a physical or operational change will occur. If so, the reviewing authority proceeds in the second step to determine whether the physical or operational change will result in an emissions increase over baseline levels. In this second step, the applicable rules branch apart, reflecting the fundamental distinctions between the technology-based provisions of NSPS and the air quality-based provisions of NSR.

57 Fed. Reg. at 32316 (Appendix E); 1990 Method Letter (Ex. 2), at 4 (same explanation concerning 1980 regulations); *see also* Memo from Gerald Emison, EPA (July 7, 1986) (Ex. 15); Memo from Richard Stoll, EPA (Ex. 16), at 2 (Aug. 25, 1976).[20] EPA again confirmed the difference between NSPS and PSD emissions calculations in the WEPCo Remand Determination

---

[20] In fact, consistent with the plain language of its regulations, the 1980 preamble to the PSD regulations *explicitly rejected* the notion that NSPS must first apply before PSD can be triggered. *See* 45 Fed. Reg. at 52713 (rejecting comment urging that PSD should apply to certain pollutants only if NSPS has first been made applicable, because "the Act requires PSD review, regardless of whether another rule already applies to the source . . . .") (Appendix B); *id.* at 52723.

and the preambles to the WEPCo Rule and proposed rule.  There, EPA stated that the pre-existing 1980 regulations require an "actual-to-future-actual" test for units that have begun normal operation, thus confirming that PSD requires consideration of both hours of operation and hourly rate even when the actual-to-potential test is not applied.  *See* WEPCo Remand Determination (Ex. 5), at 6-10; 57 Fed. Reg. at 32323, 32335 (Appendix E); 56 Fed. Reg. at 27633 & n.10 (Appendix D).

The fundamental distinction between the NSPS and the PSD emissions tests has also been widely recognized by the courts, which have confirmed that PSD emissions increases are measured by increases in actual annual emissions, not hourly rates.  *See New York*, 413 F.3d at 15, 18-20 (recognizing "divergence" between hourly emissions based NSPS test and actual annual emissions based PSD test, and rejecting argument that such "divergence" was unlawful); *WEPCo*, 893 F.2d at 905, 913, 915 (holding that "important differences between the PSD and NSPS programs" include that "each program measures emissions in a fundamentally distinct manner" and that "[u]nlike NSPS, PSD is concerned with changes in *total annual emissions*."); *Puerto Rican Cement*, 889 F.2d at 293-94, 297-98 (holding that PSD can apply if physical change leads to increase in total annual emissions even where hourly rate of emissions would decrease); *Cinergy*, 384 F. Supp. 2d at 1276-1278 (rejecting hourly rate test for PSD and holding that "if a physical change will result in a unit increasing its operating hours, the projected actual operating hours would include the increase"); *Ohio Edison*, 276 F. Supp. 2d at 875-76 (contrasting NSPS and PSD and rejecting hourly rate test for PSD); *SIGECO*, 245 F. Supp. 2d at 998 (holding that EPA's PSD regulations "provide that an increase in the *total amount of annual emissions* activates the modifications provisions.") (emphasis in original); *but see Duke Energy*,

33

411 F.3d at 542, 547 (holding that EPA lacks authority to interpret NSPS and PSD definitions of modification differently due to statutory cross-reference of the term "modification"); *Duke Energy*, 278 F. Supp. 2d at 642-43 (holding that NSPS regulations were incorporated into PSD by statutory cross reference); *Alabama Power*, 372 F. Supp. 2d at 1298 n.27 (adopting by reference *Duke* district court's analysis).

### D.    EKPC Misreads the Production Rate/Hours of Operation Exclusion.

Notwithstanding the weight of authority and clear language of EPA's regulations, EKPC nevertheless argues that an inapplicable part of the PSD regulations, known as the "production rate/hours of operation" exclusion, turns the regulations into an hourly rate test. *See* EKPC's March 25, 2005 Supplemental Interrogatory Responses (Ex. 14), at 36. Under that exclusion, "[a] physical change or change in the method of operation shall not include" an "increase in the hours of operation or in the production rate." 40 C.F.R. 51.166(b)(2)(iii) (1987). As support for this argument, EKPC will likely cite the *Duke* district court. *See Duke Energy,* 278 F. Supp. 2d at 641, *aff'd on other grounds*, 411 F.3d at 539, 542.

