UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

Eastern District of Kentucky
FILED

JAN 17 2006

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 04-34 - KSF

UNITED STATES OF AMERICA                                     PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.            DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF ITS
FOURTH MOTION FOR SUMMARY JUDGMENT:**

**EKPC'S ACTIONS IN CONNECTION WITH THE INLAND STEAM
SUPPLY PROJECT INVOLVED PHYSICAL AND OPERATIONAL CHANGES
WITHIN THE MEANING OF THE APPLICABLE
PREVENTION OF SIGNIFICANT DETERIORATION REGULATIONS**

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Spurlock Unit 2's Original Boiler and Turbine Design Capacity . . . . . . . . . . . . . 7

      B.    EKPC Previously Applied for a PSD Permit Upon Initial
           Construction of Spurlock Unit 2, and Identified the Rated Heat
           Input Capacity of the Unit as 4850 mmBTU per Hour, With a
           Short-Term Peak Heat Input of 5120 mmBTU Per Hour . . . . . . . . . . . . . . . . . . . 8

      C.    EKPC Obtained State Construction and Operating Permits
           for Spurlock Unit 2 Based on a Rated Heat Input Capacity of
           4850 mmBTU per Hour . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.    Subsequent Reliance on Spurlock Unit 2's Rated Capacity
           of 4850 mmBTU Per Hour . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.    Planning for the Spurlock Steam Supply Project . . . . . . . . . . . . . . . . . . . . . . . . . 14

      F.    EKPC Expected Heat Input Increases Associated with the
           Inland Steam Supply Project Above 5120 mmBTU per Hour . . . . . . . . . . . . . . . 16

      G.    EKPC's Attempts to Change the Heat Input Limit in its
           Operating Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      H.    EKPC Begins Operating Spurlock Unit 2 at its Uprated
           Capacity Without State Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      I.    Construction and Operational Changes Required for the Inland Steam Supply
           Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

STANDARD OF REVIEW FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.    The Inland Steam Supply Project Constituted A "Physical Change" Because the Project
    Was Not Routine Maintenance, Repair, or Replacement. . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.    Nature and Extent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B.     Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.     Frequency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.     Cost  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

II.    EKPC Changed the Method of Operation of the Spurlock Unit 2 Boiler. . . . . . . . . . . . 31

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Isle Royale Boaters Ass'n v. Norton*, 154 F. Supp. 2d 1098 (W.D. Mich. 2001) . . . . . . . . . 26, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . 25

*New York v. EPA*, 413 F.3d  3 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Chrysler Corp.*, 437 F. Supp. 94 (D.D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Southern Ind. Gas & Elec. Co.*, 2003 WL 446280 (S.D. Ind. Feb. 18, 2003) . . . 4

*United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) . . . . . . . . 4

*Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 3, 5

## FEDERAL STATUTES

42 U.S.C. § 7401(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 7470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. §§ 7479(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## FEDERAL REGULATIONS

40 C.F.R. § 51.166 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 51.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 52.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 32, 33, 36


39 Fed. Reg. 42510 (Dec. 5, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

45 Fed. Reg. 52676 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6, 37

54 Fed. Reg. 36309 (Sept. 1, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33

57 Fed. Reg. 32314 (July 21, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

68 Fed. Reg. 61248 (Oct. 27, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

70 Fed. Reg. 33838 (June 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATE REGULATIONS

401 KAR 50:035 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 32, 33, 34, 36

401 KAR 51:017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 19, 32, 33

## INTRODUCTION

East Kentucky Power Cooperative (EKPC) owns and operates the Spurlock Generating

Station located in Mason County, Kentucky.  EKPC modified Spurlock Unit 2 as part of a large

construction project to generate additional steam and supply that steam to a neighboring facility,

the Inland Container Corporation (Inland).  EKPC's Inland Steam Supply Project was a $20

million business venture that involved the construction and addition of major power plant

components, including the construction of massive new reboilers, a large pumping station at the

Ohio River, water treatment facilities, and supply lines, changes to the boiler's high pressure

feedwater system, and the uprating of the boiler to a larger heat input and steam production

capacity.[1]  The project also involved significant operational changes at Spurlock Unit 2 which

were inconsistent with EKPC's original applications to construct and operate the unit.

The United States alleges that these modifications violated the Prevention of Significant

Deterioration (PSD) provisions of the Clean Air Act (Act).  The term "modification" is defined

by the Act and applicable PSD regulations to mean any physical or operational "change" that will

result in an "increase" in air pollution.[2]  The present motion seeks to establish as a matter of law

---

[1] Heat input is a measure of the amount of energy produced by combustion of coal, and is measured in million British thermal units (mmBTU).  A boiler in a coal-fired electricity generating unit uses the energy from combusting coal to convert water to high pressure steam, which is then passed through a turbine-generator to produce electricity.  A boiler's maximum heat input rate is the amount of energy from the coal per unit of time (e.g., mmBTU per hour), which is essentially a measure of the boiler's size or capacity.

[2] This is one of several motions for summary judgment brought by the Government.  Simultaneously filed briefs address the legal standard for the "routine maintenance, repair and replacement" exclusion, the application of this standard to capital improvements undertaken by EKPC at the Dale plant, and whether EKPC had "fair notice" of EPA's interpretation of this exclusion under the undisputed facts of this case.  See United States' First Motion for Summary Judgment on the Applicable Legal Test for the Routine Maintenance, Repair and Replacement Exclusion; United States' Third Motion for Summary Judgment that EKPC's Capital Improvement Work at Dale Unit 3 Involved Physical Changes That Are Not Routine Maintenance, Repair or Replacement; and United States' Fifth Motion for Summary Judgment on Affirmative Defenses.  In addition, independent of its PSD allegations, the United States has filed a motion for summary judgment seeking to establish that EKPC is operating Spurlock Unit 2 in violation of its operating permit.  See United States Sixth Motion for Summary Judgment on Operating Permit Violations at Spurlock Unit 2.

that the Inland steam supply project involved a "physical change" and a "change in the method of operation" to satisfy the first prong of the PSD inquiry. Proof of an "increase" in emissions will require a trial, the contours of which will be established by this Court's ruling on the United States' Second Motion for Summary Judgment on the Applicable Emissions Test.

## STATUTORY AND REGULATORY BACKGROUND

The 1970 Clean Air Act was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). It directed EPA to promulgate National Ambient Air Quality Standards (NAAQS) specifying allowable concentrations of air pollutants in the ambient air. *Id.* § 7409. States in turn were required to develop state implementation plans (SIPs) to achieve and maintain NAAQS. *Id.* § 7410.

In 1977, Congress amended the Clean Air Act to introduce the New Source Review (NSR) program, which includes the PSD program. The PSD program subjects new and modified major stationary sources to new permitting and pollution control requirements. The PSD program was designed to, *inter alia,* "protect public health and welfare" and "insure [sic] that economic growth will occur in a manner consistent with the preservation of existing clean air resources." 42 U.S.C. § 7470.[3]

Acknowledging the expense of retrofitting existing sources with the pollution controls required by the PSD program, Congress provided that major stationary sources existing at the time of passage would not be required to comply with PSD unless they undergo a "modification."

---

[3] For additional background concerning the PSD program, see the United States' First Motion for Summary Judgment on the Applicable Legal Test for the Routine Maintenance, Repair and Replacement Exclusion.

See *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 905, 909 (7th Cir. 1990) *(WEPCo)*;

*Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979). The Clear Air Act defines

"modification" as:

> any physical change in, or change in the method of operation of, a stationary
> source which increases the amount of any air pollutant emitted by such source or
> which results in the emission of any air pollutant not previously emitted.

42 U.S.C. §§ 7479(2)(C), 7411(a)(4).

In order to determine whether a planned activity is a "modification," the statute thus

requires as a first step an evaluation of whether the project contemplates a "physical change . . .

or change in the method of operation." *Id.* Neither the Act nor EPA's PSD regulations further

define "physical change" or "change in the method of operation." However, EPA's PSD

regulations provide that certain kinds of activities, such as "[r]outine maintenance, repair and

replacement" and certain increases "in the hours of operation or in the production rate" are

deemed not to be physical or operational changes. *See, e.g.*, 40 C.F.R. § 51.166(b)(2)(iii)(a), (f);

45 Fed. Reg. 52676, 52698, 52730 (Aug. 7, 1980) (Appendix A).[4]

EPA has explained that the exclusions applicable at the time of the projects at issue in

this case are intended to be construed in a "common-sense" fashion:

> The EPA has always recognized that the definition of physical or
> operational change . . . could, standing alone, encompass the most mundane
> activities at an industrial facility (even the repair or replacement of a single leaky

---

[4] In 2003, EPA promulgated a new "Equipment Replacement Provision" that would apply prospectively only, and would provide that the replacement of components of a process unit with identical or "functionally equivalent" components will not be deemed a "modification" if (1) there is no change in the basic design parameters of the unit; (2) applicable emission or operation limits are not exceeded; and (3) the cost of the replacement activity does not exceed twenty percent of the replacement value of the process unit. 68 Fed. Reg. 61248, 61252 (Oct. 27, 2003). The new rule was challenged by environmental organizations and certain states, and is currently not in effect because it has been stayed by the D.C. Circuit. 70 Fed. Reg. 33838, 33847 (June 10, 2005). Thus, both because of its prospective-only application and its current status, this rule is not at issue in this case.

pipe, or a change in the way that pipe is utilized). However, EPA has always recognized that Congress obviously did not intend to make every activity at a source subject to new source requirements.

