UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34 - KSF

UNITED STATES OF AMERICA

PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.                    DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

**UNITED STATES' RESPONSE TO EKPC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 1
<u>LEGAL STANDARDS</u>**

# Exhibit 10

701 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2696
Telephone 202-508-5000

# EEI   EDISON ELECTRIC INSTITUTE

July 18, 1991

TO:     Environment and Energy Committee

FROM:   Alice R. Mayer

SUBJECT: Proposed Rule Related to WEPCo

Please review the attached advice provided by the Utility Air Regulatory Group (UARG) regarding the June 14, 1991 EPA proposed "WEPCo fix".

attachment

:\wepcofix

**PLAINTIFF'S EXHIBIT**
1760
CV: C2-99-1182/1250

EEI 0005475

# MEMORANDUM

DATE: July 9, 1991

FILE: 31531.350001

TO: Edison Electric Institute
American Public Power Association
National Rural Electric Cooperative Association

FROM: Hunton & Williams

## David Hawkins' Letter on WEPCo

We understand that David Hawkins, senior attorney with the Natural Resources Defense Council (NRDC), has recently written a letter to each of the chief executive officers of the 100 largest electric utility companies in this nation concerning the "WEPCo fix" which EPA proposed in 56 Federal Register 27630 (June 14, 1991). Attached is a copy of the letter that Mr. Hawkins wrote to Pennsylvania Power and Light. We want to respond to Mr. Hawkins' letter and to assure you that EPA's Federal Register notice explaining what its current regulations provide concerning facility "modifications" is fully consistent with law.

## I. Background

Since 1988, EPA has engaged in what it has termed an "activist posture" regarding new source programs whereby it has reinterpreted the modification regulations to bring existing

EEI 0005476

2

sources under new source requirements. EPA staff used a project at Wisconsin Electric Power Company's (WEPCo) Port Washington power plant as the principal vehicle for abruptly departing from its past interpretations of new source requirements.

WEPCo had proposed a "like kind replacement" of deteriorated equipment that physically constrained maximum unit operations in the case of two units and that required the shutdown of a third unit for safety reasons. The project was designed merely to allow the plant to return to operations levels characteristic of operations before the equipment had deteriorated.

Under the modification rules, "prevention of significant deterioration" (PSD) and "new source performance standards" (NSPS) review is required whenever a source proposes a "physical or operational change" that will "result in" an "emissions increase." 40 C.F.R. §§ 60.14, 52.21(b)(2) (1990). In a series of letters in 1988-1989, EPA determined that the Port Washington project triggered review under both the PSD and NSPS programs. Among other things, EPA found that the PSD modification rule required a comparison between past actual and future "potential" emissions in order to determine whether emissions would increase after the proposed project, even though the plant had a lengthy operating history and EPA's rules required such a comparison only for facilities that had not "begun normal operations." EPA also found that NSPS was triggered by comparing hourly emissions using deteriorated operations with full capacity hourly emissions after the repairs.

EEI 0005477

3

Soon after its WEPCo decision, EPA expanded its new interpretations to require PSD review for a project to allow natural gas-firing at an oil-fired plant, and to require NSPS and PSD review when a clean coal technology project was removed after a demonstration concluded. EPA's "activist posture" delayed the availability of data from several clean coal technology projects that would have been useful in on-going rulemakings under Title IV.

WEPCo challenged EPA's determinations in the U.S. Court of Appeals.[1] The court affirmed EPA's NSPS determination, holding that EPA could compare hourly emissions using deteriorated equipment immediately before the replacement with hourly emissions after the changes. By contrast, the court reversed the PSD determination, holding that EPA should engage in a rulemaking if it wished to compare past actual with future potential emissions at an existing unit that had an operating history.

Subsequent to the WEPCo decision, EPA maintained that the "actual-to-actual" approach mandated by the court for calculating emissions increases for PSD purposes applied only to "like kind" replacements of the type proposed by WEPCo. This exceedingly artificial reading of the Seventh Circuit decision could have required utilities to undergo PSD review before installing pollution controls (activity that does not involve "like kind replacement"). This would have increased the cost of the acid

---

[1]     WEPCo v. Reilly, 893 F.2d 901 (7th Cir. 1990).

EEI 0005478

4

rain provisions of the 1990 Amendments by billions of dollars, thereby frustrating congressional intent and threatening the achievement of the required reductions in the most efficient and least costly manner.

## II. The Federal Register Notice

The recent Federal Register notice rectifies the problems associated with the Agency's attempt to reinterpret the modification rules in WEPCo and in subsequent decisions. This notice consists of two parts — (1) a preamble which is EPA's interpretation of current law, and (2) a notice of a proposed rule.

