UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34  - KSF


UNITED STATES OF AMERICA

PLAINTIFF,


VS.


EAST KENTUCKY POWER COOPERATIVE, INC.                    DEFENDANT.


* * * * * * * * * * *

**UNITED STATES' RESPONSE TO EKPC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 1
<u>LEGAL STANDARDS</u>**


# Exhibit 11

BEFORE THE
UNITED STATES OF AMERICA
ENVIRONMENTAL PROTECTION AGENCY

Docket No. A-90-06

Statement of Henry V. Nickel, on behalf of the
Utility Air Regulatory Group, on EPA's Proposed Rule
on New Source Review and Confirmation of Existing Law

## Introduction

My name is Henry V. Nickel.  I am a partner with Hunton &
Williams in Washington, D.C.  I am appearing here today on behalf
of the Utility Air Regulatory Group (UARG), an ad hoc
organization of 71 individual electric utilities, as well as the
three industry trade associations.  Since 1970, I have repre-
sented clients, including UARG, in virtually every significant
Clean Air Act rulemaking involving the regulation of major
stationary sources.  I also represented Wisconsin Electric Power
Company in litigation before the U.S. Court of Appeals for the
Seventh Circuit that culminated in the so-called "WEPCo" deci-
sion.

Before turning to the specifics of EPA's proposed rule, I
would like to address two broader issues that UARG believes are
important in assessing the proposed rule and its preamble in
general.

First, as whole, the proposed rule and its preamble send a
welcome signal to the electric utility industry that EPA has

PLAINTIFF'S
EXHIBIT
1759
CV: C2-99-1182/1250

EEI 0003194

2

moved away from those interpretations of its New Source Review (NSR) rules -- its so-called "WEPCo interpretations" -- that have cast a considerable "cloud" over pollution control projects and other legitimate utility activities at existing sources. In this regard, the proposed rule and preamble recognize that EPA's NSR provisions have <u>never</u> contemplated that every activity that would lead to an emission increase should trigger NSR. For instance, from their inception, the NSR rules have excluded whole categories of activities at existing sources, such as "routine maintenance, repair, and replacement," or emission increases resulting from increases in hours of operation or production rate. Generally, these exclusions apply to activities that would be expected to occur at existing sources during their useful life and therefore are consistent with their continued grandfathered status.

Second, and relatedly, the proposed rule should be viewed as giving effect to the plain meaning of existing law, not as an expression of new law. Indeed, in contrast to EPA's "WEPCo interpretations," the view of current law contained in the preamble to the proposed rule is in line with the agency's own historic understanding of its NSR rules.

### Pollution Control Projects

Consistent with its original interpretation of the NSR rules, EPA's notice makes clear that most, if not all, pollution

EEI 0003195

3

control projects are excluded from NSR.  Only where EPA finds that a pollution control replacement project would make a unit "less environmentally beneficial" would NSR apply.

While we are pleased with EPA's decision to remove the WEPCo "cloud" that has threatened timely and successful efforts by the utility industry to meet the requirements of Title IV, we do not believe that, as a matter of law, any change in EPA's rules is necessary.  Since the early 1970's, the New Source Performance Standards (NSPS) rules have excluded pollution control projects from the definition of "modification" unless the replacement of such pollution controls rendered the unit "less environmentally beneficial."  In 1977, when the Clean Air Act was amended to include the NSR provisions, Congress provided that the term "modification" was to have the same meaning as under the NSPS program.  Further, in 1983, EPA determined that environmentally beneficial pollution control projects are excluded from NSR.  The interpretation of current law announced by EPA in its recent notice is consistent with the Act and the agency's earlier determination.

Thus, while we support the intent of EPA's proposed rule on pollution control projects generally, we do not believe that this rule is in fact needed.  But if such a rule is to be adopted, it should not be restricted to pollution control projects in the electric utility industry.  Such a restriction cannot be

EEI 0003196

4

logically reconciled with the EPA's own understanding of its NSR rules or with Congress's intent in enacting the NSR program.

## "Actual-to-Actual"

We support EPA's affirmation that the "linchpin" for deciding whether to use "future actual" or "future potential" emissions in calculating an emission increase is whether the unit has "begun normal operations." 56 Fed. Reg. 27,633 (June 14, 1991). EPA's NSR rules allow for the comparison of "past actual" emissions to "future potential" emissions only where a unit has "not begun normal operations." Where normal operations have begun, the "actual-to-actual" approach applies.

