UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34 - KSF

UNITED STATES OF AMERICA

PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.           DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

**UNITED STATES' RESPONSE TO EKPC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 1
<u>LEGAL STANDARDS</u>**

# Exhibit 15



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION III
841 Chestnut Building
Philadelphia, Pennsylvania 19107

Mr. William J. Riley, Manager
Air and Water Programs
Environmental Affairs Department
Bethlehem Steel Corporation
Martin Tower
Eighth and Eaton Streets
Bethlehem, Pennsylvania 18016

DEC 16 1991

Dear Mr. Riley:

    Thank you for providing EPA with a copy of your letter, dated September 13, 1991, to Mr. George P. Ferreri, Director, Air Management Administration, Maryland Department of the Environment. In an effort to resolve outstanding issues with respect to the potential applicability of the Prevention of Significant Deterioration ("PSD") Regulations to the proposed coke oven renovations at Sparrows Point, EPA offers the following further comments in response to your letter.

    EPA reiterates that these further comments do not constitute a final determination by Region III or the Agency, may vary depending on the actual renovation and future use of the coke oven batteries, and are subject to any and all changes in the regulations themselves or EPA policy in general.

    Your letter indicates your belief that any coke oven battery repair, renovation and/or replacement, including a pad up rebuild, which results in an "in kind" facility which is "essentially the same as that which was initially permitted," is exempt from the PSD review as "routine maintenance, repair and replacement." However, the mere fact that proposed work may result in a same or functionally similar emissions unit is not dispositive of whether or not the renovation is "routine" for purposes of the PSD Regulations.

    In determining whether proposed work at an existing facility is "routine," EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as any other relevant factors. Typically, EPA will consider such factors as whether (1) the repair/replacement is immediate after discovery of deterioration; (2) the replaced equipment is standard in the industry and is replaced frequently; (3) the repair/replacement is expensive; and (4) the repair/replacement appreciably prolongs the life of the facility.

EPAOAQ 0020364

Conversations with representatives of the steel industry and with persons familiar with EPA's regulatory history of coke oven batteries indicate that oven dusting, oven patching, and end flue repairs are all considered "routine" maintenance and repair in the industry. Likewise, taking an individual oven out of service for rebricking generally has been deemed "routine" repair and, therefore, not subject to PSD review. The battery, i.e., the group of coke ovens, and not any one individual oven, has historically been viewed as the source to which the PSD regulations apply. In addition, taking a battery out of service and placing it on "hot idle," whereby the ovens remain heated but coke-making is temporarily discontinued, appears to be a routine practice in the industry which typically does not subject the battery to more stringent standards upon resumption of operations. However, the demolition and reconstruction of a coke oven battery from the pad up generally has been subject to PSD review (a new BACT determination, for example), even where some of the original equipment remains underground.

In this case, all of the factors suggest that the work required to renovate Coke Oven Batteries A and 11/12 appears not to be "routine." The available information indicates that the nature and extent (i.e., a pad up rebuild) of any proposed work are substantial. It would appear that the purpose of the work at Sparrows Point is to completely rehabilitate aging coke oven batteries whose operating capacity has significantly deteriorated over a period of years. It is EPA's understanding that the proposed renovation project will substantially extend the useful life of the batteries, as an alternative to retiring them as they approach the end of their useful physical and economic life. Moreover, although Bethlehem has not supplied EPA with a cost analysis of any proposed work at the plant, by Bethlehem's own admission, any renovation project would be costly, both in relative and absolute terms. In short, the magnitude of the necessary renovations as well as the down time required to implement them suggest that the renovation of Coke Oven Batteries A and 11/12 is more than "routine."

However, please bear in mind that any renovation of coke oven batteries A and 11/12 will be subject to PSD review only if such renovation represents a "major modification" to the existing plant. A major modification is defined as any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase (expressed in tons per year) of any regulated pollutant. 40 C.F.R. § 52.21(b)(2)(i). Therefore, if the proposed work results in no significant net emissions increase, the renovation would not constitute a major modification and would not be subject to the PSD regulations.

2

EPAOAQ 0020365

As always, EPA is pleased to discuss these issues further with you and your colleagues at Bethlehem Steel as you contemplate the renovation of Coke Oven Batteries A and 11/12. Please contact Bernard Turlinski, Chief, Air Enforcement Branch, at (215) 597-3989, to arrange such a meeting.

Very truly yours,

Thomas J. Maslany, Director
Air, Radiation and Toxics Division

cc: George Ferreri, Director
Air Management Administration
Maryland Department of the Environment

David Solomon (MD-15)
Air Quality Management Division

EPAOAQ 0020366