UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34  - KSF


UNITED STATES OF AMERICA

PLAINTIFF,


VS.


EAST KENTUCKY POWER COOPERATIVE, INC.          DEFENDANT.


\* \* \* \* \* \* \* \* \* \* \*


**PLAINTIFF UNITED STATES' RESPONSE TO DEFENDANT EAST KENTUCKY
POWER COOPERATIVE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 2 (COUNTS 1, 2, AND 3 – SPURLOCK CLAIMS)**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

EKPC'S STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    EKPC's Physical And Operational Changes At Spurlock Unit 2 Triggered PSD
      Requirements Regardless Of Whether They Also Involved A Modification Under EPA's
      Separate NSPS Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    EPA's PSD Regulations Do Not Include a "Capital Expenditure" Requirement. . 7

      B.    EPA's PSD Regulations Do Not Require an Increase in Maximum Achievable
            Hourly Emissions Rates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    EKPC's Statutory Argument is Jurisdictionally Barred and Contrary to Law. . 12

            1.    EKPC Cannot Challenge The Differences Between the NSPS and PSD
                  Regulations in This Enforcement Action. . . . . . . . . . . . . . . . . . . . . . 13

            2.    EKPC's Argument That Congress Mandated Identical Regulatory
                  Definitions of Modification for PSD and NSPS Purposes is Contrary to
                  Established Caselaw. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      D.    EPA Has Previously Applied PSD Requirements to Projects Without Regard to
            NSPS Applicability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.   EKPC's Alternate Argument, That The Inland Steam Supply Project Was Not A Major
      Modification Under the 1980 Rules, Is Illogical And Contrary To The Plain Language Of
      The PSD Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    EKPC's Argument That the Inland Steam Supply Project Involved No Physical
            Change is Contrary to Logic and the Plain Meaning of the Regulations. . . . . . 21

      B.    Even If It Had "Stood Alone," the Increased Production Rate at Spurlock Unit 2
            Would Not Qualify For the Hours Of Operation/Production Rate Exclusion. . . 25

III.  EKPC Is Obligated To Operate In Compliance With Its Operating Permits. . . . . . . . 26

      A.    The Original Spurlock Operating Permit is Enforceable by EPA. . . . . . . . . . . 27

      B.    Whether Or Not a Former Employee of KDAQ Believes the Spurlock Operating
            Permit Was Enforceable by EPA is Irrelevant. . . . . . . . . . . . . . . . . . . . . . . 30

C.      EKPC Confuses the Issue of Whether a Permit Limit is Enforceable by EPA As a
        Legal Matter, With the Issue of Whether a Source May Rely On a Permit Limit to
        Avoid PSD Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.      EKPC's Spurlock Operating Permit Includes a Specific "Condition" Requiring
        EKPC to Operate Spurlock Unit 2 at "4850 mmBTU/hr maximum heat input." 34

E.      EPA's Objection to a Separate Title V Permit for the Tennessee Valley Authority
        is Irrelevant to Whether EPA Can Enforce the Terms of EKPC's Title V Permit
        for the Spurlock Plant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## FEDERAL CASES - REPORTED

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

*ASARCO Inc. v. EPA*, 578 F.2d 319 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Atlantic Dry Cleaners & Dyers v. United States*, 286 U.S. 427 (1932) . . . . . . . . . . . . . . . . . 16

*Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898 (7th Cir. 1994) . . . . . . . . . . . . . . . . . 30

*Citizens for a Better Env't v. EPA*, 649 F.2d 522 (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . 29

*Citizens for Clean Air v. EPA*, 959 F.2d 839 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Concerned Citizens of Bridesburg v. Philadelphia Water Dept.*, 843 F.2d 679
        (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 16

*General Motors Corp. v. United States*, 496 U.S. 530 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Greenbaum v. EPA*, 370 F.3d 527 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*,
        874 F.2d 332 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kentucky Res. Council, Inc. v. EPA*, 304 F. Supp. 2d 920 (W.D. Ky. 2004) . . . . . . . . . . . . . . 27

*Motor Vehicle Mfr's Ass'n v. Costle*, 647 F.2d 675 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . 13

*National-Southwire Aluminum Co. V. EPA*, 838 F.2d 835 (6th Cir. 1988) . . . . . . . . . . . . . . . . 13

*Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 10, 12, 14, 15, 16, 18, 19

*Northern Plains Res. Council v. EPA*, 645 F.2d 1349 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . 17

*Potomac Elec. Power Co. v. EPA*, 650 F.2d 509 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989) . . . . . . . . . . . . . . . . 10, 13, 20, 24

*Save Our Health Organization v. RECOMP of Minnesota*, 829 F. Supp. 288
(D. Minn. 1993), *aff'd* 37 F.3d 1334 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Union Elec. Co. v. EPA*, 515 F.2d 206 (8th Cir. 1975), *aff'd*, 427 U.S. 246 (1976) . . . . . . . . . 27

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005) . . . . . . . . . . . . 10, 17, 23

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001) . . . . . . . . . . . . . . . . . . . 16

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D. N.C. 2003),
*aff'd on other grounds*, 11 F.3d 549 (4th Cir. 2005) . . . . . . . . . . . . . . . . 10, 12, 15, 18, 37

*United States v. Ethyl Corp.*, 761 F.2d 1153 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Ford Motor Co.*, 814 F.2d 1099 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 38-39

*United States v. Ford Motor Co.*, 736 F. Supp. 1539 (W.D. Mo. 1990) . . . . . . . . . . . . . . . 31, 39

*United States v. Louisiana Pacific Corp.*, 682 F. Supp. 1141 (D. Colo. 1988) . . . . . . . . 29-30, 33

*United States v. Louisiana Pacific Corp.*, 925 F. Supp. 1484 (D. Colo. 1996) . . . . . . . . . . . . . . 29

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . . 29, 31, 34

*United States v. Ohio Edison Co.*, F. Supp. 2d 829 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . 10

*United States v. SCM Corp.*, 667 F. Supp. 1110 (D. Md. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994
(S.D. Ind. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) . . . . . . . . . . . 10, 13, 17, 20, 24

**FEDERAL CASES - UNREPORTED**

*Concerned Citizens of Bridesburg v. EPA*, No. 85-14, 1985 U.S. Dist. LEXIS
20501 (E.D. Pa. Apr. 23, 1985), *aff'd on other grounds*, 843 F.2d 679
(3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Rochester Public Utilities*, PSD Appeal No. 03-03, 2004 WL 3214482
(Envt'l Appeals Bd., U.S. EPA Aug. 3, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States v. Campbell Soup Co.*, 1997 WL 258894 (E.D. Cal. March 11, 1997) . . . . . . . . . 29

*United States v. Southern Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/S,
    2002 WL 1760699 (S.D. Ind. July 26, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## FEDERAL STATUTES

42 U.S.C. § 7410(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. § 7413(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

42 U.S.C. § 7413(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29, 30-31, 34

42 U.S.C. § 7479(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. § 7607(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 7607(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 7607(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

42 U.S.C. §§ 7661-7661(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## FEDERAL REGULATIONS

40 C.F.R. § 51.166(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

40 C.F.R. § 51.166(b)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

40 C.F.R. § 51.166(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

40 C.F.R. § 51.166(b)(21) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

40 C.F.R. § 51.166(b)(23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10

40 C.F.R. § 51.166(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

40 C.F.R. § 51.166(j)-(r) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

40 C.F.R. § 51.166(j)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

40 C.F.R. § 52.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 32, 34

40 C.F.R. § 60.14(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

40 C.F.R. § 60.14(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11

45 Fed. Reg. 52676 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 24

47 Fed. Reg. 30059 (July 12, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

56 Fed. Reg. 27630 (June 14, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

57 Fed. Reg. 32314 (July 21, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

67 Fed. Reg. 80186 (Dec. 31, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

## STATE REGULATIONS

401 Ky. Admin. Reg. 51:017 Section 1(2)(b)(1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**INTRODUCTION AND SUMMARY**

Plaintiff, the United States of America, hereby responds to Defendant East Kentucky Power Cooperative's (EKPC) Summary Judgment Motion No. 2. EKPC seeks judgment on all of the Government's claims against Spurlock Unit 2, including our Prevention of Significant Deterioration (PSD) and Title V modification claims (Counts 1 and 2), which arise from EKPC's illegal modification of Spurlock Unit 2 as part of a large construction project to generate additional steam and supply that steam to a neighboring facility, as well as our separate claim alleging violations of EKPC's operating permit for Spurlock Unit 2 (Count 3).

EKPC's argument with respect to the PSD and Title V modification claims is based on two irrelevant assertions that, even if true, cannot shield it from liability for its violations of the Clean Air Act (CAA). First, EKPC claims that its $20 million Inland Steam Supply Project would not have been considered a modification under EPA's separate New Source Performance Standards (NSPS) program. Even is this were true, it is irrelevant as a matter of law to whether EKPC modified Spurlock Unit 2 under the PSD program. As discussed below, the applicable PSD regulations set forth a fundamentally different test for determining whether a change to a major stationary source such as Spurlock Unit 2 is considered a "major modification" that triggers PSD permitting requirements. Second, EKPC claims that the Inland Steam Supply Project did not trigger PSD review because Spurlock Unit 2 had previously been issued a permit when it first constructed the unit in 1976, under a prior version of EPA's PSD regulations. But the fact that EKPC received a PSD permit when it originally constructed Spurlock Unit 2 does not immunize EKPC's *subsequent* modification of the unit. It was this subsequent modification under the current PSD regulations that required a PSD permit in this case.

1

EKPC's argument with respect to Count 3 (the operating permit claims) is similarly infirm. EKPC does not dispute that it uprated the Spurlock Unit 2 boiler to a new and higher production rate that exceeded the maximum production rate contained in its operating permits for Spurlock Unit 2. Instead, EKPC claims that this maximum production rate is not enforceable by EPA. This argument is contrary to the plain language of the Act and EPA's regulations, as well as the established caselaw, which all make clear that EPA may enforce the terms and conditions of EKPC's operating permits. As EKPC concedes, these permits were issued pursuant to Title V of the CAA or Kentucky's approved State Implementation Plan. Accordingly, they are enforceable by EPA as a matter of federal law under Section 113 of the CAA.

