IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

Eastern District of Kentucky
**FILED**

**FEB 1 3 2006**

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 5:04-CV-00034-KSF |
| | ) | |
| EAST KENTUCKY POWER | ) | |
| COOPERATIVE, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT EAST KENTUCKY POWER COOPERATIVE, INC.'S OPPOSITION TO
PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF ITS FOURTH
MOTION FOR SUMMARY JUDGMENT:
EKPC'S ACTIONS IN CONNECTION WITH THE INLAND STEAM SUPPLY
PROJECT INVOLVED PHYSICAL AND OPERATIONAL CHANGES
WITHIN THE MEANING OF THE APPLICABLE
<u>PREVENTION OF SIGNIFICANT DETERIORATION REGULATIONS</u>**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................ii

I.      PRELIMINARY STATEMENT...................................................................................1

II.     STATUTORY AND REGULATORY BACKGROUND OF EPA'S AND
        KENTUCKY'S PSD PERMITTING PROGRAMS...........................................................3

III.    FACTUAL BACKGROUND.......................................................................................6

        A.    The Existing PSD Permit for Spurlock 2.................................................6

        B.    The Inland Container Project.................................................................10

        C.    No Physical Change Occurred to the Emissions Unit at Spurlock 2. ....................11

        D.    No Change in the Method of Operation of the Emissions Unit at Spurlock 2 .......13

        E.    Spurlock 2 Never Exceeded 4850 mmBtu/hr as An Annual Average Hourly
              Heat Input ............................................................................................15

IV.     ARGUMENT..........................................................................................................15

        A.    EPA's Motion Must be Denied Because None of the Spurlock Projects
              Were NSPS Modifications....................................................................16

        B.    EPA's Motion Must be Denied Because EKPC Did Not Change the
              Method of Operation of the Spurlock 2 Boiler. ......................................18

              1)    Spurlock 2 is Not Subject to, and Did not Violate, 40 C.F.R §
                    52.21(r)(1) (source obligation provision in EPA's 1980 PSD rules), 401
                    K.A.R. 51:017 (Kentucky's preconstruction permitting rules) or 401
                    K.A.R. 50.035 (Kentucky's operating permit rules)................................. 18

              2)    The Activities Alleged by EPA at Spurlock 2 Were Not "Major
                    Modifications" under the Kentucky SIP. ................................................. 21

V.      CONCLUSION .......................................................................................................25

## TABLE OF AUTHORITIES

Page

### CASES

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) ...................................................5, 18

*United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005) ...........................................17

### STATUTES

42 U.S.C. § 7407 ...............................................................................................................................3

42 U.S.C.  §7409 ............................................................................................................................16

42 U.S.C. § 7411 ............................................................................................................................17

42 U.S.C. § 7411(a)(4) ...................................................................................................................15

42 U.S.C. § 7413 ............................................................................................................................20

42 U.S.C. §§ 7471-7479 ..................................................................................................................4

42 U.S.C. § 7479(2)(C) ...............................................................................................................4, 17

42 U.S.C. §§ 7501-7508 ..................................................................................................................4

### REGULATIONS

40 C.F.R. §§ 50.4 - 50.12 ...............................................................................................................16

40 C.F.R. § 51.165(a) .......................................................................................................................3

40 C.F.R. § 51.18 .............................................................................................................................5

40 C.F.R. § 51.24 .............................................................................................................................5

40 C.F.R. Part 52 ...........................................................................................................6, 16, 19, 21

40 C.F.R. § 52.01(d) (1975) .............................................................................................................4

40 C.F.R. § 52.01(h) .........................................................................................................................7

40 C.F.R. § 52.21 (1977) ..........................................................................................................*passim*

40 C.F.R. § 52.21(b)(2) (1979) ........................................................................................................4

40 C.F.R. § 52.21(b)(2)(i) ...............................................................................................................5

40 C.F.R. § 52.21(b)(2)(iii)(f) ..................................................................5, 21

40 C.F.R. § 52.21(e)(2) (1975) .................................................................*passim*

40 C.F.R. § 52.21(i)(1) .............................................................................5, 20

40 C.F.R. § 52.21(r)(1) (2005) .................................................................*passim*

40 C.F.R. § 52.21(s)(1) (1979) ..................................................................5

40 C.F.R. § 52.24 ......................................................................................3

40 C.F.R. § 52.931 ...............................................................................6, 19

401 K.A.R. 50:035 ...............................................................................passim

401 K.A.R. 51:017 ...................................................................................18

401 K.A.R. 51:017 Section 1(2)(b) (1992) ...............................................22

401 K.A.R. 51:017 Section 1(2)(b)(5) (1992) .......................................21, 23

401 K.A.R. 51:052 Section 2(b)(5) (1988) ................................................23

## FEDERAL REGISTER

39 Fed.Reg. 42,510 (1974) ....................................................................3, 4

43 Fed.Reg. 26,380 (1978) ....................................................................4, 5

45 Fed.Reg. 52,676 (1980) ...........................................................5, 18, 24

47 Fed.Reg. 56,882 (1982) ................................................................6, 19

52 Fed.Reg. 8,311 (1987) .......................................................4, 6, 19, 24

54 Fed.Reg. 36,307 (1989) ............................................................6, 9, 19

55 Fed.Reg. 4,169 (1990) ......................................................................24

## I.  PRELIMINARY STATEMENT

Defendant East Kentucky Power Cooperative, Inc. ("EKPC") respectfully submits this brief in opposition to Plaintiff's ("EPA's") Fourth Motion for Summary Judgment on prevention of significant deterioration ("PSD") preconstruction permitting issues. In an attempt to make its case, EPA papers over the record with facts that are not material, stretches to assert as "facts" issues which are genuinely disputed or which are squarely contradicted by the record, and cites to this Court the wrong law.

First, EPA's covers *ad nauseum* the undisputed facts about the changes to the balance of the Spurlock Steam Station during the Inland Container Project. EPA fails to recognize, however, that *none* of these facts are material to this motion. Unless a project takes the form of a physical or operational change to an emissions unit at a source, it is irrelevant for PSD purposes: it does not constitute "modification" under the Kentucky state implementation plan ("SIP") and best available control technology ("BACT") (i.e., additional pollution controls) is not required on the unit. PSD regulates the construction of new emissions capacity by focusing on changes to emissions units. Anything else that happens at the source is irrelevant and immaterial.

Second, EPA misstates the facts which *are* material to the central issue: whether a physical or operational change occurred to the emissions unit (i.e., the boiler on Spurlock 2) in or as a result of the Inland Container Project. EPA repeats three key misstatements throughout the brief in various forms. In misstatement number one, EPA claims that there is no dispute that physical changes occurred at Spurlock 2 as part of the Inland Container Project. For example, EPA asserts that Ken Weiss, one of EKPC's expert witnesses, agreed that a tap to the feedwater line on Spurlock 2 as part of the Inland Container Project constituted a physical change to the emission unit. Plaintiff United States' Memorandum in Support of its Fourth Motion for Summary Judgment ("U.S. Fourth Mem.") ¶¶ 58-59. That was not his testimony. In fact, Mr.

