UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34 - KSF

UNITED STATES OF AMERICA

PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.                    DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS
FIRST MOTION FOR SUMMARY JUDGMENT:**

**THE APPLICABLE LEGAL TEST FOR THE
<u>ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT EXCLUSION</u>**

# TABLE OF CONTENTS

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    EPA's Interpretation Of Its Own Regulations Is Entitled To Deference. . . . . . . . . . . . . 2

      A.    EKPC's Discussion of Heart Bypass Surgeries Actually Demonstrates the
            Reasonableness of EPA's Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    The WEPCo Matter Disproves EKPC's Reading of the Exclusion. . . . . . . . . . . . 5

      C.    EKPC's Efforts to Discredit EPA's Discussion of the WEPCo Preamble Show
            That It Cannot Dispute the Reasonableness of EPA's Interpretation. . . . . . . . . . 7

II.   EKPC Bears The Burden Of Proving That Its Projects Were Routine Maintenance. . . . . 9

III.  EPA May Enforce Its Interpretation Of The Routine Maintenance Exclusion. . . . . . . . 13

      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

**Federal Cases**

*Auer v. Robbins*, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Communities for a Better Env't v. Cenco Refining Co.*, 179 F. Supp. 2d 1128
(D.C. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994) . . . . . . . . . . . . . . . . . . . . . . . 11

*Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355 (D.C. Cir. 1989) . . . . . . . . . . . . 11

*National-Southwire Aluminum Co. v. EPA*, 838 F.2d 835 (6th Cir. 1988) . . . . . . . . . . . . . . . 3, 4

*National Steel Corp. v. United States Coast Guard*, 995 F. Supp. 773 (E.D. Mich. 1997) . . . . . 11

*NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706 (2001) . . . . . . . . . . . . . . . . . 11, 12

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997) . . . . . . . . . . . . 15

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) . . . . . . . . . . . . . . . 3, 7, 12

*United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045 (N.D. Ind. 2001) . . . . . . . . . 13

*United States v. Chevron USA, Inc.*, 380 F. Supp. 2d 1104 (N.D. Cal. 2005) . . . . . . . . . . . . . . 13

*United States v. Chevron USA, Inc.*, 639 F. Supp. 770 (W.D. Tex. 1985) . . . . . . . . . . . . . . . . . 14

*United States v. Cinemark USA, Inc.*, 348 F.3d 569 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 15

*United States v. City of Painesville*, 431 F. Supp. 496 (N.D. Ohio 1977) . . . . . . . . . . . . . . . . . 14

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) . . . . . . . . . . . . . 3, 10

*United States v. First City Nat'l Bank of Houston*, 386 U.S. 361 (1967) . . . . . . . . . . . . . . . . . . 10

*United States v. Ford Motor Co.*, 736 F. Supp. 1539 (W.D. Mo. 1990) . . . . . . . . . . . . . . . . . . . 13

*United States v. Larkins*, 657 F. Supp. 76 (W.D. Ky. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Louisiana Pac. Corp.*, 682 F. Supp. 1141 (D. Colo. 1988) . . . . . . . . . . . . . . . 14

*United States v. Murphy Oil USA, Inc.*, 155 F. Supp. 2d 1117 (W.D. Wis. 2001) . . . . . . . . . . 14

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) . . . . . . . . . . 3, 7, 10, 14

*United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) . . . . . . . . 3

**Unreported Federal Cases**

*In re Tennessee Valley Authority*, 2000 WL 1358648 (Envtl. Appeals Bd. Sept. 15, 2000) . . . . . 9

*United States v. Campbell Soup Co.*, No. CV-S-95-1854 DFL,1997 WL 258894
    (E.D. Cal. March 11, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cinergy Corp.*, No. 1:99-cv-01693-LJM-VSS,
    2006 WL 372726 (S.D. Ind. Feb. 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 10

*United States v. Nevada Power Co.*, No. CV-S-87-861-RDF, 1990 WL 149660
    (D. Nev. June 1, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Southern Ind. Gas & Elec. Co.*, No. IP 99-1692-C-M/F,
    2003 WL 446280 (S.D. Ind. Feb. 18, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Federal Statutes**

29 U.S.C. § 152(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 1321(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 1321(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 1344(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 7413(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

42 U.S.C. § 7413(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 7413(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 7413(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

**Federal Register Notices**

57 Fed. Reg. 32314 (July 21, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

The United States' first motion for summary judgment seeks a ruling that EPA's interpretation of the "routine maintenance" exclusion in the applicable Prevention of Significant Deterioration (PSD) and New Source Performance Standards (NSPS) regulations should apply in this case. EKPC raises no genuine issues of material fact in its opposition. Instead, EKPC simply presses its own legal interpretations of EPA's regulations. The question for the Court is not whether EKPC's alternate interpretation is plausible, but whether EPA's interpretation is reasonable and entitled to deference.

