UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34 - KSF


UNITED STATES OF AMERICA

PLAINTIFF,


VS.


EAST KENTUCKY POWER COOPERATIVE, INC.          DEFENDANT.


* * * * * * * * * * *

**PLAINTIFF UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS
FOURTH MOTION FOR SUMMARY JUDGMENT:**

**EKPC'S ACTIONS IN CONNECTION WITH THE INLAND STEAM
SUPPLY PROJECT INVOLVED PHYSICAL AND OPERATIONAL CHANGES
WITHIN THE MEANING OF THE APPLICABLE
<u>PREVENTION OF SIGNIFICANT DETERIORATION REGULATIONS</u>**

**TABLE OF CONTENTS**

STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

I.      The Inland Steam Supply Project Was A Physical Change. . . . . . . . . . . . . . . . . . . . -5-

II.     EKPC Changed The Method of Operation Of Spurlock Unit 2 By Increasing
        The Production Rate Of the Spurlock Unit 2 Boiler. . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

        A.      There Is No Dispute that EKPC Expected to Increase Heat Input
                Levels Above the Levels in its Permits and Permit Applications. . . . . . . . . . -10-

        B.      There Is No Dispute That EKPC Expected to Increase Heat Input
                Levels Above the Levels Used in Prior PSD Modeling. . . . . . . . . . . . . . . . . . -13-

III.    The Inland Steam Supply Project Is Subject To The Kentucky PSD Regulations. . . . -14-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

# TABLE OF AUTHORITIES

## Federal Cases

*Bsharah v. Eltra Corp.*, 394 F.2d 502 (6th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Binzel*, 907 F.2d 746 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Chrysler Corp.*, 437 F. Supp. 94 (D.D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 12

## Federal Statutes

42 U.S.C. § 7475(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 7479(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Federal Regulations

40 C.F.R. § 51.166(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

40 C.F.R. § 51.166(b)(1)(i)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 51.166(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 51.166(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

40 C.F.R. § 51.166(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(j)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 51.166(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 52.21(b)(2)(iii)(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

40 C.F.R. § 52.21(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

40 C.F.R. § 52.21(r)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Federal Register Notices**

39 Fed. Reg. 42510 (Dec. 5, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

45 Fed. Reg. 52676 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

54 Fed. Reg. 36307 (Sept. 1, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**State Regulations**

401 KAR 51:017 Section 1(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

401 KAR 51:017 Section 1(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

401 KAR 51:017 Section 1(2)(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

401 KAR 51:017 Section 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:017 Section 8(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

401 KAR 51:017 Section 8(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

401 KAR 51:017 Section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:017 Section 9(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:017 Section 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:017 Section 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:017 Section 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:017 Section 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

401 KAR 51:035 Section 1(2)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

401 KAR 51:035 Section 5(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

401 KAR 51:035 Section 7(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

The United States' fourth motion for summary judgment raises the issue of whether the Inland Steam Supply Project satisfies the first prong of the "major modification" test under the Prevention of Significant Deterioration (PSD) regulations. This prong is satisfied if a project is either a "physical change" or a "change in the method of operation" of a "major stationary source." If a project involves *either* type of change, then it must be evaluated under the second prong of the PSD test to determine whether it is expected to increase emissions. The method for projecting emissions increases is the subject of separate briefing. The only question posed by this motion is whether EKPC's activities with respect to the Inland Steam Supply Project involved either a physical *or* operational change.

The undisputed facts show that the answer to this question must be yes for both types of changes. The term "physical change" is not defined in the Clean Air Act or PSD regulations. Instead, the applicable regulations provide a narrow exclusion for certain work that is not considered a change in the first place: "routine maintenance, repair and replacement." EKPC does not contend that the changes associated with the Inland Steam Supply Project constituted routine maintenance, repair or replacement. EKPC's only dispute is with whether *some* of its changes occurred at an "emissions unit." Although the facts show that EKPC actually has physically changed an "emissions unit," this dispute is irrelevant to whether PSD was triggered. PSD applies to changes to a "major stationary source," which includes more than just an "emissions unit."[1] As demonstrated below, there is no dispute that EKPC changed a "major

---

[1] At the time of the Inland Steam Supply Project, the Spurlock Plant was comprised of two electricity generating units, Spurlock Unit 1 and Spurlock Unit 2. Each electricity generating unit is made up of multiple components required to generate steam and turn that steam into electricity. An "emissions unit," which includes a boiler, is one part of an electricity generating unit such as Spurlock Unit 2. An "emissions unit" means "any part of a stationary source which emits or would have the potential to emit" pollution. 40 C.F.R. § 51.166(b)(7).

stationary source." Accordingly, the Court can rule as a matter of law that the Inland Steam

Supply Project was a physical change under the first prong of the major modification test.

