UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 04-34 - KSF

UNITED STATES OF AMERICA

                                                                                      PLAINTIFF,

VS.

EAST KENTUCKY POWER COOPERATIVE, INC.              DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS
SIXTH MOTION FOR SUMMARY JUDGMENT:**

**OPERATING PERMIT VIOLATIONS AT SPURLOCK UNIT 2
DUE TO OPERATION AT AN UPRATED CAPACITY**

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

NO GENUINE DISPUTE OF MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4-

I.     The Maximum Hourly Heat Input Rate for the Spurlock Unit 2 Boiler Is A Legally Enforceable Permit Limit Regardless of Whether or Not a Specific Method of Measurement Is Provided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5-

    A.     State Operating Permit Explicitly Prohibited Deviation from the Heat Input Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5-

    B.     The Heat Input Limit Is a Firmly Fixed Process Equipment Parameter . . . . . . - 6-

    C.     EKPC Erroneously Conflates Requirements for State Implementation Plans (SIPs) and for Permits Issued Pursuant to Those SIPs . . . . . . . . . . . . . . . . . . . - 7-

    D.     EKPC's Own Actions Also Show That Maximum Hourly Heat Input Rate Is a Legally Enforceable Permit Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8-

    E.     Since Uprating The Spurlock Unit 2 Boiler, EKPC Has Been Operating a Different Unit Than Was Permitted By The Spurlock Title V Permit . . . . . . . . - 9-

II.     Practical Enforceability Is Not Relevant to the Claim at Issue in This Motion . . . . . - 11-

III.     EPA May Enforce the Spurlock Operating Permits Under Section 113 of the Clean Air Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12-

    A.     The 1983 Spurlock Operating Permit Was Issued Pursuant to a State Operating Permit Program That Had Been Approved Into the Kentucky SIP . . . . . . . . . - 12-

    B.     The 1983 Spurlock Operating Permit Was Subsumed Into the Spurlock Title V Permit.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 15-

## TABLE OF AUTHORITIES

**Federal Cases**

*Save Our Health Org. v. Recomp of Minnesota, Inc.*, 829 F. Supp. 288 (D. Minn. 1993) . . . . . 13

*United States v. Louisiana-Pacific Corp.*, 925 F. Supp. 1484 (D. Colo. 1995) . . . . . . . . . . . . . . 13

**Federal Regulations**

40 C.F.R. § 70.6(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Federal Register Notices**

47 Fed. Reg. 30059 (July 12, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

54 Fed. Reg. 27274 (June 28, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**State Regulations**

404 KAR 52:001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## INTRODUCTION

In its Opposition to the United States' Sixth Motion for Summary Judgment, East Kentucky Power Cooperative (EKPC) mounts a convoluted defense to the United States' relatively straightforward allegation, that over the last five years EKPC has violated its state operating permit, and then its Title V permit, for Spurlock Unit 2.  The claim at issue in the United States' Sixth Motion for Summary Judgment is separate and independent from the Government's claim that EKPC modified Spurlock Unit 2 under the Prevention of Significant Deterioration (PSD) program.  EKPC's discussion of PSD applications, EPA emissions modeling, New Source Review (NSR) permits, and NSR guidance is thus irrelevant to the narrow issue presented by this claim – whether EKPC violated the Spurlock operating permits by admittedly uprating the boiler at Spurlock Unit 2 and subsequently operating it at unpermitted maximum heat input levels.  In addition, EKPC's arguments about the Spurlock state operating permit are irrelevant after December 14, 1999, the date the Spurlock Title V permit was issued.

Stripped of its extraneous discussions, EKPC's Opposition fails to create a genuine issue of fact or provide a legal reason why the United States' Sixth Motion for Summary Judgment should not be granted.  EKPC admits, as it must, that it uprated Spurlock Unit 2 to a higher maximum heat input capacity.  EKPC claims, however, that the word "maximum" contained in its operating permit actually means "average" and that the term per "hr" actually means per "year."  EKPC did not raise this "annual average" argument in defense of the non-modification Spurlock claims in either its Answer or in its Second Motion for Summary Judgment.  Moreover, as we show below, this new "factual" assertion is rebutted by the plain language of the relevant permits.