EKPC's argument and, respectfully, the *Duke* district court's holding, is illogical and contrary to the plain language of the exclusion upon which it purports to rely. The PSD "modification" test has two steps. First, a source must determine whether a physical or operational "change" will occur. 40 C.F.R. § 51.166(b)(2) (1987). Second, if so, the source must determine whether the change should be expected to result in a significant net emissions increase (either by the actual-to-potential test if the unit has not begun normal operations, or the actual-to-future-actual test if it has). *Id.* § 51.166(b)(2), (21); WEPCo Remand Determination (Ex. 5), at 6-10; 57 Fed. Reg. at 32323, 32335 (Appendix E); 56 Fed. Reg. at 27633 & n.10

(Appendix D). By its explicit terms, the production rate/hours of operation exclusion applies at the *first step* of the analysis, not the second step – that is, it affects only whether a project constitutes a "change," not how to calculate emissions increases. 40 C.F.R § 51.166(b)(2) (1987). Thus, the exclusion merely indicates that an increase in hours of operation or production rate will not by *itself* be considered a "change" for PSD purposes. Otherwise, even normal fluctuations in hours of operation or production to simply "take advantage of favorable market conditions" could be considered an operational "change" that would then have to be evaluated for its potential emissions impacts. As EPA explained in the 1980 preamble's discussion of the "increased hours" exclusion:

> While EPA has concluded that as a general rule Congress intended any significant net increase in such [actual] emissions to undergo PSD or nonattainment review, it is also convinced that Congress could not have intended a company to have to get a NSR permit before it could lawfully change hours or rate of operation. Plainly, such a requirement would severely and unduly hamper the ability of any company to take advantage of favorable market conditions.

45 Fed. Reg. at 52704 (Appendix B).

EPA's authoritative interpretation of this exclusion thus holds that it addresses increases in hours or production rates that are due to simple business decisions to increase output from existing units based on factors like "favorable market conditions" absent any other physical or operational change. This interpretation is well grounded in the plain language and intent of the exclusion. *WEPCo*, 893 F.2d at 916 n.11 (exclusion "was provided to allow facilities to take advantage of fluctuating market conditions, not construction or modification activity"); *Puerto Rican Cement*, 889 F.2d at 298 (construing exclusion to apply to increased use of existing capacity, not to use of new capacity); *Cinergy*, 384 F.Supp.2d at 1278; ([T]he plain meaning of the increased hours exclusion is that an increase in hours or production rate are not a "physical

35

change" and thus cannot, alone, be a modification . . . if a physical change results in an increase in hours of operation that causes a net emissions increase, modification has occurred."); *Ohio Edison*, 276 F. Supp. 2d at 876 (exclusion "clearly creates an exemption to the definition of 'physical change' that applies when there is an increase in hours of operation *unaccompanied* by physical construction to the unit itself.").

Here, the United States contends that the "changes" necessary to trigger PSD were not mere increases in hours of operation or production rate, but massive multi-million dollar projects at EKPC's units. The fact that those projects allowed EKPC's units to add to their ability to emit on an annual basis (*i.e.*, increase their hours of operation or production rate) is plainly relevant to the question whether the "changes" would result in increases in total actual annual emissions under the PSD rules.

### E. EPA's Authoritative Interpretation of the Production Rate/Hours of Operation Exclusion is Long-Standing.

EPA set forth its authoritative interpretation of the PSD regulations, and the production rate/hours of operation exclusion in the preamble to the 1980 regulations. After the 1980 rules were promulgated EPA again confirmed that the exclusion applies only at the first step of the modification test, and thus does not exempt physical or operational "changes" that themselves result in increased hours of operation or production rates. *See* PREPA Determination (Ex. 11), at 5 (rejecting interpretation of exclusion because project involved "more than an increase in hours of operation."). Similarly, in the WEPCo matter, EPA confirmed that this provision excludes

*only* increases in hours or rate of production that are unrelated to any physical or operational change.[21]   EPA has continued to applied this interpretation.[22]

EKPC will nevertheless urge the Court to ignore the plain meaning of the PSD regulations and EPA's reasonable and long-standing interpretation, and instead refuse to defer to EPA's interpretation based on its claim that EPA "reiterated" "[t]hroughout the 1980s" that projects that increase hours of operation and production rates are not "modifications."  *See* EKPC's March 25, 2005 Supplemental Interrogatory Responses (Ex. 14), at 37.  As support for this claim, EKPC cites 1981 statements by Edward Reich, then the Director of EPA's Division of Stationary Source Enforcement, construing the production rate/hours of operation exclusion.[23]