As a result, EPA has defined 'modification' . . . to include common-sense exclusions from the 'physical or operational change' component of the definition.

57 Fed. Reg. 32314, 32316 (July 21, 1992) (Appendix B). EPA has further characterized the

hours of operation/production rate exclusion as one of a "narrow and limited set of exclusions

. . . only to allow for routine changes in the normal course of business . . . ." Letter from David

Howekamp, EPA Region IX Air Management Division Director, to Robert Connery, Holland

and Hart, at 5-6 (Nov. 6, 1987) (Cyprus Casa Grande Applicability Determination) (Ex. 1).

EPA regulations do not define "routine maintenance, repair, and replacement," but EPA's

authoritative interpretation of the routine maintenance exclusion applicable in this case holds that

it is a "very narrow exclusion" and that its application calls for a multi-factor, "common-sense,"

"case-by-case" determination taking into account the "nature, extent, purpose, frequency, and

cost" of the activity. Memorandum from Don Clay, Acting Assistant Administrator of EPA, to

David Kee, EPA (Sept. 9, 1988) (Clay Memo) (Ex. 2); see United States v. Southern Ind. Gas

& Elec. Co. (SIGECO I), 2003 WL 446280, at * 2 (S.D. Ind. Feb. 18, 2003);  United States v.

Southern Ind. Gas & Elec. Co. (SIGECO II), 245 F. Supp. 2d 994, 1014 (S.D. Ind. 2003).

Consistent with its plain language as a simple exclusion from the definition of operational

"change," EPA's authoritative interpretation of the production rate/hours of operation exclusion

similarly holds that it is narrowly construed, so as to allow sources to simply vary production rate

and operating hours as part of normal operations within otherwise applicable limits.  Otherwise,

even normal and lawful variations could potentially be considered an operational change.

However, EPA has explained that the exclusion does not apply when increased hours or production rates are otherwise unlawful, nor does it apply when such increases are themselves caused by or associated with other physical or operational changes:

> Although a source may vary its hours of operation or production as part of its everyday operations, an increase in emissions attributable to an increase in hours of operation or production rate which is the result of a construction-related activity is not excluded from review.

57 Fed. Reg. at 32328; *see also* 45 Fed. Reg. at 52704 (exclusion allows sources to "take advantage of favorable market conditions"); *WEPCO*, 893 F.2d at 916 n. 11 (exclusion "was provided to allow facilities to take advantage of fluctuating market conditions, not construction or modification activity"); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 297-98 (1st Cir. 1989) (upholding EPA interpretation of exclusion as allowing sources "simply to increase their output" through "*increased use of existing facilities*" as opposed to increases resulting from construction or modification activity).

This exclusion thus applies only to "simple, "stand-alone" changes that do not otherwise violate the law and which are not caused by some other physical or operational change that allows for increased hours or production rates:

> [T]his exclusion is intended to allow a company to lawfully increase emissions through a simple change in hours or rate of operation up to its potential to emit (unless already subject to any federally enforceable limit) without having to obtain a PSD permit. Thus, emissions increases . . . associated with increased operations would not, standing alone, subject [a source] to PSD requirements. However, . . . the exclusion for increases in hours of operation or production rate does not take the project beyond the reach of PSD coverage if those increases do not stand alone but rather are associated with non-excluded physical or operational changes.

Clay Memo, at 6-7 (Ex. 2); *see* Letter from Lee Thomas, EPA Administrator, to John Boston, WEPCo, at 4-5 (Oct. 14, 1988) (1988 Thomas Letter) (Ex. 3) (holding that the exclusion is

intended to allow increased hours and production in response to "routine fluctuations in the business cycle" and *not* in response to increases "stemming from significant new capital investment."); *In re Monroe Elec. Generating Plant Proposed Operating Permit*, Petition No. 6-99-2, at 13 (U.S. EPA 1999) (Monroe Electric Determination) (Ex. 4) ("The purpose of this 'increase in hours' exception was to avoid undue disruption by allowing routine increases in production during the normal course of business in order to respond to market conditions."); Cyprus Casa Grande Determination, (Ex. 1) at 3, 6 (exclusion intended to apply to "routine change in the hours or rate of operation").

Following EPA's promulgation of its 1980 PSD regulations, Kentucky submitted its own PSD regulations to EPA for approval and inclusion in the Kentucky SIP at 401 KAR 51:017 (Appendix C).[5] EPA approved Kentucky's SIP provisions for PSD on September 1, 1989, after determining that Kentucky's PSD regulations met EPA's minimum requirements set forth at 40 C.F.R. § 51.166 for approval of state PSD regulations. *See* 54 Fed. Reg. at 36307 (Appendix D). For enforcement purposes, however, EPA explicitly retained in the SIP its own pre-existing PSD regulations promulgated at 40 C.F.R. § 52.21, as they apply to sources (such as Spurlock Unit 2) that originally obtained PSD permits directly from EPA under these regulations. *See* 54 Fed. Reg. at 36309. Thus, the applicable language governing the routine maintenance and production

---

[5] EPA initially promulgated PSD regulations in December 1974 at 40 C.F.R. § 52.21, which applied to construction which, like that at Spurlock Unit 2, commenced on or after June 1, 1975. *See* 39 Fed. Reg. 42510, 42514, 42515 (Dec. 5, 1974). When Congress enacted the statutory PSD program in 1977, it significantly expanded and strengthened PSD requirements and broadened the scope of the program under which sources such as Spurlock Unit 2 had been originally permitted. *New York v. EPA*, 413 F.3d 3, 12, 19-20 (D.C. Cir. 2005); *Alabama Power*, 636 F.2d at 349-50. In 1980, EPA thus promulgated regulations setting forth the minimum requirements for EPA-approved PSD programs contained in SIPs at 40 C.F.R. § 51.24 (later redesignated as 40 C.F.R. § 51.166 (1987)). *See* 45 Fed. Reg. at 52729. The regulatory PSD requirements for sources in states without approved PSD programs in their SIPS were amended at 40 C.F.R. § 52.21. *See id.* at 52735. Prior to 1980 EPA directly issued PSD permits in Kentucky under 40 C.F.R. § 52.21. *See* 54 Fed. Reg. 36307, 36309 (Sept. 1, 1989).

rate/hours of operation exclusions as applied to the modifications alleged in this case states in

material part:

> A physical change or change in the method of operation shall not include:
>
> 1. Routine maintenance, repair and replacement;
> \*\*\*
> 5. An increase in the hours of operation or in the production rate, unless the change would be prohibited after January 6, 1975 pursuant to 40 CFR 52.21 . . . or under 401 KAR 50:035. . . .[6]

401 Ky. Admin. Reg. 51:017 Section 1(2)(b) (1992) (Appendix C).

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. The Spurlock generating Station is located in Mason County, Kentucky. At times

relevant to this case, the station had two steam-electric generating stations, including Spurlock

Unit 2, which went into commercial operation in March 1981. EKPC Feb. 25, 2005 Responses

to Interrogatories (Ex. 5), Page 11.

### A.    Spurlock Unit 2's Original Boiler and Turbine Design Capacity.

2. The boiler on Unit 2 was designed and manufactured by Combustion Engineering. It

originally had a maximum continuous rating (MCR) of 3,800,000 pounds of steam per hour at

1005°F. The guaranteed steam load was 3,600,000 pounds of steam per hour. EKPC Feb. 25,

2005 Responses to Interrogatories (Ex. 5), Page 14-15; EKPC Responses to First Set of Requests

for Admissions (Ex. 6), No. 91; Combustion Engineering Instruction Manual (Ex. 7 ), at S-

0035939, S-0035942, S-0035945; July 1, 1976 Design Summary Letter (Ex. 8), at

EKPC_ABB0000461 - EKPC_ABB0000465.

---

[6] At the time of the alleged modifications, 401 KAR 50:035 set forth Kentucky's separate SIP provisions governing construction and operation of all air pollution sources, even those that did not trigger PSD requirements (Appendix E).