In the preamble of the Federal Register notice, EPA announces a clarification of its WEPCo interpretations that represents a return to the Agency's past understanding of its new source review (NSR) rules. In practical effect, the preamble constitutes a separate interpretive rule on these issues, and these interpretations of existing law are effective immediately. The proposed rule changes contained in the notice are subject to the notice-and-comment requirements of the Administrative Procedure Act. As a result, the proposed rules will be effective only after they are promulgated by the Agency.

The following discussion summarizes the most important aspects of the Federal Register notice, including both the Agency's interpretation of existing law, and the proposed changes to existing law.

EEI 0005479

5

### A. Pollution Control Projects

Under current NSPS rules, the addition or use of pollution controls is excluded without qualification from NSR, and the removal or replacement of a pollution control system or device is excluded unless the Agency finds that the new system is less environmentally beneficial than the system it replaces. In the notice, EPA reaffirms that it will apply its PSD rules in harmony with its NSPS rules, and return to its past practice of excluding pollution control projects from NSR, provided that in the case of removal or replacement of control equipment the project is not less environmentally beneficial than the system being replaced. Since pollution control projects called for by Title IV of the 1990 Clean Air Act Amendments involve the <u>addition</u> of pollution controls, and not the removal or replacement, EPA's interpretive ruling removes the <u>WEPCo</u> cloud that threatened timely and successful efforts by the utility industry to implement Title IV.

The major difference between the existing pollution control project exclusion for NSPS and PSD purposes, and the proposed rule change for PSD, is that, under current law, the Agency applies the "less environmentally beneficial" test only to the "removal or replacement" of pollution control equipment. Under the proposed rule, EPA would, for PSD purposes, apply this test to the addition and use, as well as the replacement, of a pollution control equipment.

For purposes of the proposed rule, EPA defines a pollution control project as a project undertaken for purposes of reducing

EEI 0005480

6

emissions from a utility unit. Such changes include the installation of emissions control equipment and projects undertaken to accommodate switching to a less polluting fuel. (For example, a unit that switches from a high sulfur to low sulfur coal may need to make certain changes to the boiler in order to avoid derating the unit.)

### B. Representative Actual Emissions

Under current regulations, the linchpin for deciding whether to use "future actual" or "future potential" emissions in calculating an emissions increase is whether the unit has "begun normal operations." In the preamble to the Federal Register notice, EPA again indicates that it interprets existing law in a manner consistent with the lengthy pre-WEPCo regulatory history of this rule. Thus, while the Agency indicates that it will continue to apply an actual-to-actual test to units that undertake "like kind replacements," it also indicates that this test will be applied to other units which are found to have "begun normal operations." In sum, EPA has conceded that, under current law, the use of the "actual-to-potential" test is appropriate only in the case of new or replacement units that have not begun normal operations.

EPA then proposes to revise its regulations to apply the actual-to-actual test in yet additional cases — i.e., to all physical or operational changes at electric utility steam generating units, except for those that are an addition of a new unit or constitute a replacement of an existing unit.

EEI 0005481

7

With respect to determining the pre-change baseline for making the "actual-to-actual" comparison, EPA historically had used the two years immediately preceding the proposed change for the baseline. While retaining the current regulatory language, EPA states that it will presume that any two consecutive years within the five years before the proposed change is representative of normal source operations for a utility. Owners or operators wishing to use other than a two-year period or a baseline period prior to the last five years can ask EPA to determine that such a period is more representative of normal operations.

EPA proposes to calculate future actual emissions using the product of the hourly emissions rate (based on the unit's physical and operational capabilities following the change) and projected capacity utilization. The projected capacity utilization is to be based on the unit's historical annual utilization rate and any available information regarding its likely post-change capacity utilization. EPA proposes to allow sources to base the projection on the two years after the change, or a different consecutive two-year period within the 10 years after the change, where EPA determines that such a period is more representative of normal source operations.

C. **Causal Link Requirement**

In the wake of the WEPCo decision, EPA had suggested that it might find an emissions increase triggering NSR based on future projections of increased capacity utilization, without regard to

EEI 0005482

8

whether the emissions increase was actually linked to a physical or operational change. In this <u>Federal Register</u> notice, EPA now confirms that its NSR rules require that the physical or operational change be shown to <u>result in</u> an increase in actual emissions in order to consider the change a modification. As a result, EPA has stated NSR will not apply unless it finds that there is a <u>casual link</u> between the proposed change and any increase in emissions.