EPA strayed from the proper interpretation of its NSR rules with its so-called "WEPCo interpretations." EPA's notice constitutes a welcome return by the agency to the correct view of the law.

With respect to determining the pre-change baseline for making the "actual-to-actual" comparison, EPA notes that, historically, it has used the two years immediately preceding the proposed change to establish the baseline. While EPA proposes to retain the current regulatory language, it has announced a new presumption that "any 2 consecutive years within the 5 years prior to the proposed change is representative of normal source operations for a utility." 56 Fed. Reg. 27,636 (June 14, 1991).

EEI 0003197

5

We believe that, in order to allow for the establishment of a truly "representative" baseline period, EPA should clarify its presumption to provide for the use of any two consecutive years within the last five years of operations. This would allow for the establishment of a more representative baseline for units that have been in a lengthy shutdown.

### "Causal Link" Requirement

In its notice of proposed rulemaking, EPA points out that, under the plain language of its NSR provisions, the physical or operational change must "result in" an increase in actual emissions in order to consider the change a modification. Thus, EPA recognizes that emission increases must be causally linked to the physical or operational change. EPA continues that, where "increased operations are in response to independent factors, such as system-wide demand growth, which would have occurred and affected the unit's operation, such increases do not result from the change and shall be excluded from the projection of future actual emissions." 56 Fed. Reg. 27,637 (June 14, 1991).

We agree with EPA's application of the causal link requirement to utility operations. We note, moreover, that excluding load growth from emission increase calculations at units that have begun normal operations is also required under the "production rate/hours of operation" exclusion in 40 C.F.R. § 52.21(b)(2)(iii)(f).

EEI 0003198

JUL-19-'91 09:46   ID:H-W WASH DC                    TEL NO:202-778-2202              #847 P07

6

## Calculation of NSPS Baseline

We generally support EPA's proposal to amend its NSPS rules to use a five-year period prior to a physical or operational change in calculating the baseline for determining maximum hourly emissions. Again, EPA's proposed change is consistent with past practice, since it recognizes that, where temporarily lowered emissions immediately before a physical or operational change are not representative of emissions after the change, such lowered emission levels should not be used.

We believe, however, that EPA's rule should be clarified to provide for the establishment of a baseline on the basis of the last five years of the unit's operations. Such a change is necessary if the unit's baseline is truly to be "representative of [the unit's] physical and operational capacity in recent years . . . ." 56 Fed. Reg. 27,638 (June 14, 1991). Also, we do not believe that there is any basis for EPA to restrict its proposed rule to electric utility units only.

## BACT Presumption for $NO_x$ Controls

We support EPA's proposal to adopt a presumption that "best available control technology" (BACT) for emission of nitrogen oxides ($NO_x$) is low $NO_x$ burners or some similar cost-effective technology. We agree with EPA that this presumption is appropriate given the strong congressional policy judgment

EEI 0003199

7

favoring the use of low $NO_x$ burners for $NO_x$ control at existing units under Title IV.

### Effect on Local Air Quality

Contrary to some criticisms that have been leveled against EPA's proposed rule, we believe it important to recognize that the proposed rule does nothing to authorize increases in emissions that threaten local air quality. A source's obligation to meet ambient requirements is independent of any obligation to meet NSR requirements. That an increase in emissions is found not to be a modification does not in any way authorize the source to exceed Prevention of Significant Deterioration (PSD) increments, ambient standards, or a visibility related limitation. Nor would an increase in utilization of a unit be expected to threaten compliance with ambient requirements. Most if not all emission limitations implementing ambient standards or PSD increments are based on annual emission factors that represent operations 365 days a year at maximum production levels.

As already noted, EPA has never considered its NSR program as addressing every type of activity within industry that potentially increases emissions. Small sources are not covered by the NSR provisions. The rules themselves exclude from the modification definition a variety of activities that can result in emission increases. For instance, emission increases

EEI 0003200

8

attributable to increases in a unit's hours of operation or production rate (i.e., annual utilization) are excluded.  In this regard, in developing the Administration's proposal on acid rain legislation, EPA projected substantial increases in utilization of units over the next 10 years and predicated, at least in part, the need for a $SO_2$ cap on these projections.  Any claims that increases in utilization of existing utility units are for the first time authorized by this notice (i.e., were somehow prohibited before this notice) have no basis in fact or law.

### Conclusion

We support EPA's decision to confirm and clarify existing law, which should further the efforts of the electric utility industry to meet the goals of Title IV in an effective and timely manner.  UARG will be submitting more detailed written comments on the proposed rule by the end of the comment period.

EEI 0003201