## EKPC'S STATEMENT OF UNDISPUTED FACTS

EKPC's "Statement of Undisputed Facts Material To Counts 1, 2, and 3" contains a number of factual statements which are simply not supported, and in some cases are flatly contradicted, by the undisputed evidence in this case. Where appropriate, we address these statements in the context of EKPC's arguments. However, several of these statements surface only in EKPC's "Statement of Undisputed Facts," and we therefore address these statements here. First, EKPC states that it contacted the Kentucky Division for Air Quality (KDAQ) concerning its modification of Spurlock Unit 2, that KDAQ "approved the project," and that KDAQ did not "raise[] any PSD concerns." EKPC Memo No. 2, at 13-14. These statements are simply not supported by the record, which contains no evidence of any approval of the project at issue in this case from KDAQ. In fact, the evidence demonstrates that when EKPC provided written notification of the project to the state, KDAQ raised explicit PSD concerns.

2

For instance, EKPC cites the deposition of Roger Cook, an employee of KDAQ's permitting department, to support its statement that it notified KDAQ of the Inland Steam Supply Project. EKPC Memo No. 2, at 13. But Mr. Cook actually testified that he did not recall discussions with EKPC concerning the project. *See* Deposition of Roger Cook, July 27, 2005, at 93 (Ex. 1). EKPC similarly states that it told William Dills of KDAQ about the project. EKPC Memo No. 2, at 13. But Mr. Dills testified that he did not remember any specific conversations with EKPC, that he did not recall EKPC providing any specific details about the work entailed with the project, and that he did not recall ever telling EKPC that the project would not trigger PSD review. *See* Deposition of James W. Dills, November 10, 2005, at 39-43 (Ex. 2).

Indeed, the only testimony that KDAQ approved of the project was provided by EKPC's own environmental affairs manager, Robert Hughes, who testified that he provided a verbal description of the project to Roger Cook. But when pressed about this statement, Mr. Hughes testified that he could not recall what exactly he may have told KDAQ about the project, and that he kept no notes of these conversations. Deposition of Robert Hughes, February 18, 2005, at 25-27, 72, 76-77 (Ex. 3).[1] Mr. Hughes could recall a number of things he did *not* tell KDAQ about the project, however, including any information about the size of the reboilers EKPC was constructing, the amount of steam EKPC expected to supply to Inland, the expected impact on operations of Spurlock Unit 2, the capacity of Spurlock Unit 2 to produce additional steam, the expected heat input to Spurlock Unit 2, where the steam would be extracted from the Spurlock

---

[1] EKPC also cites the testimony of EKPC's construction division director, Gary Crawford, for the proposition that EKPC advised KDAQ of the project and received approval. But a review of the transcript reveals that Mr. Crawford was simply testifying about Mr. Hughes' statement that he had spoken with the state. EKPC Ex. 116, at 184-185. Mr. Crawford confirmed that there was nothing in writing to support a determination that PSD did not apply to the project. *See id.* at 184.

Unit 2 boiler, and what work needed to be done on the Spurlock Unit 2 boilers. *Id.* at 28-32.

Mr. Hughes even testified that he did not ever recall specifically asking KDAQ if the project

required PSD review. *Id.* at 30.

Not only is there no support for EKPC's statements that KDAQ verbally approved the

Inland Steam Supply Project, but the only *written* correspondence in which EKPC notified

KDAQ of the project indicates that KDAQ *did* raise PSD concerns. In a letter not mentioned in

EKPC's brief, EKPC told KDAQ about its efforts to attract Inland to the area, and that Inland

required both electricity and steam to operate. *See* December 15, 1993 Letter from Robert

Hughes to John Hornback (Ex. 46 to Docket No. 67). In that letter, EKPC went on to say that

supplying steam to Inland could cause Spurlock Unit 2 to exceed its permitted maximum hourly

heat input rate, and requested that this permitted production rate be increased to facilitate the

project. *See id.* KDAQ did not approve EKPC's proposal, and instead told EKPC that PSD

issues were implicated. KDAQ therefore required EKPC to submit emissions calculations in

order to demonstrate whether PSD requirements were triggered. *See* February 3, 1994 Letter

from Gerald Goebel to Robert Hughes (Ex. 47 to Docket No. 67).

EKPC never provided the requested emissions calculations to KDAQ, which

subsequently sent EKPC a letter stating that it would discontinue the review process if EKPC did

not respond within 15 days. *See* December 20, 1994 Letter from Gerald Goebel to Robert

Hughes (Ex. 48 to Docket No. 67). Only then did EKPC respond, saying that it was reevaluating

the future planned use of Spurlock Unit 2 and "will evaluate the need to continue this process at

a later date." January 16, 1995 Letter from Robert Hughes to Gerald Goebel (Ex. 49 to Docket

No. 67). At this point, however, EKPC had already uprated its boiler. *See* Memorandum in

Support of United States' Fourth Motion for Summary Judgment (Spurlock - Inland Steam Supply Project) (Docket No. 67), SOF ¶ 53.  Significantly, Mr. Cook testified that he never told EKPC that it could operate at the uprated condition.  *See* Ex. 1, at 190-191.  Moreover, the only notification that Mr. Dills testified that he recalled receiving from EKPC concerning the project was EKPC's December 15, 1993 letter – the letter which required EKPC to submit PSD emissions calculations.  Ex. 2, at 40-42.  Mr. Dills further confirmed that he was not aware of any conversations that were inconsistent with the written correspondence resulting from this letter.  *See id.* at 42.  This written correspondence directly refutes EKPC's claim that "None of the agencies raised any PSD concerns."  EKPC Memo No. 2, at 14.

EKPC's Statement of Undisputed Facts is also filled with conclusory assertions that the Inland Steam Supply project did not affect the operation of Spurlock Unit 2 or affect boiler steam production in any way.  EKPC Memo No. 2, at 15.  However, these statements are all based on the deposition testimony of EKPC's employees, who appear to completely ignore the fact that EKPC expected to increase the heat input to Spurlock Unit 2 as a result of the project, and that EKPC admittedly "uprated" Spurlock Unit 2 to a higher steam production capacity.  *See* Memorandum in Support of United States' Fourth Motion for Summary Judgment (Spurlock - Inland Steam Supply Project) (Docket No. 67), SOF ¶¶ 39-47.  Uprating required a further increase in the heat input rate for the Spurlock Unit 2 boiler.  *See id.* SOF ¶¶ 44-47.  Indeed, as EKPC explained in its only written notification to KDAQ, EKPC needed to increase the permitted heat input at Spurlock Unit 2 in order to reach peak electric load while still providing the steam necessary for Inland's operations.  *See* December 15, 1993 Letter from Robert Hughes to John Hornback (Ex. 46 to Docket No. 67).

**ARGUMENT**

I.    **EKPC's Physical And Operational Changes At Spurlock Unit 2 Triggered PSD Requirements Regardless Of Whether They Also Involved A Modification Under EPA's Separate NSPS Regulations.**

EKPC argues that the Inland Steam Supply Project did not trigger PSD requirements because, it contends, the project did not qualify as a "modification" under EPA's separate NSPS regulations. Contrary to the plain language of the regulations, EKPC asserts that EPA's PSD and NSPS regulations both define "modification" identically, and infers that since EPA has not brought an enforcement action alleging NSPS violations at Spurlock Unit 2, no violation can be found under the PSD regulations either. EKPC Memo No. 2, at 18. EKPC further argues that EPA *must* interpret the different PSD and NSPS regulations identically, given Congress's decision to use the same *statutory* definition of "modification" under both programs. EKPC's arguments are without merit.

As a preliminary matter, EKPC's contention is contradicted by EPA's statements when it promulgated the 1980 PSD regulations. In rejecting a comment arguing that PSD should apply to certain pollutants only if NSPS has first been made applicable, EPA stated that "the Act requires PSD review, *regardless of whether another rule already applies to the source . . . .*" 45 Fed. Reg. 52676, 52713 (Aug. 7, 1980) (emphasis added). More fundamentally, however, the plain language of EPA's regulations refutes EKPC's argument that EPA must first show an NSPS modification before PSD may be triggered. This is because the PSD and NSPS regulations use patently different tests for determining whether a project will be considered a "change," and whether such a change would be expected to result in an emissions "increase." The Court need go no further then to compare the plain language of the regulations themselves to

6

determine that EKPC's argument must fail.  Indeed, to hold otherwise would require this Court

to hold that the regulations do not mean what they say.  Finally, EKPC's argument that EPA

must interpret its PSD and NSPS regulations identically despite their fundamental differences is

both jurisdictionally barred and contrary to established law.

**A.    EPA's PSD Regulations Do Not Include a "Capital Expenditure" Requirement.**

EPA's NSPS regulations exclude from the definition of a "modification," those increases

in production rate that "can be accomplished without a capital expenditure."  40 C.F.R. §

60.14(e)(2).  EKPC asserts that the Inland Steam Supply Project involved no such capital

expenditure at Spurlock Unit 2, and that therefore its project cannot be deemed a modification

under the NSPS regulations.  EKPC Memo No. 2, at 19.[7]  Even if EKPC's assertion were true,

however, it is irrelevant to the Government's claims.  The NSPS regulations are simply not at

issue at Spurlock Unit 2.  Rather, the Government alleges that the Inland Steam Supply Project

violated the applicable *PSD regulations*.  A "capital expenditure" requirement is found nowhere

in the PSD regulations, which by their plain language apply simply to "any physical change in or

change in the method of operation of a major stationary source that would result in a significant

net emissions increase of any pollutant subject to regulations under the Act."  40 C.F.R. §

51.166(b)(2)(i) (1987) (Appendix F to Docket No. 56).  EKPC's assertion that the PSD

regulations are triggered only by projects that involve a capital expenditure under the separate

---

[7] In a January 17, 2006 declaration from Dana Cox, EKPC claims for the first time in this litigation that the total cost of the steam supply work that is at issue in this case was only $195,270.00.  *See* EKPC Ex. 127.  This new, deflated figure is directly contrary to EKPC's discovery responses, which identified the cost of the work at issue in this case as $20,567,795.00.  In any case, EKPC's post-hoc attempt to deflate the cost of the Inland Steam Supply Project for NSPS purposes is irrelevant because, as discussed above, the NSPS regulations are not at issue in the Spurlock claims, and EKPC does not dispute that the total capital cost of the Project was more than $20 million.