1

Weiss explained that there was *no physical change* to Spurlock 2 as part of the steam extraction project, Weiss Dep. (11/15/05) at 88 (Ex. 199), and his opinion is amply supported by the testimony of Spurlock Station Manager Sam Holloway. *See, e.g.,* Holloway Dep. at 57-58 (Ex. 119); *id.* at 61-63 (Ex. 200).

In misstatement number two, EPA characterizes 4850 mmBtu/hr as the "capacity" of the boiler on Spurlock 2. *See, e.g.,* U.S. Fourth Mem. at ¶¶ 9, 12, 18, 20, 27, 31. That value (4850 mmBtu/hr) is only the annual average manufacturer's rating that was used for annual modeling—an annual average that EKPC never exceeded (and EPA does not so contend). Lacking evidence that EKPC exceeded the annual average of 4850 mmBtu/hr, EPA attempts to turn "4850 mmBtu/hr" into a limit on "capacity" not to be exceeded in *any* hour. EPA does so knowing full well that it expected Spurlock 2 to operate well over 4850 mmBtu/hr on occasion in any given year and issued EKPC a PSD permit for Spurlock 2 that says *nothing* about the unit's hourly heat input.

In misstatement number three, EPA asserts that the re-rating of Spurlock 2 from 3.8 million to 4 million pounds per hour of steam in 1994, two years after the Inland Container Project, was part of the same project or activity. U.S. Fourth Mem. at ¶ 53 and 35-36. Not so. Sam Holloway testified without contradiction that this administrative re-rate, which required no change to the boiler components at all, was done to meet EKPC's spinning reserve requirements. Holloway Dep. at 64-65 (Ex. 119); *id* at 177, 181-182 (Ex. 200). The re-rate had nothing to do with the Inland Container Project. In sum, EPA distorts the record in order to create an inaccurate picture of the relevant facts.

Finally, in its overzealous search for some kind of PSD violation, EPA cites to this Court the wrong law. It is undisputed that EKPC already has a PSD permit for Spurlock 2, and no

2

activities which EKPC allegedly undertook on the unit violated the terms of that permit. Those are the material facts.[1] Presented with these insurmountable hurdles to proving a PSD violation occurred, EPA resorts to citing inapplicable regulations: 40 C.F.R. § 52.21(r)(1), 401 K.A.R. 50:035 and 401 K.A.R. 51:017. U.S. Fourth Mem. at 32-33. The PSD permit issued by EPA for Spurlock 2 is not some meaningless, outdated or superceded piece of paper. It has continuing force and effect, binding EPA just as much as it does EKPC. Having issued this PSD permit for Spurlock 2, EPA cannot try to use 40 C.F.R. § 52.21(r)(1) or the Kentucky regulations against EKPC. In basing its PSD claim on an alleged violation of these inapplicable regulations, EPA offers nothing more than the hole in the doughnut.

    For these reasons, as stated more fully below, EPA's motion must be denied.

## II. STATUTORY AND REGULATORY BACKGROUND OF EPA'S AND KENTUCKY'S PSD PERMITTING PROGRAMS

    The federal PSD preconstruction permitting program had its genesis in regulations EPA promulgated in 1974 pursuant to the Clean Air Act ("CAA" or "the Act") Amendments of 1970. *See* 39 Fed.Reg. 42,510 (1974) (Ex. 10).[2] These regulations required preconstruction review of, and permits for, certain new "stationary sources" and "modifications" of those sources. *Id.* Pursuant to these regulations, with certain regulatory exclusions, a "physical change in, or change in the method of operation of, a stationary source which increases the emissions rate of any pollutant . . ." is a "modification" which triggered PSD preconstruction permit

---

[1] *See* EKPC's Memorandum in Support of its Motion for Partial Summary Judgment Number 2 (Counts 1, 2 and 3– Spurlock 2 Claims) at 6 ("EKPC Spurlock 2 Mem.").

[2] These regulations became effective on January 6, 1975. A PSD program refers to requirements that must be met in an area designated by EPA as being in attainment of national ambient air quality standards ("NAAQS"). 42 U.S.C. § 7407. Areas that are designated as nonattainment for a NAAQS must meet certain more stringent requirements aimed at ultimate attainment of the NAAQS. *See* 40 C.F.R. § 51.165(a) and § 52.24 (nonattainment regulations).

requirements.[3] The 1974 regulations imposed certain obligations on PSD sources, including the requirement that the source operate "in accordance with the [preconstruction permit] application, *as approved and conditioned by the [EPA] Administrator … .*" 40 C.F.R. § 52.21(e)(2) (1975) (emphasis added).

In the preamble to the 1974 regulations, EPA noted its disapproval of all existing SIPs "as they failed to provide for the prevention of significant deterioration of air quality." 39 Fed.Reg. 42,520 (1974) (Ex. 10). Thus, EPA's 1974 rules controlled the PSD preconstruction permitting programs for sources in every state until each of those states submitted SIPs which were approved by EPA. Accordingly, between 1974 and 1980, EPA directly issued federal PSD permits to new and modified PSD sources in Kentucky. *See* 52 Fed.Reg. 8,311, 8,312 (1987).

In 1977, Congress codified EPA's regulatory PSD program.[4] As discussed more fully in EKPC Spurlock 2 Mem. at 6, Congress did not change the applicability provisions of EPA's 1974 regulations; it simply formally incorporated the CAA's new source performance standard ("NSPS") definition of "modification" into the PSD definition of "construction" activities that were subject to PSD preconstruction permitting. 42 U.S.C. § 7479(2)(C). In 1978, EPA promulgated rules to implement these 1977 Amendments.[5]

---

[3] *Id.* at 42,514. The regulations exclude from the definition of "modification" certain activities including "an increase in the production rate, if such increase does not exceed the operating design capacity of the source [and] [a]n increase in the hours of operation of that source." *Id.*

[4] 42 U.S.C. §§ 7471-7479. Congress established a separate preconstruction permit program for new and modified sources locating in areas where NAAQS are not being met (*i.e.*, nonattainment areas). 42 U.S.C. §§ 7501-7508.

[5] The 1978 rules created a new regulatory term "major modification" and provided that a source would be deemed to have undergone a "major modification" only if it undertook a change that increased its "potential emission rate." 43 Fed.Reg. 26,380, 26403 (1978) (Ex. 14), codified at 40 C.F.R. § 52.21(b)(2) (1979). Thus, the rules ensured that PSD "preconstruction" review would be limited to "construction" at existing units that would be a "modification" which was defined under 40 C.F.R. § 52.01(d) to involve activities that increased the "emission rate" of a facility which is within the meaning of "modification" under the NSPS program. Like the 1974 provisions (codified at 40 C.F.R. § 52.21(e)(2) (1975)), EPA's 1978 PSD rules impose specific "obligations" on PSD sources which are issued permits under the 1978 regulations. Among those is the obligation that a source construct and operate "in

(continued...)