As demonstrated in the Government's opening brief, EPA's interpretation of the routine maintenance exclusion found in the applicable regulations is entitled to deference because it is reasonable and consistent with the plain language of the regulations. It is also long-standing. Indeed, EPA and the utility industry had this same debate more than 15 years ago, when industry urged EPA to adopt the same broad test urged by EKPC and, when EPA declined, unsuccessfully challenged EPA's interpretation in the *WEPCo* case.

Further, there is no question that EKPC is seeking the benefit of a regulatory exclusion from the requirements of a statute. Thus, under well established rules of construction, EKPC must bear the burden of proving that it is entitled to the routine maintenance exclusion.

Finally, EKPC may not avoid this enforcement action by arguing that EPA did not issue a formal applicability determination covering its projects. EKPC's assertion that EPA must issue an applicability determination as a condition precedent to an enforcement action is contrary to the Clean Air Act. Under Section 113 of the Clean Air Act, the only prerequisite to filing a federal enforcement action for violation of PSD provisions in a state implementation plan is a Notice Of Violation (NOV) issued 30 days prior to suit. As to NSPS and Title V violations,

there is not even an NOV requirement.  EKPC's attempt to impose new conditions prior to filing

an enforcement action under the Clean Air Act is creative but meritless.

## ARGUMENT

**I.    EPA's Interpretation Of Its Own Regulations Is Entitled To Deference.**

The Court has been presented with starkly different interpretations of EPA's routine

maintenance exclusion.  EKPC argues that the exclusion should be interpreted this way:

> The RMRR determination turns on what is routine within the relevant industrial category, not on what is routine at an individual emissions unit.

EKPC Opp. No. 1, at 3.  By that, EKPC means that whether a project is routine maintenance

"turns on" whether "similar" have been performed in the industry as whole in accordance with

established business practices.  *See id*; Aug. 15, 2005 Golden Report (Ex. 12 to Docket No. 61),

at 24, 26, 31.  This may be the test that EKPC would prefer, but it is not EPA's interpretation and

hence it is not the law.  Rather, EPA's interpretation holds that the "very narrow exclusion"

provided by the applicable regulations for routine maintenance is intended "to construe the term

'physical change' very broadly, to cover virtually any significant alteration *to an existing plant*."

1988 Clay Memo (Ex. 2 to Docket No. 61), at 3 (emphasis added).  EPA thus interprets the

routine maintenance exclusion to require a case-by-case analysis, considering the nature and

extent, purpose, frequency, and cost of an activity to come to a "common-sense" determination

of whether it is routine maintenance for the type of plant at issue, *i.e.*, "a regular, customary, or

standard undertaking for the purpose of maintaining the plant in its present condition."  *Id.* at 3-

4; *see also* Casa Grande Determination (Ex. 15 to Docket No. 61), at 3-6; Monroe Electric

Determination (Ex. 18 to Docket No. 56), at 12; Detroit Edison Determination (Ex. 17 to Docket

No. 61), at enclosure pp. 6-17.  Courts have held that EPA's interpretation has three hallmarks:

> First, the exemption applies to a narrow range of activities, . . . . Second, the exemption applies only to activities that are routine for a generating unit. The exemption does not turn on whether the activity is prevalent within the industry as a whole. Third, no activity is categorically exempt. EPA examines each activity on a case-by-case basis, looking at the nature and extent, purpose, frequency, and cost of the activity.

*United States v. Southern Ind. Gas & Elec. Co. (SIGECO)*, No. IP 99-1692-C-M/F, 2003 WL 446280, at * 2 (S.D. Ind. Feb. 18, 2003).[1] It is this interpretation, not EKPC's alternate interpretation, which the court must defer to so long as it is not "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see National-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 838 (6th Cir. 1988) ("The Agency's interpretation of its own regulations is entitled to special deference.").

EKPC's opposition ignores the reasonableness of EPA's interpretation, and instead makes three equally unavailing arguments concerning (1) an analogy concerning heart bypass surgeries, (2) the Clay Memo and the Seventh Circuit's decision in *Wisconsin Elec. Power Co. v. Reilly* (*WEPCO*), 893 F.2d 901 (7th Cir. 1990), and (3) EPA's statement in the 1992 WEPCo Rule preamble confirming the extent to which industry practice may be relevant to routine maintenance determinations. As discussed below, EKPC's three arguments do nothing to alter the fact that EPA's interpretation is reasonable and entitled to deference.