The undisputed facts also show that EKPC changed the method of operation of Spurlock

Unit 2. Although the statute and regulations do not explicitly define "change in the method of

operation," the regulations provide a narrow exclusion for changes in "hours of operation or in

the production rate." The regulations further provide that even a simple increase in production

rate *will* be considered a "change" if the increase would violate other requirements, such as

requirements contained in permits or permit applications. EKPC does not dispute that it

expected hourly heat input levels to exceed the boiler heat input levels in its pre-existing permits

and permit applications. Accordingly, the Court should also rule as a matter of law that EKPC

changed the method of operation of Spurlock Unit 2 within the meaning of the PSD regulations.

## STATEMENT OF MATERIAL FACTS

EKPC takes issue with three facts asserted by the United States. As discussed below, the

record shows that each of these facts is well grounded in EKPC's documents and its expert's

admissions. In any case, even if there were any genuine dispute concerning these facts, they are

not material to whether the Inland Steam Supply Project was a physical or operational "change."

First, EKPC accuses the United States of mischaracterizing EKPC's "PSD" expert, Mr.

Ken Weiss, as having testified that some of the physical changes at Spurlock Unit 2 were done to

an "emissions unit." EKPC Opp. No. 4, at 1. In fact, Mr. Weiss' sworn testimony

unambiguously shows that he concedes EKPC changed an emissions unit at Spurlock Unit 2:

> Q. Do you know whether or not any changes needed to be made to the high pressure
> feedwater system at Spurlock unit 2 as part of the steam extraction project?
>
> A. Yes. I would say they did.

-2-

\* \* \*

Q.   You're not a boiler expert, but you would agree that the Rasnic memo sets forth what the boiler is for purposes of an emissions unit?

A.   Yes.

\* \* \*

Q.   So putting aside the impact and causation, et cetera, because after all, that's not something that we are going to settle here, you would agree, though, that the high pressure feedwater system is indeed part of the boiler, correct?

A.   I would agree that the high pressure feedwater system is within the confines in this diagram of the solid line which is how Rasnic defines boiler.

Q.   And that's how you define the boiler?

A.   Yes.

Ex. 16 to Docket No. 67, at 119, 121, 125-26.  The parties agree that the Rasnic Memo discussed by Mr. Weiss defines the boiler.  Thus, Mr. Weiss has conceded that a physical change has indeed been made to the boiler, which is part of an "emissions unit" at Spurlock Unit 2.  Even if Mr. Weiss had not so testified, EKPC's dispute is not material, because EKPC does not dispute that it changed a "major stationary source."  As discussed below, PSD applies to changes to a "major stationary source," not just changes to an "emissions unit."  *See infra* Section I.

Second, EKPC accuses the United States of mischaracterizing the "capacity" of Spurlock Unit 2 as having originally been "4850 mmBTU per hour."  EKPC Opp. No. 4, at 2.  The United States simply cited EKPC's own documents concerning the unit's rated capacity, and EKPC responds with only unsupported conclusory assertions.[2]  However, even if EKPC's dispute concerning the capacity of Spurlock Unit 2 had merit, it would not be material to whether the

---

[2]  Conclusory assertions are not enough.  The non-moving party "must adduce more than a scintilla of evidence" to survive, and has an affirmative duty to direct the Court's attention to specific portions of the record upon which it relies to create a genuine issue of material fact.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989); *Bsharah v. Eltra Corp.*, 394 F.2d 502, 503 (6th Cir. 1968) (in summary judgment proceedings, affidavits containing mere conclusions have no probative value); *United States v. Binzel*, 907 F.2d 746, 749 (7th Cir. 1990).

United States is entitled to summary judgment.  EKPC does not dispute that it anticipated

operating Spurlock Unit 2 at hourly heat input levels higher than even the highest short-term

peak hourly levels identified in its original PSD permit application.  *See* Docket No. 67, SOF ¶¶

39-40, 48.  Such operation is inconsistent with EKPC's prior PSD permit and application and

thus is by definition considered a "change in the method of operation."  *See infra* Section II.