EKPC's legal defenses fare no better. EKPC argues that the maximum hourly heat input limit contained in the two relevant Spurlock operating permits is not enforceable or, at least, not enforceable by EPA. EKPC's argument is rebutted by the plain language of the permits, the Clean Air Act, EPA regulations implementing the Clean Air Act, case law, and EKPC's own actions. EKPC's state operating permit specifically prohibited *any* deviation from the conditions specified therein, and provided that the permit would become null and void upon violation of such conditions. One such explicit "condition" was a fixed, not to be exceeded operating parameter – the maximum heat input rate of the boiler. This permit was issued pursuant to regulations approved by EPA as part of Kentucky's State Implementation Plan (SIP) and is thus enforceable by EPA as a matter of law. This operating permit was subsequently "subsumed" into a Title V permit that states on its face that it is federally enforceable, and that continues to identify Spurlock Unit 2 as a 4850 mmBtu per hour unit (the boiler's capacity prior to the unpermitted uprating). Therefore, this Court should find that there is no genuine dispute of material fact regarding the United States' Sixth Motion for Summary Judgment, and that judgment should be entered for the United States as a matter of law.

## NO GENUINE DISPUTE OF MATERIAL FACT

EKPC and its experts have admitted that the company uprated and has operated the Spurlock Unit 2 boiler at heat input rate exceeding 4850 mmBtu per hour. *See* EKPC Answer, ¶ 1; Dep. of Edward K. Levy (November 3, 2005) (Ex. 37 to Docket No. 71), at 72-76; Feb. 25, 2005 EKPC's Responses to United States' First Set of Interrogatories (Ex. 1 to Docket No. 71), at 14-15. With this admission, there remains no genuine dispute of material fact associated with the United States' Sixth Motion for Summary Judgment.

Undaunted by this reality, EKPC argues in its Opposition that the United States has not shown that the company exceeded this heat input rate on an *annual average* basis. There is a very good reason that the United States did not attempt to make this showing – it is irrelevant to the United States' claim that EKPC violated, and continues to violate, the maximum hourly heat input limit contained in the Spurlock operating permits, which, as the term itself indicates, is an hourly maximum limit and is not based on an annual average.

In support of its "annual average basis" argument, EKPC makes the general assertion that "[t]here is nothing in the record to indicate that 4850 mmBtu/hour was presumed to be anything other than an approximate estimate of the *annual* average hourly rate input." EKPC Opp. No. 6, at 19. EKPC then disputes the existence of an explicit maximum hourly input limit, claiming that:

> EPA can find no basis for its claim that such a condition ever existed. Because there was no such [maximum heat input capacity] in any earlier Spurlock 2 permit, there was no such condition that would have been "subsumed" in the Title V Permit.

*Id.* at 20. EKPC's argument is belied by the facts. The plain language of the permit articulates maximum heat input as an hourly limit:

| POINT OF EMISSION | AFFECTED FACILITY | CONDITIONS |
|---|---|---|
| 01 (1) | Indirect Heat Exchanger (Unit 1) | 2825 mmBTU/hr maximum heat input. |
| 02 (2) | Indirect Heat Exchanger (Unit 2) | 4850 mmBTU/hr maximum heat input. |

-3-

October 7, 1983 Spurlock Operating Permit (Ex. 14 to Docket No. 71), at 1.  This language makes clear that the 1983 Spurlock operating permit was conditioned upon the operation of Spurlock Unit 2 at a 4850 mmBtu per hour *maximum* heat input rate.  EKPC cites nothing in support of its suggestion that, absent more specificity, a maximum hourly limit is presumed to mean annual average, and the United States is aware of no such presumption.  Moreover, this permit explicitly states that "[n]o deviation from the plans and specifications submitted with your application or the conditions specified herein is permitted, unless authorized in writing by the Division of Air Pollution Control."  *Id.*

The Spurlock Title V permit subsequently identified 4850 mmBtu/hour as the maximum continuous rating for Spurlock Unit 2, and permitted operation of equipment only as described in the permit.  *See* Spurlock Title V Permit (Ex. 35 to Docket No. 71), at EKPC R16-000643, 649, 654.  Once EKPC uprated (i.e., increased the rated heat input capacity of) the boiler, it began operating a fundamentally different, and therefore unpermitted, unit than that which is factually described in its permits.  Each operating permit, then, has been clear on its face that the Spurlock Unit 2 operating parameter at issue is 4850 mmBtu *per hour*.[1]  Thus, there is no genuine dispute of material fact regarding the United States' Sixth Motion for Summary Judgment, and the claim at issue is ripe for adjudication.