---

[21] Clay Memo (Ex. 1), at 7 ("the exclusion for increases in hours of operation or production rate does not take the project beyond the reach of PSD coverage if those increases do not stand alone but rather are associated with non-excluded physical or operational changes."); Letter from Lee Thomas, EPA Administrator, to John Boston, WEPCo, at 4-5 (Oct. 14, 1988) (1988 Thomas Letter) (rejecting WEPCo's interpretation of the hours of operation exclusion) (Ex. 17);  Letter from Don Clay, EPA to John Boston, WEPCo (Feb. 15, 1989) (Ex. 4), at 9-10 (reiterating that an increase in hours of operation attributable to a physical or operational change can trigger a PSD emissions increase).

[22] *See, e.g.*, 57 Fed. Reg. at 32328 ("Although a source may vary its hours of operations, . . . an increase in emissions attributable to an increase in hours of operation or production rate which is the result of a construction-related activity is not excluded from review.") (Appendix E); *In re Monroe Elec. Generating Plant Proposed Operating Permit*, Petition No. 6-99-2, (U.S. EPA 1999) (Monroe Electric Determination) (Ex. 18), at 20 ("The purpose of this 'increase in hours' exception was to avoid undue disruption by allowing routine increases in production during the normal course of business in order to respond to market conditions."); TVA Order (Ex. 3), at 98 n.80 ("[EPA] for many years has interpreted the hours of operation/production rate exception as applicable to operational changes where there is no other change . . .").

[23] A January 1981 memo discussed a proposed ethanol plant that would require a switch in fuel and increased hours of operation at an existing power plant.  The memo concluded that the project could be considered a modification, but that emissions increases associated with the project would be below PSD significance thresholds and thus would not trigger PSD.  Memo from Ed Reich, EPA, to Charles Whitmore, EPA (Jan. 22, 1981) (Ex. 21). With no discussion of any other changes to the power plant, the memo went on to state that the "increase in hours of operation" and "fuel switch" exemptions would apply.  *Id.* at 2.  As the *Ohio Edison* court found, these issues are simply not pertinent to industry's proffered interpretation of the production rate/hours of operation exclusion.  276 F. Supp. 2d at 877.

In the June 1981 Reich letter, Mr. Reich addressed a proposed fuel switch involving converting gas turbines from middle distillates to natural gas.  Letter from Ed Reich, EPA, to Amasjit Gill, General Electric (Jun 24, 1981) (Ex. 22).  Mr. Reich stated that "emissions rates" after the conversion would not increase, and that actual emissions would increase only from an increase in production rate or hours of operation, "both of which are specifically exempt from PSD review." *Id.*  The letter appears to ignore whether a physical change has taken place, (and analyzed

(continued...)

This is not a new argument.  WEPCo unsuccessfully urged the Seventh Circuit to rely upon the very same letter in support of its argument concerning the production rate/hours of operation exclusion, but the Seventh Circuit rejected WEPCo's argument.  *WEPCo*, 893 F.2d at 916 n.11; Petitioner's Initial Brief, *WEPCo v. Reilly*, (7th Cir.) (May 22, 1989) (Ex. 19), at 64; *but see Duke*, 278 F. Supp. 2d at 641-42, *aff'd on other grounds*, 411 F.3d at 539, 542 (relying on Reich statements without discussing clear evidence rejecting the interpretation of the production rate/hours of operation exclusion the court found embedded therein).  The First Circuit also rejected reliance on the 1981 Reich letter in upholding EPA's interpretation of the hours of operation exclusion.  *See Puerto Rican Cement*, 889 F.2d at 299  ("[n]o large agency can guarantee that all its administrators will react similarly, or interpret regulations identically, throughout the United States."); Brief for Respondent, *Puerto Rican Cement Co. v. EPA* (1ˢᵗ Cir.) (June 29, 1989) (Ex. 20), at 31.  Consistent with the First and Seventh Circuits' findings, neither Reich statement should be read to override the plain language of the regulations and EPA's authoritative interpretation announced both before and after those statements.