3. Based on both design and testing, the Spurlock Unit 2 boiler required a heat input rate of 5,120 mmBTU per hour to operate at 3,800,000 pounds per hour of steam. November 2005 Joint Stipulation Concerning Plaintiff's Exhibit 173 with attachment (Ex. 9).

4. The original design data for Spurlock Unit 2 indicates that 454,200 pounds per hour of coal with a heating value of 10,648 BTU per pound, was assumed to be required to produce 3,600,000 pounds per hour of steam. EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 94. The boiler heat input rate required to produce this much steam using such coal is 454,200 pounds of coal times 10,648 BTU per pound equals 4,836,321,600 BTU per hour, or approximately 4,836 mmBTU per hour.

5. The steam turbine at Spurlock Unit 2 was originally designed to handle 3,580,250 pounds per hour of steam with the steam inlet valves wide open. EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 90.

**B.    EKPC Previously Applied for a PSD Permit Upon Initial Construction of Spurlock Unit 2, and Identified the Rated Heat Input Capacity of the Unit as 4850 mmBTU per Hour, With a Short-Term Peak Heat Input of 5120 mmBTU Per Hour.**

6. Spurlock Unit 2 was constructed in the mid-1970s, and prior to beginning construction on the unit, EKPC was required to apply for and obtain approval from EPA under EPA's 1974 PSD regulations set forth at 40 C.F.R § 52.21. *See supra* footnote 5.

7. As part of the PSD review process, EKPC was required to submit to EPA a PSD application, including an "Air Pollutant Emissions Report." The instructions for completing the Air Pollutant Emissions Report informed EKPC that the required information would be used to determine the impact of the unit on air quality. Therefore:

Data requested in this report should be representative of anticipated operating conditions. Any changes in this data should be reported immediately to the EPA Regional Office, as this may affect the air quality or emissions analysis. (Such as new fuel supplies, process modifications, change in emission rates, etc.).

Instructions for Completing the Air Pollutant Emissions Report (Ex. 10), at H-0074403; EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 65.

8. As part of its PSD application, EKPC submitted its Air Pollution Emissions Report for Spurlock Unit 2 in March 1976. March 19, 1976 Letter from Ronald Rainson with enclosures (Ex. 11); Jan. 23, 2003 Letter from Jay Holloway with enclosures (Ex. 12); January 10, 2005 Declaration of Mary Hawkins (Ex. 13).

9. EKPC's PSD application identified the rated capacity of Spurlock Unit 2 as 4,850 mmBTU per hour. EKPC calculated this heat input to result in 526 megawatts (MW) of power generation. March 19, 1976 Air Pollutant Emissions Report (Ex. 11), at KDAQ0000003.

10. Although EKPC indicated in a footnote that Spurlock Unit 2 was capable of a short-term peak heat input rate of 5,120 mmBTU per hour, when asked to estimate the unit's total annual emissions, EKPC did so using the unit's rated capacity of 4,850 mmBTU per hour. March 19, 1976 Air Pollutant Emissions Report (Ex. 11), at KDAQ0000021.

11. On September 21, 1976, EPA issued formal permission for EKPC to construct Spurlock Unit 2 under the 1974 PSD regulations. September 21, 1976 Letter from John Little (Ex. 14); September 1, 1976 Pre-Construction Review and Final Determination (Ex. 15).

12. For purposes of estimating annual emissions of sulfur dioxide ($SO_2$) from Spurlock Unit 2 to determine compliance with PSD requirements, EPA modeled the unit at a boiler heat input of 4,850 mmBTU per hour, which corresponded to the rated heat input capacity identified

9

by EKPC in its PSD application. EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 67; Dep. of Kenneth Weiss (November 15, 2005) (Ex. 16), at 25.

13. For purposes of estimating short-term emissions of $SO_2$ from Spurlock Unit 2 to determine compliance with PSD requirements, EPA also modeled Spurlock Unit 2 at a short-term heat input of 5,120 mmBTU per hour, which corresponded to the short-term peak heat input rate identified by EKPC in its PSD application. September 1, 1976 Pre-Construction Review and Final Determination (Ex. 15), at Table 1; Dep. of Kenneth Weiss (November 15, 2005)(Ex. 16), at 33-34, 175-176.

14. EKPC indicated that Spurlock Unit 2 would burn coal containing 1.2 pounds of $SO_2$ per mmBTU in information submitted as part of its PSD application, and EPA's subsequent Authority to Construct permit allowed Spurlock Unit 2 to burn coal containing 1.2 pounds of $SO_2$ per mmBTU. March 19, 1976 Letter from Ronald Rainson with enclosures (Ex. 11), at KDAQ0000021; September 1, 1976 Pre-Construction Review and Final Determination (Ex. 15), at EPA4ENF018165.

15. Assuming a rated heat input of 4,850 mmBTU per hour, this equates to approximately 733 grams per second of $SO_2$. At a heat input rate of 5,120 mmBTU per hour, this equates to approximately 774 grams per second of $SO_2$. Dep. of Kenneth Weiss (November 15, 2005) (Ex. 16), at 25, 33-34, 175-176.

16. When it approved EKPC's application to construct Spurlock Unit 2, EPA specifically stated that the Authority to Construct was based on the information submitted in EKPC's PSD application, and advised EKPC that subsequent construction which proceeded in material

variance with the information in its application would be subject to enforcement action.

September 21, 1976 Letter from John Little (Ex. 14), at 1.

> 17.  EPA subsequently reiterated this warning to EKPC:

> A conditional approval such as this to construct a new source under PSD regulations carries with it an obligation, on the part of the applicant, to maintain contact with the approving regulatory agency and to keep that agency informed of any changes contemplated in the proposed source. . . . *Any change from your application must be reviewed to ensure compliance with the PSD requirements, e.g., BACT and applicable air quality increments.*

March 13, 1978 Letter from G.T. Helms (Ex. 17), at 2 (italics added; underline in original).

### C.    EKPC Obtained State Construction and Operating Permits for Spurlock Unit 2 Based on a Rated Heat Input Capacity of 4850 mmBTU per Hour.

18.  In its separate January 23, 1976 application to the state of Kentucky's Division of Air Pollution Control[7] for a "permit to construct and operate," EKPC indicated that the rated capacity of Spurlock Unit 2 was approximately 4,850 mmBTU per hour, and that the only purpose of the unit was "power-electric generation." January 23, 1976 Letter from William Gill with enclosures (Ex. 18), at EPA4ENF018180, EPA4ENF018182.

19.  The Kentucky Division of Air Pollution Control also performed its own analysis of expected emissions from Spurlock Unit 2 for purposes of demonstrating compliance with the NAAQS. Tr. of April 3, 1976 Joint Public Hearing (Ex. 19), at KY-0000006.

20.  For this analysis, the Kentucky Division of Air Pollution Control indicated that it had assumed that Spurlock Unit 2 would operate at its rated capacity of 4,850 mmBTU per hour. Tr.

---

[7] The Kentucky Division of Air Pollution Control was a predecessor to the Kentucky Division for Air Quality (KDAQ).

of April 3, 1976 Joint Public Hearing (Ex. 19), at KY-0000005; EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 66.

21. The state of Kentucky subsequently issued its own state construction permit for Spurlock Unit 2 in December 1976. The permit advised that "No deviation from the plans and specifications submitted with your application or the conditions specified herein is permitted, unless authorized in writing by the Division of Air Pollution." December 2, 1976 Construction Permit (Ex. 20).

22. EKPC thereafter applied for a state operating permit for Spurlock Unit 2 pursuant to 401 Ky. Admin. Reg. 50:035. EKPC reiterated that the rated capacity of Spurlock Unit 2 was 4,850 mmBTU per hour. May 18, 1982 Letter from Robert Hughes with enclosure (Ex. 21).

23. The Kentucky Division of Air Pollution Control issued an operating permit covering Spurlock Unit 2 in November 1982, which was subsequently amended on October 7, 1983. November 10, 1982 Operating Permit (Ex. 22); October 7, 1983 Operating Permit (Ex. 23).

24. The state operating permit stated that it was "subject to all conditions and operating limitations contained" in the permit. One of these explicit "conditions" was that Spurlock Unit 2 be operated at "4,850 mmBtu/hr maximum heat input." The permit advised that "No deviation from the plans and specifications submitted with your application or the conditions specified herein is permitted, unless authorized in writing by the Division of Air Pollution Control." November 10, 1982 Operating Permit (Ex. 22), at EKPC R16-000421; October 7, 1983 Operating Permit (Ex. 23), at EKPC R16-000424.