The proposed rule would clarify this requirement for electric utility units. The proposed rule makes clear that, where increased operations are in response to independent factors, such as system-wide demand growth, which would have occurred and affected the unit's operation apart from any physical or operational change, such increases do not result from the change and shall be excluded from the projection of future actual emissions. Accordingly, in assessing whether the proposed change will result in an increase in actual emissions, utilities need not include in their projection of post-change utilization that portion of the increased rate of utilization due to factors unrelated to the physical or operational change, such as an increase in projected capacity utilization due to the rate of electricity demand growth for the utility system as a whole.

EPA's proposal requires, however, that during the baseline period the plant must have been able to accommodate the projected demand growth physically and legally, even in the absence of the particular change. In this regard, EPA states that increased

EEI 0005483

9

operations (and resultant increases in emissions) that could not physically and legally be accommodated <u>but for</u> the proposed physical or operational change should be considered to result from the change.

### D. NSPS Baseline

EPA proposes that the pre-change baseline for NSPS applicability purposes be calculated using the highest hourly emissions rate achievable at any time during the five years before the change. This is consistent with past practice, where EPA recognized that if temporarily lowered emissions immediately before a change were not representative of pre-change emissions, another, more representative emission level should be used.

### E. BACT for $NO_x$

EPA proposes to adopt a presumption that, in the case of PSD permits, best available control technology (BACT) for emissions of $NO_x$ from existing coal-fired units undergoing a modification is low $NO_x$ burners or a similar, cost-effective technology. EPA finds this presumption to be appropriate in light of the strong congressional policy judgment favoring use of low $NO_x$ burners for acid rain control in § 407.

## III. Hawkins' Letter

Mr. Hawkins states his concern with the proposal aspect of this notice. For example, he states that "<u>the changes proposed by EPA</u> are unlawful and unjustified as drafted" and that "pending resolution of this controversy" you should ignore "the Agency's June 14 notice of <u>proposed</u> rulemaking." We agree with Mr.

10

Hawkins that the <u>proposed</u> rules are just that, and that you should not assume that the final rules will be identical to the proposed rules. As noted above, there is an ongoing public comment period during which anyone may address this proposal. For example, the presumption that low $NO_x$ burners is BACT is not the law until the final rule is promulgated.

By contrast, EPA's articulation of <u>current</u> law in the preamble is effective immediately, and there is no practical reason why you should not rely on EPA's explanation of the requirements of its own rules that are currently on the books. In fact, EPA's explanation of its existing rules is consistent with how EPA consistently interpreted and applied these rules before the <u>WEPCo</u> decision. Moreover, we understand that the Department of Justice carefully reviewed, and agrees with, this explanation of current law.

Indeed, the preamble is in part based on interpretations issued by EPA when Mr. Hawkins was the Assistant Administrator for Air and Radiation in the Carter Administration. For example, the preamble concludes that pollution control projects at existing stationary sources are not subject to NSR because Congress intended the PSD modification rules to be applied in harmony with the NSPS modification rules.[2/] This conclusion is based on statements contained in the preamble to the 1978 PSD rules which were prepared under the supervision of then Assistant

---

[2/] 56 Fed. Reg. 27636 (1991). The NSPS regulations exclude most pollution control projects. 40 C.F.R. § 60.14(e)(5) (1990).

EEI 0005485

11

Administrator Hawkins.[3/] Mr. Hawkins' assertion that it is somehow "unlawful" and "unjustified" to return to interpretations that were legal while he was Assistant Administrator is, to say the least, unusual.

NRDC is apparently threatening to litigate one or more test cases involving "modifications" at power plants. We doubt, however, that Mr. Hawkins is eager to file suit against any electric utility for installing scrubbers or low $NO_x$ burners to comply with Title IV of the 1990 Clean Air Act Amendments. Nor do we believe that Mr. Hawkins is anxious to file suit against a company increasing efficiency at a plant, thereby reducing emissions of pollutants that may contribute to "global warming."[4/] We seriously doubt that NRDC would expend its scarce resources on frivolous suits directed at punishing utilities that have installed pollution controls or repairs that do not directly cause an emissions increase.[5/]

---

[3/] See 43 Fed. Reg. 26396 (1978).

[4/] As Henson Moore, Deputy Secretary of Energy, has stated in the Energy Daily (February 26, 1990), "for every five percent improvement in the efficiency of coal combustion, we reduce carbon dioxide emissions from that plant by 15 percent."