NSPS regulations is thus flatly inconsistent with the applicable regulations which, unlike the

NSPS regulations, do not contain a "capital expenditure" exclusion.  Compare *id.* § 51.166(b)(2)

(no capital expenditure provision) with 40 C.F.R. § 60.14(e)(2) (capital expenditure provision).

EKPC is simply adding words to the PSD regulations that do not exist.

Because the PSD regulations apply without regard to whether a capital expenditure is

involved, EKPC's argument must be rejected as contrary to the plain language of the regulations.

The only question for PSD purposes is whether the Inland Steam Supply Project involved

physical or operational "changes" that were expected to increase total actual annual emissions

from Spurlock Unit 2, measured in tons per year.  *See* 40 C.F.R. § 51.166(b)(2), (3), (21),

(23)(1987).  As we have already shown in our own motion for summary judgment, and as

admitted by EKPC in its own brief, there is no dispute that the Inland Steam Supply Project

involved physical and operational changes under the PSD program.  *See* Memorandum in

Support of United States' Fourth Motion for Summary Judgment (Spurlock - Inland Steam

Supply Project) (Docket No. 67), at 26-31; EKPC Memo No. 2, at 14 ("The work required for

Inland Container was substantial, but minimal work was required on the Spurlock 2 boiler."); *id.*

15 ("A third tap was made in the feedwater system to extract a small amount of water for use in

attemporating the steam.  Of these three taps, only the third touched part of the Unit 2 within the

NSPS 'affected facility' as defined by EPA.") (footnote omitted); *id.* at 18 ("The Inland

Container Project consisted almost exclusively of work outside the Spurlock 2 boiler- the

'affected facility' with which NSPS is concerned."); *id.* at 19 ("In this case, the portion of the

Inland Container Project that affected Spurlock 2 was minimal.").  The only exclusion under the

PSD regulations for such physical changes is the "routine maintenance" exclusion, and EKPC nowhere claims in its briefing that the Inland Steam Supply Project was routine maintenance.

Accordingly, the only issue remaining for trial is whether these admitted changes were expected to cause an increase in actual annual emissions under the PSD program. Whether or not these changes also may have involved capital expenditures under the separate NSPS program is simply irrelevant to the PSD analysis for Spurlock Unit 2.

**B.    EPA's PSD Regulations Do Not Require an Increase in Maximum Achievable Hourly Emissions Rates.**

In addition to trying to add a non-existent "capital expenditure" requirement to EPA's PSD regulations, EKPC also argues that the PSD regulations require EPA to demonstrate that the Inland Steam Supply Project would result in an increase in the maximum achievable *hourly* emissions rate from Spurlock Unit 2, as required under the separate NSPS regulations, rather than *annual* emissions as required under the PSD regulations. *See* EKPC Memo No. 2, at 18. We addressed this argument in our own Second Motion for Summary Judgment, and will not repeat that discussion in its entirety here. *See* Memorandum in Support of Second Motion for Summary Judgment: The Applicable Legal Test for Determining Emissions Increases (Docket No. 56), at 25-39. Put simply, the plain language of EPA's 1980 PSD regulations requires a comparison of total annual emissions before and after a project, not a comparison of maximum hourly emission rates. Specifically, when EPA promulgated the applicable PSD regulations in 1980, it set forth an emissions test that measures whether a physical or operational change would result in a "net emissions increase" in annual "actual emissions," measured in "tons per year." *See* 40 C.F.R. § 51.166(b)(2), (3), (21) (1987).

9

Thus, unlike NSPS, the PSD regulations require consideration of a source's actual total *annual* emissions, not its hourly emissions. *Compare* 40 C.F.R. § 51.166(b)(3), (21), (23) (1987) (actual annual emissions increases measured in tons per year) *with* 40 C.F.R. § 60.14(b) (maximum hourly emissions increases measured in kilograms per hour); *see New York v. EPA*, 413 F.3d 3, 14-15, 18-20 (D.C. Cir. 2005) (illustrating the practical difference between the PSD actual annual emissions test and the NSPS hourly rate test, before rejecting industry's argument that such differences were unlawful); *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 915 (7th Cir. 1990) (*WEPCo*) ("Unlike NSPS, PSD is concerned with changes in *total annual emissions*, expressed in tons per year."); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 293-94, 297-98 (1st Cir. 1989) (holding that PSD can apply if a physical change leads to an increase in total annual emissions even where the hourly rate of emissions would decrease); *United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1276-1278 (S.D. Ind. 2005) (rejecting hourly rate test for PSD); *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 875-76 (S.D. Ohio 2003) (contrasting NSPS and PSD and rejecting hourly rate test for PSD); *United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 998 (S.D. Ind. 2003) ("For the PSD program, on the other hand, the EPA regulations provide that an increase in the *total amount of annual emissions* activates the modifications provisions."); *but see United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003), *aff'd on other grounds*, 11 F.3d 549 (4th Cir. 2005).

Consistent with these cases, EPA has a long history of explaining the differences between its PSD and NSPS emissions tests. These differences reflect the fundamental distinctions between the two programs, with the PSD program focused on actual ambient air quality and the NSPS program focused on technological concerns. For instance, EPA explained when it

promulgated the 1980 PSD regulations that the emissions test focused on increases in total actual

annual emissions, as measured in tons per year.  *See* 45 Fed. Reg. 52676, 52698-99, 52704,

52711-12 (Aug. 7, 1980).  EPA has also gone on to consistently explain the fundamental

differences between PSD and NSPS in later guidance.  *See*, *e.g.*, July 7, 1986 Memo from Gerald

Emison, EPA Office of Air Quality, Planning and Standards (Ex. 15 to Docket No. 56), at 2

(noting differences between PSD and NSPS modification regulations based on different purposes

of the programs); February 15, 1989 Letter from Don Clay, EPA, to John Boston, WEPCo (Ex. 4

to Docket No. 56), at 9-10 (explaining that PSD emissions increase can come from increase in

hourly production rate or increases in hours of operation, and that an "hourly capacity

demonstration for NSPS purposes is not relevant to the PSD analysis"); January 30, 1990 Letter

from David Kee, EPA, to Timothy Method, Indiana Dept. of Envtl. Management (Ex. 2 to

Docket No. 56), at 4 (explaining that the NSPS test measures increases in hourly emission rates

while NSR measures increases in total annual emissions, and that this difference in methodology

reflects the "fundamental distinctions" between the purposes of the two programs); June 8, 1990

Letter from William Rosenberg, EPA, to John Boston, WEPCo (WEPCo Remand Determination)

(Ex. 5 to Docket No. 56), at 1, 7-8 (explaining that the "actual-to-actual" test under the 1980

regulations requires consideration of *both* annual hours of operation *and* hourly emissions rates,

and rejecting the same test proffered by EKPC as "not fairly discernible from any reading of the

[1980] regulations"); 56 Fed. Reg. 27630, 27633 and n.10 (June 14, 1991) (confirming that the

"actual-to-actual" test applied in the WEPCo Remand Determination would continue to apply

under the 1980 regulations).[3/]  The KDAQ also interprets PSD to apply to increase in tons per year of emissions, and not increases in hourly rates.  *See*, *e.g.*, Ex. 1 at 95; Ex. 2, at 65-66.

In sum, by arguing that an hourly rate test is somehow embedded *sub silentio* in the PSD regulations, EKPC is asking this Court to rule that not only do the regulations mean something other than what they plainly say, but that EPA (and KDAQ) has fundamentally misunderstood the regulations for the past three decades.

C.    **EKPC's Statutory Argument is Jurisdictionally Barred and Contrary to Law.**

The plain language of the PSD regulations contains no capital expenditure requirement. Nor do the regulations speak of emissions increases in terms of "kilograms per hour."  The PSD regulations are simply different in these regards than the NSPS regulations.  EKPC nevertheless argues that the Court should ignore these differences, because it contends, based on *United States v. Duke Energy Corp.*, 11 F.3d 539 (4th Cir. 2005), that Congress actually *required* EPA to define "modification" activities identically for NSPS and PSD purposes.  EKPC Memo No. 2, at 18.  EKPC divines this congressional intent from the fact that the 1977 PSD provisions of the Act cross-reference the pre-existing statutory definition of "modification" contained in the NSPS provisions of the Act.  *Id.*  However, EKPC cannot challenge the differences between the NSPS and PSD regulations in this enforcement action, because such a challenge is both too late and in the wrong court.  Moreover, EKPC's argument reads far more into this cross-reference than can be justified, and is contrary to a long line of cases confirming EPA's ability to interpret identical statutory definitions differently for purposes of implementing the PSD and NSPS regulations.

---

[3/] EPA has also continued to apply this same interpretation in later regulations promulgated in 1992 and 2002.  *See* 57 Fed. Reg. 32314, 32316, 32323 (July 21, 1992); *New York*, 413 F.3d at 15-18.

1.    **EKPC Cannot Challenge The Differences Between the NSPS and PSD Regulations in This Enforcement Action.**

Section 307 of the Clean Air Act makes clear that petitions for review of nationally applicable regulations under the Clean Air Act, including for the PSD program, may be filed only in the D.C. Circuit "within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register." 42 U.S.C. § 7607(b)(1); *see WEPCo*, 893 F.2d at 914 n.6; *Puerto Rican Cement*, 889 F.2d at 299; *National-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 839 n.5 (6th Cir. 1988); *United States v. Ethyl Corp.*, 761 F.2d 1153, 1155 (5th Cir. 1985); *Motor Vehicle Mfr's Ass'n v. Costle*, 647 F.2d 675, 677 n.3 (6th Cir. 1981). The statute also states that if judicial review before the D.C. Circuit is possible pursuant to Section 307(b)(1), then those regulations "shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. § 7607(b)(2). *See Ethyl Corp.*, 761 F.2d at 1156-57. Therefore, EKPC's contention that EPA's 1980 PSD regulations should include a capital expenditure requirement is jurisdictionally barred as both untimely and in the wrong court, as is its contention that EPA should have promulgated identical NSPS and PSD emissions tests.