4

EPA promulgated final PSD rules in 1980 in response to the decision of the United States
Court of Appeals for the D.C. Circuit in *Alabama Power v. Costle*, 636 F.2d 323 (D.C. Cir.
1979). Under those regulations, for there to be a "major modification" which would trigger PSD
permit requirements, there must be a "physical change or change in the method of operation." 45
Fed.Reg. 52,676, 52735 (Ex. 20), codified at 40 C.F.R. § 52.21(b)(2)(i)(1981). The 1980 rules
provide, however, that "a physical or operational change" does *not* include an "increase in the
hours of operation or in the production rate, unless such change would be prohibited under any
federally enforceable permit condition which was established after January 6, 1975 pursuant to
40 C.F.R. § 52.21 or under regulations approved pursuant to 40 C.F.R 51.18 or 40 C.F.R. 51.24."
45 Fed.Reg. at 52,736 (Ex. 20), codified at 40 C.F.R. § 52.21(b)(2)(iii)(f)(1981).[6] The 1978
"source obligation" provision prohibiting a source or modification that constructs or operates
"not in accordance with the application submitted pursuant" to 40 C.F.R. § 52.21, remained in
effect under the 1980 PSD rules, but was codified under 40 C.F.R. § 52.21(r)(1). Significantly,
however, EPA made clear that the "source obligation" provision would *not* have the effect of
imposing additional obligations on a source that received its preconstruction permit before the
promulgation of the 1980 PSD rules. Specifically, the grandfather provision of the 1980
regulations expressly provided that the requirements of 40 C.F.R. § 52.21(r)(1) "shall not apply"
to a major stationary source or modification if "construction commenced on the source or
modification before April 7, 1977." 40 C.F.R. § 52.21(i)(1). For such sources, the "regulations

---

accordance with the application submitted pursuant to this section or with the terms of any approval to construct" or
be subject to enforcement action. 43 Fed.Reg. at 26,409 (Ex. 14), codified at 40 C.F.R. § 52.21(s)(1) (1979).

[6] The corresponding provision of EPA's current PSD regulations remains substantially the same. 40 C.F.R. §
52.21(b)(2)(iii)(f) (2005) excludes from the definition of "major modification," "an increase in the hours of
operation or in the production rate, unless such change would be prohibited under any federally enforceable permit
condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved
pursuant to 40 CFR subpart I or 40 CFR 41.166."

at 40 C.F.R. § 52.21 as in effect before April 7, 1977, shall govern the review and permitting of such source or modification." *Id.*

EPA approved Kentucky's PSD SIP in 1989. 54 Fed.Reg. 36,307 (1989).[7] EPA's notice of approval made clear, however, that existing PSD-permitted sources located in Kentucky (*i.e.*, those sources which were previously permitted under EPA's Part 52 PSD rules prior to 1989) were grandfathered from Kentucky's newly-approved PSD SIP provisions. *Id.* at, 36,309. Specifically, those sources would remain subject to the provisions of "40 C.F.R. §52.21(b) through (w)." 40 C.F.R. § 52.931.

### III.  FACTUAL BACKGROUND

#### A.     The Existing PSD Permit for Spurlock 2

EKPC applied to Kentucky and EPA for preconstruction permits for Spurlock 2 in 1976. W. Gill letter to F. Stanonis (Jan. 23, 1976) (Ex. 110); Air Pollution Emissions Report for Hugh L. Spurlock Power Station (Mar. 19, 1976) (Ex. 112); W. Gill letter to G.T. Helms (Apr. 7, 1976) (Ex. 111). These permit applications requested permission to construct a new pulverized coal boiler manufactured by Combustion Engineering, controlled by an electrostatic precipitator, and to construct facilities on site to handle the fuel for the boiler. *Id.* In order to allow Kentucky and EPA to assess the proposed, not yet built or operating facility, EKPC described estimated operating parameters for the boiler that it believed could influence emissions from Spurlock 2.[8]

---

[7] From 1980 until 1989, Kentucky issued PSD permits under EPA's Part 52 PSD rules pursuant to a delegation of authority from EPA. *See* 47 Fed.Reg. 56,882 (1982); 52 Fed.Reg. 8,311 (1987).

[8] As discussed more fully in EKPC's Opposition to Plaintiff United States' Memorandum in Support of its Sixth Motion for Summary Judgment at 2-4, at the time a preconstruction permit application is filed, in order to model the environmental impact of the proposed source, the source and the permitting authority make a number of assumptions regarding how the proposed unit will be operated, the parameters that will affect the release of pollutants from the unit, the amount of pollutants that will be emitted from the unit, and the atmospheric conditions that will affect short term and long term concentrations of emitted pollutants. The permit issuer then must decide which of those operating parameters, assumed in the modeling, should be enforced through the emission limitations established in the permit.

Included among those parameters was the proposed boiler's "rated" heat input. Prior to operation, the rated heat input does not describe the highest heat input that the boiler will be capable of achieving but rather the heat input rating that the manufacturer will guarantee can be achieved.[9] Accordingly, in the line of the state permit application seeking a description of the "rated capacity-input (BTU/Hr)" for the boiler, EKPC stated that the manufacturer's "rated" capacity was "approximately 4850 x $10^6$ BTU/HR" with the unit operating 8760 hours a year. *Id.*

In accordance with its 1974 PSD regulations, EPA conducted an air quality atmospheric modeling analysis of the projected emissions from Spurlock 2 in order to evaluate compliance with applicable NAAQS and PSD increments. EPA used the estimated operating parameters described in the permit applications—including the unit's "rated" heat input of 4850 mmBtu/hr—to make its assessment.

Specifically, in modeling compliance with the annual NAAQS and PSD increments, EPA used a 4850 mmBtu/hr heat input value to determine the boiler's annual mass emissions rate (e.g., 5,820 lbs/hr $SO_2$ averaged over 8760 hours). U.S. Sixth Mem. at ¶ 5; Weiss Dep. (11/15/05) at 25 (Ex. 199); Report of Kenneth N. Weiss ("Weiss Report") at 38-40 (Ex. 201). In evaluating compliance with the short term (3 hour and 24 hour) increments and NAAQS, EPA used a higher hourly heat input value (5120 mmBtu/hr) to derive the short term mass emissions rate (*e.g.*, 6144 lbs/hr $SO_2$). Weiss Dep. (11/15/05) at 33-34 (Ex. 199); Weiss Report at 36-40 (Ex. 201). The modeling also assumed that an average 0.66 percent sulfur coal, having an emission rate of 1.2 pounds per million Btu (lb/mmBtu), would be burned. W. Gill letter to F.

---

[9] 40 C.F.R. § 52.01(h). *See, e.g.,* EKPC's 1982 Application for an Operating Permit for Spurlock 2 (where the line on the application form seeking information on the facility's "rated capacity" states, "refer to manufacturer's specification, if necessary."). (U.S. Fourth Mem. Ex. 21).

Stanonis (Jan. 23, 1976) (Ex. 110); Weiss Dep. (11/15/05) at 25 (Ex. 199). EPA analysis

confirmed that the emissions from the proposed unit would not cause or contribute to air

pollution in violation of the applicable NAAQS and PSD increments. J. Ravan letter to R.

Hughes (Sept. 21, 1976) ("Spurlock 2 PSD Permit") (Ex. 202).    Accordingly, on September 21,

1976, EPA issued a PSD preconstruction permit for Spurlock 2.  *Id.*

     The September 1976 PSD preconstruction permit issued by EPA to Spurlock 2 listed the

"Conditions of Approval." *Id.* These permit "conditions" were unambiguous and detailed.