---

[1] *See also United States v. Ohio Edison Co*, 276 F. Supp. 2d 829, 854-56 (S.D. Ohio 2003); *United States v. Southern Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1008-09 (S.D. Ind. 2003); *but see United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 637-38 (M.D.N.C. 2003). Since the filing of EKPC's opposition, the Southern District of Indiana has confirmed its decisions in *SIGECO*, and again upheld EPA's interpretation – including that the routine maintenance exclusion "applies only to activities that are routine for a generating unit" – as reasonable and entitled to deference. *United States v. Cinergy*, No. 1:99-cv-01693-LJM-VSS, 2006 WL 372726 (S.D. Ind. Feb. 16, 2006), at 5 (slip opinion attached as Ex. 1). The *Cinergy* court confirmed that the frequency of a project at a particular unit, as well as the frequency of a project in the industry, are both relevant considerations to help determine whether a project meets this narrow test. *See id.* at 7. In so holding, the court confirmed that the test does *not* – as EKPC argues here – "turn on whether a certain type of project is prevalent within the industry as a whole." *Id.*

3

A. **EKPC's Discussion of Heart Bypass Surgeries Actually Demonstrates the Reasonableness of EPA's Interpretation.**

EKPC concedes that a "heart bypass" analogy illustrates the difference between EPA's interpretation of routineness and EKPC's interpretation. EKPC Opp. No. 1, at 4.[2] But EKPC then goes on to criticize the United States because, EKPC claims, the analogy does not "*prove* the correctness*" of EPA's interpretation. *Id.* That is not the law. The United States does not need to *prove* that EPA's interpretation of its own regulations is more reasonable than EKPC's. Rather, EPA's interpretation is entitled to deference as long as it is consistent with the plain language of the regulations. *See National-Southwire*, 838 F.2d at 838. Indeed, EPA's interpretation need not even be the best one, only "a reasonable construction." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994). As explained in our opening brief, EPA's narrow interpretation easily passes this test because it fits comfortably within the plain language of the "routine maintenance, repair, and replacement" exclusion and the purposes of the Clean Air Act.

That said, EKPC's discussion of the heart bypass analogy actually does prove exactly why EPA's interpretation is particularly appropriate as applied to EKPC's projects. First, it must be noted that EPA's interpretation of the routine maintenance exclusion does not exist in a vacuum. The regulatory exclusion for routine maintenance exists in the context of an environmental protection statute that requires owners of *sources* to comply with permitting and other requirements prior to undertaking projects that will increase emissions to the air. The statute and regulations plainly apply to *sources* (patients in the bypass analogy), not contractors who perform work at sources (cardiac specialists in the bypass analogy). Just as one would

---

[2] EKPC recognizes that a heart bypass would not be a routine medical procedure for a patient, but argues that it would be for cardiac specialists.

4

expect a patient's insurance company to impose more documentation and approval requirements

on a patient prior to authorizing major heart surgery versus a routine check-up, so too do the

applicable regulations impose more requirements on *sources* undertaking massive construction

projects versus routine maintenance projects.  This is true even though similar activities may

occur each year, just as similar heart surgeries occur each year.  Indeed, patients presumably

hope that their surgeons have performed many similar surgeries in the past, just as sources

presumably select contractors with prior experience performing similar construction work.  But

that does not render a complicated, costly, life-extending, once-in-a-lifetime event a routine

medical procedure for patients or routine maintenance for sources.  Because the PSD and NSPS

regulations focus on requirements for modified *sources*, EPA's focus on what is routine

maintenance for those sources is more reasonable than EKPC's focus on the overall prevalence

of an activity in the industry.

      **B.**      **The WEPCo Matter Disproves EKPC's Reading of the Exclusion.**

EKPC apparently does not dispute that the Clay Memo set forth EPA's interpretation of

the routine maintenance exclusion in the context of utility renovation projects.  Nor does EKPC

address EPA's consistent prior and subsequent determinations.  Instead, EKPC simply asserts

that the Clay Memo supports its own interpretation of the exclusion.  *See* EKPC Opp. No. 1, at 6.

Yet EKPC's opposition makes no reference to any specific language of the Clay Memo itself,

and EKPC fails to even attempt to rebut the explanation in the Government's opening brief as to

why EKPC's reading of the Clay Memo is wrong.  *See* Docket No. 61, at 13-17, 31-33.