Third, EKPC accuses the United States of mischaracterizing EKPC's "uprating" of

Spurlock Unit 2 as being part of the Inland Steam Supply Project.  EKPC Opp. No. 4, at 2.  In

fact, EKPC's own documents show that the uprating was indisputably part of the project.  *See*

Docket No. 67, SOF ¶¶ 42-48.  EKPC's engineering studies for the Inland Steam Supply Project

evaluated whether Spurlock Unit 2 could be "uprated" to produce additional steam.  *See* Exs. 36,

37, and 38 to Docket No. 67.  A subsequent more formal uprating study explicitly incorporated

and referred back to these studies, and specifically evaluated the extraction of steam for use by

Inland.  *See* Exs. 39, 42, and 44 to Docket No. 67.  This uprating was referred to as a "continuing

phased evaluation of the potential for Spurlock Generating Station to be utilized as the host

steam supply" for Inland.  *See* Ex. 43 to Docket No. 67.  After completion of the uprating study,

EKPC wrote a letter to the Kentucky Division for Air Quality (KDAQ) about its plans to supply

steam to Inland and requested that the permitted heat input rate be raised to 5355 mmBTU per

hour to account for the fact that it would need to increase its heat input.  Ex. 46 to Docket No.

67.

EKPC's conclusory assertion that the uprating was unrelated to the Inland Steam Supply

Project in the face of this evidence is not sufficient to create a genuine issue of fact.[3]  But even if

---

[3] See cases cited *supra* note 2.

it were, it would not be material. Even standing alone, the uprating would be an operational change because it is undisputed that such uprated operation is inconsistent with EKPC's operating permit, as well as its original PSD permit application and PSD construction approval. *See* Docket No. 67, SOF ¶¶ 39-40, 48. Indeed, KDAQ told EKPC as much when it required EKPC to submit emissions calculations to demonstrate whether operating Spurlock Unit 2 at an uprated capacity would result in an emissions increase for PSD purposes. *See* Ex. 47 to Docket No. 67. EKPC never submitted the calculations, and instead sent KDAQ a letter representing that it was reevaluating the "future planned use" of the unit. Ex. 49 to Docket No. 67. In fact, as EKPC does not dispute, it had already uprated the unit. *See* Docket No. 67, at SOF ¶ 53.

## ARGUMENT

### I.    The Inland Steam Supply Project Was A Physical Change.

The United States demonstrated in its fourth motion for summary judgment that EKPC undertook a $20 million construction project to supply steam from Spurlock Unit 2 to the Inland Container Corporation. EKPC does not dispute this, and admits elsewhere that it was not routine maintenance. *See* EKPC Opp. No. 5, at 17 n.19. Accordingly, the United States is entitled to judgment that the Inland Steam Supply Project was a physical change under the PSD regulations.

EKPC's sole contention with respect to the "physical change" aspect of the "major modification" definition is that the Inland Steam Supply Project did not involve a change to an "emissions unit." EKPC Opp. No. 4, at 11-12. EKPC's contention is legally irrelevant to whether EKPC undertook a "major modification." As the United States explained in prior briefing, PSD applies to changes at a "major stationary source" (*i.e.*, an entire plant), not just changes to a boiler. *See* Docket No. 76, at 35-39. The PSD regulations specifically define a

"major modification" as a physical change to a "major stationary source" that significantly

increases emissions, regardless of whether an "emissions unit" is changed. *See* 40 C.F.R. §

51.166(b)(2); 401 KAR 51:017 Section 1(2). A "major stationary source" includes "[f]ossil fuel-

fired steam electric plants of more than 250 million British thermal units per hour heat input"

that have the potential to emit more than 100 tons per year of specified pollutants. 40 C.F.R. §

51.166(b)(1)(i)(a); 401 KAR 51:017 Section 1(1)(a). The question posed by the regulations is

whether there was a change to a "major stationary source," not whether there was a change to an

"emissions unit." As noted above, there is no dispute that the Inland Steam Supply project

involved physical changes to the Spurlock Plant, and EKPC itself admits that the Spurlock Plant

is a "major stationary source." *See* Ex. 6 to Docket No. 67, at No. 19.[4]

The question of whether an "emissions unit" is changed does not become relevant until

*after* it is determined that a change to a major stationary source is a "major modification." The

regulations include numerous requirements that must be met by a major stationary source that

undergoes a "major modification," including:

- *A control technology review*, to determine technology for controlling emissions;

- *A source impact analysis,* to determine if the emissions increase would cause or contribute to a violation of any air quality standard or PSD increment;

- *An air quality model*, to analyze impacts from the emissions increase;

- *An air quality analysis* requiring submission of extensive ambient air quality data;

- *Operation of monitoring stations*;

---

[4] There is also no dispute that Spurlock Unit 2 alone qualifies as a "major stationary source," because it has a heat input capacity far greater than 250 mmBTU per hour and the potential to emit more than 100 tons per year of pollutants. *See id.* at No. 68; Ex. 11 to Docket No. 67.