## ARGUMENT

After failing to create a genuine issue of fact, EKPC makes four legal assertions in its Opposition.  EKPC does not dispute that there is a direct relationship between heat input and

---

[1] Inexplicably, EKPC offers its expert's observation that the identified heat input of 4,850 mmBtu per hour in the 1983 Spurlock operating permit "is not accompanied by any definitions of averaging period" as support that the heat input limit is not enforceable.  *See* EKPC Opp. No. 6, at 3-4.  The logical inference to be drawn from the absence of an average period on the face of the permit is that the limit is not an average at all.

-4-

emissions. *See* Dep. of Kenneth Weiss (Nov. 15, 2005) (Ex. 8 to Docket No. 71), at 25. EKPC simply argues that heat input is inherently unenforceable at Spurlock Unit 2 because its permits did not include a method of measuring heat input. EKPC makes a related argument that the permits are not practically enforceable, a concept that is not relevant to these permits. EKPC then asserts that even if the heat input limit is enforceable as identified in the 1983 Spurlock operating permit, that permit is not federally enforceable. Finally, EKPC asserts that the heat input limit is not a federally enforceable limit in the Spurlock Title V permit. The United States will reply to each of these erroneous arguments in turn.

**I.     The Maximum Hourly Heat Input Rate for the Spurlock Unit 2 Boiler Is A Legally Enforceable Permit Limit Regardless of Whether or Not a Specific Method of Measurement Is Provided.**

EKPC argues that "an emission limitation or an operational limitation does not exist, as a matter of law, without having both a numerical limit and a method for measuring compliance with that numerical limit." EKPC Opp. No. 6, at 12. EKPC's complaint about a lack of measurement method is off the mark.

**A.     The State Operating Permit Explicitly Prohibits Deviation from the Heat Input Limit.**

The 1983 state operating permit included explicit language prohibiting any deviation "from the plans and specifications submitted with your application or the conditions specified" in the permit. *See supra* at 4, quoting Ex. 14 to Docket No. 71, at 1. EKPC's state operating permit application specified that the Spurlock Unit 2 boiler had a capacity of 4850 mmBtu per hour. *See* Ex. 12 to Docket No. 71, at 3 (listing Unit 2's "rated capacity" as "4850 x $10^6$ BTU"). Moreover, as also noted *supra* at 3-4, the 1983 state operating permit included the condition that Spurlock Unit 2 be operated at 4850 mmBtu per hour. Therefore, it was clear from the permit

-5-

that EKPC was not permitted to deviate operation of Spurlock Unit 2 from the maximum 4850 mmBtu per hour heat input rate. When EKPC uprated the Spurlock Unit 2 boiler on January 13, 1994, it deviated *per se* from the permitted heat input rate. The extent of deviation is not relevant to liability.

        **B.**      **The Heat Input Limit Is a Firmly Fixed Process Equipment Parameter.**

EKPC also cites to EPA guidance for support of the company's contention that an emissions limitation or an operational limitation must contain both a numerical limit and a method for measuring compliance with that limit. *See* EKPC Opp. No. 6, at 13 n.18, 19 (citing *New Source Review Workshop Manual*, October 1990 (EKPC's Ex. 203) ("NSR Workshop Manual"), at H. 5-6). EKPC misconstrues the EPA guidance. The NSR Workshop Manual to which EKPC refers describes not only numerical limits and methods of measuring compliance with such limits, but also a third category of "surrogate limits" to limit pollution in permits held by a stationary source – process equipment parameters. It is this third category that applies to a permit condition such as the maximum hourly heat input rate here at issue. Process equipment parameters are different than emission and operational limitations, and nothing in EPA guidance states that a permitted process equipment parameter must contain both a numerical limit and a compliance measurement method.

A parameter is not a number to be measured periodically to confirm compliance. Instead, a parameter is identified at the outset, which may require "initial source testing or may be extracted from confirmed design characteristics contained in the permit application." *Id.* at H.6. "Whenever possible, 'never to be exceeded' values should be specified for surrogate compliance parameters." *Id.* at H.7. Once included in the permit, "[t]hese alternate compliance parameters

may be used in conjunction with measured test data to monitor continuous compliance." *Id.* at H.6.