Specifically, neither of the statements is clear or authoritative enough to establish an hourly rate test or to trump EPA's otherwise clear interpretation of the production rate/hours of operation exclusion set forth in the 1980 preamble.[24]  EPA explained its interpretation of the 1980 regulations in the preamble to the PSD regulations, and made clear that an actual annual emissions approach would apply to modifications.  EPA also made clear that the production

---

[23](...continued)
no evidence of whether a physical change would cause an increase in hours of operation.

[24] Indeed, EPA had determined in the January 1981 Reich Memo that emissions increases associated with the project would be below PSD significance thresholds; accordingly, the comment regarding the exclusion was not the basis for EPA's decision.

rate/hours of operation exclusion allowed sources to increase emissions through a simple change in hours of operation or production to respond to market fluctuations. 45 Fed. Reg. at 52704 (Appendix B). That interpretation could not have been changed through a memo from an EPA official without notice and comment, even if the memo had the import EKPC ascribes to it. *See Paralyzed Veterans of Am. v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997). Further, even if the statements could be read to suggest that PSD must incorporate an hourly rate emissions increase test, such a statement could not be authoritative because it would be flatly inconsistent with the plain language of the PSD regulations and the production rate/hours of operation exclusion, which applies by its plain terms only at the first step of the modification test. *See Cinergy*, 384 F. Supp. 2d at 1278; *Ohio Edison*, 276 F. Supp. 2d at 876-77. Finally, EPA has repeatedly and authoritatively rejected the position that EKPC claims is embedded in Mr. Reich's statements, including in multiple statements issued by the EPA Administrator as well as in the Federal Register. *See*, *e.g.*, 1988 Thomas Letter (Ex. 17), at 4-5; 57 Fed. Reg. at 32,328 (Appendix E); Monroe Electric Determination (Ex. 18), at 13.

## F.    Even if the Regulations Were Not Clear, EPA's Interpretation Is Entitled to Substantial Deference.

The plain language of the PSD regulations establishes a test based on total annual emissions, not hourly emission rates. But even were that not so, deference is due to EPA's interpretation of its own regulations, which carries "controlling" weight unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). The PSD regulations apply to increases in the total amount of "actual" annual emissions from a source, measured in "tons per year." By definition, the total amount of actual annual emissions from a source is a

function of both the hourly rate of emissions and the annual hours of operation.  EPA's interpretation of the PSD regulations reasonably holds that increases in "actual" annual emissions may result from changes that affect either, or both, of these components.  This interpretation comports with the intent of the PSD program to protect actual ambient air quality, by recognizing that a project that enables a source to increase its hours of operation or production rate could significantly increase total emissions to the atmosphere without affecting hourly rates.  EPA's reasonable interpretation of the regulations is neither plainly erroneous nor inconsistent with the regulatory text, and is entitled to deference.

## CONCLUSION

The Court should conclude as a matter of law that EPA's interpretation of the separate PSD and NSPS emissions increase tests is reasonable and entitled to deference.  First, the Court should confirm that EKPC's pre-project emissions baseline for PSD purposes must be based on evidence of *actual* annual emissions prior to its projects, not hypothetical allowable emissions. Second, the Court should confirm that the PSD and NSPS programs contemplate a *projection* of future emissions, and that post-change emissions should be calculated based on the amount of future emissions that were expected to result from EKPC's changes, not based on the amount of pollution that actually happened to be emitted immediately following the changes.   Finally, the Court should confirm that PSD applies under the applicable regulations to physical and operational changes that are expected to significantly increase *total actual annual emissions*, even if the hourly rate of emissions does not change.

DATED: January 17, 2006.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

___/s/ Jason Dunn_____
PHILLIP A. BROOKS
JASON A. DUNN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111

FRANCES E. CATRON
Acting United States Attorney
Eastern District of Kentucky

ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661

OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Memorandum in Support of Motion for Summary Judgment on the Applicable Legal Test for Determining Emissions Increases was served on January 17, 2006, on the persons listed below:

John M. Holloway III                    By Express Mail and E-Mail
Angela L. Jenkins
Hunton and Williams LLP
951 East Byrd St.
Richmond, Virginia 23219-4074
(804) 788-8200

T. Thomas Cottingham, III               By Express Mail and E-Mail
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: (704) 378-4700


_____/Jason Dunn_____
Jason Dunn