12

**D.    Subsequent Reliance on Spurlock Unit 2's Rated Capacity of 4850 mmBTU Per Hour.**

25.  In February 1984, Kentucky Power Co. (an unrelated public utility) submitted a PSD permit application for construction of a new coal-fired generating unit in Lewis County, Kentucky.  Feb. 8, 1984 Letter from Robert Matthews enclosing PSD Application (Ex. 24).

26.  The PSD permit application modeled the contribution of Spurlock Unit 2 to air quality based on an $SO_2$ emissions rate of approximately 734 grams per second.  Feb. 8, 1984 Letter from Robert Matthews enclosing PSD Application (Ex. 24), at A4129600620111043, 082, 107.

27.  At Spurlock Unit 2's permitted coal sulfur content of 1.2 pounds of $SO_2$ per mmBTU, this emissions rate equates to Spurlock Unit 2's rated capacity of 4,850 mmBTU per hour.  *See* SOF ¶¶ 14, 15.

28.  In March 1986, the Cincinnati Gas & Electric Company, the Columbus & Southern Ohio Electric Co., and the Dayton Power & Light Co. submitted a PSD permit application for construction of a new coal-fired generating unit at the Zimmer Power Station, which was also to be located in the vicinity of Spurlock Unit 2.  March 1986 Air Quality Analyses in Support of a PSD Permit for Construction of the Zimmer Power Station (Ex. 25).

29.  The Zimmer PSD permit application  modeled the contribution of Spurlock Unit 2 to air quality based on an $SO_2$ emissions rate of approximately 733 grams per second.  March 1986 Air Quality Analyses in Support of a PSD Permit for Construction of the Zimmer Power Station (Ex. 25), at C4129000170010473, C4129000170010518.

30. In September 1986, updated PSD modeling was prepared for EKPC analyzing the impact of Spurlock Unit 2 on ambient air quality to comply with recently enacted "Good Engineering Practice" stack height regulations. Good Engineering Stack Height Modeling of EKPC Units 1 and 2 (Ex. 26).

31. For purposes of this modeling, EKPC's contractor assumed that Spurlock Unit 2 would have an $SO_2$ emissions rate of approximately 733 grams per second. Good Engineering Stack Height Modeling of EKPC Units 1 and 2 (Ex. 26), at C-0118665, C-0118686, C-0118698, C-0118723, C-0118753. At Spurlock Unit 2's permitted coal sulfur content of 1.2 pounds of $SO_2$ per mmBTU, this emissions rate equates to Spurlock Unit 2's rated capacity of 4,850 mmBTU per hour. *See* SOF ¶¶ 14, 15.

32. Since at least 1985, EKPC's reports to the Kentucky Emissions Inventory System have indicated that Spurlock Unit 2 has an annual heat input capacity of 4,850 mmBTU per hour. EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 68.

33. EKPC recently applied for PSD permits for new coal-fired generating units at the Spurlock Plant. PSD modeling for Spurlock Unit 2 was again based on a heat input capacity of 4,850 mmBTU per hour. Dep. of Robert Hughes (February 18, 2005) (Ex. 27), at 218-19; EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 72.

E.    **Planning for the Spurlock Steam Supply Project.**

34. In 1989, EKPC's Board of Directors authorized a "Steam Supply Alternatives Investigation" to evaluate whether EKPC could supply approximately 300,000 pounds per hour of steam from the Spurlock Plant to an adjacent box manufacturing facility to be constructed by

14

the Inland Container Corporation (Inland). June 12, 1989 Board of Directors Meeting Minutes (Ex. 28).

35. EKPC's Board of Directors authorized the Inland Steam Supply Project on October 9, 1990. A contract with Inland was signed on November 12, 1990. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Page 22. Under the Agreement, EKPC would own, operate, and maintain all facilities and equipment necessary for supplying steam to Inland, while Inland would pay a monthly facilities charge designed to reimburse EKPC for construction costs. Project Documents (Ex. 29), at S-0083458, 83490, 83501, 83506.

36. EKPC retained the consulting and engineering firm of Black and Veatch to perform the "Steam Supply Alternatives Investigation." October 10, 1989 Letter from Gary Crawford (Ex. 30).

37. Black and Veatch issued a final report discussing various options for supplying steam to Inland, and concluded, *inter alia*, that NSPS and PSD would not apply to the project provided that the heat input rate for Spurlock Unit 2 did not exceed 4,850 mmBTU per hour, the value contained in the existing air permit for Spurlock Unit 2. December 15, 1989 Steam Supply Alternatives Investigation (Ex. 31), at 2-5, 7-7 to 7-8.

38. After receiving the Black and Veatch report, EKPC hired Black and Veatch and ABB-Combustion Engineering, the original boiler manufacturer, to undertake various detailed engineering studies to evaluate the effects of supplying steam to Inland from Spurlock Unit 2. In an August 31, 1990 report, Black and Veatch discussed various designs for a reboiler system to generate and supply 300,000 pounds per hour of steam to Inland. The reboiler system would require addition of a large shell and tube heat exchanger to the Spurlock plant, with steam from

15

the Spurlock plant providing the energy to heat feedwater in the reboilers, thereby creating new steam to send to Inland.  August 31, 1990 Black and Veatch Report - Reboiler (Ex. 32), at S-0012041, 12049; October 2, 1990 Letter to Gary Crawford, EKPC with enclosures (Ex. 33), at S-0016479.

**F.    EKPC Expected Heat Input Increases Associated with the Inland Steam Supply Project Above 5120 mmBTU per Hour.**

39.  EKPC prepared heat input calculations that indicated that supplying 300,000 pounds per hour of steam to Inland would require an additional 432 mmBTU per hour of heat input from Spurlock Unit 2.  February 19, 1992 Memo to Sam Holloway with enclosures (Ex. 34), at H-0045696.

40.  Black and Veatch prepared a July 25, 1991 Reboiler Supply Study to evaluate the effects of supplying steam to Inland using a reboiler supply system.  The 1991 Reboiler Supply Study indicated that EKPC would expect increase the heat input rate of Spurlock Unit 2 to levels greater than 5,120 mmBTU per hour in connection with the Inland Steam Supply Project.  The study indicated that the heat input rate of Spurlock Unit 2 could reach 5,197 mmBTU per hour when supplying steam to Inland.  August 20, 1991 Memo from Hubert Smith enclosing July 25, 1991 Reboiler Supply Study (Ex. 35), at C-0109081; EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 79.

41.  A follow-up "Auxiliary Steam Flow Study" was prepared by ABB-Combustion Engineering to formally evaluate the operational effects of supplying steam to Inland from Spurlock Unit 2.  March 17, 1992 Memo from Mark Paluta enclosing March 13, 1992 Auxiliary Steam Flow Study (Ex. 36).

16

42. The study assumed that the Spurlock Unit 2 turbine could accept a maximum of 3,650,000 pounds per hour of steam at rated conditions. Compared to the Spurlock Unit 2 boiler's MCR of 3,800,000 pounds per hour of steam, this left only 150,000 pounds of steam available to provide to Inland. As requested, the Auxiliary Steam Flow Study also evaluated whether Spurlock Unit 2 could be "uprated" to produce additional steam, up to 3,950,000 pounds per hour, so as to still be able to provide the total requirements of 300,000 pounds per hour of steam to Inland while maintaining full turbine capacity of 3,650,000 pounds per hour of steam. March 17, 1992 Memo from Mark Paluta enclosing March 13, 1992 Auxiliary Steam Flow Study (Ex. 36), at S-0082289 - S-0082291, S-0082297; February 27, 1991 Memo to Sam Holloway (Ex. 37), at EKPC_BV3229; Sept. 30, 1991 Memo to Hubert Smith (Ex. 38); March 1, 1993 Memo to Richard Kieda (Ex. 39), at EKPC_ABB0001367, 1369; EKPC Responses to First Set of Requests for Admissions (Ex. 6), Nos. 80, 81, 82; Declaration of Yan Lachowicz (Ex. 40); Declaration of Stephen E. Pieschl (Ex. 41).

43. EKPC subsequently requested a more formal "uprating study" which was issued in August 1993. The 1993 Uprating Study concluded that Spurlock Unit 2 could be uprated to produce up to 4,000,000 pounds per hour of steam. August 19, 1993 Uprating Study (Ex. 42);EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 83.

44. The August 1993 Uprating Study was based in part on an expected fuel analysis provided by EKPC that was used to predict performance of the Spurlock Unit 2 boiler at uprated conditions. The Uprating Study predicted that producing 4,000,000 pounds per hour of steam would require 426,000 pounds of coal per hour with a heat input value of 12,531 BTU per pound. August 19, 1993 Uprating Study (Ex. 42), page 5-7 and App. A-11. The boiler heat input rate

17

required to produce this much steam using such coal is 426,200 pounds of coal times 12,531 BTU per pound equals 5,340,712,200 per hour, or approximately 5340 mmBTU per hour.