[5/] According to The New York Times (November 29, 1990), NRDC is currently defending a suit for millions of dollars of damages in Yakima County, Washington, that was brought by apple growers in the wake of NRDC's involvement in the alar scare. We recognize that "public interest" law firms such as NRDC have often played by their own rules, but on June 18, 1991 the Circuit Court of Appeals for the Eleventh Circuit affirmed over a $1 million dollar fine against a tax-exempt "public interest" law firm for filing a suit in federal court which had no basis in law or fact. Avirgan v. Hull, Lexis 12347 (11th Cir. 1991).

EEI 0005486

12

Accordingly, we have advised those utility companies that are members of the Utility Air Regulatory Group (UARG) not to overreact to this NRDC letter. Rather, utility companies should continue to review individual projects under EPA's existing modification rules, as they have done in the past. Of course, application of EPA's modification rules in any specific setting can involve complex legal and technical issues, even under EPA's clarification of existing law. It is important, therefore, to coordinate review of any proposed project with the relevant environmental department and legal staff.

EEI 0005487




Natural Resources
Defense Council

1350 New York Ave., N.W.
Washington, DC 20005
202-783-7800
Fax 202-783-5917

June 21, 1991

John T. Kauffman
Chairman, President & CEO
Pennsylvania Power & Light Company
Two North Ninth Street
Allentown, PA 18101

RECEIVED
JUN 27 1991
CHAIRMAN'S
OFFICE

Dear Mr. Kauffman:

On June 14, 1991, the U.S. Environmental Protection Agency (EPA) published a proposal to revise its existing rules defining what actions constitute a "modification" or a "physical change or change in the method of operation" with respect to the applicability of federal Clean Air Act requirements relating to new and modified sources of air pollution. 56 Fed. Reg. 27630.

These proposed regulatory changes apply to existing electric utility generating units and are commonly known in the industry as the "WEPCO fix."

We are writing to inform you of our opinion that the changes proposed by EPA are unlawful and unjustified as drafted. We intend to vigorously oppose adoption of the changes in final form.

EPA's notice of proposed rulemaking indicates that during the pendency of the rulemaking the Agency will treat certain activities covered by the proposed rulemaking as not triggering the Act's new and modified source requirements. We want to advise you of our objection to this aspect of EPA's action as well.

We urge that, pending resolution of this controversy, you evaluate the applicability of Clean Air Act new and modified source requirements to planned changes at your facilities on the basis of existing EPA rules and regulations and not on the basis of the Agency's June 14 notice of proposed rulemaking.

As you may know, section 304 of the Clean Air Act authorizes citizens to seek judicial relief in U.S. District Court against "any person who proposes to construct or constructs any new or modified major emitting facility without a permit required" under the Act. Clearly, litigation to challenge such attempted construction is less desirable than a process where the proponents of proposed modifications apply for and receive needed Clean Air Act permits.

Since we intend to examine proposed electric utility unit changes in appropriate cases to determine applicability of Clean Air Act new and modified source requirements, we wanted to advise your company directly of our opinion that the proposed changes in applicability in the EPA June 14 rulemaking notice are not lawful.

One Sutter Park

40 West 20th Street
New York, New York 10011
212 727-2700
Fax 212 727-1773

71 Stevenson Street
San Francisco, CA 94105
415 777-0220
Fax 415 495-5996

617 South Olive Street
Los Angeles, CA 90014
213 892-1500
Fax 213 629-5389

212 Merchant St., Suite 203
Honolulu, Hawaii 96813
808 533-1075
Fax 808 521-6841

EEI 0005488

The EPA proposal also states that the agency intends to apply a "presumption" that certain existing-source technologies for nitrogen oxides constitute "best available control technology" for modified electric generating units. In NRDC's opinion there is no factual or legal basis for such a presumption. We would urge you not to rely on any such presumption in selecting proposed nitrogen oxides controls for any planned modifications at your facilities.

Finally, NRDC does believe that certain clarifications respecting applicability of new source requirements are appropriate. In particular, we believe that exemptions from new source requirements should be made available for genuine pollution control projects that reduce emissions from an existing source, provided that the operation of the source after such a change does not result in an adverse air quality impact.[1] We are prepared to discuss the development of such exemptions with electric utility industry members, the States and EPA in an effort to find common ground on this issue.

Sincerely,

David G. Hawkins
Senior Attorney

---

[1] However, the exclusion proposed in EPA's notice does not contain adequate air quality safeguards. Certain legislative provisions, such as S. 1220 (the Johnston-Wallop bill), define pollution control projects so broadly as to be meaningless and also fail to contain adequate air quality safeguards.

EEI 0005489