EKPC cannot avoid this jurisdictional bar by simply arguing that the PSD regulations should be *interpreted* consistently with the NSPS program. Such an argument would require that two regulatory provisions with plainly different language be interpreted by this Court to reach the same meaning. Given the clear differences between the plain language of the PSD and NSPS regulations, this would hardly be interpretation at all, but rather invalidation. Moreover, simply holding that the NSPS and PSD regulations must be interpreted identically does not end the analysis. Even if Congress *had* required the NSPS and PSD regulatory definitions of "modification" to be identical, and even if this Court had jurisdiction to review EPA's

regulations, the Court would need to choose the definition that controls. EKPC cannot explain why it believes the NSPS regulatory definition should trump the PSD definition of modification. For instance, a first-in-time rule, *i.e.*, a rule by which whatever regulation was promulgated first should trump any later regulation, undermines EKPC's capital expenditure argument. As EKPC recognizes, the NSPS regulations promulgating the capital expenditure provision were issued in 1975, *after* EPA issued its initial 1974 PSD regulations, which did not have such a provision. *See* EKPC Memo No. 2, at 5. Nor can EKPC argue that Congress intended to simply incorporate the NSPS regulations existing at the time of enactment of the PSD program in 1977, as that argument has now been explicitly rejected by the D.C. Circuit. *See New York v. EPA*, 413 F.3d at 19-20, 41 ("nothing indicates that Congress intended to incorporate preexisting NSPS regulations into the NSR program."). EPA has consistently explained that the fundamentally different emissions tests under the PSD and NSPS regulations reflect the different purposes of the two programs. *See supra* Section I.B. We respectfully submit that these issues, with their dramatic implications for two sets of longstanding, nationally applicable CAA regulations, are better left to the D.C. Circuit and, if needed, EPA on remand from that court.

Although the time for EKPC to challenge the differences between EPA's PSD and NSPS regulations has long since passed, EKPC's industry colleagues *did* seek to make this precise argument in their own challenges to the 1980 regulations in the D.C. Circuit. In *New York v. EPA*, the D.C. Circuit considered industry's challenges to, *inter alia*, the 1980 PSD regulations based on industry's contention that the PSD regulations impermissibly differed from the NSPS regulations. *See* 413 F.3d. at 18. The D.C. Circuit soundly rejected industry's challenge to EPA's 1980 PSD regulations, holding that Congress's decision to cross-reference the pre-

14

existing NSPS definition of "modification" when it enacted the PSD provisions of the Clean Air

Act indicates "no more than if Congress had used a little more ink and repeated the NSPS

definitions verbatim." *Id.* at 19.[4]  The D.C. Circuit stopped short of addressing whether

Congress intended to require EPA to use identical regulatory definitions of modification in the

NSPS and PSD programs, holding that such an argument had been waived by industry.  *See id.* at

20.  However, the D.C. Circuit unambiguously upheld EPA's 1980 tons-per-year focused *PSD*

*regulations*, which even industry agreed differed from the pre-existing NSPS regulations.  *See id.*

at 18-19.  Since the argument that NSPS and PSD regulations must be interpreted identically

could have been made before the D.C. Circuit (had it not been waived), it cannot be resurrected

in this enforcement action.  *See* 42 U.S.C. 7607(b)(2).[5]

> ### 2.    EKPC's Argument That Congress Mandated Identical Regulatory Definitions of Modification for PSD and NSPS Purposes is Contrary to Established Caselaw.

Even if EKPC could raise its congressional intent argument anew, it is contrary to a long

line of cases confirming that Congress's use of identical statutory definitions does not limit an

agency's discretion to interpret component terms in such definitions differently when

---

[4] The court also noted that Congress *did* expressly incorporate regulatory provisions in other parts of the statute, making it unlikely that it intended to do so for the modification definition.  *See id.* at 19.  This conclusion is further buttressed by the fact that, at the time of the enactment of the PSD program, EPA had promulgated two separate NSPS modification definitions, making it impossible to say *which* definition Congress intended to incorporate.  *See id.* at 19-20.

[5] Because it held that the PSD and NSPS modification provisions must be identical, the Fourth Circuit's holding in Duke Energy went to the very heart of the validity of EPA's NSPS and PSD regulations for "modifications," which the D.C. Circuit alone has jurisdiction to review under 42 U.S.C. § 7607(b).  The Fourth Circuit stated that it was avoiding this jurisdictional bar by reasoning that "the PSD regulations can be interpreted consistently" with the NSPS regulations.  *Duke Energy*, 411 F.3d at 549 n.7.  However, the Fourth Circuit made this statement without any independent analysis of the actual language of the patently different PSD and NSPS regulations.  *See supra* Section I.A and B.  Moreover, the Fourth Circuit made this statement *before* the D.C. Circuit confirmed the differences between the NSPS and PSD regulations, and upheld the validity of EPA's tons-per-year PSD regulations.

implementing separate regulatory programs. Indeed, in this specific context, the D.C. Circuit has confirmed that, rather than mandating a particular *regulatory* definition, Congress's decision to cross-reference the pre-existing statutory definition of "modification" was the mere equivalent of "having simply repeated" in the PSD context "the definitional language used before in the NSPS context," telling us "no more than if Congress had used a little more ink and repeated the NSPS definition verbatim." *New York*, 413 F.3d at 19. The D.C. Circuit has thus confirmed that Congress simply chose to use the same *statutory* definition of modification for both PSD and NSPS purposes.

Given this guidance from the D.C. Circuit, the question whether the regulatory provisions defining component terms of "modification" must be the same under NSPS and PSD is controlled by Supreme Court precedent establishing that agencies retain discretion to interpret identical *statutory* language differently for different regulatory programs. *See*, *e.g.*, *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595, 597 (2004) ("context tells us that 'age' means one thing in § 623(a)(1) and another in § 623(f)"). As the Supreme Court has noted, "the meaning of the same words well may vary to meet the purposes of the law." *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) (citing *Atlantic Dry Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932)) (internal brackets omitted). EKPC's argument that Congress created an irrebuttable presumption of uniform regulatory usage is flatly contrary to the Supreme Court's repeated instructions cautioning against such automatic presumptions.

Indeed, the D.C. Circuit has specifically recognized that statutory terms common to PSD and NSPS – including component terms of the definition of "modification" – may be interpreted differently by EPA. For instance, in *Alabama Power Co. v. Costle*, the court held that the *same*

statutory cross-reference to the term "modification" involved in this case imported the NSPS statutory definition of "source" into the PSD statute as well.  636 F.2d 323, 396 (D.C. Cir. 1979). Although this cross-reference meant that the term "source" had to be read to have the same meaning in both NSPS and PSD, the D.C. Circuit confirmed that "EPA has latitude to adopt definitions of the *component terms* of 'source' [for PSD purposes] that are different in scope from those that may be employed for NSPS and other clean air programs, due to differences in the purpose and structure of the two programs." *Id.* at 397-98 (emphasis added).  The D.C. Circuit went on to hold that the very same undefined component term in the statutory definition of "modification" at issue in this case – "increases" – could be interpreted differently for PSD and NSPS purposes.  *Id.* at 400-02.  The court thus upheld an EPA interpretation of "increases" that allowed "bubbling" for PSD purposes even though it had previously held, in *ASARCO Inc. v. EPA*, 578 F.2d 319 (D.C. Cir. 1978) that the same interpretation "would be contrary to the intent of the NSPS provisions."  *Id.* at 402.[g]

EKPC ignores the central holding of these cases – that even if Congress mandates identical statutory definitions, EPA retains discretion to interpret ambiguous *component terms* of such definitions differently.  Nothing in the Act mandates a particular interpretation of the

---

[g] *See also Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1358 (D.C. Cir. 1995) ("Different programs have different objectives and structures.  EPA is not bound to any one definition of 'major source.'"); *WEPCo*, 893 F.2d at 905, 913 (recognizing "fundamentally distinct" applicability tests despite noting that Congress had "adopted its NSPS definition of 'modification' for the PSD program."); *Citizens for Clean Air v. EPA*, 959 F.2d 839, 849 (9th Cir. 1992) ("definitions of statutory terms are not necessarily transferable between the PSD and NSPS programs"); *Northern Plains Res. Council v. EPA*, 645 F.2d 1349, 1355-57 (9th Cir. 1981) (EPA has discretion to interpret the Clean Air Act statutory term "commenced [construction]" differently in the NSPS and PSD regulations); *Potomac Elec. Power Co. v. EPA*, 650 F.2d 509, 517 n. 2 (4th Cir. 1981) (*PEPCo*) (noting that PSD and NSPS regulations find their statutory mandate in different parts of the CAA, and that construction of undefined component terms of "source" for PSD purposes "should be considered of little, if any, precedential value in construing the same terms for purposes of the NSPS regulations."); *Cinergy*, 384 F. Supp. 2d at 1276 ("Congress did not limit the EPA's authority to further define 'modification' in the regulations as it deemed fit to serve the purposes of the PSD program.").

ambiguous component terms of the definition of modification. *See New York*, 413 F.3d at 22, 27. Indeed, the *Duke Energy* decision upon which EKPC relies completely fails to address this critical distinction between a statutory definition and its ambiguous component terms. Instead, the *Duke Energy* court attempted to distinguish these cases by asserting that the statutory definitions involved therein were "not linked" by statutory cross reference. 411 F.3d at 550. This observation is irrelevant to EPA's discretion to interpret ambiguous component terms of the statutory definitions. *See New York*, 413 F.3d at 19, 27. Furthermore, it is simply wrong as a factual matter. For instance, the *Duke Energy* court characterized the PSD and NSPS definitions of "source" involved in the Fourth Circuit's prior *PEPCo* decision as involving no statutory cross-reference between the PSD and NSPS provisions. In fact, as the D.C. Circuit held, the NSPS definition of "source" at issue in *PEPCo was* imported into the PSD statute by the *very same* statutory cross-reference to the term "modification" involved in this case. *See Alabama Power*, 636 F.2d at 396. The Fourth Circuit did not address this similarity with *PEPCo*, and did not even even attempt to distinguish *Alabama Power*, which held that EPA could interpret ambiguous component terms differently in the two programs despite this very same statutory cross-reference. *See id.* at 397-98, 400-02.