They imposed emission limits and monitoring and reporting requirements to ensure compliance

with those limits. Specifically, the "conditions" provided that (1) emissions of particulate matter

shall not exceed 0.18 grams per million calories heat input (0.10 pound per million BTU), (2)

with certain exceptions, opacity of emissions shall not exceed 20%, and (3) emissions of sulfur

dioxide shall not exceed 2.2 grams per million calories of heat input (1.2 pounds per million

BTU). *Id.* The permit "conditions" also provided that (1) EKPC must purchase, after seeking

approval from EPA, control devices to meet the emission limits specified in the permit and (2)

EKPC must submit information on stack parameters that result from the selected controls. *Id.*

     Significantly, the preconstruction permit "conditions" do not include any limit on the heat

input rate of the Spurlock 2 boiler, nor do they identify a method for measuring an annual

average heat input value of 4850, nor do they include a requirement to report annual heat input.[10]

By contrast, the permit imposed lb/mmBtu limitations on emissions of $SO_2$ and particulate

matter and imposed compliance monitoring and reporting requirements. *Id.*  By controlling $SO_2$

emissions through a lb/mmBtu emission rate limitation, EPA has made clear that heat input and

---

[10] EPA has asserted in past guidance that it has authority to impose such limits. *See, e.g.*, EPA, *New Source Review Workshop Manual* at A.5-A.9, H.1-H.2 and H.5-H.7 (Draft Oct. 1990) (Ex. 203).

8

sulfur content in fuel (both operating parameters described in the March 1976 Air Pollutions

Emissions Report for Hugh L. Spurlock Power Station (Ex. 112)) were not intended to be a limit

on unit operations.[11]

     The Commonwealth of Kentucky issued a state preconstruction permit for Spurlock 2 on

December 2, 1976. (Ex. 204). Like the federal permit, the state permit included no mention of

heat input capacity of the Spurlock 2 boiler and contained no condition that directly or indirectly

controls heat input.[12]

     EKPC constructed (and subsequently operated) the pulverized coal boiler and related fuel

handling equipment in accordance with the permit applications it filed with Kentucky and EPA

and under the conditions specified in the final permits. Had EKPC, for example, constructed and

operated two boilers or constructed and operated a boiler that burned municipal wastes instead of

pulverized coal, it would have been subject to enforcement under 40 C.F.R. § 52.21(e)(2)(1975)

for construction and operation not in accordance with its application. The estimated operating

parameters contained in the PSD application, including the heat input rating, were never invisible

limitations on unit operations enforceable under 40 C.F.R. § 52.21(e)(2). To have become

enforceable, the permit would have to had to identify them as enforceable permit conditions and

include a method for measuring compliance.

     As EPA has explained, a PSD permit must be "*a stand-alone document* that identifies

the emissions units to be regulated, establishes emissions limits to be met, specifies methods for

---

[11] As EPA has acknowledged, a PSD permit issuer may determine that, in order to protect NAAQS and increments, it is appropriate to include in the permit a limit on a unit's capacity by including in the permit itself a limit on emissions expressed in lbs/hr. *See* EPA, *New Source Review Workshop Manual* at H.5 (Draft Oct. 1990) (Ex. 203). If, on the other hand, the permit issuer determines that an hourly limit is not needed to protect NAAQS and increments (as did EPA when it issued EKPC's 1976 PSD preconstruction permit), then the permit may include limits expressed in lbs/mmBtu, limits which do not constrain the capacity of the unit. *Id.*

[12] The 1976 state permit was issued under versions of the state preconstruction permit regulations that "were never part of the federally approved SIP." 54 Fed.Reg. at 36,308 (1989). As such, the permit is not federally enforceable.

9

determining compliance and/or excess emissions, and outlines the procedures necessary to

maintain continuous compliance with the emission limits." Effective Permit Writing, Student

Guidebook, EPA-450/September 1986, Air Pollution Training Institute, at 109 (Ex. 205). Thus,

EPA has directed that

> [p]ermit conditions should be written as clearly and directly as
> possible and state precisely what is expected of the source. They
> should contain as few exceptions or conditional statements as
> possible.   The permit should state *what* is to be measured,
> recorded, or reported; *what* the emission standards are, and *how*
> these standards are to be met.

*Id.* (emphasis in original) at 111-112. Accordingly, EPA explained that "it is important that the

emission limits [in a PSD permit] reflect all the conditions in the permit application. If the

application assumes limited hours of operation or limited materials of production, these should

also be stated as permit conditions along with methods to measure or monitor these

requirements." *Id.* at 114. The Spurlock 2 PSD permit satisfied EPA's own criteria. It is a

stand-alone document that fully sets out the applicable enforceable conditions and the means to

measure compliance with those conditions. The "approximate" heat input value mentioned in

the state permit application and used in the PSD air quality analysis is not included as a condition

in the permit and, therefore, is not an enforceable limit on operations.

## B.    The Inland Container Project

In 1989, EKPC began considering whether to undertake a project involving the supply of

steam from Spurlock to an Inland Container box plant that was proposed to be located adjacent

to Spurlock. Before proceeding with the Inland Container Project, and in accordance with its

established procedure, EKPC notified KDAQ that EKPC would be supplying steam from

Spurlock 2 to the Inland Container facility. Dills Dep. at 39-40 (Ex. 106). EKPC had evaluated

the project and concluded that it would not require any revisions to the Spurlock's air permits

because Spurlock 2 would not exceed permitted emissions. Hughes Dep. (2/18/05) at 29 (Ex. 86); Hughes 30(b)(6) Dep. (4/13/05) at 29-32 (Ex. 115); Crawford 30(b)(6) Dep. at 181-184 (Ex. 116). EKPC asked Roger Cook to confirm that the project did not require any permitting. Hughes Dep. at 23-28; 30; 68-70 (Ex. 86). In response, KDAQ, through Roger Cook, advised EKPC that the project triggered no air permitting requirements. *Id*. at 23-30; 68-71; Hughes 30(b)(6) Dep. at 32-33 (Ex. 115). This confirmed EKPC's initial assessment that PSD would not apply to the project and no further information or paperwork would be necessary for compliance with air quality regulations. Hughes Dep. at 199-200 (Ex. 86); *see also* Inland Container permit application and permit (Exs. 206 and 207, respectively ).

### C.    No Physical Change Occurred to the Emissions Unit at Spurlock 2.

EPA includes a great deal of information and argument in its brief about changes to other areas of Spurlock Station, not involving Spurlock 2. Although all the work performed at the station itself cost approximately $20 million, only a fraction of that had anything to do with Spurlock 2 itself. EKPC Resp. to U.S. Interrog. 4(A) (Ex. 171); *see* Declaration of Dana Cox ("Cox Decl.") (Ex. 127). Building a new water intake structure on the Ohio River at Spurlock to improve the quality of water intake for Spurlock Station has no effect on boiler capacity or operation and, consequently, no effect on air emissions.[13] Similarly, improving the water treatment facilities at the plant has no effect on boiler capacity or operation and no effect on air emissions. The central question EPA asks this Court to decide is whether the Inland Container Project involved a physical change or change in the method of operation *of the emissions unit* (i.e., boiler) at Spurlock 2—not anything else at Spurlock Station, because nothing else can be

---

[13] It does, however, have an effect on water quality and EKPC therefore applied for and received permits for the Inland Container Project from Kentucky's Natural Resources and Environmental Protection Cabinet and the U.S. Army Corps of Engineers. *See* EKPC's Spurlock 2 Mem. at 13 (discussing all the regulatory approvals EKPC sought and received for the Inland Container Project).

material. EKPC's response will therefore address only those facts which are material to that question.