The Clay Memo explicitly rejected the very test that EKPC urges on this Court – the

broad "established business practice" test that WEPCo asked for in 1988.  *See id.* at 14-17.  The

Clay Memo found WEPCo's project to be non-routine, not based on overall business practices or a comparison to similar industry projects, but rather based on a case-by-case evaluation of the nature and extent, purpose, frequency, and cost of the projects, to determine whether the projects were routine in the context of projects undertaken *at a utility plant*, *i.e.*, "a regular, customary, or standard undertaking for the purpose of maintaining *the plant* in its *present condition*."  Ex. 2 to Docket No. 61, at 3-4 (emphasis added).  The United States does not dispute that "industry practice" can inform the analysis of routine maintenance in several ways (*i.e.*, what is routine maintenance for other units in the same industry may shed light on whether a particular project is routine for a unit in that industry, just as the frequency with which an activity occurs at the source level within the industry is relevant).  But that does not turn the routine maintenance test into EKPC's common in the industry test.[3]  *See Cinergy* (Ex. 1), at 5-7.  EKPC offers no response to EPA's explanation of how general industry practice *can* inform the analysis of whether a project is routine *for an individual unit*.[4]  U.S. Memo in Support of First Motion (Docket No. 61), at 33-34.

---

[3] An informal industry survey undertaken by EPA after issuance of the Clay Memo was expressly undertaken to address WEPCo's claim that it was being unfairly singled out as an equitable matter, not WEPCo's claim that its projects were routine.  *See* October 14, 1988 Letter to Boston (Ex. 4 to Docket No. 61), at 3 (addressing "routineness" before moving on to "equity question.").

[4] EKPC also claims that EPA's interpretation "first emerged as a litigating position in Plaintiff's enforcement initiative."  EKPC Opp. No. 1, at 2.  This is demonstrably false.  In addition to the utility-specific 1988 Clay Memo (which was issued more than a decade prior to EPA's "enforcement initiative"), EPA previously applied a case-specific, multi-factor, narrow interpretation of the routine maintenance exclusion in prior determinations.  *See* U.S. Memo in Support of First Motion (Docket No. 61), at 32-33; U.S. Opp. To EKPC Motion No. 1 (Docket No. 76), at 19 n.18.  EKPC's claim that EPA recently fabricated a new routine maintenance interpretation is also contrary to the 15 year old complaints of its own lawyers in this case.  *See, e.g.*, June 5, 1989 Letter from Henry Nickel, Hunton and Williams (Ex. 6 to Docket No. 61), at enclosure p. 3 (lobbying the Department of Energy to overturn EPA's narrow interpretation and characterizing EPA interpretation as applying only to activities that "(1) are frequently done at that plant, (2) involve no major equipment, (3) are inexpensive, and (4) do not extend the life of a plant.").

EKPC also disputes that the Seventh Circuit upheld EPA's narrow interpretation, and instead incorrectly asserts that the *WEPCo* court adopted a common in the industry approach. EKPC Opp. No. 1, at 6. In fact, the *WEPCo* court unambiguously deferred to and upheld EPA's determination in the Clay Memo. *See* 893 F.2d at 912. Indeed, EKPC offers no discussion at all of the actual holding of *WEPCo*. Instead, EKPC cites the *Duke Energy* district court decision for the proposition that "the only way in which both experience at a unit and in the industry at large can be relevant is under a routine within the industry standard." EKPC Opp. No. 1, at 6. That proposition does not follow. As noted above, industry experience *can* be relevant under EPA's narrow interpretation; if, for example, a source offers evidence that a project undertaken for the first time by that source is nevertheless frequently performed in the lives of other individual units in the same industry, EPA will consider such evidence of industry practice. Similarly, the fact that a project has never been done before by any utility is strong evidence that the industry does not consider it routine maintenance for its units. There is no requirement that a source ignore industry practice. However, the simple prevalence of other once-in-a-lifetime projects at other sources sheds little if any light on whether a project is truly "routine maintenance" for a unit. *Ohio Edison*, 276 F. Supp. 2d at 856. EKPC offers no rebuttal to this basic proposition.[5]

**C.     EKPC's Efforts to Discredit EPA's Discussion of the WEPCo Preamble Show That It Cannot Dispute the Reasonableness of EPA's Interpretation.**

At bottom, EKPC stakes its interpretation of the routine maintenance exclusion on a sentence in a 1992 preamble to a rule dealing with emissions calculations that confirmed that