- *Provision of source information*, including a description of such information as nature, location, design construction, and typical operating schedule; and

- *Additional impact analyses*, to provide an analysis of the impairment to visibility, soils, and vegetation, that would occur as a result of the emissions increase.

40 C.F.R. § 51.166 (i)-(o); 401 KAR 51:017 Sections 8-14.  Once it has been determined that a major stationary source has been modified, the definition of an emissions unit is relevant to the first of these requirements, the control technology review.  This review requires best available control technology (BACT) to be installed on an "emissions unit" that is changed as part of a major modification.  40 C.F.R. § 51.166(j)(3); 401 KAR 51:017 Section 9(3).[5]  In short, the question of whether or not an "emissions unit" was changed will become relevant in this case only after it is determined there was a "major modification," and even then it will be relevant only to the BACT analysis, not to any other requirements of PSD review.[6]

The documents cited by EKPC make this precise point.  EKPC points to a case involving a steam supply project undertaken by Rochester Public Utilities (RPU) as if it supported its position.  *See* EKPC Opp. No. 4, at 13.  In fact, that case held that simply tapping a steam transport line constituted a physical change to a major stationary source that was expected to significantly increase emissions on an annual basis, and thus was a "major modification" even though no emissions unit was changed.[7]  As RPU itself put it: "the steam line changes constitute

---

[5] Compliance with the BACT requirement will be an issue in the remedy phase of this case.

[6] EPA has consistently applied the PSD regulations to require a BACT analysis for emissions units only *after* it is determined whether there is a "major modification," because PSD applies to an entire plant not just an emissions unit.  *See In re: Rochester Public Utilities* (Ex. 26 to Docket No. 76) (RPU Order), at 1, 6, 9-10, 22-23; 29-35; Aug. 6, 2001 Letter from Seitz (Ex. 28 to Docket No. 76), at 2; 1998 Sunflower Determination (Ex. 25 to Docket No. 76), at 2; July 28, 1983 Memo to Michael Johnston, EPA from Edward Reich, EPA (Ex. 1), at 3; December 20, 1988 Letter from Kee (Ex. 27 to Docket No. 76), at 1; *see also* Detroit Edison Determination (Ex. 17 to Docket No. 61), at 4, 15-17 (evaluating PSD applicability for turbine project that did not involve emissions unit).

[7] *See* RPU Order, at 1, 6, 9-10, 22-23; 29-35.

-7-

a 'physical' change' to the Silver Lake Plant."[8]  Based on existing state and EPA guidance

concerning similar projects, the Minnesota Pollution Control Agency (MPCA) determined that

RPU's steam supply project was indeed a "major modification" because emissions attributable to

the project were expected to increase on an annual basis, and EPA concurred with that

assessment.[9]  However, BACT was not required because it was determined that the boilers

themselves would not be physically changed.  *See id.*  Far from helping its case, EKPC's citation

of the RPU case is fatal to its argument that PSD applies only to changes at "emissions units."

     In sum, there is no dispute that the Inland Steam Supply Project constituted a "physical

change" to a "major stationary source" under the PSD regulations.  The question of whether

EKPC physically changed an "emissions unit" is not relevant to this inquiry.  That said, we note

that EKPC actually admits that a "feedwater tap occurred on the high pressure side of the boiler

feed pump" at Spurlock Unit 2.  EKPC Opp. No. 4, at 12.  EKPC's expert admits that this

---

[8] December 15, 2000 Letter from Walter Lorber, RPU, to Jenny Reinertsen, Minnesota Pollution Control Agency (Ex. 2), at 2; *see also* July 2001 Application for Major (PSD) Permit Amendment (Ex. 3), at 3-1 (project is considered a "physical change" and "various means for exemption under PSD regulations are not available (e.g., routine maintenance, pure increase in hours or rate of operation").