The heat input limit is not an "emission limitation or operational limitation" but a firmly fixed process equipment parameter. Once identified, it is plain from the face of the operating permit that 4850 mmBtu per hour was written in as a "never to be exceeded" value. After the heat input rate of the Spurlock Unit 2 boiler was included in the state operating permit, the permitting authorities relied on this parameter, as well as with subsequently reported lb/mmBtu measurements of $SO_2$, to monitor the unit's compliance. *See,* e.g., U.S. Memo in Support of Sixth Motion (Docket No. 71), SOF ¶¶ 9-10. EKPC has not disputed third party reliance on the 4850 mmBtu per hour rating of the Spurlock Unit 2 boiler. The heat input rate of Spurlock Unit 2's boiler, then, was a legally enforceable fixed process equipment parameter in the 1983 state operating permit, regardless of any lack of measurement methods.

### C. EKPC Erroneously Conflates Requirements for State Implementation Plans (SIPs) and for Permits Issued Pursuant to Those SIPs.

The primary, and truly the only, legal issue here is whether EKPC violated a state operating permit that was issued pursuant to an approved SIP, as discussed *infra* in Section III. However, EKPC reads new enforceability prerequisites into permits by conflating substantive and procedural SIP requirements with permit requirements. For example, EKPC cites to Section 110 of the Clean Air Act and 40 C.F.R. § 51.111(a) (1) for the proposition that a SIP must "include a control strategy" that includes, among other things, "procedures for monitoring compliance with each of the selected control measures." EKPC Opp. No. 6, at 13-14. The cited regulatory provision is one part of the minimum standards required by EPA before it will approve a SIP. And in fact, by approving this SIP, EPA determined that the Kentucky SIP did

meet these and other substantive requirements of Section 110. However, EKPC then makes an illogical jump to the conclusion that *each permit* issued pursuant to a SIP must independently include a method of measuring compliance with each of the selected control measures. *See id.* at 15. This leap in logic is unsupported by the law.

EKPC also argues that the Spurlock permit did not meet a procedural requirement specified in Section 110 of the Clean Air Act. EKPC speculates that if "Kentucky submitted the permit to EPA for approval as an enforceable control measure in the Kentucky SIP, EPA would have disapproved the submittal by return mail [in part because] it was not adopted following public hearing." EKPC Opp. No. 6, at 17. However, Section 110 requires that public hearings be held for SIP provisions, not necessarily for permits issued pursuant to the SIP. On January 9, 10, April 16, and June 7, 1979, public hearings were held on the SIP revisions that established Kentucky's operating permit program. *See* 47 Fed. Reg. 30059 (July 12, 1982).

That Kentucky never submitted the Spurlock permit to EPA for approval *into* the SIP is irrelevant. The operating permit need not be part of the SIP, it need only be issued pursuant to the SIP, as discussed in Section III. The substantive and procedural requirements for SIPs and for permits issued pursuant to a SIP are not the same and should not be conflated.[2]

### D. EKPC's Own Actions Also Show That Maximum Hourly Heat Input Rate Is a Legally Enforceable Permit Limit.

In our Sixth Motion for Summary Judgment, the United States described the actions EKPC has taken to seek to change the heat input limits in its Spurlock operating permits. *See* Docket No. 71, at 24-26. These actions span a number of years, from 1993, when EKPC wrote

---

[2] Likewise, other Clean Air Act programs cited by EKPC – NSPS, NESHAPS, and Title IV – as providing the regulated community with "reference test methods" and other performance test measures (*see* EKPC Opp. No. 6, at 14-15) do not require that permits implementing those programs repeat those methods and measures.

the Kentucky Division of Air Quality ("KDAQ") requesting an increase in the permitted heat input rate to 5355 mmBtu per hour, to 1997, when EKPC sought to amend the permitted heat input rate identified in the draft Spurlock Title V permit to 5600 mmBtu per hour.  As noted in the United States' opening brief, EKPC admits that the heat input rate is the *only* operating parameter it has ever sought to change for Spurlock Unit 2.  *See id.* at 24 (citing Dep. of Robert Hughes (Feb. 18, 2005) (Ex. 31 to Docket No. 71), at 163).  Of course EKPC viewed the maximum heat input contained in its permit as a permit condition, otherwise it would not have written to the KDAQ to "request that the *permitted* heat input for this unit be increased."  *See* December 15, 1993 Letter from Robert Hughes to John Hornback (Ex. 26 to Docket No. 71) (emphasis added).  EKPC's undisputed actions create the unavoidable inference that the company believed the boiler capacity was an enforceable limit.