45.   ABB-Combustion Engineering referred to the August 1993 Uprating Study as a "continuing phased evaluation of the potential for Spurlock Generating Station to be utilized as the host steam supply and maintain original steam flow to the turbine generator" and as a "continuation" of the preliminary analysis reported in the March 1992 Auxiliary Steam Flow Study.  May 17, 1993 Memo to Richard Kieda (Ex. 43), ay EKPC_ABB0001330; August 4, 1993 Modeling Files (Ex. 44), at EKPC_ABB0000027; Declaration of Yan Lachowicz (Ex. 40).

46.   Additional modeling performed by ABB-Combustion Engineering in support of the August 1993 Uprating Study indicated a total heat input requirement of 5,337 mmBTU per hour in order to generate 4,000,000 pounds per hour of steam while extracting steam for Inland. August 4, 1993 Modeling Files (Ex. 44), at EKPC_ABB0000027, 33; Declaration of Yan Lachowicz (Ex. 40).

47.   EKPC independently calculated that a heat input of approximately 5,354.25 mmBTU per hour is required to produce 4,000,000 pounds per hour of steam at Spurlock Unit 2.  H.L. Spurlock Unit Ratings (Ex. 45).

### G.    EKPC's Attempts to Change the Heat Input Limit in its Operating Permit.

48.   On December 15, 1993, EKPC wrote to KDAQ concerning the Inland Steam Supply Project. EKPC stated that supplying steam to Inland could cause Spurlock Unit 2 to exceed the permitted 4,850 mmBTU per hour heat input rate contained in its operating permit, and requested that the permitted heat input be increased to 5,355 mmBTU per hour.  December 15, 1993 Letter from Robert Hughes to John Hornback (Ex. 46).

18

49. On February 3, 1994, KDAQ declined to grant EKPC's request to increase the heat input limit for Spurlock Unit 2. Instead, KDAQ required that EKPC submit emissions calculations to determine whether PSD would be triggered by such an increase:

> [I]f the proposed increase in the heat input rate results in a significant net emissions increase, then your proposal would be a major modification, as defined in 401 KAR 51:017.
>
> Therefore, you are required to quantify the emissions from your proposal in order to demonstrate the applicability or non-applicability of Regulation 401 KAR 51:017, Prevention of significant deterioration of air quality.

February 3, 1994 Letter from Gerald Goebel to Robert Hughes (Ex. 47).

50. EKPC never provided the requested emissions calculations to KDAQ. Having received no written response from EKPC by the deadline provided in its letter, on December 20, 1994, KDAQ sent a letter stating that it would discontinue the review process if EKPC did not respond within 15 days. December 20, 1994 Letter from Gerald Goebel to Robert Hughes (Ex. 48).

51. On January 16, 1995, EKPC responded to KDAQ by withdrawing its proposal to increase the heat input limit for Spurlock Unit 2, stating:

> *We are currently reviewing the operating status of our units* and would request that our proposal to increase the permitted heat input be withdrawn at this time.
>
> We will review the facility operation *and its future planned use* and will evaluate the need to continue this process at a later date.

January 16, 1995 Letter from Robert Hughes to Gerald Goebel (Ex. 49) (emphasis added).

52. KDAQ subsequently sent EKPC a letter confirming that it had ceased review of EKPC's proposal. March 13, 1995 Letter from Gerald Goebel to Robert Hughes (Ex. 50).

**H.    EKPC Begins Operating Spurlock Unit 2 at its Uprated Capacity Without State Approval.**

53.  On January 13, 1994, EKPC gave instructions to its plant operators that they could commence operation of the Spurlock Unit 2 boiler up to 4,000,000 pounds per hour of steam. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Page 14-15; January 13, 1994 Memo from B. Hensley (Ex. 51).  The instruction to plant operators to allow unit operation above 3,800,000 pounds per hour of steam (up to 4,000,000 pounds per hour of steam) was issued even before EKPC heard back from KDAQ concerning its December 15, 1993 request to increase the heat input rate of Spurlock Unit 2.  At no time prior to its commencement of operations at a capacity of 4,000,000 pounds per hour of steam did the state of Kentucky or EPA grant EKPC approval to increase the rated capacity of the Spurlock Unit 2 boiler.  Neither agency has approved EKPC's operation at 4,000,000 pounds per hour of steam.  *See* SOF ¶ 48-52.

54. EKPC's environmental affairs manager subsequently reported to the U.S. Department of Energy's Energy Information Administration that EKPC had uprated the Spurlock Unit 2 boiler to a capacity of 4,000,000 pounds per hour of steam.  1995 Steam-Electric Plant Operation and Design Report (Ex. 52) at HL-0006020.

**I.    Construction and Operational Changes Required for the Inland Steam Supply Project.**

55.  The Inland Steam Supply Project required the addition of new high pressure and process steam systems and a new makeup water supply system, including the addition of reboilers, a reboiler superheater, pressure reducing desuperheating control valves, treated water storage tank, makeup water pumps, auxiliary deaerator, blowdown cooler, reboiler preheaters, reboiler feed pumps, drain tanks, a reverse osmosis system, and new lines to carry process steam

20

from the reboilers to Inland and to return condensed water to the reboilers. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Pages 18, 59-69.

56. The new reboilers are 41 feet long, 10 feet high, and weigh approximately 90,800 pounds. The new reboiler superheater is 32 feet long, 6 feet high, and weighs 12,500 pounds. The new treated water storage tank is 37 feet in diameter, 35 feet tall, and holds 250,000 gallons. The new reboiler makeup water pumps weigh 2,425 pounds, the new reboiler feed pumps weigh 3,240 pounds, and the new makeup water pumps weigh 9,455 pounds. The auxiliary deaerator is 16.5 feet high, 19 feet long, 9 feet wide, and weighs 14,800 pounds. The reboiler preheater is 36 feet long. The drain tanks are 12 feet long and weigh 12,000 pounds. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Pages 64-67.

57. As part of the Inland Steam Supply Project, EKPC tapped into the Spurlock Unit 2 boiler feedwater system, on the high pressure side of the existing boiler feedwater pumps. This change was necessary in order to supply feedwater to the new attemperating system for controlling the temperature of the steam sent from Unit 2 to the reboiler supply system. EKPC Responses to First Set of Requests for Admissions (Ex. 6), No. 76; Dep. of Samuel Holloway (June 3, 2005), at 33, 133-37 (Ex. 53).

58. EKPC made changes to the high pressure feedwater system at Spurlock Unit 2 as a result of the steam supply project. Dep. of Kenneth Weiss (November 15, 2005) (Ex. 16), at 119.

59. According to EKPC expert Kenneth N. Weiss, the high pressure feedwater system is within the confines of the boiler. Dep. of Kenneth Weiss (November 15, 2005) (Ex. 16), at 125; Nov. 25, 1986 Memo from J. Rasnic (Ex. 54), at EPA3GEN061714, 61726.

21

60. The August 1993 Uprating study had indicated that in order to uprate the Spurlock Unit 2 boiler to 4,000,000 pounds per hour steam, EKPC also needed to increase the boiler safety valve relieving capacities in order to comply with boiler code requirements. Operation at uprated conditions required EKPC to increase the safety valves settings in order to comply with this code requirement. August 1993 Uprating Study (Ex. 42), at 3-1, 5-4 to 5-5; January 13, 1994 Letter to Sam Holloway from Factory Mutual Engineering (Ex. 55); Dep. of Samuel Holloway (June 3, 2005) (Ex. 53), at 156-158; Dep. of Kenneth Weiss (November 15, 2005) (Ex. 16), at 118, 119.

61. The Inland Steam Supply Project required the involvement of many EKPC business divisions, including the Construction Division, the Production Engineering Division, the Member Services Business Unit, Spurlock Plant Management, and EKPC Environmental Affairs. The implementation of the steam supply project was managed by the Director of EKPC's Construction Division at the specific request of EKPC's Chief Executive Officer. Other responsibilities of the Construction Division have included building new power plants on the EKPC system. 30(b)(6) Dep. of Gary Crawford (March 31, 2005) (Ex. 56), at 10-13, 207-09; EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Page 131.

62. Parts for the Inland Steam Supply Project were procured in 1991, with installation occurring in stages from 1991 to the Fall of 1992. The initial tie-in to Unit 2 occurred following an outage that lasted from April to July 1992. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Page 22, 69-70, 73, 76.

63. The construction and engineering of the Inland Steam Supply Project was performed by outside contractors and required the use of heavy equipment such as cranes. The project involved almost 20 separate construction and related contracts. EKPC Feb. 25, 2005 Responses

22

to Interrogatories (Ex. 5), Pages 26, 32, 151; May 10, 1994 Memo to Frank Oliva with enclosures (Ex. 57), at C-0100244-247.