Thus, although the D.C. Circuit in *New York* did not go on to address the statutory argument made by EKPC, it also did not question its prior rulings on this very issue.[7] Indeed, the *New York* court gave no indication that, had it been squarely presented with the issue, its ruling would have been any different than that set forth in *Alabama Power*, which held that EPA

---

[7] As noted above, the reason for the New York court's silence on the issue is that industry waived the argument. *See New York*, 413 F.3d at 20.

may interpret the modification tests differently for purposes of the PSD and NSPS programs. *See* 636 F.2d at 400-02. One is hard pressed to see how the D.C. Circuit's decision *could* be any different, given its explicit confirmation in *New York* that Congress gave EPA broad discretion to promulgate PSD regulations that interpret component terms of the definition of modification, such as "increases." *New York*, 413 F.3d at 27 ("In enacting the NSR program, Congress did not specify how to calculate increases in emissions, leaving EPA to fill in that gap while balancing the economic and environmental goals of the statute.").[9]

### D.    EPA Has Previously Applied PSD Requirements to Projects Without Regard to NSPS Applicability.

EPA has often found that a source triggered PSD but not the NSPS, a circumstance that should be impossible under EKPC's supposed rubric. For instance, in a determination involving a plant owned by Rochester Public Utilities (RPU), EPA determined that simply tapping into a steam line in order to supply steam to an off-site user was a "physical change" that triggered PSD requirements. *See In re Rochester Public Utilities*, PSD Appeal No. 03-03, 2004 WL 3214482, at 1, 3, 6-7, 22 (Envt'l Appeals Bd., U.S. EPA Aug. 3, 2004) (RPU Order) (Ex. 4). There was no requirement that NSPS first apply to the RPU physical changes, or that emissions increases were to be measured by reference to hourly emissions. Rather, emissions were expected to increase in that case due to increased annual consumption of coal over historic

---

[9] We also note that even if EKPC could raise its congressional intent argument anew in this case, it would do it little good here. This is because, whether or not Congress may have intended that the NSPS and PSD regulations be interpreted identically, one thing is clear following the D.C. Circuit's *New York* opinion: EPA's PSD regulations focus on increases in actual annual emissions rather than hourly emissions, and those regulations have been unequivocally upheld by the only court with jurisdiction to entertain challenges to those regulations. *See New York*, 413 F.3d at 14-15, 18-20 (rejecting argument that "divergence" between PSD and NSPS modification regulations was unlawful). Thus, even applying EKPC's theory that NSPS and PSD regulations must be interpreted identically, EKPC would be left only with the argument that the NSPS regulations must be interpreted identically with the PSD regulations as upheld by the D.C. Circuit. Of course, EKPC does not make that argument because it would be fatal to its hourly rate test.

levels. RPU Order, at 7.[9] Similarly, there was no hourly rate requirement in the *Puerto Rican Cement* and *WEPCo* cases. *See Puerto Rican Cement*, 889 F.2d at 293-94, 297-98 (holding that PSD can apply if physical change leads to increase in total annual emissions even where hourly rate of emissions would decrease); *WEPCO*, 893 F.2d at 913, 918 (recognizing that projects at two of WEPCo's five units would *not* trigger NSPS, but remanding PSD issues to EPA as to all units); WEPCo Remand Determination (Ex. 5 to Docket No. 56), at 10-11 (finding, after remand, that PSD applies to all five units for nitrogen oxides, but NSPS only applies to three of them).[10]

---

[9] Indeed, the sole issue in the RPU case was where and whether best available control technology ("BACT") should be installed given that PSD review was required for the project. *See id.* at 1, 22. Under EPA's regulations, an existing source that undergoes a "major modification" must comply with various PSD requirements. 40 C.F.R. § 51.166(i)(1), (j)-(r) (1987). One of these PSD requirements includes installation of BACT. *See id.* at § 51.166(j)(3). However, BACT need only be installed on the actual "emissions unit" that is "changed," *e.g.*, the boiler. *See id*; *see also* RPU Order, at 9-10; 29-35. In the RPU case, EPA agreed that while a PSD permit was required, and while all other PSD requirements needed to be satisfied for RPU's steam supply project, BACT was not required for the project because there had been no change to the boilers at RPU's plants. *See id.*, at 1, 14.

While not relevant at the present stage of this case, we note that the RPU case involved a project significantly less extensive than EKPC's Inland Steam Supply Project, which required the construction of massive new reboilers, the redesign of the Spurlock Unit 2 boiler's high-pressure feedwater system, and the "uprating" of the Spurlock Unit 2 boiler. *See* Memorandum in Support of United States' Fourth Motion for Summary Judgment (Spurlock - Inland Steam Supply Project) (Docket No. 67), at 26-31. In addition, unlike the RPU project, EKPC changed the method of operation of the Spurlock Unit 2 boiler by, *e.g.*, increasing the heat input rate of the boiler above the levels identified in EKPC's prior PSD application and operating permit. *See id.*, at 31-38. Accordingly, unlike the RPU case, EPA alleges that not only was PSD triggered, but that BACT is required for the Spurlock Unit 2 boiler. However, because this enforcement action has been bifurcated into separate liability and remedy phases, the only question currently before the Court is whether the Inland Steam Supply Project involved "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulations under the Act." 40 C.F.R. § 51.166(b)(2)(i) (1987). Questions related to the application of BACT to the Spurlock Unit 2 boiler must await this Court's determination of PSD liability.

[10] *See also* February 15, 1989 Letter from Don Clay, EPA, to John Boston, WEPCo (Ex. 4 to Docket No. 56), at 19 ("hourly capacity demonstration for NSPS purposes is not relevant to the PSD analysis"); *In re Monroe Elec. Generating Plant Proposed Operating Permit*, Petition No. 6-99-2, (U.S. EPA 1999) (Monroe Electric Determination) (Ex. 18 to Docket No. 56), at 24, 26 (finding that PSD applies to restart of unit, but not NSPS); July 7, 1986 Memo from Gerald Emison, EPA Office of Air Quality, Planning and Standards (Ex. 15 to Docket No. 56), at 2 (stating that NSPS exclusion from definition of "modification" does not automatically apply to PSD definition of "modification").

II.    **EKPC's Alternate Argument, That The Inland Steam Supply Project Was Not A Major Modification Under the 1980 Rules, Is Illogical And Contrary To The Plain Language Of The PSD Regulations.**

EKPC hedges its bets by urging the Court to rule in its favor even if its 'NSPS as a prerequisite' test for PSD applicability is rejected. *See* EKPC Memo No. 2, at 20-23. This argument is equally unavailing, and relies on an illogical and contorted construction of the regulations that is as difficult to follow as it is wrong.

A.    **EKPC's Argument That the Inland Steam Supply Project Involved No Physical Change is Contrary to Logic and the Plain Meaning of the Regulations.**

EKPC sums up its argument with respect to the 1980 PSD regulations this way: there was no physical change at the Spurlock Plant because Spurlock Unit 2 was issued a PSD permit in 1976 that, it alleges, "did not limit 'hours of operation' or 'production rate' increases" at Spurlock Unit 2. EKPC Memo No. 2, at 23. This argument doesn't even make sense. Essentially, what EKPC is arguing is that because it had a 1976 PSD permit that allowed EKPC to operate Spurlock Unit 2 year-round, the subsequent Inland Steam Supply Project was not a physical change. However, there is obviously no connection between (1) whether a source has a preexisting PSD permit and (2) whether that source subsequently makes a physical change to a facility. In effect, under EKPC's reading of the regulations, if a source has a permit that does not restrict its hours of operation or its production rate, it is forever after immunized from the "modification" provisions of the Clean Air Act. So, according to EKPC, once a source has obtained a PSD permit that allows year-round operation, nothing it could do would ever qualify as a "physical change" under the Clean Air Act.

21

Clearly, EKPC's claim that its original permit shields it from any further application of the Clean Air Act, no matter how extensive the future work, is both illogical and contrary to the plain language and intent of the Clean Air Act. Whether or not EKPC's pre-existing permit contained *operating* restrictions is patently irrelevant to the question of whether EKPC constructed a *physical* change. Here is the applicable language of the PSD regulations:

> 'Major modification' means a physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase. . . .
> ***
> A physical change or change in the method of operation shall not include:
>
> 1. Routine maintenance, repair and replacement;
> ***
> 5. An increase in the hours of operation or in the production rate, unless the change would be prohibited after January 6, 1975 pursuant to 40 CFR 52.21 . . . or under 401 KAR 50:035. . . .

401 Ky. Admin. Reg. 51:017 Section 1(2)(b) (1992). The PSD regulations plainly set forth a two part test for "major modifications:" there must be (1) a physical or operational change, that (2) is expected to significantly increase emissions. The regulations provide that certain kinds of activities, such as "routine maintenance, repair and replacement" and certain increases "in the hours of operation or in the production rate" are not themselves considered to be physical or operational "changes." By their explicit terms, these exclusions apply at the *first step* of the analysis, not the second step – that is, they affect whether something is a "change," not how to calculate emissions increases. Thus, "routine maintenance" is not itself considered a physical change. Similarly, certain increases in hours or production rates are not themselves considered an operational change. This does not mean that such increases are also excluded from the analysis of what constitutes an emissions increase when there has been a separate physical

change at the source.  Rather, the exclusion merely indicates that an increase in hours of operation will not *itself* be considered a "change" for PSD purposes.  *See id.*; *see also Cinergy*, 384 F. Supp. 2d at 1277-78.

EKPC, by contrast, asks the Court to read the regulations to provide carte blanche for any physical change that increases hours of operation or production rate.  That is simply not what the regulations say.  Nor has EPA ever interpreted the regulations that way.  Rather, consistent with its plain language as a simple exclusion from the definition of operational "change," EPA has repeatedly explained that the production rate/hours of operation exclusion allows sources to simply vary production rate and operating hours as part of normal operations within otherwise applicable limits, but *only* when such variations stand alone and are not themselves caused by or associated with other physical or operational changes:

> [T]his exclusion is intended to allow a company to lawfully increase emissions through a simple change in hours or rate of operation up to its potential to emit (unless already subject to any federally enforceable limit) without having to obtain a PSD permit.  Thus, emissions increases . . . associated with increased operations would not, standing alone, subject [a source] to PSD requirements.  However, . . . the exclusion for increases in hours of operation or production rate does not take the project beyond the reach of PSD coverage if those increases do not stand alone but rather are associated with non-excluded physical or operational changes.