The portion of the Inland Container Project that affected Spurlock 2 was minimal. Specifically, a tap was made into the main steam line between the boiler and the turbine to draw off the steam ("the steam tap"). A second tap was made to return condensate to the deaerator after leaving the reboiler ("the condensate tap"). Shipp Dep. at 26-27, 44 (Ex. 118); Cox Decl. at ¶ 2 (Ex. 127). These taps were outside the NSPS "affected facility" for coal-fired electric utility boilers and, therefore, irrelevant under NSPS. A third tap was made in the feedwater system to extract a small amount of water for use in attemporating the steam ("the feedwater tap"). *Id.* There is no dispute that the feedwater tap occurred on the high pressure side of the boiler feed pump, and thus within the NSPS "affected facility." What is disputed is whether that constituted a "physical change" to the emissions unit. Ken Weiss testified that it was not a physical change. Weiss Dep. at 88, 263-64 (Ex. 199). Sam Holloway testified there were no physical changes to the boiler. Holloway Dep. at 57-58 (Ex. 119). Even EPA itself has issued PSD applicability determinations which specified that connecting equipment to parts of the boiler like the burners does not constitute a physical change to the boiler.[14] In any event, to be a "physical change" under EPA's NSPS rules, the feedwater tap would have had to involve a "capital expenditure" that increased "production rate." The tap did not involve either a "capital expenditure" or an increase in "production rate."[15]

---

[14] *See, e.g.,* G. Emison letter to M. Sterling, at 2 (Jan. 18, 1990) (Ex. 208) ("Our review indicates that, by itself, the addition of gas canes to the burners *is not a physical change or change in the method of operation in the unit*, and, consequently, would not subject the boiler to a BACT review.")

[15] Even if one rolls together the total cost of all three taps, which was the only part of the Inland Container Project to touch Spurlock 2, the cost was far below the amount that would constitute a "capital expenditure" on the Spurlock 2 boiler triggering NSPS. *See* EKPC's Spurlock 2 Mem. at n.6 and 27. Furthermore, the feedwater tap in no way

(continued...)

12

EPA elsewhere has agreed that steam extraction projects do not cause a physical change

to an emission unit, and thus are not subject to PSD requirements.

> Tapping one of the steam lines would constitute a physical change to
> the associated boiler only if the boiler and steam line were part of the
> same emission unit. We do not view the steam line or steam turbine as
> part of the boiler emission unit. Accordingly, tapping the steam lines
> does not constitute a physical change to [] boilers.

R. Miller letter to J. Reinersten (Aug. 6, 2001) (Ex. 209).

EPA's Office of General Counsel ("OGC") filed an amicus brief in the Rochester Public

Utilities ("RPU") case supporting the determination that, although the changes at the RPU

facility may have triggered PSD applicability to the extent the changes would result in a

significant net emissions increase at the source, these changes did not subject the boilers to

BACT because the changes to the steam line did not constitute physical changes to the boiler. *In

re Rochester Public Utilities Application for a PSD Permit*, Brief of Amicus U.S. EPA Office of

General Counsel (EAB June 2, 2004) ("OGC amicus brief") (Ex. 210). In reaching this

conclusion, OGC noted that "EPA has not historically treated non-boiler components as part of

the boiler emissions unit and, accordingly, a modification to the steam lines did not constitute a

physical change to the boiler." *Id.* at 10. OGC also clarified the views articulated by EPA prior

to the issuance of the 2002 NSR reform rules, including that a change in the steam lines or a

turbine would not constitute a physical change to the boiler emissions unit. *Id.*

### D.    No Change in the Method of Operation of the Emissions Unit at Spurlock 2.

EPA has recognized that steam extraction does not constitute a "change in the method of

operation" of a unit. *See* OGC amicus brief at 13 (Ex. 212). Notably, this position was widely

held throughout the EPA. The steam extraction at Spurlock was no different. The Inland

---

increased the emissions capacity of the unit. If anything, diverting feedwater away from the boiler would reduce its
capacity to burn coal. Parker Report at 5-9 (Ex. 180).

Container Project did not affect the operation of the boiler. Holloway Dep. at 79-80 (Ex. 200).
The boiler on Spurlock 2 had always had the additional capacity to produce additional steam.
Crawford 30(b)(6) Dep. at 45-46 (Ex. 116). The steam supply project did not change how the
unit was operated or dispatched. *Id.* at 176-177, 179 (Ex. 116); Holloway Dep. at 79-80 (Ex.
200). Neither did the project affect boiler steam production capacity in any way. Holloway Dep.
at 63, 65 (Ex. 119). The Project did not allow Spurlock 2 to operate more hours than its 1976
PSD permit allowed it to operate (8760 hours). The Project did not allow Spurlock 2 to increase
the production rate above a level set by that permit, because the permit imposed no such limit.
The boiler as constructed under the original PSD permit was fundamentally the same as it exists
today. EKPC never did anything to increase its designed fuel burning or steam production
capability. *Id.* at 57-58, 78, 148-150.

After the Inland Container Project, EKPC continued for two years to run the Spurlock 2
boiler at its rated maximum hourly steaming capacity of 3.8 million pounds per hour of steam.
Keida Dep. at 29-30 (Ex. 122). In 1994, EKPC re-rated the maximum hourly steaming capacity
of the boiler to 4 million pounds per hour of steam. This administrative re-rate required no
change to the boiler components at all and was done to meet EKPC's spinning reserve
requirements. Holloway Dep. at 64-65 (Ex. 119); *id.* at 177, 181-182 (Ex. 200). "Spinning
reserve" is unloaded generation which is synchronized and ready to serve additional demand.
Spinning reserve must be immediately available and capable of being fully loaded within ten
minutes. *See* ECAR Document No. 2, Daily Operation Reserve, *available at*
http://www.ecar.org/documents/document%202_6-98.pdf. (Ex 212). EKPC currently has a total

[16] OGC's amicus brief, moreover, took the position that the steam extraction process also did not constitute a
"change in the method of operation" of the unit. Notably, this position was consistent with a survey taken by EPA
Headquarters of EPA's regional offices as well as its program offices. Rochester Public Utility/Mayo Clinic Project
Update Mem. (Ex. 211).

daily reserve requirement of 4% of the forecasted daily one-hour peak load. At least 1.5% of this must be spinning reserve and the remaining 2.5% may come from 10-minute quick start units or other qualified interruptible load. Because EKPC does not have any qualified "quick start" units or interruptible loads, spinning reserve and total reserve are the same for EKPC, *i.e.*, 4%.