---

[5] EKPC does not even attempt to explain how its routine in the industry test could possibly be construed as a "very narrow exclusion" as EPA stated in the Clay Memo. Nor can it. EKPC's President and environmental affairs manager both conceded that they could think of no maintenance, repair, or replacement activity that would be considered non-routine for a power plant. *See* U.S. Memo in Support of First Motion (Docket No. 61), at 22-23.

application of the exclusion "must be based on . . . whether that type of equipment has been repaired or replaced by sources within the relevant industrial category." 57 Fed. Reg. 32314, 32326 (July 21, 1992). EKPC never squarely addresses EPA's explanation of this sentence, *i.e.*, that it recognizes that one should consider whether an activity is routine in the context of the "relevant industrial category" – that is, the particular industry at issue. *See* U.S. Memo in Support of First Motion (Docket No. 61), at 33-34; TVA Order (Ex. 14 to Docket No. 61), at 49-50; Detroit Edison Determination (Ex. 17 to Docket No. 61), at enclosure p. 15. Instead, EKPC implies that EPA's explanation "defies credulity" since, EKPC contends, "no one has *ever* argued" that the routine maintenance exclusion allows "comparisons of projects *across* industrial categories." EKPC Opp. No. 1, at 7.

Whether or not someone has specifically argued for "cross-industry" comparisons does not determine whether EPA's interpretation is reasonable and thus entitled to deference. However, in fact EKPC is flat wrong to claim that no one had ever argued for such cross-industry comparisons. In fact, EKPC's own lawyers in this case made precisely such an argument in the WEPCo matter, when WEPCo unsuccessfully tried to convince EPA to adopt a broad established business practice test. Hunton and Williams argued that WEPCo's projects should be considered routine because "The Port Washington project is no different in kind from restoration projects undertaken in the past by owners of power plants, paper plants, steel mills, and other industrial facilities." *See* July 29, 1988 Memo (Ex. 1 to Docket No. 61), at memorandum p. 15. EPA's discussion of the preamble language is not only reasonable, it is compelled by the history of EPA's and industry's dispute over the proper scope of the routine maintenance exclusion.

8

EKPC similarly attacks EPA's discussion of the 1992 preamble because, EKPC incorrectly contends, it is different than EPA's argument in *In re Tennessee Valley Authority*, 2000 WL 1358648 (Envtl. Appeals Bd. Sept. 15, 2000) (Ex. 14 to Docket No. 61). EKPC goes so far as to claim that EPA's explanation of the preamble language is a "creative reinterpretation" of the preamble that had not yet been "concocted" at the time of the TVA case. *See* EKPC Opp. No. 1, at 7. This argument is spurious. As is clear from a portion of the TVA decision that EKPC fails to quote, the interpretation that EPA urges this Court to follow here is the *identical* interpretation urged by EPA's enforcement office in the TVA case. After discussing the very same 1992 preamble language at issue here, the Environmental Appeals Board stated that:

> EPA Enforcement acknowledges that the determination of what is routine is necessarily informed by the context of the industry within which a facility operates. . . but argues that the fact that a number of facilities within an industry may have undertaken a project which would be viewed as significant in the life of any individual facility does not render such a project 'routine' within the meaning of the exception.

TVA Order (Ex. 14 to Docket No. 61), at 49 (citation omitted). This is the same interpretation of the preamble language urged by EPA here, and is likewise consistent with the interpretation of the routine maintenance exclusion set forth in the Clay Memo. It is reasonable and entitled to deference. EKPC's *ad hominem* attacks on EPA's discussion of the WEPCo preamble are belied by the facts and only serve to further highlight that EKPC has no response to the reasonableness of EPA's interpretation.

## II.     EKPC Bears The Burden Of Proving That Its Projects Were Routine Maintenance.

EKPC asserts that it is entitled to the benefits of the routine maintenance exclusion, which exempts projects from being considered a "physical change" under the Clean Air Act.

Answer, ¶ 115.  Accordingly EKPC, as the party claiming the benefit of an exemption to compliance with a statute, bears the burden of proof as to the exclusion.  *See United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967).  This rule has been specifically applied in the context of the routine maintenance exclusion, most recently by the Southern District of Indiana in a recent decision issued subsequent to the Government's motion.  *See Cinergy*, No. 1:99-cv-01693-LJM-VSS (Ex. 1) at 7-8; *see also Ohio Edison*, 276 F. Supp. 2d at 856; *but see Duke Energy,* 278 F. Supp. 2d at 639-40.  It has also been applied by EPA's Environmental Appeals Board.  *See* TVA Order (Ex. 14 to Docket No. 61), at 45 n.31.