[9] *See* December 29, 2000 Letter to Robert Miller, EPA from Jenny Reinertsen, MPCA (Ex. 4); August 6, 2001 Letter to Jenny Reinertsen, MPCA, from Robert Miller, EPA (Ex. 5).  EKPC also cites an internal, pre-decisional EPA memo concerning the RPU project as if it supported its position.  *See* EKPC Opp. No. 4, at 14 n.16.  A review of EKPC Ex. 211 contradicts EKPC's theory, and is completely consistent with the regulations and EPA's long-standing interpretation that PSD review is triggered by a change to a major stationary source, not just changes to "emissions units."  EKPC's related contention that EPA determined there was no change in the method of operation at RPU is similarly unsupported by this or any document.  Although the RPU project was determined to constitute a physical change, whether it also involved a change in the method of operation was not even addressed by the state or EPA in their determinations.  *See* RPU Order (Ex. 26 to Docket No. 76), at 14, 30 n.33; Dec, 29, 2000 Letter from Reinertsen (Ex. 4); August 6, 2001 Letter from Miller (Ex. 5).  In a subsequent amicus brief cited by EKPC, EPA's Office of General Counsel simply stated that based on the facts of the RPU case that had been developed, the modification did not involve a change in the method of operation of a *boiler*.  EKPC Ex. 212.  In the present case, in addition to the changes to the "major stationary source," there was also a change to the boiler because unlike RPU, EKPC's project involved an increase in permitted boiler heat input levels and an increase that was inconsistent with prior PSD permit applications and construction approval.  As shown in Section II, such increases are considered by definition to be a change in the method of operation.

change occurred at the boiler, which is part of an "emissions unit."  *See supra*, at 2-3.[10]  EKPC

also nowhere disputes that the boiler valve settings were changed as part of its decision to uprate

Spurlock Unit 2.  *See* Docket No. 67, SOF ¶ 60.  Accordingly, although the Court need only

determine at this stage that EKPC physically changed a "major stationary source," the Court

should also rule as a matter of law that the Inland Steam Supply Project was a physical change to

an emissions unit at Spurlock Unit 2.  Regardless, the United States is entitled to summary

judgment that the project satisfies the first prong of the PSD "major modification" test because

there is no dispute that it was a "physical change" to a "major stationary source."

## II.    EKPC Changed The Method of Operation Of Spurlock Unit 2 By Increasing The Production Rate Of the Spurlock Unit 2 Boiler.

There is another reason why the first prong of the "major modification" test has been met

in this case:  EKPC "changed the method of operation" of Spurlock Unit 2.  This argument boils

down to the following facts, none of which are disputed:  Following the Inland Steam Supply

Project, EKPC expected that Spurlock Unit 2 would be required to operate at hourly heat input

levels higher than the hourly heat input condition contained in its operating permit, higher than

the hourly heat input levels in its original PSD permit application upon which its prior PSD

permit was based, and higher than the hourly heat input levels relied on in performing prior air

quality analyses.  Under the PSD regulations, an expected production rate increase involving any

one of these three facts is considered by definition to be a "change in the method of operation."

---

[10] EKPC's alternate claim that the feedwater tap did not involve a "capital expenditure" to an "affected facility" under the NSPS program is irrelevant even if it were supported.  A capital expenditure requirement is found nowhere in the PSD regulations, nor is there any mention of "affected facilities."  Both are terms found only in the NSPS regulations.  Moreover, EKPC's attempt to import such requirements is a jurisdictionally barred challenge to the regulations.  *See* U.S. Opp. to EKPC Memo No. 2 (Docket No. 77), at 6-9, 12-19; *see also* December 20, 1988 Letter from Kee (Ex. 27 to Docket No. 76), at 1 (PSD applies to total plant, not just an "affected facility").

A.    **There Is No Dispute that EKPC Expected to Increase Heat Input Levels Above the Levels in its Permits and Permit Applications.**

First, the Court can rule as a matter of law that EKPC changed the method of operation of Spurlock Unit 2 because it needed to increase production rate in violation of an its existing operating permit. The PSD regulations define a production rate increase as a "change in the method of operation" if it would be "prohibited . . . under 401 KAR 50:035." *See* 401 KAR 51:017 Section 1(2)(b)(5). EKPC's operating permit was issued pursuant to 401 KAR 50:035, and these regulations require permits to be subject to the terms and conditions set forth therein. *See* 401 KAR 50:035, Sections 1(2)(a), 5(1), 7(1) (1988).[11] EKPC's permit included several explicit "conditions," one of which was a "4850 mmBTU/hr maximum heat input," and specifically prohibited any "deviation from the . . . conditions specified herein." *See* Exs. 22 and 23 to Docket No. 67. EKPC does not dispute that it expected to operate Spurlock Unit 2 above this hourly level following the Inland Steam Supply Project. *See* Docket No. 67, SOF ¶¶ 39-40, 48. Rather, EKPC contends that the permit did not really limit hourly heat input, and that the permit was not enforceable by EPA. *See* EKPC Opp. No. 4, at 18. The United States addressed this argument in prior briefing. The plain language of EKPC's permit limited operation to a maximum hourly heat input rate of 4850 mmBTU per hour, and the permit is enforceable by EPA under 42 U.S.C. § 113. *See* Docket No. 71, at 17; Docket No. 77, at 27-30.[12]