        **E.**      **Since Uprating the Spurlock Unit 2 Boiler, EKPC Has Been Operating a Different Unit Than Was Permitted By The Spurlock Title V Permit.**

The Spurlock Title V permit describes Spurlock Unit 2 as a boiler with a Maximum Continuous Rating of 4850 mmBtu per hour.  Spurlock Title V Permit (Ex. 35 to Docket No. 71), at 12.  The permit then states that it "hereby authorizes the operation *of the equipment described herein* in accordance with the terms and conditions of this permit."  *Id.* at 1.  EKPC was permitted to operate a unit described as having "4850mmBtu per hour" capacity.  EKPC is not operating the 4850 mmBtu per hour unit that was described in the Title V permit, because the company uprated the boiler to a new Maximum Continuous Rating.

In its Opposition, EKPC asserts that it "never increased the 'heat input capacity rating' of Spurlock 2."  EKPC Opp. No. 6, at 7.  Instead, the company contends that it "re-rated the

-9-

maximum hourly *steaming capacity* of the boiler to 4 million pounds per hour of steam." *Id.*

This distinction is nonsensical and contradicts EKPC's interrogatory responses:

> Interrogatory 1 (H): [Describe in full and complete detail each of the individual Electricity Generating Units at the EKPC Plants. Include in your answer:] the maximum steam flow or steam production capacity of the boiler, including any changes over time.
>
> Response: . . . EKPC assumes that EPA refers to the design rating, rather than the boiler's actual maximum steam flow or steam production capability, and will respond on that basis. . . . The maximum steam flow for the Spurlock Unit 2 boiler is 4,000,000 pounds per hour. This rating was changed on January 13, 1994. The original maximum steam flow was 3,850,000 pounds per hour.

Feb. 25, 2005 EKPC's Responses to United States' First Set of Interrogatories (Ex. 1 to Docket No. 71), at 14. In response to Interrogatory 1(I), which asked for the "maximum continuous rating" of each boiler, EKPC responded in part, "The maximum continuous rating for the Spurlock Unit 2 boiler is 4,000,000 pounds per hour. This rating was changed on January 13, 1994. The original maximum continuous rating was 3,850,000 pounds per hour." *Id.* at 14-15. In these responses, then, EKPC characterizes the uprating as a change in the maximum steam flow of the boiler *and* an increase in the maximum continuous rating (i.e., capacity rating) for the boiler. The responses also establish that prior to the uprating, the boiler in fact had a lower maximum capacity. When EKPC uprated the boiler, it began operating a unit that was not described in the Spurlock Title V permit and therefore a unit that was not permitted to operate. Again, as noted *supra* at I.A., the extent of deviation is not relevant given EKPC's admission that it uprated Spurlock Unit 2 to a new and higher maximum continuous rating than the MCR contained in its permit.

**II.     Practical Enforceability Is Not Relevant to the Claim at Issue in This Motion.**

In a related argument, EKPC also contends that its permitted heat input is not "practically enforceable" under EPA's regulations. *See*, e.g., EKPC Opp. No. 6, at 14-15, 18-19. However, EKPC mistakenly applies this "practical enforceability" concept to this context. The authorities EKPC cites – for instance, a 1995 EPA memo entitled, "Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under Section 112 and Title V of the Clean Air Act," and an EPA rule published at 54 Fed. Reg. 27274, 27283 (June 28, 1989) – relate to instances where a source has accepted or is seeking limits in order to operate below the "major stationary source" or "major modification" thresholds that trigger PSD requirements. In this context, a source can accept an "enforceable limit" on its operations in its permit that will preclude a significant net increase in emissions (e.g., a limit on hours of operation or production rate). We agree that in the context of an operational limit that will prevent a source from exceeding PSD annual emissions limits, the "practical enforceability" concept is relevant. But that is not the context here.