64. Installation labor hours alone amounted to 24,856 man-hours for the outage that began in April 1992. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Pages 69.

65. The Inland Steam Supply Project was not intended to maintain the plant. Rather, it was undertaken for economic development purposes. EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Page 96.

66. The Inland Steam Supply Project was unprecedented for EKPC. Dep. of Samuel Holloway (June 3, 2005) (Ex. 53) ("Well, that's the only time we did it. I don't suppose you could call that routine"), at 208-209; 30(b)(6) Dep. of Gary Crawford (March 31, 2005) (Ex. 56), at 208.

67. Converted to an equivalent electricity demand, Inland's steam requirements were expected to be equivalent to approximately 29 MW (29,000 KW). Nov. 13, 1991 Integrated Resource Plan (Ex. 58), at 120.

68. EKPC's Board of Directors initially authorized the use of $12,062,000 for steam supply related expenses and for the construction of a substation and interconnecting lines. This amount was increased to $12,281,000 in February of 1991, and to $22,500,000 in September of 1992. The additional 1992 authorization was due to scope changes in the project including a larger water intake structure from the Ohio River to meet both Inland and EKPC demands, the decision to use two reboilers rather than a single reboiler, an upgrade of EKPC's water treatment system, and an upgrade of the plant's electrical system that was required to accommodate the project. Sept. 9, 1992 Board Resolution (Ex. 59); August 28, 1992 Memo to Operations

23

Committee and Board of Directors (Ex. 60); May 10, 1994 Memo to Frank Oliva with enclosures (Ex. 57), at C-0100248-49 (enclosed Nov. 4, 1992 Letter to Steven Slovikosky.

69. Financing for the Inland Steam Supply Project was arranged through the National Rural Utilities Cooperative Finance Corporation. December 11, 1992 Letter from Donald Norris to Thomas Eddy and enclosures (Ex. 61).

70. In correspondence with the U.S. Rural Electrification Administration concerning the financing of the project, EKPC stated that it was "modifying the facilities of its Spurlock Power Station in order to supply steam" to Inland. EKPC stated that the total project cost was estimated at $22,500,000, and that "Inland's portion of the capital modifications to Spurlock Power Station are estimated at $17,500,000 and EKPC's portion at $5,000,000." While EKPC paid for and financed the "capital modifications," Inland was to reimburse it for its portion of the financing via a monthly facilities charge to be paid over the 20-year life of its contract to supply steam. EKPC explained that Inland was expected to operate on a 24-hour basis throughout the year, with maintenance scheduled for 10 to 15 days per year. The total final capital cost for the steam supply project was approximately $20,500,000. December 11, 1992 Letter from Donald Norris to Thomas Eddy and enclosures (Ex. 61); May 6, 1994 Letter from Roy Palk to Thomas Eddy and enclosures (Ex. 62); EKPC Feb. 25, 2005 Responses to Interrogatories (Ex. 5), Page 81.

71. In calendar year 1993, operating revenue for EKPC increased by $3,061,900 due primarily to revenue received from Inland Container for steam service. 1993 REA Form 12 (Ex. 67), at S-0000721.

72.  The increased revenue generated from the Inland Steam Supply Project contributed to EKPC losing its tax exempt status for the 1993 tax year.  January 20, 1997 Letter to Joseph Tomlinson (Ex. 68), at 4SH_0002359.

73.  EKPC reported the following annual boiler maintenance expenses to the Federal Energy Regulatory Commission (FERC) for the entire Spurlock Plant (not individual Spurlock Units):

| Year | Reported Amount | Source |
|------|-----------------|--------|
| 1991 | $ 10,295,167 | FERC Form 1, EKPC (1991), at C-0086762-63 (Ex. 63). |
| 1992 | $ 9,060, 180 | FERC Form 1, EKPC (1992), at C-0087094-95 (Ex. 64). |
| 1993 | $7,463,309 | FERC Form 1, EKPC (1993), at C-0087265-66 (Ex. 65). |
| 1994 | $8,666,963 | FERC Form 1, EKPC (1994), at C-0087622-23 (Ex. 66). |

74.  EKPC reported in 1992 that "installed capacity" at the Spurlock Station cost $592/kW.  FERC Form 1, EKPC (1992), at C-0087094-95 (Ex. 64).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper under Rule 56 where the court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Although evidence must be viewed in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), the non-moving party must go beyond pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 257 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  EKPC must adduce more than a scintilla of

evidence to survive, and has an affirmative duty to direct the Court's attention to specific portions of the record upon which it relies to create a genuine issue of material fact. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). EKPC has the burden of establishing the applicability of the routine maintenance exclusion. *Ohio Edison*, 276 F. Supp. 2d at 856. Thus, if EKPC fails to a make a sufficient showing on an essential element of this defense, Plaintiff is entitled to judgment as a matter of law because "a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Isle Royale Boaters Ass'n v. Norton*, 154 F. Supp. 2d 1098, 1111 (W.D. Mich. 2001) ("[a] moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case").

## ARGUMENT

I.    **The Inland Steam Supply Project Constituted A "Physical Change" Because the Project Was Not Routine Maintenance, Repair, or Replacement.**

Even though EKPC asserted in its Answer that the Inland Steam Supply Project was "routine maintenance, repair and replacement," it apparently now concedes that it was not. Neither Sam Holloway, the Spurlock plant manager, nor Jerry Golden, EKPC's retained boiler expert, claim that the steam supply project to Inland qualifies as routine maintenance repair, and replacement.[8] In fact, EKPC has produced no evidence that the Spurlock project was routine maintenance, repair and replacement. Because EKPC has failed to provide any evidence that the

---

[8] *See* SOF ¶ 66 (Statement by Samuel Holloway that "Well, that's the only time we did it. I don't suppose you could call that routine"). Mr Golden does not address the Inland Steam Supply Project. Expert Report of Jerry L. Golden, *United States v. East Kentucky Power Cooperative*, August 15, 2005 (Ex. 69). In contrast, he claims that both of the other two projects at issue in this case, the upgrades at Dale Unit 3 and Dale Unit 4 are routine maintenance.

Inland Steam Supply Project is routine maintenance, the Government is entitled to summary judgment even absent the discussion below. *See Isle Royale Boaters Ass'n*, 154 F. Supp.2d at 1111 (W.D. Mich. 2001) ("a moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case").

Even if EKPC did not waive its routine maintenance defense, the evidence is undisputed that under the PSD regulations applicable to EKPC's conduct, the Inland Steam Supply project does not qualify as routine maintenance, repair or replacement.[9]

There is no dispute that EKPC made extensive, costly physical changes in connection with its steam supply project without obtaining permits or installing appropriate pollution control devices. As discussed below, EKPC's own documents and the testimony of its employees show that the steam supply project does not qualify for the exclusion.

In the late 1980s and early 1990s, EKPC planned and implemented a construction project designed to allow Spurlock Unit 2 to generate additional steam, and to supply that additional steam to the Inland Container Corporation. The Inland Steam Supply Project ended up costing more than $20 million, and included, *inter alia*, the construction of new reboilers and a main steam supply system, changes to the existing boiler feedwater system, the installation of new condensate, water treatment, and makeup water systems, and the uprating of the boiler to a new and higher steam production capacity that was higher than the boiler had been previously

---

[9] As with the Dale Unit 3 project addressed in the Government's Third Motion for Summary Judgment, EPA analyzed and applied the "routine maintenance, repair or replacement" exclusion by using a common sense multi-factor test that assesses the nature and extent; purpose; frequency; and cost of the proposed work. *See* Clay Memo, at 3-6.

27

permitted to operate. SOF ¶¶ 24, 53, 55, 57, 58, 59, 60, 70. As a direct result of this capital improvement work, EKPC was able both to generate more steam and to profitably sell that additional steam to Inland. Applying the factors set forth by EPA and upheld by the Seventh Circuit in *WEPCo*, the facts established by EKPC's own testimony and documents show that EKPC cannot establish that the Inland Steam Supply Project constituted routine maintenance, repair or replacement.

### A.    Nature and Extent

The construction work that EKPC performed to enable it to sell process steam to Inland was not even "maintenance, repair, or replacement" work, much less "routine maintenance, repair, or replacement." The work involved building an entirely new process steam line to the neighboring Inland Container facility, plus *the addition* of new high pressure and process steam systems, a new pumping station at the Ohio River to supply cooling tower makeup water for the station, the addition of reboilers, a reboiler superheater, pressure reducing desuperheating control valves, treated water storage tank, makeup water pumps, auxiliary deaerator, blowdown cooler, reboiler preheaters, reboiler feed pumps, drain tanks, and a reverse osmosis system. This project was not maintenance, it was not repair, and it was not replacement. Rather, it was the *construction* and *addition* of entirely new components and systems that did not exist before. SOF ¶¶ 55-56.