23

September 9, 1988 Memo from Donald Clay, Acting Assistant Administrator of EPA, to David

Kee, EPA (Clay Memo) (Ex. 2 to Docket No. 61), at 6-7.[11]  In response to comments urging

EPA to change this requirement, EPA further stated in 1992:

> Although a source may vary its hours of operation or production as part of its
> everyday operations, an increase in emissions attributable to an increase in hours
> of operation or production rate which is the result of a construction-related
> activity is not excluded from review.

57 Fed. Reg. at 32328.  EKPC's reading of the hours of operation exclusion is thus contradicted

by the plain language of the regulations and EPA's authoritative explanation of their meaning.

Finally, we note that there is actually no dispute that EKPC made physical changes in

order to supply steam from Spurlock Unit 2 to Inland Container Corporation.  Not only are these

physical changes described in detail in the United States' Memorandum in Support of its Fourth

Motion for Summary Judgment, *see* Docket No. 67, at 26-31, but ironically, EKPC has actually

admitted elsewhere in its own brief that it made physical changes not just to the Spurlock plant,

but to the Spurlock Unit 2 boiler.  *See* EKPC Memo. No. 2, at 14 ("The work required for Inland

Container was substantial, but minimal work was required on the Spurlock 2 boiler."); *see also*

---

[11] *See also* 45 Fed. Reg. at 52704 (exclusion allows sources to "take advantage of favorable market conditions"); October 14, 1988 Letter from Lee Thomas, EPA Administrator, to John Boston, WEPCo (1988 Thomas Letter) (Ex. 17 to Docket No. 56), at 4-5 (holding that the exclusion is intended to allow increased hours and production in response to "routine fluctuations in the business cycle" and *not* in response to increases "stemming from significant new capital investment."); Monroe Electric Determination (Ex. 18 to Docket No. 56), at 13 ("The purpose of this 'increase in hours' exception was to avoid undue disruption by allowing routine increases in production during the normal course of business in order to respond to market conditions."); November 6, 1987 Letter from David Howekamp, EPA Region IX, to Robert Connery (Cyprus Casa Grande Determination) (Ex. 15 to Docket No. 61), at 3, 6 (exclusion intended to apply to "routine change in the hours or rate of operation"); *WEPCO*, 893 F.2d at 916 n. 11 (exclusion "was provided to allow facilities to take advantage of fluctuating market conditions, not construction or modification activity"); *Puerto Rican Cement*, 889 F.2d at 297-98 (upholding EPA interpretation of exclusion as allowing sources "simply to increase their output" through "*increased use of existing facilities*" as opposed to increases resulting from construction or modification activity).

*id.* at 15, 18, 19.  The emissions increases from these physical changes must be included in the PSD analysis for Spurlock Unit 2.

      **B.**      **Even If It Had "Stood Alone," the Increased Production Rate at Spurlock Unit 2 Would Not Qualify For the Hours Of Operation/Production Rate Exclusion.**

      EKPC asserts that its 1976 PSD permit for Spurlock Unit 2 contained no production rate limitations, and that therefore any increase in production could not be considered a change in the method of operation under the regulations.  EKPC Memo No. 2, at 22-23.  This argument is wrong for three reasons.  First, EKPC's assertion concerning its PSD permit is simply not supported.  For instance, EKPC ignores the very PSD application upon which its permit was issued, which indicated a maximum production rate far below the level at which EKPC expected to operate the unit following the Inland Steam Supply Project.  *See* March 19, 1976 PSD Application (Ex. 11 to Docket No. 67); Memorandum in Support of United States' Fourth Motion for Summary Judgment (Spurlock - Inland Steam Supply Project) (Docket No. 67), at 34.  EKPC also ignores EPA's explicit condition of approving its PSD application, which required that all subsequent construction activities be undertaken in accordance with its application.  *See* September 21, 1976 Letter from John Little (Ex. 14 to Docket No. 67) ("any construction which proceeds at material variance with information submitted in your application, will be regarded as a violation of construction authority, and will be subject to enforcement action.").[12]

---

[12] EKPC also ignores EPA's specific admonition following issuance of the original PSD permit, in which EPA had to specifically remind EKPC that it was required to notify EPA of any changes to the information included in its application.  *See* March 13, 1978 Letter from G.T. Helms (Ex. 17 to Docket No. 67) ("A conditional approval such as this to construct a new source under PSD regulations carries with it an obligation, on the part of the applicant, to maintain contact with the approving regulatory agency and to keep that agency informed of any changes contemplated in the proposed source. . . .  Any change from your application <u>must</u> be reviewed to ensure compliance with the PSD requirements").

Second, the regulations simply do not say that construction projects that result in production rate increases are not modifications. As noted above, the regulations exclude production rate increases from themselves being considered a "change;" the regulations do not exclude construction activity that, like the Inland Steam Supply Project, *results in* an increase in production rates (and hence emissions).

Third, even if the hours of operation/production rate exclusion *could* be read as EKPC asserts, the increased production at Spurlock Unit 2 would still be considered a change in the method of operation under the plain language of the PSD regulations. This is because the regulations specifically define a "change in the method of operation" as *including* any increase in production rate at Spurlock Unit 2 that is inconsistent with EKPC's prior representations in its PSD permit application or with any separate operating permit. *See* Memorandum in Support of United States' Fourth Motion for Summary Judgment (Spurlock - Inland Steam Supply Project) (Docket No. 67), at 32-36. EKPC admits, as it must, that it expected to operate Spurlock Unit 2 at production levels that were inconsistent with its PSD application, and that were higher than the levels listed as "conditions" in its operating permit. *See id.* at 34. There can thus be no dispute that EKPC changed the method of operation of Spurlock Unit 2 under the PSD regulations.

## III.    EKPC Is Obligated To Operate In Compliance With Its Operating Permits.

EKPC also moves for judgment on the Government's third claim, which is not based on any PSD violation, but rather seeks to hold EKPC accountable for violations of its operating permits for Spurlock Unit 2, which limit the unit to operating at a production rate of 4850 mmBTU per hour. EKPC Memo No. 2, at 23. EKPC does not dispute that is has violated this

26

limit. Rather, EKPC argues that the limit is not enforceable by EPA. EKPC's argument must fail, because the Clean Air Act plainly provides EPA with authority to enforce EKPC's operating permits.

**A.    The Original Spurlock Operating Permit is Enforceable by EPA.**

EKPC argues that its original operating permit for the Spurlock Plant is not enforceable because the operating permit program under which it was issued "did not implement any requirement of 42 U.S.C. § 7410 and was not adopted to implement any NAAQS in Kentucky." EKPC Memo No. 2, at 3, 10. EKPC is wrong. The Clean Air Act mandates that each state submit to EPA a "state implementation plan" (SIP) for attaining the NAAQS. 42 U.S.C. § 7410(a)(1). Kentucky submitted the air permitting regulations at issue here as part of its proposed SIP, and there is no dispute that EPA subsequently approved these regulations as part of the Kentucky SIP. *See* U.S. Memorandum in Support of Sixth Motion for Summary Judgment (Docket No. 71), at 16-17 (describing how state operating permit regulations were approved into SIP); EKPC Memo No. 2, at 10 (conceding that state operating permit program was approved by EPA). As required, these regulations were issued following public hearing, and EPA determined that they met all applicable requirements for approval into the SIP. *See* 47 Fed. Reg. 30059 (July 12, 1982). Once EPA approved these permitting regulations as part of the SIP, the permitting program and all of its requirements, including the requirements in permits issued pursuant to the program, became enforceable by EPA. *See* 42 U.S.C. § 7413(b)(1); 40 C.F.R. § 52.23; *see also Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 335 (6th Cir. 1989); *Union Elec. Co. v. EPA*, 515 F.2d 206, 211 (8th Cir. 1975), *aff'd* 427 U.S. 246 (1976); *Kentucky Res. Council, Inc. v. EPA*, 304 F. Supp. 2d 920, 926-27 (W.D. Ky. 2004). As

27

the Sixth Circuit recently confirmed, "If the EPA approves the SIP, either wholly or partially, the approved provisions become enforceable by the federal government." *Greenbaum v. EPA*, 370 F.3d 527, 531 (6th Cir. 2004).

Indeed, contrary to EKPC's argument, the provisions of the Kentucky SIP would be enforceable by EPA even if they were not directly related to Kentucky's efforts to address NAAQS and other air quality concerns. The Act provides EPA with broad authority to enforce "*any* requirement or prohibition of an applicable implementation plan or permit." 42 U.S.C. § 7413(b)(1) (emphasis added). Courts have thus confirmed that EPA may enforce SIP requirements even where, unlike the present case, those requirements were inappropriately included in a SIP. For instance, in *Concerned Citizens of Bridesburg v. EPA*, No. 85-14, 1985 U.S. Dist. LEXIS 20501 (E.D. Pa. Apr. 23, 1985), *aff'd on other grounds*, 843 F.2d 679 (3d Cir. 1988) (Ex. 10), the court held that an odor regulation that was in the SIP could be enforced through a CAA Section 304 citizen suit (*i.e.*, was legally enforceable) simply because the regulation was contained in the SIP. *Id.* at *16-17. The court rejected the argument that the regulation was not enforceable because it was not related to achievement of the NAAQS, and therefore should not have been included in the SIP. *See id.* On appeal, the Third Circuit held that despite EPA's later effort to delete odor regulations from the SIP, their inclusion in the SIP at the time of trial was sufficient to afford the plaintiffs a "cognizable federal claim" under the Act. *Concerned Citizens of Bridesburg v. Philadelphia Water Dept.*, 843 F.2d 679, 681 (3d Cir. 1988).