### E.    Spurlock 2 Never Exceeded 4850 mmBtu/hr as an Annual Average Hourly Heat Input.

Spurlock 2 never exceeded 4850 mmBtu/hr as an annual average hourly heat input. EPA does not contend that it has, nor could it. The uncontroverted facts in this case establish that the annual average hourly heat input at Spurlock 2 has always been below 4850 mmBtu. As discussed more fully in EKPC's Memorandum in Opposition to U.S. Sixth Mot., none of EPA's own calculations to support its Notice of Violation ("NOV") on Spurlock 2 show an annual average hourly heat input in excess of 4850 mmBtu/hr. Similarly, none of the emissions calculations performed for EPA's use at trial by its expert witness, Ron Sahu, show that Spurlock 2 operated at an annual average hourly heat input in excess of 4850 mmBtu/hr. For example, the highest annual average mmBtu/hr recorded from 1993 to 1996 by Dr. Sahu was 4011 mmBtu/hr—again, well below 4850 mmBtu/hr. *See* Sahu Spreadsheets (Ex. 213). There is no genuine dispute, therefore, that Spurlock 2 never surpassed the annual average mmBtu/hr reflected in the descriptive portion of its operating permits—either as a result of the Inland Container Project or for any other reason.

### IV.  ARGUMENT

EPA's motion for summary judgment suffers legal and factual flaws that require its denial. First, to establish that EKPC engaged in "construction" that required a new PSD permit, EPA must establish that physical activities undertaken at the Spurlock 2 boiler constituted a New Source Performance Standard ("NSPS") "modification" as defined in 42 U.S.C. § 7411(a)(4).

EPA has not even alleged, much less presented undisputed facts establishing, that any changes at

the Spurlock 2 boiler were "modifications" under 42 U.S.C. § 7411. Second, EPA has alleged

that activities undertaken at Spurlock 2 resulted in "operational changes" that were "major

modifications."[17] However, EPA bases these claims on alleged violations of EPA regulations

(40 C.F.R. § 52.21(r)(1)(2005)) and Kentucky state implementation plan ("SIP") regulations

(401 K.A.R. 50:035 and 401 K.A.R. 51:017) that do not, as a matter of law, even apply to

Spurlock 2.[18] Under the PSD requirements that *do* apply to Spurlock 2, no project undertaken at

Spurlock 2 involved a "physical or operational change" that could trigger permitting as a "major

modification."

### A.    EPA's Motion Must be Denied Because None of the Spurlock Projects Were NSPS Modifications.

In support of its motion for summary judgment, EPA claims that the Inland Container

Project and certain non-construction related activities involving a boiler uprate at Spurlock 2

constituted "major modifications" which triggered PSD permitting.[19] As discussed in Defendant

EKPC's Spurlock 2 Mem. at 17-23, EPA's claims are without merit. In fact, EPA does not

allege that these activities are "modifications" as that term is defined in the Act's NSPS

regulations, nor does EPA offer any undisputed facts that would allow this court to find that the

activities are NSPS modifications. Thus, they do not involve "construction" which could be

subject to PSD preconstruction review.

---

[17] *See* U.S. Fourth Mem. at 31-33.

[18] The SIP is a plan developed by each individual State which identifies how that State will attain and/or maintain the primary and secondary national ambient air quality standards set forth in 42 U.S.C. § 7409 and 40 Code of Federal Regulations §§ 50.4 through 50.12. EPA's action on each State's SIP is set forth in 40 C.F.R. Part 52.

[19] U.S. Fourth Mem. at 33-36.

There is only one definition of "modification" in the Clean Air Act; that definition is found at 42 U.S.C. § 7411 (establishing the NSPS program). In the 1977 CAA Amendments codifying the 1974 regulatory PSD program, Congress required EPA to define "construction" activities subject to the PSD preconstruction review program consistently with the definition of "modification" in Section 7411 for the NSPS program. 42 U.S.C. § 7479(2)(C). EPA, in fact, did so, and EPA cannot now interpret the statutory term "modification" in the PSD program to cover construction activities at existing sources that are not now—nor have ever been—a "modification" under the NSPS program. *See United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005). As *Duke Energy* held, a project at an existing unit will constitute an NSPS "modification" only if the project involved work on the boiler that increased the maximum achievable hourly emissions rate. *Id.* at 550.

EPA has not alleged, and cannot prove on the basis of any undisputed facts, that either the Inland Container Project or the unrelated uprate of the boiler increased the maximum achievable hourly emissions rate from the Spurlock boiler.[20] Thus, neither of these projects constituted an NSPS "modification." Accordingly, they cannot trigger PSD "major modification" preconstruction permit requirements.

---

[20] As discussed more fully in EKPC's Opposition to Plaintiff United States' Memorandum in Support of its Sixth Motion for Summary Judgment at 7, the administrative change of the Spurlock 2 boiler in 1994 was unrelated to the Inland Container Project. The administrative re-rate was done to meet EKPC's spinning reserve requirements and required no change to the boiler components at all. Holloway Dep. at 64-65 (Ex. 119); *id.* at 177, 181-182 (Ex. 200). *See also* EKPC Spurlock 2 Mem. at 18-19.

**B.     EPA's Motion Must be Denied Because EKPC Did Not Change the Method of Operation of the Spurlock 2 Boiler.**

EPA claims that EKPC changed the "method of operation" of the Spurlock 2 boiler as that term is defined in the federal and state PSD preconstruction review regulations.[21]  To support its claim, EPA must prove three basic points:  (1) that the preconstruction permit applications EKPC submitted to EPA and Kentucky limited the heat input for the Spurlock 2 boiler; (2) that the federal and state permits made the heat input rate mentioned in those permit applications federally enforceable; and (3) that EKPC operated the boiler in excess of that heat input rate.

No facts support EPA's claims.  Specifically, there are no conditions in the federal or state preconstruction permits limiting Spurlock 2's "hours of operation" or "production rate." The permit applications submitted by EKPC did not impose a limit on the heat input for the Spurlock 2 boiler.  Moreover, even if the 4850 heat input rating were a limit, it is an annual average limit that has never been exceeded.  Thus, EPA's claims that Spurlock 2 "changed the method of operation" of the Spurlock 2 boiler must fail as a matter of law.

> 1) Spurlock 2 is Not Subject to, and Did not Violate, 40 C.F.R §
> 52.21(r)(1) (source obligation provision in EPA's 1980 PSD
> rules), 401 K.A.R. 51:017 (Kentucky's preconstruction permitting
> rules) or 401 K.A.R. 50:035 (Kentucky's operating permit rules).

In 1976, EPA issued a PSD preconstruction permit to Spurlock 2 "in accordance with [EPA's 1974] regulations for the prevention of significant deterioration of air quality." Joint Public Hearing - Rural Electrification Admin.(Aug. 3, 1976) (Ex. 214).[22]  At the time EPA

---

[21] U.S. Fourth Mem. at 31 - 38.