    In an effort to avoid this clear rule, EKPC cites to a number of environmental cases for the inapposite proposition that EPA bears the burden of establishing a regulatory violation. EKPC Opp. No. 1, at 9  The United States does not contend otherwise.  However, it is undisputed that EKPC claims that its projects are exempt from Clean Air Act requirements because of an exception which excludes "routine maintenance" activities.  Accordingly, while EPA bears the burden of proving a physical or operational change that increases emissions, the burden shifts to EKPC to establish its entitlement to the routine maintenance exclusion.  EKPC's contention that it is not really the party "asserting the benefit" of this exclusion ignores reality.

    EKPC also cites cases which, it claims, support its argument that the general rule placing the burden on the party claiming the benefit of an exemption does not apply where the exemption is "definitional," *i.e*, where the exempted activity is "an element of the definition" of the prohibited activity.  *Id.* at 9-10.  EKPC's cases simply do not support its proposition.  In fact, they unambiguously confirm that the party claiming the benefit of an exemption bears the burden, even where the exemption *is* "definitional."

For instance, *National Steel Corp. v. United States Coast Guard*, 995 F. Supp. 773 (E.D.

Mich. 1997) dealt with the Clean Water Act's prohibition against "discharge" of oil at 33 U.S.C.

§ 1321(b)(3).  Like the regulatory definition of "physical change," the statutory definition of

"discharge" itself specifically defined discharge as excluding certain activities.  *Id.* § 1321(a)(2).

Citing the general rule of statutory construction, the court held:

> The burden is on the Coast Guard to show that there exists substantial evidence in
> the record to support its finding.  Great Lakes, however, had the burden of
> proving to the Coast Guard that one of the statutory exemptions was applicable.

*Id.* at 778.  Similarly, *United States v. Larkins*, 657 F. Supp. 76 (W.D. Ky. 1987), dealt with the

Clean Water Act's prohibition against discharging pollutants under 33 U.S.C. § 1311(a).  That

section makes discharges unlawful except in compliance with, *inter alia*, a maintenance

exception at 33 U.S.C. § 1344(f).  Even though the applicable exception was referenced in 33

U.S.C. § 1311(a), the court held that the burden of proof shifted "to the defendants to show that

their construction activities qualify for an exemption"  *Larkins*, 657 F. Supp. at 85 (footnote

omitted).[6]  EKPC's contention that environmental cases somehow follow a different statutory

rule of construction is simply not borne out by its citations.[7]

Finally, EKPC takes issue with our citation of *NLRB v. Kentucky River Community Care,*

*Inc.*, 532 U.S. 706 (2001).  EKPC Opp. No. 1, at 11-13.  EKPC's discussion of this case misses

---

[6] The other case cited by EKPC, *Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355 (D.C. Cir. 1989)
(*HWTA*) is inapposite for two reasons.  First, unlike the present case, the regulations at issue in that case expressly
*allowed* storage of waste unless *EPA* could demonstrate that such storage was for an improper purpose.  *See id.* at
359-60.  Second, the *HWTA* case referred to the burden of coming forward, and although EKPC cites a subsequent
Supreme Court case for the proposition that *HWTA* should be read as opining on the burden of proof, that case
actually confirms that the burden shifts to the proponent of an affirmative defense.  *See Director, OWCP v.
Greenwich Collieries*, 512 U.S. 267, 274, 279 (1994).

[7] As discussed in our opening brief, the general rule concerning exceptions to statutory mandates applies with
even more force for the routine maintenance exclusion, because it is not found in the statute at all but is rather a
creature of regulation.  *See* Docket No. 61, at 26 n.10.  EKPC does not respond to this argument.

the point.  The import of *Kentucky River* is that it confirms beyond doubt that the general rule

concerning burdens of proof applies equally to what EKPC refers to as "definitional" exclusions.

At issue in *Kentucky River* was whether certain employees were "supervisory" under the

National Labor Relations Act (NLRA) and therefore "excluded from the protections of the Act."

532 U.S. at 708.  Just as the regulatory term "physical change" is specifically defined by EPA's

regulations to exclude "routine maintenance," the statutory term "employee" is specifically

defined by the NLRA to exclude a "supervisor."  29 U.S.C. § 152(3).  The supervisor exclusion

was thus unambiguously "definitional."  The Supreme Court nevertheless held that the general

rule of statutory construction placed the burden on the party seeking the benefit of the exclusion.