---

[11] EKPC's assertion that it "never filed an application, or received an operating permit" under a version of 401 KAR 50:035 existing *in 1988* is inapposite. EKPC Opp. No. 4, at 24. EKPC's operating permit application was explicitly submitted pursuant to 401 KAR 50:035 in 1982, and these regulations have at all relevant times contained the above-referenced requirements. *See* 1982 Operating Permit Application (Ex. 21 to Docket No. 67); Appendix E to Docket No. 67, Appendix I to Docket No. 71, at 2285-89.

[12] While this is a purely legal question, we note that EKPC's argument that the permit limit was not enforceable is also contrary to historic fact. EKPC itself indicated that 4850 mmBTU per hour was a limit when it submitted a "request that the permitted heat input for this unit be increased to $5355 \times 10^6$ BTU/Hour" in connection with the Inland Steam Supply Project. Ex. 46 to Docket No. 67. EKPC's contractor in charge of the Inland Steam Supply

Even putting aside the enforceability of EKPC's operating permit, there is another reason why EKPC changed the method of operation of Spurlock Unit 2: EKPC expected to operate Spurlock Unit 2 at heat inputs above those identified in the PSD permit application upon which its original PSD construction approval was based. EKPC does not dispute that when it first constructed the unit, it submitted a PSD application identifying a short-term design peak heat input rate for Spurlock Unit 2 of 5120 mmBTU per hour. *See* Docket No. 67, SOF ¶ 10. Nor does EKPC dispute that it expected to operate above even this highest peak heat input following the Inland Steam Supply Project. *See id.* ¶¶ 40, 46-48. Such an increase in production rate is specifically defined as an operational change under the regulations because it would be "prohibited . . . pursuant to 40 CFR 52.21." 401 KAR 51:017 Section 1(2)(b)(5). At the time of the alleged modification, the referenced regulations at "40 CFR 52.21" made it illegal to operate in a manner that was not in accordance with a pre-existing PSD permit or PSD permit application. *See* 40 C.F.R. § 52.21(r)(1).

EKPC responds to this argument by asserting that Kentucky did not mean to refer to the then-existing version of 40 C.F.R. § 52.21 when it included "40 CFR 52.21" in its regulatory definition of a "change in the method of operation," but instead meant to refer to the old 1975 version of 40 C.F.R. § 52.21. EKPC Opp. No. 4, at 19-20. EKPC cites no evidence that Kentucky intended to ignore the then-existing version of 40 C.F.R. § 52.21 when it promulgated

---

Project indicated that 4850 mmBTU per hour was a limit when it advised EKPC that PSD would not apply to an increase in heat input so long as any such increase stayed below the level identified in the permit. *See* Ex. 31 to Docket No. 67, at 2-5, 7-7 to 7-8. Other utilities certainly treated 4850 mmBTU per hour as a limit when they based their own air quality modeling on Spurlock Unit 2's permitted capacity of 4850 mmBTU per hour. *See* Docket No. 67, SOF ¶¶ 28-29. And KDAQ certainly indicated that 4850 mmBTU per hour was a limit when it told EKPC that increasing the permitted heat input to a higher level meant that EKPC would need to submit PSD emissions calculations to determine whether the change would significantly increase emissions. *See* Ex. 47 to Docket No. 67.

its PSD regulations.  While EKPC points out that existing sources were grandfathered from the

newer PSD regulations, that does not mean that those regulations are irrelevant to Kentucky's

subsequently issued definition of a "*major modification*," or that Kentucky was referring to

something other than the then-current version of the regulations.

But even if Kentucky *had* meant to refer to the 1975 version of 40 C.F.R. § 52.21 rather

than the then-existing version of the regulations, it would make no difference to this case.  The

1975 version of EPA's PSD regulations also required sources to operate in compliance with both

their PSD permits and applications.  *See* 40 C.F.R. § 52.21(e)(2).[13]  Indeed, it is axiomatic that a

permit is based on and thus incorporates the information included in the application upon which

it is based.  EKPC's own expert recognizes this basic fact as applied to PSD permit applications.