As we explained in our Opposition to EKPC's Mot. for Summary Judgment No. 2 (*see* Docket No. 77), EKPC is confusing two federal enforceability concepts. The first is EPA's general authority under Section 113 of the Clean Air Act (*see infra* at Section III). The second is whether a source can *itself* rely on a permit limit to avoid PSD review. In order to rely on a permit limit to become a "synthetic minor source" or otherwise avoid PSD, the permit limit that purports to prevent a significant net increase in emissions must be practically enforceable as well as legally enforceable. Because a synthetic minor permit keeps an otherwise applicable source from having to comply with PSD and other Clean Air Act requirements, it is crucial that the

limits in these types of permits are enforceable as a practical matter so that the public and permitting authorities can easily assure compliance. "Synthetic minor" permits thus require additional prerequisites before they can act to shield a source from Clean Air Act requirements. The Spurlock Plant does not have a synthetic minor permit, and EKPC has failed to show how or why the concept of "practical enforceability" should allow it to evade the consequences of its admitted violation of an explicit permit condition, just because it might have been difficult for EPA to have proven the violation without the admission. Thus, "practical enforceability" is irrelevant to the disposition of the United States' Sixth Motion. *See also* United States' Opp. to EKPC Mot. No. 2 (Docket No. 77), at 31-34.[3]

### III.     EPA May Enforce the Spurlock Operating Permits Under Section 113 of the Clean Air Act.

#### A.     The 1983 Spurlock Operating Permit Was Issued Pursuant to a State Operating Permit Program That Had Been Approved into the Kentucky SIP.

As to operation prior to December 14, 1999 (the date of the Title V permit issuance), the only issue is whether the state operating permit containing the 4850 mmBtu per hour limit were issued pursuant to an approved SIP. As discussed in the United States' Sixth Motion, EPA approved the very detailed 50:035 operating permit program into the Kentucky SIP on July 12, 1982. *See* Docket No. 71, at 16-17. Therefore, the 1983 Spurlock operating permit, like its November 1982 predecessor, was issued pursuant to an EPA-approved SIP program. As a matter of law, this means EPA has the authority to enforce the terms and conditions of the 1983

---

[3] Moreover, the underlying purpose of practical enforceability – i.e., to ensure the public can easily assure compliance – is not at issue in this case given EKPC's *admission* that it uprated Spurlock Unit 2 and operates above 4850 mmBtu per hour.

state operating permit. *See* U.S. Memo in Support of Sixth Mot. (Docket No. 71), at 17; United States' Opp. To EKPC No. 2 (Docket No. 77), at 27-30.

EKPC attempts to create doubt about this clear rule by misconstruing long-standing law. Perhaps most remarkably, EKPC tries to distinguish *United States v. Louisiana-Pacific Corp.*, 925 F. Supp. 1484 (D. Colo. 1995) by asserting that the operating permit found to be federally enforceable in that case was a Title V permit, not a state operating permit. To the contrary, the case clearly states that the permit at issue was a 1988 state operating permit issued pursuant to SIP-approved regulations. *Louisiana-Pacific Corp.*, 925 F. Supp. at 1486. Indeed, Title V was not even enacted until 1990. Moreover, the court explicitly distinguished a Title V case as not applicable since the permit at issue was a state operating permit. *Id.* EKPC is thus mistaken in arguing that *Louisiana-Pacific* does not apply.

EKPC also misconstrues *Save Our Health Org. v. Recomp of Minnesota, Inc.*, 829 F. Supp. 288 (D. Minn. 1993) as supporting its argument. EKPC states "that the odor regulation allegedly violated by the defendant in that case may be federally enforceable because it remained part of the EPA approved state implementation plan." EKPC Opp. No. 6, at 17 n.25. In fact, the issue was whether a permit issued pursuant to such a regulation was enforceable. *Recomp*, 829 F. Supp. at 289-90. *Recomp* unambiguously supports the government's position in this case, as do the other authorities we cited in our opening brief (which EKPC does not even attempt to distinguish). *See* U.S. Memo in Support of Sixth Motion (Docket No. 71), at 15-16.

In sum, contrary to EKPC's misreading of the relevant case law, courts have consistently upheld EPA's statutory and regulatory authority to enforce any limitation contained in a state-issued permit, provided that the permit was issued pursuant to an EPA-approved state

implementation plan. *See id.* Since EPA approved 401 Ky Admin. Reg. 50:035 prior to the issuance of the 1983 Spurlock state operating permits, EPA plainly has the authority to enforce the terms of that permit.