In addition, the project involved physical changes to the Spurlock Unit 2 boiler. These included changes to the boiler's high-pressure feedwater system, in order to allow for temperature control of the steam sent from Unit 2 to the reboiler system. SOF ¶¶ 57-58. As admitted by EKPC's expert, Kenneth N. Weiss, the high pressure feedwater system is within the

28

confines of the boiler, and EKPC made changes to the Unit 2 high pressure feedwater system as part of the Spurlock process steam project. SOF ¶¶ 58-59.

The project also required another subtle but significant change to the Spurlock Unit 2 boiler. In order to comply with the boiler code, EKPC had to change the Unit 2 boiler safety valve settings in connection with uprating the boiler to a larger steam production capacity. SOF ¶ 60. By uprating the Unit 2 boiler from a maximum continuous rating of 3,800,000 pounds per hour of steam to 4,000,000 pounds per hour of steam, EKPC was able to supply the maximum amount of expected steam to Inland (approximately 300,000 pounds per hour of steam) while still supplying the Unit 2 turbine with 3,650,000 pounds per hour of steam. SOF ¶¶ 42, 43. This increased steam production was expected to require a correspondingly greater heat input rate. SOF ¶¶ 39, 44, 46-47.

Other evidence of the non-routine nature and extent of the Spurlock project includes the following: EKPC began planning the work for the steam supply project in 1989, and commissioned multiple detailed engineering studies. SOF ¶¶ 34-38. The project involved almost 20 separate contracts and required the work of numerous contractors, including the original boiler manufacturer. SOF ¶¶ 38, 63. The project involved installation of very large pieces of equipment. For example, the two new reboilers were 41 feet long, 10 feet high, and weighed approximately 90,800 pounds. SOF ¶ 56. Because it was a new construction project, it was managed by EKPC's Construction Division Director, whose other responsibilities included building new power plants on the EKPC system. SOF ¶ 61. The work also had to be approved by the EKPC Board of Directors, and required outside financing. SOF ¶¶ 35, 68-70. As a result

29

of the project, EKPC significantly increased its operating revenue – so much so that it lost its tax exempt status for tax year 1993. SOF ¶¶ 71-72.

Moreover, like the Dale Unit 3 project discussed in the Government's Third Summary Judgment brief, the costs of the Inland Steam Supply Project were also capitalized. SOF ¶ 70, which further indicates the non-routine nature of this project.[10]

### B.   Purpose

The sole purpose of the Spurlock project was to increase the steam production and heat input capacity of Spurlock Unit 2 to levels above those at which it had been previously permitted, and to allow EKPC to do something it had never done before – sell process steam to an industrial customer. SOF ¶¶ 65-66. The purpose of this project was certainly not to "maintain the plant in its present condition." Clay Memo (Ex. 2), at 4. As stated earlier, it was not even maintenance, much less *routine* maintenance, repair and replacement.

### C.   Frequency

This was the first and only time EKPC has ever constructed a process steam supply line for an outside customer at any of its plants, let alone the Spurlock plant. SOF ¶ 66. *See* Clay Memo (Ex. 2), at 5 (project is infrequent when it occurs once or twice during the life of typical units); *Ohio Edison*, 276 F. Supp. 2d at 861. A project to supply process steam to an off-site facility is not something that is performed frequently at typical units in the electric utility industry. Rather, this type of project is a once-in a lifetime (if ever) project that fundamentally changes the unit at issue.

---

[10] For a more detailed discussion of the significance of capitalization, *see* United States' Memorandum in Support of its Third Motion for Summary Judgment, p. 22.

### D.    Cost

The cost of the Inland Steam Supply Project exceeded $20 million. SOF ¶ 70. As in the

*WEPCo* case, this expenditure is large on both a relative and an absolute basis. This cost alone is

twice the boiler maintenance expenses for any given year for the entire Spurlock plant in the

years 1991 through 1994. SOF ¶ 73. East Kentucky treated the costs of the steam supply project

as capital expenditures, sought to finance the entire amount of expenditures, and plans to recoup

a portion of the expenses through a 20-year contract with Inland. SOF ¶ 70.

Moreover, because the purpose of this project was solely to produce additional steam for

sale off-site, it is fair to compute the relative cost based on the cost of that steam alone. Because

the process steam sold to Inland is the equivalent of 29 MW, the relative cost is approximately

$690/kilowatt. SOF ¶ 67. This amount is more than what EKPC itself reported was the cost of

the entire "installed capacity" at the Spurlock Station in 1992. SOF ¶ 74.[11]

In sum, EKPC's own documents and testimony establish that the Inland Steam Supply

Project described above was not maintenance, repair or replacement, much less routine

maintenance, repair and replacement.

## II.    EKPC Changed the Method of Operation of the Spurlock Unit 2 Boiler.

Not only did EKPC physically change Spurlock Unit 2 as a result of the Inland Steam

Supply Project, but it also changed its method of operation. Thus, even aside from EKPC's

physical changes made at Spurlock Unit 2, the Court should find that EKPC "changed" Spurlock

---

[11] As with the Dale Unit 3 project, the cost of the Spurlock project was higher on a relative scale than all the capital and maintenance costs for all five units at WEPCO's Port Washington facility, which EKPC expert, Jerry Golden admits can "be used for guidance as to what should be considered a routine expenditure on a $/kW basis." *See* United States' Memorandum in Support of its Third Motion for Summary Judgment, p. 24-25.

Unit 2 for PSD purposes. This is because the PSD regulations specifically provide that operating a source, such as Spurlock Unit 2, in a manner that is inconsistent with a prior permit application is considered *by definition* to be a "change in the method of operation."[12]

The applicable PSD regulations governing the production rate/hours of operation exclusions state in material part:

> A physical change or change in the method of operation shall not include:
> \*\*\*
> 5. An increase in the hours of operation or in the production rate, *unless the change would be prohibited after January 6, 1975 pursuant to 40 CFR 52.21 . . . or under 401 KAR 50:035. . . .*

401 Ky. Admin. Reg. 51:017 Section 1(2)(b) (1992) (Appendix C). By definition, then, the regulations define a "change in the method of operation" as *including* an increase in the hours of operation or in the production rates that *would be* prohibited by 40 C.F.R. § 52.21 or 401 Ky. Admin. Reg. 50:035. The applicable regulations set forth at 40 C.F.R. § 52.21, in turn, prohibit the owner or operator of a source that originally obtained PSD approval under EPA's regulations from operating that source "not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct." 40 C.F.R. § 52.21(r)(1). These EPA regulations at 40 C.F.R. § 52.21 were explicitly retained in the Kentucky SIP for purposes of enforcement against sources which obtained PSD permits directly from EPA prior to approval of Kentucky's PSD regulations. *See* 54 Fed. Reg. at 36309 (Appendix D). EKPC applied for and obtained a PSD permit for Spurlock Unit 2 from EPA under these regulations. SOF ¶¶ 6-8.

---

[12] This argument about the change in the method of operation of Spurlock Unit 2 is not based on its failure to comply with a relatively trivial provision of its permit application, which in turn triggers the requirement that the source owner must comply with PSD. Rather, EKPC's permit application included specific information on the rated *capacity* of the unit, and it is EKPC's actions to uprate its boiler and exceed that capacity that is the basis for PSD applicability.

The applicable state construction and operation regulations set forth at 401 Ky. Admin. Reg. 50:035 similarly prohibit any operation "not in accordance with the application submitted pursuant to this regulation." 401 Ky. Admin. Reg. 50:035, Section 7(1) (1988) (Appendix E); *see also id.* at Section 1(2)(a) (prohibiting operation unless "a permit to so operate" has been issued), Section 5(1) ("Permits issued hereunder shall be subject to such terms and conditions set forth and embodied in the permit as the cabinet shall deem necessary to ensure compliance with its standards."). EKPC applied for and obtained its 1980 state operating permit under 401 Ky. Admin. Reg. 50:035. SOF ¶ 22.

Thus, under the plain language of the applicable production rate/hours of operation exclusion set forth at 401 Ky. Admin. Reg. 51:017 Section 1(2)(b), operation not in accordance with a PSD application or authority to construct (as required by 40 C.F.R. § 52.21(r)(1)) or operation not in accordance with a state operating permit application or permit (as required by 401 Ky. Admin. Reg. 50:035) constitutes, by definition, a change in the method of operation of a source. In other words, the plain language of the exclusion clearly defines operation not in accordance with a previously submitted PSD application or PSD permit, or state operating permit application or permit, as a regulatory "change in the method of operation."