Similarly, in *Save our Health Organization v. RECOMP of Minnesota*, 829 F. Supp. 288, 291 (D. Minn. 1993), *aff'd* 37 F.3d 1334, 1336 (8th Cir. 1994), the court held that a state solid

28

waste permit was enforceable under the CAA, even though the permit was not even issued pursuant to the state's air pollution control program. The court rejected the source's defense that the solid waste regulations were improperly included in the SIP because they did not relate to any NAAQS, and instead held that all permits issued pursuant to approved SIP provisions should be considered legally enforceable unless and until the SIP is revised to remove the previously approved provisions. *See id.*[13]

In sum, because the Spurlock operating permit was issued pursuant to state air permitting regulations that were approved by EPA and incorporated into the Kentucky SIP, it is enforceable by EPA by definition. *See* 42 U.S.C. § 7413(b)(1); 40 C.F.R. § 52.23; *United States v. Marine Shale Processors*, 81 F.3d 1329, 1354 (5th Cir. 1996) (holding that the Act "provides EPA with broad authority to enforce state air permits"); *Citizens for a Better Env't v. EPA*, 649 F.2d 522, 529 (7th Cir. 1981) (state rule requiring sources to operate under provisions of operating program was approved by EPA, and therefore sources not complying with such operating programs were subject to enforcement action by EPA); *United States v. Campbell Soup Co.*, 1997 WL 258894, at * 5 (E.D. Cal. March 11, 1997) (finding that language of CAA Section 113 is "sweeping language" that should be interpreted broadly); *United States v. Louisiana Pacific Corp.*, 925 F. Supp. 1484, 1486-87 (D. Colo. 1996) (state permit was "federally enforceable because it is contained in a permit issued pursuant to an EPA approved permitting program"); *RECOMP*, 829 F. Supp. at 291 (state permit was enforceable because it was issued pursuant to regulations included in approved SIP); *United States v. Lousiana Pacific Corp.*, 682 F. Supp.

---

[13] The Supreme Court has also confirmed that a SIP provision remains enforceable unless and until the SIP is modified through the appropriate SIP revision procedures, even after a state promulgates new regulations to revise it. *General Motors Corp. v. U.S.*, 496 U.S. 530, 540-41 (1990) ("There can be little or no doubt that the existing SIP remains the applicable implementation plan even after the State has submitted a proposed revision.").

1141, 1159 (D. Colo. 1988) (state permits that are issued pursuant to approved SIP "are federally

enforceable by definition"); *United States v. SCM Corp.*, 667 F. Supp. 1110, 1130 (D. Md. 1987)

(operating permit was federally enforceable because "[f]ailure to abide by the terms of an

operating permit constitutes a violation of Maryland's SIP").

> **B.    Whether Or Not a Former Employee of KDAQ Believes the Spurlock Operating Permit Was Enforceable by EPA is Irrelevant.**

To support its argument that EPA may not enforce the Spurlock operating permit, EKPC

proffers a former employee of KDAQ, William Dills, who testified that it was his

"understanding" that state operating permits were not enforceable by EPA.  EKPC Memo No. 2,

at 24.[14]  Mr. Dills's recollection of his own "understanding" is irrelevant to the question before

this Court.  Whether EKPC's operating permits are enforceable by EPA hinges on the law itself,

and not on an (incorrect) "understanding" provided by a former employee of KDAQ.  *See Torres*

*v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (testimony concerning a legal

conclusion improperly invades the province of the court to determine the applicable law); *see*

*also Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning

of federal regulations is not a question of fact, to be resolved by the jury after a battle of the

experts.  It is a question of law, to be resolved by the court.").

As discussed above, although states have primary responsibility for administering and

enforcing SIPs, EPA may directly sue the owner or operator of a major stationary source

"[w]henever such person has violated, or is in violation of, any requirement or prohibition of an

applicable implementation plan or permit."  42 U.S.C. § 7413(b)(1).  EPA's independent

---

[14] Mr. Dills was not in the branch of KDAQ responsible for enforcing permits.  *See* Ex. 2, at 8.  Mr. Dills also could not recall whether anyone at EPA had ever specifically told him that state operating permits were not enforceable, and could cite to nothing in the regulations or EPA guidance to support his "understanding."  *See id.* at 33-35.

enforcement authority is a critical part of the Clean Air Act.  "As Congress recognized, the tension between a state's concern for its environment and its desire to maintain and build an industrial base is ever present.  Independent federal enforcement authority is critical to ensure that states do not relax their enforcement efforts in an attempt to attract industry."  *United States v. Ford Motor Co.*, 736 F. Supp. 1539, 1550 (W.D. Mo. 1990); *see also Marine Shale*, 81 F.3d at 1355 (CAA contemplates dual enforcement scheme to prevent destructive race to the bottom).  Nothing in the statute requires Kentucky to agree with EPA's allegations, let alone that a former employee's "understanding" agree with EPA's allegations.[15]

**C.    EKPC Confuses the Issue of Whether a Permit Limit is Enforceable by EPA As a Legal Matter, With the Issue of Whether a Source May Rely On a Permit Limit to Avoid PSD Review.**

In discussing the issue of whether EPA can enforce EKPC's operating permits, EKPC confuses the concept of whether a requirement is legally enforceable by EPA with the concept of whether a particular requirement is practically enforceable for other purposes.  Whether a restriction on operations is "legally enforceable" simply refers to whether or not some regulatory authority, such as EPA, has the legal right to enforce the requirement under the CAA and its implementing regulations.  *See* 67 Fed. Reg. 80186, 80190-91 (Dec. 31, 2002).  However, EPA regulations also attach specific obligations and requirements to requirements that are considered "federally enforceable" under the regulations.  For instance, as discussed below, a source owner can avoid PSD review if it can point to a "federally enforceable" limitation on its operations that limits the source to emitting pollution in amounts less that PSD thresholds.  However, for

---

[15]  Significantly, even Mr. Dills concedes that EKPC's operating permits are enforceable by Kentucky.  He simply believes they are not enforceable by EPA.  *See* Ex. 2, at 37-38.

requirements to be considered "federally enforceable" in this context, they must be more than legally enforceable; they must also be made practically enforceable so that regulators and the public can easily ensure compliance. *See*, *e.g. id.* The issue in this case is whether EKPC's operating permit for Spurlock Unit 2 is legally enforceable by EPA, not whether it may or may not meet additional requirements for practical enforceability.

Thus, neither of the authorities upon which EKPC relies support its contention that the operating permit for Spurlock Unit 2 is not enforceable by EPA. *See* EKPC Memo No. 2, at 25, 26 (citing a 1995 EPA guidance memo and 30(b)(6) deposition testimony provided in this case). The snippets that EKPC extracts from these sources do not relate to whether EPA may enforce EKPC's operating permit as a legal matter under Section 113 of the CAA and 40 C.F.R. § 52.23. Rather, they deal with the regulatory concept of "federal enforceability" that governs whether a source may artificially limit its emissions for purposes of avoiding the requirements of the PSD program in the first place.

For instance, the January 25, 1995 guidance memo cited by EKPC specifically relates to the ability of a source to avoid PSD review by placing non-physical or "synthetic" restrictions on its "potential to emit," so as to stay below the size thresholds for which major source PSD permits are required.[16] However, before a source can affirmatively rely on such restrictions so as to avoid PSD review, EPA requires that the restrictions be made "federally enforceable" to

---

[16] In an attempt to stay under the 100 tons-per-year "potential to emit" threshold for being considered a major PSD source, see 42 U.S.C. 7479(1), a utility can seek to have legal restrictions inserted in an operating permit that prevent it from emitting more than the statutory threshold, even though the source has the physical capacity to emit more than 100 tons per year. An existing source undertaking a physical or operational change can similarly seek to artificially restrain its potential to emit in an attempt to avoid increasing its emissions by more than the 40 tons-per-year "major modification" threshold. Permits for such sources or modifications are known as "synthetic minor permits," because they artificially limit the source to capacities below the major PSD thresholds. *See*, *e.g.* November 17, 1998 Guidance on the Appropriate Injunctive Relief for Violations of Major New Source Review Requirements (Ex. 5), at 1 n. 3.

ensure that EPA and concerned citizens groups have notice of such restrictions, and an opportunity to ensure compliance with such restrictions. Otherwise, sources could seek to insert limitations in their permits that would be difficult for EPA and concerned citizens to enforce as a practical matter.[17] The 1995 EPA guidance memo cited by EKPC in support of its argument was issued to address this specific regulatory meaning of "federal enforceability," not to address the question of whether EPA can *legally* enforce a permit restriction. *See* EKPC Ex. 129, at 1.

Indeed, the title of the 1995 memo is "Guidance on Enforceability Requirements *for Limiting Potential to Emit* through SIP and § 112 Rules and General Permits." *See* EKPC Ex. 129 (emphasis added). The memo addresses the requirements that must be met before a source can *itself* affirmatively rely on a synthetic permit limit to avoid PSD review, and advises sources that such limitations must be enforceable as a practical matter in order to be considered as an appropriate limit on a source's potential to emit. *See id*; *see also* January 25, 1995 Memo from John Seitz, EPA, to Air Division Directors re: "Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act" (Ex. 6), at 2 ("The concept of federal enforceability incorporates two separate fundamental elements that must be present in all limitations on a source's potential to emit.").