[22] In 1978, EPA revised its PSD regulations to respond to changes made in the PSD program by the 1977 Clean Air Act Amendments and, in 1980, adopted further revisions in response to the decision of the United States Court of Appeals for the District of Columbia in *Alabama Power v. Costle*. *See* 45 Fed.Reg. 52,676 (1980) (Ex. 20).

issued that permit, Kentucky had no authority to review, act upon or enforce PSD permit

applications. EPA "directly issued federal PSD permits to all new PSD sources in Kentucky

between 1974 and 1980." 54 Fed.Reg. 36,307 (1989). On May 19, 1980, EPA delegated to

Kentucky authority to implement and enforce EPA's PSD regulations codified at 40 C.F.R. Part

52 for sources in Kentucky. *See* 47 Fed.Reg. 56,882 (1982) (Ex. 215); 52 Fed.Reg. 8,311

(1987). It was not until 1989, however, that EPA approved Kentucky's PSD program. 54

Fed.Reg. at 36,307.

EPA's approval of Kentucky's program contained a significant caveat that had the effect

of grandfathering from the state program sources like Spurlock 2 which were issued federal PSD

permits prior to 1989. Specifically, EPA stated that "[f]or enforcement purposes, *EPA must*

*retain in the Kentucky SIP the EPA PSD regulations of 40 C.F.R. 52.21 as they apply to these*

*sources*." *Id* at 36,309 (emphasis added). Accordingly, EPA's regulations provide:

> *The provisions of [40 C.F.R.] §52.21(b) through (w) are hereby*
> *incorporated and made a part of the applicable state plan for the*
> *State of Kentucky* only as they apply to permits issued pursuant to
> §52.21 prior to final approval of Kentucky's Regulation for Prevention
> of Significant Deterioration (PSD) ....

40 C.F.R. § 52.931 (emphasis added). Thus, Spurlock 2, as the holder of a 1976 PSD

preconstruction permit issued by EPA pursuant to § 52.21, is subject to the terms and provisions

of the federal PSD regulations and not the Kentucky SIP approved PSD regulations.

EPA repeatedly asserts that EKPC violated "the source obligation" provision at 40 C.F.R. §

52.21(r)(1)(2005), which provides that "[a]ny owner or operator who constructs or operates a

source or modification not in accordance with the application submitted pursuant to this section

or with the terms of any approval to construct ... shall be subject to appropriate enforcement

action." EPA's assertion conveniently ignores the fact that 40 C.F.R. § 52.21(r)(1) (as

promulgated by EPA in 1980) does not apply to the Spurlock 2 permit because the Spurlock 2

permit is explicitly grandfathered from 40 C.F.R. § 52.21(r). Specifically, 40 C.F.R. §

52.21(i)(1) (one of the grandfather provisions included in EPA's 1980 PSD rules) provides that

"the requirements of ... . paragraphs *(j) through (r)* [of § 52.21] *shall not apply*" to a major

stationary source or modification if "construction commenced on the source or modification

before August 7, 1977." For sources like Spurlock that commenced construction before August

7, 1977, "*the regulations at 40 C.F.R. 52.21 as in effect before August 7, 1977, shall govern*

*the review and permitting of such source or modification*." 40 C.F.R. § 52.21(i)(1) (emphasis

added). In sum, Spurlock 2 is not now, nor ever has been, subject to 40 C.F.R. § 52.21(r)(1).

The federal PSD regulatory provision in effect at the time the Spurlock 2 PSD permit was

issued (and which predated § 52.21(r)(1)) was 40 C.F.R. § 52.21(e)(2) (1975). That section, in

language different from § 52.21(r)(1), provided that "[a]ny owner or operator who constructs,

modifies, or operates a stationary source not in accordance with the application, *as approved and*

*conditioned by the [EPA] Administrator*, ... shall be subject to enforcement action under section

7413 of the Act." (emphasis added). EPA has not alleged that EKPC violated 40 C.F.R. §

52.21(e)(2), nor are there any undisputed facts in the record in this case that could support such

an allegation.

As discussed fully above, the heat input rating mentioned in the Spurlock 2 permit

application was not "approved and conditioned" by EPA in the permit it issued in 1976. No such

rating is even mentioned in that permit. The heat input rating was described as an "approximate"

annual heat input rating when it first appeared in the application EKPC filed with Kentucky in

January 1976. W. Gill letter to F. Stanonis (Jan. 23, 1976) (Ex. 110). It was used to model the

potential annual impact of emissions from the boiler but was not explicitly or implicitly

constrained by any PSD permit conditions. There can be no dispute that by its own terms an "approximate" value is not enforceable and, therefore, can not be considered as a limit that is "approved and conditioned by the [EPA] Administrator." If EPA had determined that an enforceable limit on the unit's maximum hourly heat input was needed to assure compliance with applicable NAAQS or PSD increments, EPA had authority to develop a limit that either directly or indirectly restricted heat input, to put it in the permit, and to require monitoring to ensure compliance. EPA took no such action.

### 2) The Activities Alleged by EPA at Spurlock 2 Were Not "Major Modifications" under the Kentucky SIP.

As discussed above, the "major modification" definition of "physical or operational change" that applies to Spurlock 2 is 40 C.F.R. § 52.21(b)(2)(iii)(f) (1981). Pursuant to that subsection, "an increase in hours of operation or in the production rate" at a facility with a § 52.21 permit is an "operational change" only if the increase is "prohibited under a federally enforceable [§ 52.21] permit condition ... ." 40 C.F.R. § 52.21(b)(2)(iii)(f) (1981). There is no condition in Spurlock 2's 1976 Part 52 PSD permit that limits "hours or operation or production rate." Therefore no project undertaken at Spurlock 2, including the small portion of the Inland Container Project that involved Spurlock 2 or the unrelated "uprate" project that involved no physical activity, could be considered a "physical or operational change" under EPA's Part 52 PSD rules. EKPC Spurlock 2 Mem. at 17-23.

EPA attempts to evade these conclusions by asserting that EKPC violated Kentucky's PSD regulations codified at 401 K.A.R. 51:017 Section 1(2)(b)(5) (1992).[23] As discussed above, Kentucky's PSD regulations are not applicable to Spurlock 2. As a result, EPA's approval of

---

[23] *See* U.S. Fourth Mem. at 32.

Kentucky's permitting program did not subject sources, like Spurlock 2, (which were permitted under EPA's PSD regulations codified at 40 C.F.R. § 52.21 prior to 1989) to the Kentucky regulatory definition of "physical or operational" changes. But even under Kentucky's own PSD regulations, EPA's analysis—that Spurlock 2 underwent a "change in the method of operation"—is fatally flawed.

Kentucky's PSD regulations at 401 K.A.R. 51:017 Section 1(2)(b) (1992) provide that "a physical change or change in the method of operation" at a major stationary source shall not include "[a]n increase in the hours of operation or in the production rate, unless the change would be prohibited after January 6, 1975 pursuant to 40 C.F.R. 52.21 . . . or under 401 K.A.R. 50:035 ... ." Thus, the Kentucky regulation references changes that are "prohibited ... pursuant to" § 52.21 and the EPA regulation references "prohibited under a ...[§ 52.21] permit condition." The issue raised by this difference in language is whether the coverage of the Kentucky PSD rule is broader than the coverage of the EPA rule, that is, whether under the Kentucky PSD program, a "physical or operational change" would include an activity that violated, for example, § 52.21(e)(2) but did not violate a condition of a § 52.21 permit. If it did, then the Kentucky PSD regulations would define "physical and operational" not only more broadly than EPA's PSD regulations but also more broadly than Kentucky's nonattainment preconstruction review regulations. For the reasons discussed below, the Kentucky PSD regulation cannot be interpreted to broaden coverage for § 52.21 permitted sources beyond coverage under EPA's PSD regulations and beyond Kentucky nonattainment preconstruction review coverage.