*Kentucky River*, 532 U.S. at 711.  The question here is whether certain activities are "routine

maintenance" and therefore excluded from the requirements of the Clean Air Act.  Accordingly,

the Supreme Court's reasoning in *Kentucky River* is equally applicable to the case at bar and

EKPC bears the burden of proving its entitlement to the routine maintenance exclusion.[8]

In short, there is no justification for this Court to deviate from the black letter law

requiring EKPC, as the proponent of an exclusion, to bear the burden of proof.

---

[8] EKPC also makes a half-hearted attempt to distinguish the definitions at issue in *Kentucky River* by claiming that it is not clear that EKPC's projects would constitute physical changes if they were not expressly excluded from the definition of physical change.  EKPC Opp. No. 1, at 13.  EKPC's argument ignores the structure of the statute and regulations.  "Physical change" is not defined by the Clean Air Act.  Instead, EPA's regulations describe activities that are not considered physical changes, such as routine maintenance.  EPA has explained that "the definition of physical change . . . could, standing alone, encompass the most mundane activities at an industrial facility."  57 Fed. Reg. at  32316.  EPA's regulations "construe the term 'physical change' very broadly, to cover virtually any significant alteration to an exiting plant."  Clay Memo (Ex. 2 to Docket No. 61), at 3; Monroe Electric Determination (Ex. 18 to Docket No. 56), at 12; *see also WEPCo*, 893 F.2d at 908 (citing cases for proposition that "'any physical change' means precisely that").  If EKPC's projects are not routine maintenance under the regulations, then they are considered physical changes.

## III.     EPA May Enforce Its Interpretation Of The Routine Maintenance Exclusion.

EKPC next argues that EPA is forbidden from enforcing its interpretation of the routine

maintenance exclusion because EPA never issued an applicability determination covering

EKPC's projects.  EKPC Opp. No. 1, at 16-17.  Essentially, what EKPC argues is that EPA must

issue a formal applicability determination to a source prior to filing a federal enforcement action

under the Clean Air Act.  While this is certainly a novel argument, it is directly contravened by

the statute.[9]  The Clean Air Act unambiguously provides EPA with authority to enforce the PSD

and NSPS provisions of the Act and applicable implementing regulations.[10]  The *only*

prerequisite to this enforcement authority is the issuance of an NOV.  *See* 42 U.S.C.

§ 7413(a)(1), (b)(1).[11]  EKPC admits that it received NOVs for its alleged violations in this case.

*See* EKPC Response to Request for Admission No. 1 (Ex. 56 to Docket No. 65); Answer, ¶ 6.[12]

By statute, EPA was entitled to enforce these violations 30 days following issuance of the

---

[9] In addition to being contrary to the statute, EKPC's argument also ignores the fact that there is one reason that EPA never issued an applicability determination evaluating EKPC's projects:  EKPC forged ahead with is projects without asking EPA for one.  In fact, in the only written correspondence to the Kentucky Division for Air Quality (KDAQ) concerning the Inland Steam Supply Project, EKPC was specifically put on notice that its actions raised PSD concerns.  EKPC responded by saying it had changed its plans.  *See* U.S. Memo in Support of Fourth Motion (Docket No. 67), at 35-36.  In the only written correspondence to KDAQ concerning any of the Dale modifications, EKPC did not ask for or receive a PSD or NSPS determination, and did not tell KDAQ that it was increasing the capacity of its units.  *See* U.S. Opp. to EKPC Motion No. 1 (Docket No. 76), at 26-27.

[10] Not surprisingly, EKPC cites no cases holding that a company can preclude an enforcement action by simply avoiding an opportunity for formal approval prior to undertaking a prohibited activity.

[11] As to EPA's NSPS and Title V claims, which unlike the PSD claims are independent of the Kentucky SIP, EPA did not even need to issue an NOV prior to initiating its enforcement action.  *See* 42 U.S.C. § 7413(a)(3); *United States v. Nevada Power Co.,* No. CV-S-87-861-RDF, 1990 WL 149660, * 8 (D. Nev. June 1, 1990); *see also United States v. BP Exploration & Oil Co.,* 167 F. Supp. 2d 1045, 1051 (N.D. Ind. 2001).

[12] The sufficiency of the NOV requirement is viewed liberally.  *See, e.g.*, *United States v. Chevron USA, Inc.*, 380 F. Supp. 2d 1104, 1109-10 (N.D. Cal. 2005); *United States v. Ford Motor Co.*, 736 F. Supp. 1539, 1550 (W.D. Mo. 1990).  The NOVs informed EKPC that EPA considered the specific projects at issue in this case to be physical changes that increased emissions.  EKPC raised the routine maintenance exclusion as an affirmative defense to argue that these projects should not be considered physical changes.