*See* Deposition of Ken Weiss (November 15, 2005), at 21 (Ex. 6); *see also United States v.*

*Chrysler Corp.*, 437 F. Supp. 94, 97 (D.D.C. 1977) (manufacturer must install parts that are the

same as those specified in application).  The permit is for the source as described in the

application.  Moreover, in this case EKPC's original PSD construction approval *itself*

specifically prohibited variance from the information in the underlying application.  *See* Sept 21,

1976 Letter from Little (Ex. 14 to Docket No. 67), at 1; March 13, 1978 Letter from Helms (Ex.

---

[13] The 1975 regulations require operation in accordance with an "application as approved and conditioned" by EPA.
EKPC apparently contends that its own PSD application is not enforceable because this language is different than the
1980 regulations, which refer to an "application" that is "submitted" and subsequently approved by EPA.  EKPC
Opp. No. 19-20.  This wording variation is a distinction without a difference.  In context, the logical meaning of the
phrase "application as approved and conditioned" simply identifies the application with which a source must
comply, *i.e.*, the one actually relied upon by the Agency and upon which a subsequent approval was based.  EKPC
points to nothing in the regulations or preamble to support an inference that EPA intended that sources need not
operate in compliance with their PSD applications.  In fact, EPA specifically told EKPC quite the opposite.  When
EPA issued EKPC a PSD permit in 1976 it included a condition prohibiting activities at variance with the underlying
application.  *See* Sept. 21, 1976 Letter from Little (Ex. 14 to Docket No. 67), at 1.  EPA subsequently reiterated this
requirement in 1978 when it specifically warned EKPC that any changes from its application would need EPA
approval.  *See* March 13, 1978 Letter from Helms (Ex. 17 to Docket No. 67), at 2.

17 to Docket No. 67), at 2.  Thus, even under EKPC's flawed legal theory, there can be no dispute that EPA explicitly conditioned EKPC's PSD permit on the information contained in its application, and that EKPC must operate in accordance with that application "as approved and conditioned" by EPA.  40 C.F.R. § 52.21(e)(2) (1975).

In sum, EKPC's expected operation of Spurlock Unit 2 was contrary to even the short-term peak production rate of 5120 mmBTU per hour identified in its original PSD application.  It was also contrary to the original PSD permit itself, because that permit prohibited any variance from the information submitted in the application upon which the permit was based.  Accordingly, even if the Court were to accept EKPC's argument that the 4850 mmBTU per hour maximum heat input condition in EKPC's operating permit was not an hourly limit, there is no dispute that EKPC expected to operate above even the highest short-term peak hourly production rate contained in its PSD permit application as approved by EPA.  Nor is there any dispute that EKPC formally uprated Spurlock unit 2 above 5120 mmBTU per hour.  Such an increase is a "change in the method of operation" under 401 KAR 51:017 Section 1(2)(b)(5).

**B.    There Is No Dispute That EKPC Expected to Increase Heat Input Levels Above the Levels Used in Prior PSD Modeling.**

Finally, there is no dispute that EPA performed PSD modeling for Spurlock Unit 2 based on the rated capacity identified in EKPC's PSD application, and also performed conservative short-term PSD modeling based on the 5120 mmBTU per short-term peak heat input rate identified by EKPC in its application.  *See* Docket No. 67, ¶¶ 12-13.  Nor is there any dispute that the state of Kentucky and other sources relied on EKPC's rated capacity of 4850 mmBTU per hour when performing air pollution modeling of Spurlock Unit 2 for their own purposes.  *See id.* ¶¶ 19-20, 25-29, 32.  By uprating Spurlock Unit 2 to a new and higher maximum continuous

-13-

rating and heat input, EKPC has altered the parameters used in this modeling.  Changes that alter such prior air pollution modeling parameters are a "change in the method of operation" even absent the specific language of the production rate exclusion.[14]  *See also Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1448-49 (9th Cir. 1984) (PSD review required for operational change that was inconsistent with PSD modeling performed by subsequent PSD permit applicants).