### B. The 1983 Spurlock Operating Permit Was Subsumed Into the Spurlock Title V Permit.

In the United States' Sixth Motion for Summary Judgment, the United States argued that the 1983 state operating permit, and the 4850 mmBtu per hour limit therein, had been incorporated into the Spurlock Title V permit.[4] Docket No. 71, at 17. EKPC responds by complaining that the law cannot permit applicable requirements from other permits to be "'subsumed' silently and secretly in[to] Title V permits." EKPC Opp. No. 6, at 21. This is a surprising position, given that the Spurlock Title V permit explicitly states that, "[a]ll previously issued construction and operating permits are hereby *subsumed* into this permit." Spurlock Title V Permit (Ex. 35 to Docket No. 71), at 674.

EKPC then asserts that "EPA's litigation position is that Title V imposes no obligation to determine which requirements in former permits are 'applicable' federal requirements." EKPC Opp. No. 6, at 21. This assertion is false. State and local permitting authorities may identify certain requirements in a Title V permit as "state-origin" requirements, a designation that takes such requirements beyond the reach of federal enforcement. *See* 40 C.F.R. § 70.6(b)(2); 401 Ky. Admin. Reg. 52:001. All remaining Title V permit requirements are by default federal requirements. In fact, the Spurlock Title V permit indicates on its face that, "[e]xcept as identified as state-origin requirements in this permit, all terms and conditions contained herein

---

[4] The Title V permit is legally enforceable by EPA, as is clear from the Clean Air Act and the plain text of the permit itself. *See* 42 U.S.C. §§ 7413(b)(1), 7661a(a); Ex. 35 to Docket No. 71, at EKPC R16-000674.

shall be enforceable by the United States Environmental Protection Agency and citizens of the United States." Spurlock Title V Permit (Ex. 35 to Docket No. 71), at 26, cited in U.S. Memo in Support of Sixth Motion (Docket No. 71), at 17 n.6.[5] Given that the Spurlock Title V permit is clear that all prior permits are "subsumed" into the current permit, and that all terms and conditions are federally enforceable unless otherwise noted, EKPC's complaint that EPA is secretly reading applicable requirements into the Spurlock operating permits is completely without merit.[6]

## CONCLUSION

For the reasons outlined herein, the United States is entitled to summary judgment on its Sixth Motion for Summary Judgment.

DATED: March 6, 2006.

>
> Respectfully Submitted,
>
> SUE ELLEN WOOLDRIDGE
> Assistant Attorney General
> Environment and Natural Resources
>  Division
> United States Department of Justice

---

[5] This is not a remarkable proposition: "[P]ursuant to § 70.6(b) (2), the permit must "specifically designate as not being federally enforceable . . . any terms and conditions included in the permit that are not required under the Act or any of its applicable requirements (e.g., state-only requirements). . . . Any terms not otherwise designated, however, *are federally enforceable* by either EPA or citizens under the citizen suit provisions of the Act." "Clean Air Act," F. William Brownell, Hunton & Williams, *Environmental Law Handbook* (Government Institutes: 1999) (original emphasis) (Ex. 1).

[6] As an aside, EKPC's reliance on state correspondence concerning other sources and other Title V permits is misplaced. The United States addressed the lack of relevance these letters have to the litigation at hand in its Opposition to EKPC's Mot. for Summary Judgment No. 2. *See* United States' Opp. No. 2 (Docket No. 77), at 37-38.

  /s/ Jason A. Dunn_____
PHILLIP A. BROOKS
JASON A. DUNN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111

FRANCES E. CATRON
Acting United States Attorney
Eastern District of Kentucky


ANDREW SPARKS
Assistant U.S. Attorney
Suite 400
110 West Vine Street
Lexington, Kentucky 40507-1671
(859) 233-2661


OF COUNSEL:

ALAN DION
Senior Attorney
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing reply in support of the United States' Sixth Motion for Summary Judgment: Operating Permit Violations at Spurlock Unit 2 was served on March 6, 2006, on the persons listed below:

| | |
|---|---|
| John M. Holloway III<br>Angela L. Jenkins<br>Hunton and Williams LLP<br>951 East Byrd St.<br>Richmond, Virginia 23219-4074<br>(804) 788-8200 | By Express Mail and E-Mail |
| T. Thomas Cottingham, III<br>Nash E. Long, III<br>Hunton & Williams<br>101 South Tryon Street, Suite 3500<br>Charlotte, NC 28280<br>Telephone: (704) 378-4700 | By Express Mail and E-Mail |

    /s/ Jason Dunn
    Jason Dunn