In this case, there is no question that the expected operation of the boiler at Spurlock Unit 2 was "not in accordance with the application" for PSD review submitted by EKPC in 1976, or with the authority to construct that was issued based on that application. There is similarly no question that EKPC's expected operation of the Spurlock Unit 2 boiler was "not in accordance with the application" for a state operating permit it submitted to the state under 401 Ky. Admin. Reg. 50:035, and with the operating permit that was issued for the unit.

EKPC's PSD application, submitted in March of 1976, included an Air Pollutant Emissions Report that indicated that Spurlock Unit 2 had a rated capacity of 4,850 mmBTU per hour, with a short-term peak heat input capacity of 5,120 mmBTU per hour. SOF ¶¶ 8-10. EKPC's state operating permit application, submitted in May 1982, simply listed the rated capacity of Spurlock Unit 2 as 4,850 mmBTU per hour, consistent with the state's modeling of the unit for purposes of demonstrating compliance with the NAAQS. SOF ¶¶ 19-20, 22. EKPC's subsequent operating permit for Spurlock Unit 2, issued in November 1982, required as an explicit "condition" of operation that the unit be operated at a "maximum heat input" of 4850 mmBTU/hour. SOF ¶¶23-24. The permit also specifically stated that "no deviation from the plans and specifications submitted with your application or the conditions specified herein is permitted, unless authorized in writing by the Division of Air Pollution Control." SOF ¶ 24.

The undisputed facts show that EKPC expected the Inland Steam Supply Project to cause the boiler at Spurlock Unit 2 to operate at heat input rates higher than the operating capacity of 4,850 mmBTU per hour, and even the short-term peak capacity of 5,120 mmBTU per hour identified in its PSD application. SOF ¶¶ 39, 40, 42-44, 46, 47. First, EKPC admits that engineering studies it procured indicated that the Inland Steam Supply Project could result in operation at 5,197 mmBTU per hour, even at the old maximum continuous rating of 3,800,000 pounds per hour of steam. SOF ¶ 40. Second, when EKPC on its own and without state approval uprated the Spurlock Unit 2 boiler to 4,000,000 pounds per hour of steam, the required heat input was expected to be even greater – more than 5,300 mmBTU per hour. SOF ¶¶ 44, 46, 47.

34

Not only do the undisputed facts show that EKPC expected as a result of the Inland Steam Supply Project to operate at heat input capacities greater than those specified in its original permit applications, EKPC's course of conduct with the state regulatory agency supports an overwhelming inference to the same effect. EKPC's engineering studies related to the Inland Steam Supply Project evaluated whether Spurlock Unit 2 could be uprated so that the unit could meet its full electricity demands while still supplying an additional amount of steam to Inland. SOF ¶¶ 42-45. Those studies indicated that at anticipated demands from Inland, the total heat input required could be as high as 5340 mmBTU per hour. SOF ¶¶ 44-46. Just months after receiving the results of a formal Uprating Study, EKPC asked KDAQ to increase the heat input capacity in EKPC's permit to 5,355 mmBTU per hour. SOF ¶ 48. There is no reason for EKPC to have requested an increase in permitted heat input unless it thought it might in fact operate at the higher heat input, and thus the request itself is an admission. But there is more.

Only weeks after receiving the request from EKPC to increase the permitted heat input for Spurlock Unit 2, KDAQ informed EKPC that the requested uprating would only be allowed if EKPC provided proof that operating at that level would not trigger PSD as a result of increased emissions. SOF ¶ 49. EKPC did not comply with the KDAQ's clear and unambiguous instructions to submit emissions calculations. In fact, EKPC remained silent. Finally, in December 1994, KDAQ sent a follow-up letter to EKPC asking about the status of the requested emissions submission. SOF ¶ 50. Only then did EKPC respond, saying that it was reevaluating the future planned use of the unit and "will evaluate the need to continue this process at a later date." SOF ¶ 51. A reasonable regulator would understand this letter to be saying that EKPC had decided that it did not need or intend to uprate its boiler and operate at a heat input greater

35

than authorized in its permit. The reasonable regulator would be wrong. As of January 13, 1994 EKPC had already instructed plant operators that they were free to exceed the old steam flow limit of 3,800,000 pounds per hour and that they could henceforth operate the boiler at 4,000,000 pounds per hour of steam. SOF ¶ 53. Unless EKPC has changed the laws of physics and discovered something as yet unrevealed in discovery, increasing the amount of steam generated of necessity requires more heat input. And EKPC well knew that the amount of heat needed to supply steam at 4,000,000 pounds per hour would greatly exceed its permitted limit of 4850 mmBTU per hour. SOF ¶¶ 44-46.

Accordingly, there can be no dispute that EKPC's decision to increase the heat input and steam production rate of Spurlock Unit 2 was itself a "change in the method of operation" as defined by the applicable PSD regulations because it was not consistent with the heat input information contained in EKPC's PSD application, as required by 40 C.F.R. § 52.21(r)(1), and because it was not consistent with EKPC's operating permit and permit application, as required by 401 Ky. Admin. Reg. 50:035. See 401 Ky. Admin. Reg. 51:017 Section 1(2)(b)5 (1992) (Appendix C).

While not necessary to the determination of this motion given the plain language of the regulations, it is also worth noting why, as a policy matter, it makes sense to treat EKPC's expected increase in heat input rate as a change in method of operation. As noted above, the air quality modeling and compliance determinations performed by EPA and KDAQ when EKPC first sought approval to construct Spurlock Unit 2 were all based on the heat input rate information provided by EKPC in its applications. SOF ¶¶ 12, 13, 19, 20. By increasing its heat input over the levels identified in its applications, EKPC has fundamentally changed the

36

assumptions upon which approval to construct the unit was based. If air quality modeling were to be redone using a higher heat input capacity and the same coal sulfur content that was identified in EKPC's permit application and subsequent permits, the unit would have been modeled at a higher emissions rate because increasing the heat input rate is directly proportional to the amount of emissions from a unit. Dep. of Kenneth Weiss (November 15, 2005) (Ex. 16), at 26-28; *cf. United States v. Chrysler Corp.*, 437 F. Supp. 94, 97 (D.D.C. 1977) (it is a violation of the Clean Air Act for an automobile manufacturer to install parts that were different from those specified on its application for certificate of conformity), *aff'd, United States v. Chrysler Corp.*, 591 F.2d 958, 961 (D.C. Cir. 1979).

Moreover, the state of Kentucky's Emissions Inventory System has consistently identified the rated capacity of Spurlock Unit 2 as 4,850 mmBTU per hour, and other sources seeking their own PSD approval following construction of Spurlock Unit 2, have not modeled the Spurlock unit based on its uprated capacity. SOF ¶¶ 25, 26, 28, 29. In a case involving an analogous exclusion from the definition of physical or operational "change" for decisions to burn certain types of alternative fuels, the Ninth Circuit held that reliance by subsequent PSD applicants on previously modeled parameters was a strong policy reason for requiring PSD review of a change that would affect prior modeling analyses. *See Hawaiian Elec. Co. v, EPA*, 723 F.2d 1440, 1448-49 (9th Cir. 1984) (holding that PSD review should be required for a change in operation that was inconsistent with PSD modeling performed by subsequent PSD permit applicants); *see also* 45 Fed. Reg. at 52704 ("any change in hours or rate of operation that would disturb a prior assessment of a source's environmental impact should have to undergo scrutiny") (Appendix A).

37

In sum, there can be no dispute that EKPC changed the method of operation of Spurlock Unit 2 under the plain language of the applicable PSD regulations. EKPC expected to operate Spurlock Unit 2 boiler at heat input levels greater than any levels identified in its PSD permit application or state operating permit application, and such operation is explicitly defined by the PSD regulations to be a "change in the method of operation." Accordingly, the Government is entitled to summary judgment that EKPC change the method of operation of Spurlock Unit 2.

## CONCLUSION

The Court should conclude as a matter of law that the Inland Steam Supply Project at Spurlock Unit 2 was a physical change that was not "routine maintenance, repair, and replacement," and that this project also involved a change in the method of operation of Spurlock Unit 2.

DATED: January 17, 2006.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

PHILLIP A. BROOKS
JASON A. DUNN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111

38

FRANCES E. CATRON
Acting United States Attorney
Eastern District of Kentucky


ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661


OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

39

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Support of the United States' Fourth Motion for Summary Judgment was served on January 17, 2006, on the persons listed below:

John M. Holloway III                       By Express Mail and E-Mail
Angela L. Jenkins
Hunton and Williams LLP
951 East Byrd St.
Richmond, Virginia 23219-4074
(804) 788-8200

T. Thomas Cottingham, III                  By Express Mail and E-Mail
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: (704) 378-4700


Jason Dunn