EPA has consistently explained this distinction between whether a limit can be enforced as a legal matter, and whether a source can rely on a limit to avoid PSD review as a practical matter. *See*, *e.g.*, Ex. 5, at 5 n. 8 ("Although all permit limits and conditions are enforceable, only operational or production limits that are 'practically enforceable' will be used to determine

---

[17] *Cf. United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1122, 1133 (D. Col. 1987) (due to the relative difficulty in enforcing certain types of restrictions on potential to emit, "not all federally enforceable restrictions are properly considered in the calculation of a source's potential to emit.").

a source's potential to emit."); June 13, 1989 Guidance on Limiting Potential to Emit in New Source Permitting (Ex. 7), at 2 (two criteria must be met for a state permit condition to limit a source's potential to emit: 1) it must be contained in a permit issued pursuant to permitting regulations approved by EPA, and 2) it must be enforceable as a practical matter). EKPC confuses these two concepts and argues that EPA may not *legally* enforce requirements that do not meet EPA's guidance for "practical enforceability." EKPC Memo No. 2, at 26. That is not the law. *See* 42 U.S.C. § 7413(b)(1); 40 C.F.R. § 52.23; *see also Marine Shale*, 81 F.3d at 1355 (rejecting similar argument because it would undermine the United States' Section 113 enforcement authority and provide sources with an incentive to obtain unenforceable permits). EPA may enforce any permit limit or condition provided only that the permit was issued pursuant to approved SIP regulations, as is the undisputed case here. *See supra* Section III.A.[18]

**D.    EKPC's Spurlock Operating Permit Includes a Specific "Condition" Requiring EKPC to Operate Spurlock Unit 2 at "4850 mmBTU/hr maximum heat input."**

EKPC also does not dispute that a "condition" was contained in its permit limiting Spurlock Unit 2 to a "4850 mmBTU/hr maximum heat input." October 7, 1983 Operating Permit (Ex. 23 to Docket No. 67). Rather, EKPC contends that despite the specific language of the permit prohibiting any deviation from this "condition" and the information submitted in its application, it was free to exceed the "maximum heat input" contained in its permit because the permit "does not say that Spurlock Unit 2 '*shall not exceed*' any *particular* hourly heat input." EKPC Memo No. 2, at 27 (emphasis added). EKPC is incorrect. The plain language of the

---

[18] Contrary to EKPC's statements, EPA's 30(b)(6) testimony on this topic was also fully consistent with this distinction. *See* 30(b)(6) Deposition of Lynn Hutchinson, June 21, 2005, at 55-56 (Ex. 8) (testifying that operating permit conditions are legally enforceable because the Kentucky operating permit program was approved into the SIP).

permit includes a very specific and "particular" hourly heat input condition – "4850 mmBTU/hr

maximum heat input." The permit goes on to specifically prohibit any "deviation" from this

hourly heat input, which is specifically listed in the permit as a "condition."  EKPC is in effect

arguing that the statement "shall not exceed" is not the same as a statement prohibiting deviation

from a "maximum heat input" condition.  EKPC's artful reading of the permit must be rejected

as contrary to its plain language.

> **E.     EPA's Objection to a Separate Title V Permit for the Tennessee Valley
> Authority is Irrelevant to Whether EPA Can Enforce the Terms of EKPC's
> Title V Permit for the Spurlock Plant.**

Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, established a comprehensive

operating permit program to better allow regulators, sources, and the public to ensure that major

sources of air pollution comply with various air pollution control requirements.  Pursuant to Title

V, Kentucky issued a Title V operating permit for the Spurlock Plant in December of 1999

which subsumed EKPC's prior original operating permit.  *See* EKPC Ex. 126.  EKPC apparently

does not dispute that the Title V permit itself is enforceable by EPA.  Rather, EKPC argues that a

specific term of the Title V permit – the maximum continuous rating – is not enforceable

because it is just a "description."  EKPC Memo No. 2, at 27-28.  We addressed this argument in

our own summary judgment briefing, and will not repeat that discussion in full here.  *See* U.S.

Memorandum in Support of Sixth Motion for Summary Judgment (Docket No. 71), at 18-24.  In

a nutshell, EKPC uprated Spurlock Unit 2 to a higher maximum continuous rating than the one

listed in its permit, and is now operating a source that is materially different than the one for

which it received a permit.  Whether or not the heat input capacity of Spurlock Unit 2 is more

accurately described as a descriptive "term" or a "condition," the maximum heat input rate of

4850 mmBTU/hour provided in EKPC's Title V permit constitutes an enforceable limit on the operation of Spurlock Unit 2. EPA can enforce this limit pursuant to 42 U.S.C. § 7413(b).

EKPC does raise two arguments concerning its Title V permit, however, that warrant a further response. First, EKPC repeatedly states that its Title V permit "superceded" its prior state operating permit for the Spurlock plant, which explicitly conditioned operation of Spurlock Unit 2 at a maximum heat input of 4850 mmBTU per hour. EKPC Memo No. 2, at 23, 24, 25. That is not what the permit says. "General Condition" number 16 of the Title V permit actually states that "All previously issued construction and operating permits are hereby *subsumed into this permit*." EKPC Ex. 126, at EKPC R16-000674 (emphasis added). EKPC's original state operating permit, including its explicit heat input limitation, was therefore "subsumed" into the Title V permit. The definition of "subsume" is "to include or place within something larger or more comprehensive."[19] Therefore the state operating limitation was not, as EKPC would argue, superceded by the Title V permit, but was instead included in its entirety within the Title V permit terms.[20] The purpose of the new Title V permit was not to change the heat input condition for Spurlock Unit 2.[21] Rather, Title V permits simply bring together pre-existing

---

[19] http://www.m-w.com.

[20] This requirement is also consistent with comments provided by EPA on other Title V permits issued to EKPC that were reviewed by the Agency. For instance, when faced with language that would have stated that EKPC's prior Dale state operating permits would become "null and void" upon issuance of Title V permits, EPA objected and insisted that the Title V permit language be changed to state that the prior permits would be "subsumed" into the new Title V permit. Deposition of Gregg Worley, May 25, 2005, at 18-19. (Ex. 9). As noted above, this very same "subsumed" language was explicitly used in the Spurlock Title V permit.

[21] If EKPC had wanted to change the permitted heat input capacity for Spurlock Unit 2 as part of the Title V permitting process, it needed to ask KDAQ to make such a change. In fact, EKPC *did* ask KDAQ to raise the permitted heat input of Spurlock Unit 2 from 4850 mmBTU per hour to 5600 mmBTU per hour. *See* Ex. 34 to Docket No. 71, at EKPC R16-000777. The KDAQ explicitly rejected EKPC's request, and instead kept the permitted heat input rate at 4850 mmBTU per hour. *See* Ex. 35 to Docket No. 71, at EKPC R16-000693 ("As stated in the Division for Air Quality Letter dated February 3, 1994, this rating cannot be increased until the demonstration of applicability or non-applicability of Regulation 401 KAR 51:017, Prevention of significant deterioration of air

requirements into one permitting scheme. *See Duke Energy*, 278 F. Supp. at 651-52. Thus, EKPC's pre-existing operating conditions did not vanish simply upon issuance of its Title V permit.

Second, EKPC points to a letter from the KDAQ to EPA concerning EPA's objections to a Title V permit issued to the Tennessee Valley Authority (TVA). EKPC Memo No. 2, at 27-28. EKPC argues that EKPC should have similarly objected to the Spurlock Title V permit if it had thought the heat input limit for Spurlock Unit 2 was enforceable, and implies that since EPA did not so object, it must have viewed the heat input as unenforceable. EKPC is wrong on both the facts and the law. From a factual standpoint, EPA's 30(b)(6) witness testified that the Regional EPA office does not review all of the Title V permits issued in a given year by the state of Kentucky, which has been delegated authority to issue such permits. Rather, EPA uses a targeted approach to review a percentage of the permits, and the Spurlock Title V permit was not targeted for review. *See* Ex. 9, at 13-14. More fundamentally, however, even where EPA does review a permit when it is first issued, whether or not it objects to that permit is simply irrelevant to whether the permit can be enforced when it is subsequently violated. The Clean Air Act broadly provides EPA with authority to enforce the terms that end up in the permit. *See* 42 U.S.C. § 7413.

Nor is EPA barred from enforcing Spurlock's Title V permit simply because KDAQ wrote a letter to EPA urging that certain heat input values in TVA's Title V permits should not

---

quality."). EKPC's generalized complaint that the KDAQ "readily agreed to change the ratings" of other units rings particularly hollow in light of this explicit rejection of EKPC's request and EKPC's subsequent failure to demonstrate compliance with PSD requirements. EKPC's complaint also ignores the fact that these other sources lawfully had their maximum heat input conditions increased, and did not simply uprate their units without securing a permit increase, as EKPC did.

be considered enforceable.  The United States has final authority to enforce the requirements of

the Clean Air Act.  As the Sixth Circuit has stated, "Although it is clear that the Clean Air Act

contemplates very significant participation in air pollution control by state air pollution control

agencies, it is equally clear that the final authority is vested in the United States Environmental

Protection Agency and the courts of the United States." *United States v. Ford Motor Co.*, 814

F.2d 1099, 1102 (6th Cir. 1987).  What KDAQ may or may not say about another permit issued

to another company certainly does not control EPA's ability to enforce EKPC's permit.  Indeed,

even if KDAQ had written *EKPC* a letter about *EKPC's* permit stating that its maximum heat

input capacity was unenforceable, EPA would still be entitled to enforce the requirements of the

permit.  *See id.*; *United States v. Southern Ind. Gas & Elec. Co.*, 2002 WL 1760699, at *5 (S.D.

Ind. July 26, 2002) (federal action for violation of PSD provisions of CAA was not barred even

though utility obtained an explicit state determination that its actions complied with PSD

requirements).[22]  Nothing in the Clean Air Act requires Kentucky to agree with EPA's

allegations.  Indeed, such a requirement would be entirely contrary to the legislative scheme,

which was designed to prevent states from excusing violations as a way of attracting industry.

*See Ford Motor Co.*, 814 F.2d at 1102 ("Absent final authority in the United States EPA, the

attainment goals of the Clean Air Act would prove ephemeral."); *Ford Motor Co.*, 736 F. Supp.

at 1550.

---

[22] Of course, in this case, there is no such determination.  Rather, the KDAQ explicitly refused to raise EKPC's permitted heat input in the Title V permitting process.  *See supra* note 21.

## CONCLUSION

For the foregoing reasons, EKPC's Motion for Summary Judgment No. 2 should be denied.

DATED: February 13, 2006.

<div style="margin-left: 40%;">

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

__/s/ Jason A. Dunn_____
PHILLIP A. BROOKS
JASON A. DUNN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111

FRANCES E. CATRON
Acting United States Attorney
Eastern District of Kentucky

ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661

</div>

OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Opposition to EKPC's Summary Judgment Motion No. 2 was served on February 13, 2006, on the persons listed below:


John M. Holloway III                By Express Mail and E-Mail
Angela L. Jenkins
Hunton and Williams LLP
951 East Byrd St.
Richmond, Virginia 23219-4074
(804) 788-8200


T. Thomas Cottingham, III           By Express Mail and E-Mail
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: (704) 378-4700



                    _/s/ Jason A. Dunn_____
                    Jason Dunn