As quoted above, Kentucky's PSD regulations provide that "a physical change or change in the method of operation shall not include . . . an increase in the hours of operation or in the production rate, unless the change would be prohibited...pursuant to 40 CFR 52.21 ...." 401

22

K.A.R. 51:017 Section 1(2)(b)(5). In contrast, Kentucky's 1988 nonattainment regulations provide that "a physical change or change in the method of operation shall not include . . . an increase in the hours of operation or in the production rate, unless such change is prohibited *under a permit condition ... pursuant to 40 CFR 52.21....*" 401 K.A.R. 51:052 Section 2(b)(5) (1988) (emphasis added). The language "prohibited ... pursuant to 40 CFR. §52.21" in 401 K.A.R. 51:017 Section 1(2)(b)(5)(1992) must be interpreted as *only covering* prohibitions contained in *§ 52.21 PSD permit conditions*. That interpretation conforms to EPA's understanding when it approved the Kentucky PSD and nonattainment preconstruction review programs and assures consistency in coverage of the PSD and nonattainment preconstruction review programs in Kentucky.

If EPA's interpretation of the State PSD regulations were correct, that would mean that a source located in areas of Kentucky meeting NAAQS would be subject to *more* expansive new source preconstruction review requirements than a source located in areas that do not meet NAAQS. In other words, sources in PSD areas could be subject to PSD permitting for an activity prohibited under § 52.21(e)(2) (for permits issued prior to March 19, 1978) or an activity prohibited under § 52.21(r)(1) (for permits issued after that date) whereas sources in nonattainment areas would not be subject to PSD review for engaging in activities prohibited under (e)(2) or (r)(1), unless that activity was also prohibited under a § 52.21 permit condition.

The regulatory history of the state PSD regulations, codified at 401 K.A.R. 51:017, does not support an interpretation of the PSD rules which would give the Kentucky PSD programs broader coverage than the EPA PSD program and broader coverage than the Kentucky nonattainment preconstruction review program. As EPA's 1989 *Federal Register* notice proposing to approve Kentucky's PSD regulations explained, Kentucky "developed its PSD

23

regulation according to EPA's PSD regulations [45 Fed.Reg. 52,676 (1980) (Ex. 20)] ... Thus, *approval of the State regulations will not substantially change implementation of the PSD program in Kentucky*." 52 Fed.Reg. 8,311 (emphasis added).

Even if the Kentucky PSD rules were broader and did apply to Spurlock 2, EPA claim that there is an "operational change" because of a heat input rate increase prohibited under § 52.21(r)(1)[24] is without merit. As discussed above, § 52.21(r)(1) does not apply to the Spurlock 2 PSD permit and EPA has not even alleged a violation of 40 C.F.R. § 52.21(e)(2). In any event, for the reasons discussed above, EPA could not show that an increase in heat input rate at Spurlock 2 was prohibited under § 52.21(e)(2). Moreover, even if EPA could establish that 4850 mmBtu/hr was a federally enforceable limit on the annual average heat input capacity of Spurlock 2, as discussed above, that limit has never been exceeded. *See* EKPC's Opposition to Plaintiff United States' Memorandum in Support if its Sixth Motion for Summary Judgment at 19-27. Finally, EPA contends that Spurlock 2 unlawfully changed its operation "under 401 K.A.R. 50:035" adopted in 1988,[25] seven years after Spurlock 2 became operational. Again, the facts and law do not support EPA's claim. 401 K.A.R. 50:035 prohibits, in pertinent part, operation of a state PSD source "not in accordance with the application" submitted pursuant to those state operating permit regulations. EKPC never filed an application, or received an operating permit, under those state operating permit regulations and, therefore, is not subject to them.[26]

---

[24] U.S. Fourth Mem. at 32.

[25] *Id.* at 33.

[26] These regulations were not even federally enforceable until 1990 when EPA approved 401 K.A.R. 50:035. 55 Fed.Reg. 4,169 (1990).

## V. CONCLUSION

For the foregoing reasons, EPA's Fourth Motion for Summary Judgment on Prevention

of Significant Deterioration Preconstruction Permitting Issues must be denied.

Respectfully submitted this 13th day of February, 2006.

/s/ T. Thomas Cottingham, III

By:   T. Thomas Cottingham, III*
Email: tcottingham@hunton.com
Nash E. Long, III*
Brent A. Rosser*
**HUNTON & WILLIAMS LLP**
101 South Tryon Street, Suite 3500
Charlotte, North Carolina 28280
(704) 378-4700
(704) 378-4890 ~ Fax

Dale W. Henley
KY Bar No. 31110
Roger Cowden
KY Bar No. 15183
**EAST KENTUCKY POWER COOPERATIVE**
4775 Lexington Road
P.O. Box 707
Winchester, Kentucky 40391-0707
(859) 744-4812
(859) 744-6008 ~ Fax

John M. Holloway III*
Angela L. Jenkins*
**HUNTON & WILLIAMS LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200
(804) 788-8218 ~ Fax

Keith Moorman
KY Bar No. 49875
**FROST BROWN TODD LLC**
2700 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507-1742
(859) 231-0000
(859) 231-0011 ~ Fax

Mark B. Bierbower*
Andrea Bear Field*
Makram B. Jaber*
Henry V. Nickel
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, DC 20006-1109
(202) 955-1500
(202) 778-2202 ~ Fax

*Admitted *pro hac vice*

25

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing **OPPOSITION TO PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF ITS FOURTH MOTION FOR SUMMARY JUDGMENT: EKPC'S ACTIONS IN CONNECTION WITH THE INLAND STEAM SUPPLY PROJECT INVOLVED PHYSICAL AND OPERATIONAL CHANGES WITHIN THE MEANING OF THE APPLICABLE PREVENTION OF SIGNIFICANT DETERIORATION REGULATIONS** upon each of the parties in this lawsuit as indicated below:

Jason A. Dunn                                                    VIA ELECTRONIC MAIL AND
Environmental Enforcement Section                FIRST CLASS U.S. MAIL
Environment & Natural Resources Division
Department of Justice
ENRD Mailroom, Room 2121
601 D. Street, NW
Washington, DC 20004
Email: Jason.Dunn@usdoj.gov

Sue Ellen Wooldridge                                       VIA FIRST CLASS U.S. MAIL
Assistant Attorney General
Environment and Natural Resources Division
Department of Justice
P.O. Box 7415
Ben Franklin Station
Washington, DC 20044

Frances E. Catron                                            VIA FIRST CLASS U.S. MAIL
Acting U.S. Attorney
Eastern District of Kentucky
110 West Vine Street, Suite 400
Lexington, KY 40507-1671

Andrew Sparks                                                 VIA FIRST CLASS U.S. MAIL
Assistant U.S. Attorney
110 West Vine Street, Suite 400
Lexington, KY 40507-1671

Alan Dion                                                         VIA FIRST CLASS U.S. MAIL
Associate Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303

This 13th day of February 2006.



/s/ T. Thomas Cottingham, III

W/575740