NOVs. *See* 42 U.S.C. § 7413(a)(1), (b)(1). Applicability determinations are an opportunity for sources to obtain guidance from EPA pertaining to specific projects; they are not a prerequisite to enforcement action.

In short, EPA has alleged that EKPC violated the PSD and NSPS provisions of the Act and applicable regulations. This Court has jurisdiction to hear an action alleging such violations pursuant to 42 U.S.C. § 7413(b). The Court's exercise of its jurisdiction will not, as EKPC contends, usurp EPA's discretion. Rather, in this litigation the Court will determine whether EPA's interpretation of the routine maintenance exclusion is reasonable, and whether EKPC has met its burden of proof to show entitlement to the exclusion. The Court will then apply the law and determine whether it was violated by EKPC's actions. This case is thus no different than any other case heard by this or any other court where a party has been alleged to have violated the law.[13]

Finally, EKPC challenges EPA's interpretation of the routine maintenance exclusion because of the case-by-case nature of routine maintenance determinations, which EKPC complains does not provide a specific enough test. EKPC Opp. No. 1, at 21-22. This is just a variation on EKPC's rulemaking challenge, which is both too late and in the wrong court. *See* U.S. Memo in Support of Fifth Motion (Docket No. 69), at 28-30. In any case, the Sixth Circuit has confirmed that such challenges are meritless in enforcement actions:

---

[13] *See, e.g.*, *United States v. City of Painesville*, 431 F. Supp. 496 (N.D. Ohio 1977); *United States v. Chevron USA, Inc.*, 639 F. Supp. 770, 778-79 (W.D. Tex. 1985); *United States v. Louisiana Pac. Corp.*, 682 F. Supp. 1141, 1159 (D. Colo. 1988); *United States v. Campbell Soup Co.*, No. CV-S-95-1854 DFL, 1997 WL 258894, at * 5 (E.D. Cal. March 11, 1997); *Ohio Edison*, 276 F. Supp. 2d at 829; *Communities for a Better Env't v. Cenco Refining Co.*, 179 F. Supp. 2d 1128, 1143-44 (D.C. Cal. 2001); *see also United States v. Murphy Oil USA, Inc.*, 155 F. Supp. 2d 1117 (W.D. Wis. 2001) (finding PSD violations despite prior state applicability determinations).

> An agency's enforcement of a general statutory or regulatory term against a regulated party cannot be defeated on the ground that the agency has failed to promulgate a more specific regulation. The choice made between proceeding by general rule or by individual *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency. . . . [T]he enforcement action is either warranted by the statute and the regulation or it is not.

*United States v. Cinemark USA, Inc.*, 348 F.3d 569, 580 (6th Cir. 2003) (internal citations and quotations omitted). EKPC's claim that EPA's interpretation of the routine maintenance exclusion is unlawful for its purported lack of specificity must fail.[14]

## CONCLUSION

The Government's First Motion for Summary Judgment should be granted. EPA's narrow, case-by-case multi-factor test for determining what is routine maintenance for an electricity generating unit is reasonable and entitled to deference.

---

[14] The case cited by EKPC, *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C. Cir. 1997), does not stand for a contrary proposition. In that case, the court deferred to an Agency interpretation even though it was "by no means obvious" from the language of the regulation. *Id.* at 583. Here, EPA's interpretation is well grounded in the plain language of the regulations and was set forth in guidance such as the Clay Memo.

DATED: March 6, 2006.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources
  Division
United States Department of Justice

__/s/ Jason A. Dunn_____
PHILLIP A. BROOKS
JASON A. DUNN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON
Environmental Enforcement Section
Environment and Natural Resources
  Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111

FRANCES E. CATRON
Acting United States Attorney
Eastern District of Kentucky

ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661

OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

16

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Reply in Support of the United States' First Motion for Summary Judgment on the Applicable Legal Test for Routine Maintenance was served on March 6, 2006, on the persons listed below:


John M. Holloway III                    By Express Mail and E-Mail
Angela L. Jenkins
Hunton and Williams LLP
951 East Byrd St.
Richmond, Virginia 23219-4074
(804) 788-8200

T. Thomas Cottingham, III               By Express Mail and E-Mail
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: (704) 378-4700



                            __/s/ Jason Dunn_____
                            Jason Dunn