**III.     The Inland Steam Supply Project Is Subject To The Kentucky PSD Regulations.**

Faced with the plain language of the regulations, which unambiguously confirm that EKPC has changed the method of operation of Spurlock Unit 2, EKPC has come up with a new argument in its opposition – that it is not subject to the Kentucky PSD regulations at all.  Instead, it claims its projects are only subject to the federal regulations at 40 C.F.R. § 52.21.  EKPC Opp. No. 4, at 19, 21-22.  This new contention is directly contrary to the provisions of the Clean Air Act and the regulations themselves and, indeed, directly contrary to EKPC's prior argument in this case that the regulations applicable to its projects are "the *state* PSD regulations, not the direct *federal* regulations found at §52.21".  EKPC Memo in Support of Motion for Summary Judgment on Legal Standards (Docket Number 57), at 10 (emphasis in original).[15]

EKPC had it right the first time.  The Kentucky PSD regulations apply to all "major modifications" that occur after September 22, 1982.  *See* 401 KAR 51:017 Section 8(4).  This includes EKPC's alleged major modification of Spurlock Unit 2 because it occurred after this

---

[14] *See* Casa Grande Determination (Ex. 15 to Docket No. 61), at 6-7; Monroe Electric Determination (Ex. 18 to Docket No. 56), at 13-14; 45 Fed. Reg. 52676, 52704 (Aug. 7, 1980) ("any change in hours or rate of operation that would disturb a prior assessment of a source's environmental impact should have to undergo scrutiny"); *see also* Sunflower Determination (Ex. 25 to Docket No. 76), at 1-2.

[15] EKPC's attempt to extract itself from the Kentucky regulations would do it no good anyway.  EKPC just as surely changed the method of operation of Spurlock unit 2 under the federal regulations.  *See infra* note 16.

date.  While EKPC points out that EPA regulations at 40 C.F.R. § 52.21 were also incorporated into the Kentucky SIP, EPA made clear that these regulations were retained for continuity of "enforcement purposes," *i.e.*, to ensure that existing sources that had already obtained PSD permits continued to comply with existing operating requirements.  *See* 54 Fed. Reg. 36307, 36309 (Sept. 1, 1989).  Incorporation of the EPA regulations for enforcement purposes did nothing to exclude sources from having to comply with Kentucky's PSD requirements for *subsequent* "major modifications," as has been alleged here.  *See* 401 KAR 51:017 Section 8(1), (4).  EKPC's contention that such subsequent "major modifications" were "grandfathered" from the Kentucky PSD regulations is contrary to the plain language of the regulations, as well as to the Clean Air Act itself.  *See* 42 U.S.C. § 7475(a), 7479(2)(C).  The Kentucky PSD regulations apply in this case.[16]

## CONCLUSION

For the foregoing reasons, the Court should rule as a matter of law that the Inland Steam Supply Project involved physical and operational "changes" under the first prong of the PSD "major modification" test.

---

[16] EKPC also argues that it should be exempted from the Kentucky regulations because they are more stringent than the federal PSD regulations.  This argument fails for two reasons.  First, even if Kentucky's regulations were more stringent, EPA's regulations set a floor for state regulations, not a ceiling.  State PSD regulations may be "more stringent" than EPA regulations.  40 C.F.R. § 51.166(b).  Second, EKPC would have also triggered EPA's regulations had they been applicable, and thus they are not any less stringent anyhow.  EKPC's increased production rate would be considered just as much of a "change in the method of operation" under EPA's PSD regulations as they are under the Kentucky PSD regulations.  Like the Kentucky regulations, EPA's 1980 regulations provide that a production rate increase is a "change in the method of operation" if it would be prohibited by an enforceable permit.  40 C.F.R. § 52.21(b)(2)(iii)(f).  As noted above, EKPC's operating and PSD permits are enforceable by EPA, and both permits were conditioned on the requirement that EKPC comply with the information contained in the underlying applications.  Moreover, EPA's 1975 PSD regulations – the regulations in place when Spurlock Unit 2 was originally constructed – provide that a production rate increase is considered a "change in the method of operation" if the increase merely exceeds a source's "design capacity."  *See* 39 Fed. Reg. 42510, 42514 (Dec. 5, 1974).  EKPC admits in interrogatory responses that it uprated Spurlock Unit 2 above its original "design" rating.  Ex. 5 to Docket No. 67, Page 14-15.

DATED: March 6, 2006.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

  /s/ Jason A. Dunn
PHILLIP A. BROOKS
JASON A. DUNN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111

FRANCES E. CATRON
Acting United States Attorney
Eastern District of Kentucky

ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661

OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

-16-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Reply in Support of the United States' Fourth Motion for Summary Judgment (Spurlock) was served on March 6, 2006, on the persons listed below:


John M. Holloway III                    By Express Mail and E-Mail
Angela L. Jenkins
Hunton and Williams LLP
951 East Byrd St.
Richmond, Virginia 23219-4074
(804) 788-8200

T. Thomas Cottingham, III               By Express Mail and E-Mail
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: (704) 378-4700


                              __/s/ Jason Dunn_____
                              Jason Dunn