UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 04-34-KSF

UNITED STATES OF AMERICA                                    PLAINTIFF

V.                          **OPINION & ORDER**

EAST KENTUCKY POWER COOPERATIVE, INC.                      DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \*

    This matter is before the Court on the plaintiff's first motion for summary judgment [DE #61] regarding the applicable legal test for the routine maintenance, repair, and replacement exclusion.  In this motion, the parties ask the Court to determine whether the "routine maintenance, repair, and replacement" exclusions found in the Clean Air Act should be applied to activities that are considered "routine at the unit" or "routine in the industry."[1]

## I.    REGULATORY BACKGROUND AND FRAMEWORK

    The plaintiff United States (referred to herein as the Environmental Protection Agency or "EPA") brought this enforcement action against defendant East Kentucky Power Cooperative, Inc. ("EKPC"), in relation to work done on EKPC's Spurlock plant in Mason County, Kentucky, and its Dale plant in Clark County, Kentucky.  The EPA maintains that EKPC  made multi-million dollar capital improvements to these coal-fired power plants without first obtaining

---

[1]    This issue is also raised in EKPC's Motion for Partial Summary Judgment No. 1, along with other issues.  Thus, a ruling on the present motion will also take care of part of EKPC's motion.

appropriate permits, in violation of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. §§ 7401 et seq.

The CAA is a very complex statute with an extensive regulatory scheme and a complicated history, as well as the obligatory plethora of acronyms. This case involves two separate programs of the CAA: the New Source Performance Standards ("NSPS") program, 42 U.S.C. § 7411, and the New Source Review ("NSR") program, which contains the Prevention of Significant Deterioration ("PSD") provisions, 42 U.S.C. §§ 7470-92.

The CAA Amendments of 1970, two purposes of which are to "protect and enhance the quality of the Nation's air resources," and "to encourage and assist the development and operation of regional air pollution prevention and control programs[,]" 42 U.S.C. § 7401(b)(1), (4), established a comprehensive federal program of air pollution oversight. To this end, Congress directed the EPA to devise National Ambient Air Quality Standards ("NAAQS"), which would establish the maximum permissible concentrations of certain air pollutants allowable in different regions of the country.[2] The CAA directed each state to develop State Implementation Plans ("SIPs") to meet these NAAQS by imposing regulatory requirements on individual sources.

To ensure the NAAQS were maintained, Congress required the EPA to promulgate New Source Performance Standards ("NSPS") to regulate the emissions of and minimize the environmental impact from "new sources," defined by the CAA as "any stationary source, the construction *or modification* of which is commenced after the publication of regulations (or, if

_____

[2]    These include lead, sulfur dioxide, nitrogen oxides, carbon monoxide, particulate matter, and ozone.

earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source."  42 U.S.C. § 7411(a)(2) (emphasis supplied).  The NSPS also applied to "modifications" of existing facilities that created new or increased pollution; Congress defined a "modification" broadly as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  Id. § 7411(a)(4).[3]  Thus, Congress imposed the NSPS immediately on any new source, but allowed an existing source to wait to install updated pollution control technology until it underwent a modification, as defined in the Act.

Given the enormous cost of retrofitting an existing aging power plant with new pollution-control devices and given the broad Congressional definition of modification as "any physical change," the EPA provided exemptions from the NSPS "modification rule" for certain activities undertaken at existing sources.  Thus, under the NSPS program, EPA regulations provide that

> [t]he following shall not, by themselves, be considered modifications under this part:
>
> > (1) Maintenance, repair, and replacement which the Administrator determines to be *routine for a source category* . . . .
> >
> > (2) An increase in production rate of an existing facility, if that increase can be accomplished without a capital expenditure on that facility.
> >
> > (3)  An increase in the hours of operation.
> >
> > . . . .

40 C.F.R. § 60.14(e)(1)-(3) (emphasis supplied).

---

[3]        The CAA does not further define the term "physical change."

-3-

As part of the 1977 CAA Amendments, Congress established the New Source Review ("NSR") permitting program, which consisted of provisions for the protection of areas with relatively clean air ("attainment areas" that had attained NAAQS) and also areas that did not meet NAAQS ("non-attainment areas").  In order to prevent relatively unpolluted attainment areas from upping emissions to the maximum levels permitted by the NAAQS, operators of regulated sources in attainment areas are required to limit emissions to a "baseline rate" and obtain a permit *before* constructing or modifying facilities.  This is known as the Prevention of Significant Deterioration ("PSD") program.[4]  42 U.S.C. §§ 7470-92.  Significantly, the PSD program, when it applies, requires new and modified sources to install the "best available control technology" ("BACT") and to perform comprehensive air quality analyses and monitoring.

In enacting the PSD program, Congress expressly incorporated the pre-existing NSPS definition of modification into the NSR definition of construction or modification.  42 U.S.C. § 7479(2)(C) (PSD program).  In its PSD regulations, the EPA defined a "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 C.F.R. § 51.166(b)(2)(i); id. § 51.21(b)(2)(i).

As with the NSPS, the PSD regulations also excluded "routine maintenance" from its requirements.  However, unlike the NSPS, under the PSD program the regulation simply stated that a modification did not include "routine maintenance, repair and replacement."  40 C.F.R.

---

[4]     The program applicable to non-attainment areas is known as the Non-Attainment New Source Review ("NNSR") program.  Only the PSD program is at issue in this case.

§ 51.166(b)(2)(iii)(a); id. § 52.21(b)(2)(iii)(a).  The EPA did not, at this time, change or further

clarify the meaning of the exclusion.

In the present motion, the parties ask the Court to rule on the meaning of the "routine

maintenance, repair, and replacement" ("RMRR") exclusion as it relates to the alleged PSD

program violations in Counts 4 and 7 and the alleged NSPS violations in Counts 5 and 8.  The

parties' disagreement can be summed up as follows.  The EPA argues that "routine" should be

defined relative to a particular unit.  In other words, it argues, the RMRR exclusion should be

applied in a limited manner and requires a case-by-case determination of whether the activity is

routinely performed at an individual unit, and takes into consideration factors such as the nature

and extent, purpose, frequency, and cost of the activity.  EKPC argues for a more broad

interpretation:  that "routine" should be defined relative to an industrial category.  In other words,

the ultimate purpose of the inquiry is to determine whether the activity is routine in the industry,

considering the same factors.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case involves changes that EKPC made to three coal-fired electric generating

stations at the Spurlock Plant located in Mason County, Kentucky (Spurlock Unit 2), and the

Dale plant located in Clark County, Kentucky (Dale Unit 3 and Dale Unit 4).  According to

EKPC, each unit, which uses a "closed-loop" process, consists of four major components:  a

boiler, a turbine, a generator, and a precipitator.  The boiler converts water to steam, which

passes through the turbines and reverts to water, to return again to the boiler to repeat the cycle.

The steam passing through the rows of blades in the turbines provides energy to turn the shaft.

The generator converts this mechanical energy into electricity.

-5-

Rather than retiring aging facilities and replacing them with new facilities, utility companies began conducting "refurbish" work or "life extension projects," which typically involve the repair or replacement of the boiler and turbine components at least once during the operation of a unit in order to maintain the availability and safety of the equipment for at least 55 to 65 years. This type of work may also increase the overall capacity of the units. A main question in this case is whether the life extension projects conducted by EKPC fall under the NSPS and PSD program requirements or whether they are excluded under the RMRR exclusion.

According to the EPA, the EKPC began a project in 1992 to supply the Inland Container Corporation ("Inland") with additional steam to drive its industrial processes. In connection with the Inland project, EKPC made $20 million worth of physical changes to allow for additional steam production, including "uprating" or increasing the capacity rating of the boiler at the Spurlock Unit 2. The EPA contends that the new capacity was significantly higher than the capacity at which EKPC had represented the unit would be operated when EKPC applied for and obtained approval to construct the unit.

As for the Dale plant, Dale Unit 4 was converted from a "pressurized unit" to a "balanced draft" unit during an outage in 1994.[5] In 1995, there was a separate outage to install low nitrogen oxide burners, replace the turbine, and repair or replace some worn pressurized parts. According to the EPA, these major components were not simply replaced but were also significantly

_____

[5]   Units can be either a "pressurized" unit or a "balanced draft" unit. A "balanced draft" unit operates at a negative pressure and has "forced draft fans" that inject air into the boiler for combustion and "induced draft fans" to extract the resulting pulverized coal or "flue gas." A pressurized unit, on the other hand, operates at a positive pressure, so there is no "induced draft fan" needed; the "forced draft fans" do double duty by forcing combustion air into the boiler and pushing the flue gas out of the boiler. Dale Unit 4 originally operated as a "pressurized" unit.

-6-

upgraded with larger components.  In late 1996, EKPC took down Dale Unit 3 to perform repairs to the induced draft fans and other work associated with the installation of the low nitrogen oxide burners, turbine replacement, and certain worn pressurized parts.  During the 1994 outage, EKPC also installed a continuous emissions monitoring system on the stack used for Dale Units 3 and 4. EKPC asserts that the 1995 projects on Dale Units 3 and 4 were performed during regularly scheduled, planned turbine outages, which typically last from several weeks to several months in duration.

Th EPA filed this enforcement action on January 28, 2004, seeking civil penalties and an order enjoining EKPC from operating the Spurlock and Dale plants in violation of the Clean Air Act.  The EPA also seeks an order requiring EKPC to remedy past violations by, among other things, installing BACT at its plants, requiring EKPC to apply for permits under the PSD program, and requiring it to take other appropriate action.

## III.    THE RMRR EXCLUSION

As noted above, the parties ask the Court to interpret the meaning of the RMRR exclusion as it relates to the alleged PSD program violations in Counts 4 and 7 and the alleged NSPS violations in Counts 5 and 8.  This requires the Court to engage in an analysis pursuant to Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837 (1984), to determine whether the EPA's interpretation if the RMRR exclusion is consistent with the CAA and what weight should be given its interpretation.

### A.    Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. Id. at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

**B.     The Parties' Positions**

*1.     EPA's Opening Brief*

The EPA argues that its interpretation of the RMRR exclusion is entitled to substantial deference under Chevron.  It asserts that it has consistently and reasonably interpreted the RMRR exclusion to exclude only activities that are routine at the unit, beginning with the 1988 proceedings in response to a request by the Wisconsin Electric Power Company ("WEPCO") for a determination of the applicability of PSD and NSPS regulations to a life extension project it was undertaking.  In a 1989 memorandum from Don Clay, then Acting Assistant Administrator of the EPA, (hereinafter the "Clay Memo"), the EPA set forth its narrow interpretation of the exclusion and its conclusion that the RMRR exclusion be applied on a "case-by-case" basis taking into account the nature and extent, purpose, frequency, and cost of the activity.[6]  In applying the "routine at the unit" analysis to the RMRR exclusion, the EPA refused to endorse WEPCO's argument that routine is measured by "established business procedure" in the industry as a whole.  The Clay Memo ultimately concluded that WEPCO's proposed activities were not routine repairs because they were a one-time occurrence at the units in question, despite purported evidence that similar replacements by other utilities were common.[7]

WEPCO challenged this determination in federal court, arguing that the EPA's interpretation was arbitrary and capricious, was retroactively applied, and was made without prior notice and comment rulemaking.  The Seventh Circuit ultimately upheld the EPA's

---

[6]     The EPA later refers to the Clay Memo as a final applicability determination on whether proposed major renovations at the WEPCO plant would qualify for the exclusion.

[7]     The conclusions in the Clay Memo are also sometimes referred to as the "WEPCO interpretations."

interpretation in <u>Wisconsin Elec. Power Co. v. Reilly</u>, 893 F.2d 901 (7th Cir. 1990) (en banc) (hereinafter "<u>WEPCO</u>").  The EPA contends that this interpretation is reasonable and consistent with the plain language of the term "routine" (as opposed to "any") and, therefore, is entitled to deference.

The EPA also argues that its interpretation is consistent and long-standing.  For example, in a 1987 letter determination concerning the Cyprus Casa Grande Corporation, the EPA evaluated rehabilitative work done at a facility and determined that because it was costly in both absolute terms and as compared to the cost of a new unit, involved the extensive replacement of key pieces of equipment, was expected to take a substantial amount of time, and was needed to make the plant operational, it did not fall within the RMRR exclusion.  The EPA never compared these factors with projects undertaken at other copper processing facilities, nor did it evaluate whether the work was prevalent in the industry.  The EPA made a similar, narrow interpretation of the RMRR exclusion in a 1978 determination.  The EPA also asserts that its interpretation is consistent with guidance in the preamble to a 1992 amendment to other provisions of the NSR and NSPS regulations (also known as the "WEPCO preamble").

As for the "routine at the industry" test advocated by EKPC, the EPA argues that it fundamentally distorts the EPA's longstanding, common-sense interpretation and improperly elevates one of the factors – frequency.  EKPC's reliance on the Clay Memo in support of its position distorts the Clay Memo by misstating how industry practice is relevant to the RMRR exclusion.  It also confuses "frequency" with "prevalence," and overemphasizes the frequency factor, rendering it alone dispositive.  According to EPA, EKPC offers an interpretation of the RMRR exclusion that would essentially swallow the rule and specific provisions of the CAA.

-10-

While industry experience concerning the frequency of similar replacements at other units may inform whether a particular activity is routine, the RMRR exclusion does not turn on the prevalence of such projects within the industry.

### 2.    *EKPC's Response*

EKPC argues that this Court should reject the EPA's interpretation as inconsistent with the language of the CAA provisions themselves and with the agency's own prior practice.  Thus, it is not entitled to deference.  EKPC asserts that the plain language of the rules themselves, legislative intent, EPA's statements in the Federal Register, its statements to the regulated community and Congress, and the EPA's conduct for at least two decades establishes an interpretation of "routine in the industry."

EKPC first argues that the language of the RMRR exclusion itself in the NSPS directs the inquiry to the industry when it exempts repairs that are "routine *for a source category*."  In 1992, the EPA advised that

> the determination of whether the repair or replacement of a particular item of equipment is "routine" under the [PSD] regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources *within the relevant industrial category*.

57 Fed. Reg. at 32,326 (emphasis supplied).  The EPA was aware that utilities all over the United States were conducting "life extension" projects, and EPA's own staff often surveyed these activities.  In response to Congressional inquiries, EPA officials confirmed they had surveyed these projects and had found no violations of the NSR program.  This lack of enforcement by the EPA can only mean that the EPA had concluded that the life extension projects were "routine" under the RMRR exclusion.

EPA officials also testified in 1980 when the rules were promulgated that the NSR provisions (including the PSD provisions) had very limited application to existing coal-fired power plants and agreed that the definition of modification did not cover activities at a plant which tend to extend the useful life of that plant or tend to increase the total emissions generated over the total life of that plant.  If the EPA was interpreting the RMRR exclusion to mean "routine at the unit," these statements would not have made sense.

The "routine at the unit" interpretation that the EPA is now pushing is nothing more than a litigating position the EPA has taken in conjunction with its "enforcement initiative" that began in 1999.  Thus, even if the current interpretation is permissible and reasonable, the EPA cannot change established interpretation of the RMRR exclusion by litigation.  Once an agency gives its regulation an interpretation, it can only change that interpretation through the process of notice and comment rulemaking.  Thus, the Court should hold that the established interpretation of the RMRR exclusion – "routine in the industry" – should apply here.

EKPC argues that the Clay Memo actually supports a "routine in the industry" interpretation.  In reaching its ultimate conclusion that WEPCO's Port Washington projects were not RMRR, the EPA based its decision in large part on its consideration of information regarding industry practice as a whole.  Further, the Seventh Circuit in WEPCO actually confirmed the relevance of industry practice under the RMRR exclusion analysis by subscribing significance to both the frequency of a project at an individual unit and in the industry.  The only way in which both experiences can be relevant is under a "routine in the industry" standard.  If the relevant inquiry were "routine at the unit," then consideration of what occurred within the utility industry would be irrelevant.

-12-

The EPA's 1992 WEPCO rule preamble statement also refers plainly to the repair or replacement of equipment by "sources within the relevant industrial category." Thus, it clarified the EPA's existing interpretation that the RMRR exclusion was to be understood as requiring a "routine within the source category" assessment, rather than a "routine at the individual unit" approach the EPA now espouses for litigation purposes.

EKPC further argues that the EPA's case-by-case, multi-factor analysis in which the outcome cannot be known until after the permitting authority has undertaken the analysis is incompatible with the established notion that regulated entities should in most cases be able to ascertain in advance whether the requirements of the NSPS and PSD apply to their proposed projects. In fact, the EPA has expressly observed that utilities "in most instances are able to readily ascertain whether [NSR] requirements apply to them." 57 Fed. Reg. at 32,332. Thus, whether the RMRR exclusion applies cannot hinge on a subjective and open-ended evaluation. If it were otherwise, the EPA would require sources to obtain a formal applicability determination akin to an adjudicatory order prior to proceeding with construction. Sources would never be able to know in advance whether a given project is "routine." However, this is the opposite of what the EPA has advocated. Id.

EKPC relies in large part on the district court's decision in United States v. Duke Energy Corp., 278 F. Supp. 619 (M.D.N.C. 2003), aff'd on other grounds, 411 F.3d 539 (4th Cir. 2005), cert. granted, 126 S. Ct. 2019 (2006) (argued Nov. 1, 2006). In Duke Energy, the district court sided with the power company and held that a "prevalent in the industry" test was the appropriate

standard and that the EPA's "routine at the unit" test was a litigation position entitled to no deference.[8]

### 3.    EPA's Reply

In reply, the EPA asserts that it had this debate with the utility industry 15 years ago in WEPCO and the industry urged the EPA to adopt its "routine in the industry" interpretation, which the EPA declined to do.  The EPA has consistently interpreted the RMRR exclusion to be a "very narrow exclusion" and that the term "physical change" in the modification provisions is to be construed very broadly "to cover virtually any significant alteration to an existing plant[,]" citing the Clay Memo.  The Clay Memo also set forth the case-by-case multi-factor test in determining what is routine maintenance – i.e., "a regular, customary, or standard undertaking for the purpose of maintaining the plant in its present condition."

The EPA asserts that EKPC has ignored the reasonableness of the "routine at the unit" interpretation and instead offers an alternate interpretation.  However, EKPC's arguments do not alter the fact that the EPA's interpretation is reasonable and entitled to deference.  The law does not require the EPA's interpretation to be the "best" one, only a "reasonable" one.

As for the Clay Memo, it does not in any way support a "routine in the industry" test.  It explicitly rejected the "established business practice" test that WEPCO asked for in 1988.  The EPA does not dispute that industry practice can inform the analysis of routine maintenance in a

---

[8]      On appeal, the Fourth Circuit did not reach the RMRR exclusion question. Therefore, the Duke Energy appeal to the United States Supreme Court does not include this issue.

number of ways,[9] but that does not turn the RMRR exclusion into a "routine in the industry" test.

EKPC's suggestion that the "routine at the unit" interpretation is nothing more than a litigation position is false. The Clay Memo was issued more than a decade before the EPA's enforcement initiative began. Prior to that, the EPA applied a case-specific, multi-factor interpretation in prior determinations. EKPC's own counsel in this case acknowledged the EPA's narrow interpretation of the RMRR exclusion in 1989 when it lobbied the Department of Energy to overturn the EPA's interpretation and characterized the RMRR exclusion as applying only to activities that "(1) are frequently done at that plant, (2) involve no major equipment, (3) are inexpensive, and (4) do not extend the life of a plant." Thus, EKPC's own counsel recognized the "routine at the unit" interpretation as long as 15 years ago.

The EPA also argues that EKPC is incorrect that the <u>WEPCO</u> court upheld a "routine in the industry" standard. The <u>WEPCO</u> decision essentially upheld the Clay Memo. EKPC simply cites language from the <u>Duke Energy</u> decision for the proposition that the only way industry experience can be relevant is under a "routine in the industry" standard. However, this ignores that industry experience can be relevant. For example, if a source offers evidence that a project undertaken for the first time by that source is frequently performed in the lives of other individual units in the same industry, the EPA will consider evidence of such industry practices. On the other hand, evidence that a project has never before been done by any utility in the industry is strong evidence that the industry does not consider it routine maintenance for its individual units.

---

[9] For example, the EPA notes that what is routine maintenance for other units in the same industry may shed light on whether a particular project is routine for a unit in that industry, just as the frequency with which an activity occurs at the source level within the industry is relevant.

-15-

A "routine at the unit" test does not mean that the EPA or a source must ignore industry practice or practice in a source category.

The EPA's 1992 WEPCO preamble statements also support its interpretation.  These statements simply recognize that one should consider whether an activity is routine in the context of a relevant industrial category – i.e., the particular industry at issue – as opposed to a different industry.

### C.     Authority from Other Courts

There are a number of other courts that have addressed the precise question raised here and have engaged in a thorough and extensive analysis of the arguments raised herein. Therefore, there is no need for this Court to unnecessarily engage in a repeat analysis of these arguments.  However, a review of the cases is helpful.

#### 1.     *Wisconsin Elec. Power Co. v. Reilly* ("*WEPCO*")

The first case to address the scope of the RMRR exclusion was Wisconsin Elec. Power Co. v. Reilly, 893 F.2d 901 (7th Cir. 1990) ("WEPCO").  In this case, plaintiff WEPCO had concluded that extensive renovations were needed if operations at its Port Washington plant were to continue.  Proposed repairs included repair and replacement of turbine-generators, boilers, mechanical and electrical auxiliaries, and the common plant facilities.  Id. at 906.  In response to the proposal, the EPA issued the Clay Memo, wherein it opined that the proposed life extension project was not routine and was not exempt from NSPS and PSD requirements.  WEPCO then appealed this determination to the district court.

The Court first noted the substantial deference that is accorded to the EPA's interpretation of CAA regulations, citing the highly technical and complex nature of the

provisions and the fact that the EPA was construing its own regulations.  Id. at 906-07.  The Court then analyzed whether the proposed repairs and maintenance constituted a "modification" under the regulations – i.e., would they result in a "physical change" coupled with an increase in the amount of any pollutant emitted?

The Seventh Circuit looked at the EPA's determination of whether the proposed work was "routine," agreeing that the nature and extent of the project was substantial and that the magnitude of the project, as well as the down-time necessary to implement it, suggested that it was more than routine.  Id. at 910-11.  Next, the court looked at that part of WEPCO's application that noted that "repetitive maintenance that are normally performed" during scheduled outages were not included in the application, suggesting that WEPCO itself did not regard the project as routine.  Id. at 911.  The EPA also had noted that the WEPCO project was unprecedented:  "WEPCO did not identify, and EPA did not find, even a single instance of renovation work at any electric utility generating station that approached the Port Washington life extension project in nature, scope, or extent."  Id. at 911.  The Seventh Circuit noted that the practice at the time was to replace old plants at the expiration of their useful lives with new plants (thus bringing the new plants into compliance with the CAA).  The WEPCO life extension project, on the other hand, was a new alternative to retiring the plant and building a new one.

WEPCO argued that the EPA had issued earlier decisions allowing certain replacement programs as routine, and that the nature and extent of those "routine" projects paralleled what WEPCO wanted to do at the Port Washington plant.  For example, WEPCO argued, at least 40 air heaters had been replaced in other plants without triggering NSPS or PSD provisions.  However, the EPA determined that those projects were dissimilar to the WEPCO project, and the

-17-

Seventh Circuit held that this was not arbitrary and capricious.  The court also found that the

cost, purpose, and frequency of the project all supported the EPA's interpretation, noting that

WEPCO had admitted that the work was the type that would normally only occur once or twice

in a unit's expected life cycle, and that the project would cost $70.5 million.  In upholding the

EPA's interpretation, the court rejected WEPCO's argument that the EPA's interpretation was

overly broad "because *any* replacement project will presumably extend the life of a facility . . . ."

Id. at 912 (emphasis in original).

### 2. *United States v. Southern Indiana Gas and Elec. Co.* ("*SIGECO*")

In United States v. Southern Indiana Gas and Elec. Co., 245 F. Supp.2d 994 (S.D. Ind.

2003) (hereinafter "SIGECO"), the parties disagreed primarily "over the scope of the frequency

factor within the routine maintenance analysis."  Id. at 999.  The work had to do with three of

SIGECO's projects:  (1) the replacement of an "economizer" during a scheduled four-week

outage in 1991, at a cost of $750,000; (2) the 1992 replacement of a "secondary superheater," at a

cost of $1.014 million; and (3) a huge project in 1997 replacing a number of components during

a ten-week outage, costing approximately $17 million.  Id. at 1000-02.  Indiana regulatory

officials had initially determined that the 1997 project would not trigger NSPS or PSD

requirements and the United States brought this enforcement action.

SIGECO argued that the EPA had always looked at the utility industry as a whole to see if

the types of activities undertaken at a particular unit were done frequently across the industry and

that the EPA had only recently changed its view of the frequency factor.  The district court

looked at public statements by the EPA about routine maintenance, citing a 1991 letter from the

then-Assistant EPA Administrator in which the EPA official stated the following:

> EPA's WEPCO decision only applies to utilities proposing "WEPCO type" changes, i.e., nonroutine replacement that would result in an actual emissions increase. This is the basis for the EPA statement that the ruling is not expected to significantly affect power plant life extension projects.

Id. at 1002. The district court also set forth the 1992 WEPCO preamble, in which the EPA stated the following:

> EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.

Id. In 1995, the EPA responded to questions raised when the industry requested a new "restoration" exclusion and stated that "EPA believes that the routine maintenance exclusion already included in the existing NSR regulations also has the effect of excluding 'routine restorations.' " Id. at 1003. The district court also looked at other projects throughout the industry, including a $2.57 million project of Mobil Oil Corporation that fell under the RMRR exclusion, and WEPCO's life extension projects that triggered NSPS and PSD requirements. Id. at 1004. The court also noted the deposition testimony of three state officials who testified that EPA's "routine at the unit" interpretation was a "180-degree turn from what EPA had done historically," a "radical reinterpretation" of EPA's previous position, and was "retroactive enforcement." Id. at 1005-06.

The EPA argued that its interpretation was the same interpretation that the Seventh Circuit upheld in WEPCO. SIGECO argued that the EPA had always looked at the utility industry as a whole. The district court concluded that the EPA's "routine at the unit" interpretation was reasonable and persuasive and subject to the court's deference. It noted that

the EPA's narrow interpretation is consistent with the plain language of the regulation.  The EPA did not exempt "repair, maintenance and replacement;" it exempted "*routine* repair, maintenance and replacement."  . . . . " . . . [T]he use of the word 'routine' puts the reader on notice that irregular or unusual activities may not qualify."

In addition, the CAA term "modification" was defined very broadly by Congress, as "any physical change" that increases emissions.  In WEPCO, the Seventh Circuit observed, "the potential reach of these modification provisions is apparent:  the most trivial activities – the replacement of leaky pipes, for example – may trigger the modification provisions if the change results in an increase in emissions of a facility."  *WEPCO*, 893 F.2d at 905. . . . Giving the routine maintenance exemption a broad reading could postpone the application of NSR to many facilities and would flout the congressional intent evidenced by its broad definition of modification. . . . . How often similar projects are undertaken throughout industry may inform the analysis, but Congress certainly did not intend to allow for companies to make an "end run" on NSR by allowing the routine maintenance exemption to swallow the modification rule.

Id. at 1009 (citations omitted).  It also noted that "[t]he vast expertise of the EPA in this highly technical and specialized area" suggested that deference was appropriate.  Id. at 1010.

The district court also held that SIGECO had fair notice of the EPA's interpretation.[10]  It asserted that SIGECO's interpretation is too broad in the sense that it focused the inquiry on one factor:

If the "prevalent or commonplace in the industry" standard was the EPA's interpretation, then a regulated party would only have to point to other similar projects in industry to show that they take place elsewhere to avoid the strictures of NSR.  The end result could be many industry projects qualifying for routine maintenance just because others in the industry have taken on similar projects, projects that may or may not have been subject to NSR for various reasons.  The comparisons could be misleading for a simple reason:  perhaps many companies have made "major modifications" at their facilities.

---

[10]      In so holding, the district court noted that the language of the exemption itself was ambiguous, including the language that projects that are "routine for a source category" are exempt.  The court noted that this language implied that the EPA will look beyond the unit itself to determine if a project qualified for routine maintenance.  Id. at 1013-14.

Id. at 1014.  Rather, it is the frequency of the activity at other individual units within the industry that is the most relevant in this context.  The court also referred to the WEPCO decision and the Clay Memo as "[p]robably the most important public statement by the EPA on routine maintenance . . . ."  Id. at 1015.  "[Certain] language in the Clay Memo, and the Seventh Circuit's validation of the EPA's interpretation in WEPCO, put the regulated community on notice that the routine maintenance exemption was a multi-factor test, and that no one factor would have dispositive weight."  Id. at 1015-16.  Ultimately, however, the SIGECO court noted that "WEPCO supports the view that the frequency of the project at the particular unit and the frequency of the project within industry are *both* relevant considerations."  Id. at 1016 (emphasis in original).

### 3.   *United States v. Ohio Edison Company*

The next case to interpret the RMRR exclusion was United States v. Ohio Edison Co., 276 F. Supp.2d 829 (S.D. Ohio 2003).  The context of this case was slightly different, as the decision was rendered following a bench trial on the issue of liability, as opposed to a ruling on summary judgment.  As evidence of the court's opinion of this case, the opening paragraph stated as follows:

> This case highlights an abysmal breakdown in the administrative process following the passage of the landmark Clean Air Act in 1970.  For thirty-three years, various administrations have wrestled with and, to a great extent, have avoided a fundamental issue addressed in the Clean Air Act, that is, at what point plants built before 1970 must comply with new air pollution standards.

Id. at 832.  This case involved eleven construction projects undertaken at seven units for a total cost of $136.4 million.

-21-

The court, in its introduction, summarized its conclusion regarding the RMRR exclusion as follows:

> While the analysis required to distinguish between a modification sufficient to trigger compliance from routine maintenance, repair and replacement is complex, the distinction is hardly subtle.  Routine maintenance, repair and replacement occurs regularly, involves no permanent improvements, is typically limited in expense, is usually performed in large plants by in-house employees, and is treated for accounting purposes as an expense.  In contrast to routine maintenance stand capital improvements which generally involve more expense, are large in scope, often involve outside contractors, involve an increase of value to the unit, are usually not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet.

Id. at 834.  The district court reviewed the decisions in WEPCO and SIGECO and ultimately held that "the EPA's approach to the interpretation of the routine maintenance exemption is reasonable and is consistent with the plain language of the regulation as well as the stated purpose and language of the CAA."  Id. at 855.  Noting that the regulation at issue does not exempt "*any* maintenance, repair, or replacement," a narrow interpretation of "routine" was justified.

The district court rejected the argument that the language "source category" in the NSPS RMRR exclusion meant that what is routine must be measured by what is done in the industry as a whole.  The court reasoned that

> the EPA's decision to consider the types of activities performed in the coal-fired electric generating industry as a whole in connection with only the "frequency" factor of the four-part test, is reasonable. Furthermore, in the Court's view, the EPA's overall narrow interpretation of the routine maintenance exemption is reasonable.  It is the frequency of an activity at a particular unit that is most instructive in the analysis of what can be considered "routine."  The types of activities undertaken within the industry as a whole have little bearing on the issue if an activity is performed at a unit only once or twice in the lifetime of that particular unit.  This Court defers to the EPA's interpretation of the routine maintenance, repair or replacement exemption.

-22-

Id. at 856.  The district court ultimately determined that none of the eleven activities fell under

the RMRR exclusion and, thus, all were subject to NSPS and PSD requirements.  Id. at 889-90.

And while the district court seemed disgusted by the "abysmal breakdown" in the

administrative process and the EPA's lack of enforcement, it ultimately concluded that the EPA's

failures in enforcement did "not absolve Ohio Edison from liability under a law that has always

been clear . . . ."  Id. at 833.  A later case indicates that Ohio Edison was settled by entry of a

Consent Decree, so there will be no appellate review of this decision.

### 4.   *United States v. Duke Energy Corporation*

The tide turned for the utility industry in United States v. Duke Energy Corp., 278 F.

Supp.2d 619 (M.D.N.C. 2003), decided just 19 days after Ohio Edison.  In this case, the work at

issue consisted of replacement and/or redesign of four sets of boiler tube assemblies-

economizers, portions of waterwalls, superheaters, and reheaters.  Id. at 624.  The district court

acknowledged the deference standard set forth in Chevron.

The district court first held that the RMRR exclusion found in the PSD program must be

defined according to what was routine maintenance, repair, and replacement within the relevant

source category.  Id. at 631.  This was based on Congress's intent to incorporate the NSPS

modification provisions and related exemptions into the PSD program.  Because the NSPS

provision refers to maintenance, repair, and replacement that is "routine for a source category,"

the PSD RMRR exclusion also covers those projects that are routine for a source category.  Id. at

632.  For further support, the court cited to the EPA's 1992 WEPCO preamble statements.

The court first analyzed the Seventh Circuit's decision in WEPCO and the arguments

advanced by the parties therein.  According to the district court,

-23-

[t]he EPA and the Seventh Circuit both confirmed the relevance of industry practice under the RMRR analysis.  The EPA gave considerable attention to WEPCO's contention that the types of replacements it contemplated undertaking were "routine" because others in the industry had undertaken similar projects.  While in the end the EPA disagreed, its disagreement was with WEPCO's characterization of the projects undertaken elsewhere, not with WEPCO's position that what other utilities were doing should inform the EPA's analysis. . . . If the relevant inquiry under the RMRR exemption is whether a particular activity is "routinely performed at an individual unit" as the EPA now asserts, the EPA in *WEPCO* could have simply concluded its RMRR inquiry with the admission by WEPCO that the proposed project would occur only once or twice during a unit's expected life cycle.

The EPA, however, requested that WEPCO "submit information regarding the frequency of replacement of steam drums . . . ."  In response to this request, "WEPCO reported that to date, no steam drums have ever been replaced at any of its coal-fired electrical generating facilities." . . . .

. . . . [T]he EPA indicated that the results of its informal survey revealed "no examples of steam drum replacement at aged electric generating facilities." The fact that no other utilities replaced steam drums can be relevant only if the appropriate inquiry is what is routine within the industry.  Otherwise, there would be no need for the EPA to conduct an informal survey given that steam drums are replaced only once or twice in the life of a generating unit.

Id. at 633-34.  The district court concluded that "[t]he EPA's continual reference [in WEPCO] to other projects within the utility industry confirms Congress's intent to define RMRR under PSD according to the relevant source category."  Id. at 635.

The [WEPCO] court's recognition of both the frequency of a project at an individual unit and in the industry confirms the relevant scope of the RMRR inquiry to be what is routine within the industry.

The only way in which both experience at a unit and in the industry at large can be relevant is under a routine within the industry standard.  Projects that are repeatedly performed at a particular unit will be routine in the industry, as will projects performed at a number of units within the industry.  If the relevant inquiry were that proposed by the EPA, namely that RMRR applies only to "activity routinely performed at an individual unit," consideration of what occurred within the utility industry is irrelevant.  The EPA in *WEPCO* could have simply dismissed WEPCO's attempt to support the routineness of its proposed project by reference to other projects, as it does with Duke Energy here, and relied primarily on WEPCO's admission that the proposed project would be performed only once or twice in the life of a unit.  Accordingly, applying its multi-factored

-24-

test, the EPA could have determined that the project did not qualify as RMRR. Yet even if the EPA were to consider what occurred within the industry, the relevant inquiry under a "routine for an individual unit" standard would be the number of times a particular project is undertaken at a unit.  The focus of the EPA's effort at distinguishing the projects identified by WEPCO from the Port Washington project, however, was on the type of equipment replaced, not the frequency with which it was replaced.

Id. at 635-36.

The district court rejected the EPA's argument that the EPA's interpretation was entitled to deference, noting that an agency interpretation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently-held agency view.  The district court also noted that the EPA's post-WEPCO statements supported a "routine in the industry" standard.  In 1990, EPA officials noted that "WEPCO's life extension project [was] not typical of the majority of utilities' life extension projects and concerns that the agency [would] broadly apply the ruling it applied to WEPCO's project [were] unfounded."  GAO report at 30-31. Further, "EPA's 1989 emission forecast assumed that the WEPCO decision would not result in a significant number of additional power plants having to comply with the NSPS and the PSD program requirements."  Id. at 31.  The EPA reiterated this position in 1995 when responding to an industry request to add a "restoration" exemption.  The district court also noted a number of EPA inspection reports from the 1980's that indicated EPA was aware of the utility industry practice of engaging in life extension projects.  These included a $50 million boiler repair, a $15 million "life extension major overhaul," and ten other life extension projects.  Duke Energy, 278 F. Supp.2d at 636 n.13.

In the end, the district court felt that the EPA's position on life extension projects confirmed the "routine in the industry" standard.  "Through the EPA's statements in the Federal

Register, its statements to the regulated community and Congress, and its conduct for at least two decades the EPA has established an interpretation of RMRR under which routine is judged by reference to whether a particular activity is routine in the industry." Id. at 637.

However, later in the opinion, the district court noted that "[b]ecause the WEPCO multi-factored test applies and is entitled to deference, the determination of RMRR cannot turn exclusively on whether a particular replacement project has ever occurred in the industry.  If this were dispositive, it would render the PSD program a nullity." Id. at 638.

### 5.   *United States v. Alabama Power Company*

The district court in United States v. Alabama Power Co., 372 F. Supp.2d 1283 (N.D. Ala. 2005) (hereinafter "APC"), also sided with the utility company and found that the RMRR exclusion applied a "routine in the industry" standard.  It concluded that WEPCO did not answer the question of whether the factors used to assess the RMRR exclusion – the nature and extent, purpose, and frequency – should be interpreted narrowly (at the unit) or broadly (in the industry). Id. at 1290.

The district court then turned to the district court decisions in Ohio Edison and Duke Energy for guidance.  It noted that "[t]he split in authority is not surprising in light of the inconsistent positions EPA has taken on core applications of the NSR rules." Id. at 1293.  The district court felt that the Ohio Edison court "either did not see EPA as having taken various positions over the years on the scope of the RMRR exclusion or, if it did, it chose not to discuss them in any detail." Id. at 1294.  Ultimately, however, the court noted that the Ohio Edison court grounded its conclusion in the language of the CAA, not the regulations, such that if the broad definition were adopted, the regulations would be in direct conflict with the superseding and

controlling language of the CAA.  Regarding Duke Energy, the district court noted that it, too,

appeared to be grounded in the statute, not in the EPA's regulations or guidance, but it reached

the opposite conclusion.  The district court then spends much of its opinion tracing the origins of

the RMRR exclusion in the PSD program, ultimately concluding that the PSD RMRR exclusion

is consistent with the RMRR exclusion found in the NSPS, even though the two regulations are

worded differently (the NSPS regulation containing the phrase "routine for the source category"

whereas the PSD regulation does not).

Ultimately, the court sided with the Duke Energy analysis, noting the following:

> Lacking in the Ohio Edison and SIEGO [sic] opinions are the reasons the EPA's
> post-WEPCO statements and actions (inaction may be a better choice of words)
> count for so little.  Put another way, if there is a countervailing case to be made to
> the Duke Energy analysis, the court could not find it in Ohio Edison or SIEGO
> [sic].
> . . . .
> Were the court convinced that Ohio Edison is better researched and
> reasoned than Duke Energy, the choice would be harder.  The issues are the same,
> the arguments overlap to a great degree, and there are pros and cons to the
> arguments of both sides.  Having said that, the court finds Duke Energy clearly
> more thorough, comprehensive and rigorous in its analysis, and therefore the more
> persuasive decision on the . . . issues discussed here.

Id. at 1305-06.  In determining how much deference was due the EPA, the district court noted

that the United States Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218

(2001), was important to this issue and quoted that opinion extensively.  It concluded that the

"Eleventh Circuit is much more likely to approach the EPA's arguments and its enforcement

posture here with Mead-like skepticism than it is to approach it with WEPCO-like deference."

Id. at 1306.  Given the EPA's inconsistent positions and the court's conclusion that the EPA's

arguments sounded more in litigation position, the district court concluded that the EPA's

-27-

interpretation of its rules was not due any deference under Chevron.  "If the Mead factors are the

degree of the agency's care, consistency, formality, its relative expertness, and the persuasiveness

of the agency's position, EPA's post-WEPCO activities would, in the court's eyes, only pass the

'expertness' prong of Mead."  Id.

> **6.**      ***New York v. American Electric Power Service Corporation***

The last and most recent decision interpreting the RMRR exclusion is New York v.

American Elec. Power Serv. Corp., 2007 WL 539536 (S.D. Ohio Feb. 15, 2007) (hereinafter

"American Electric").  In American Electric, the district court stated the issue and then reached

the following conclusion:

> Having considered the parties' arguments, this Court agrees with the
> relevant analysis contained in the line of persuasive-authority cases including
> [Ohio Edison].  The Court therefore expressly adopts and incorporates the
> relevant portions of the August 7, 2003 Opinion and Order in *Ohio Edison*, which
> presents a persuasive rationale for rejecting Defendants' position that this Court
> need not and does not unnecessarily repeat in full here. . . . The Court thus
> concludes that the multi-factored, case-by-case approach is the correct standard,
> with industry practices necessarily informing that inquiry.
>
> The Court recognizes that Defendants have argued that the [EPA] has
> altered its position over time.  The Court has wrestled with this argument in light
> of the posture of the motion before the Court – a summary judgment motion – and
> has concluded that, as the United States effectively points out . . . , Defendants'
> summary judgment evidence must be considered in context.  The necessary
> context of the various statements, including the 1992 preamble, support the
> holding of *Ohio Edison*.  Although select portions of text yield some support for
> Defendants' position, that text must be read within the context of the
> communication and its intended purpose and function, as well as part of the
> overarching framework of several years practices [sic] to which the United States
> directs this Court.

Id. at *3 (citations omitted).  The court then concludes that to adopt the industry's interpretation

"and consider *only* industry practices would be to ignore the plain language of the statutory

-28-

regulations by judicially erecting a curious scheme in which the regulated determine the applicability of the regulations without an indication of supporting legislative intent." Id.

    **D.**    **Discussion**

The Court finds, as it must, that the regulatory scheme under the CAA is highly detailed, complex, and that the EPA can bring the benefit of specialized experience to bear on subtle questions such as the interpretation of the RMRR exclusion.  The Court also recognizes that when an agency has interpreted one of its regulations in a consistent manner, that interpretation is controlling, unless plainly erroneous or inconsistent with the statute.  However, when, as here, the regulatory agency takes an inconsistent view of the regulations, makes inconsistent statements with respect to the regulation, and also enforces the regulation with no discernible consistency (which was the situation at least as of the time the work at issue in this case commenced), the weight to be given that position diminishes considerably in the Court's view. See Good Samaritan Hosp. v. Shalala, 408 U.S. 402, 417 (1993) (cited in Mead, 533 U.S. at 228 n.8).  Looking at all the factors outlined in Mead with respect to the "fair measure of deference" to be afforded to an agency administering its own regulations, the Court would have to agree with the Alabama Power Co. court that the only factor that favors deference to the EPA's current position on the RMRR exclusion is its relative expertness.  Alabama Power Co., 372 F. Supp.2d at 1306.

Having reviewed the parties' arguments and the cases exhaustively analyzing this issue, the Court finds that the Duke Energy case presents a persuasive rationale for rejecting the EPA's position that this Court need not and does not unnecessarily repeat in full here.  Thus, the Court holds that it will ultimately determine whether EKPC's projects fall under the RMRR exclusion

by applying the WEPCO multi-factor test – nature and extent, purpose, frequency, and cost – with reference to the industry as a whole, not just the particular EKPC unit at issue.  This does not mean that a particular project will be considered routine simply because it has been performed by another entity within the industry.  The test does not turn on whether a particular replacement project has *ever* occurred in the industry or even necessarily the number of times it has occurred within the industry.  Rather, the Court will consider all of the WEPCO factors, including frequency, taking into consideration the work conducted at the particular EKPC unit, the work conducted by others in the industry, and the work conducted at other individual units within the industry.  Based on the above, the Court will deny the plaintiff's motion regarding the RMRR exclusion test to be applied.[11]

## IV.    BURDEN OF PROOF

The United States also asks the Court to determine who bears the burden of proof at trial in relation to the RMRR exclusion. The EPA argues that the party claiming that it benefits from an exclusion from compliance with a statute generally bears the burden of proof.  The EKPC argues that this normal allocation does not apply to an exclusion from a statutory definition – in other words, the RMRR exclusion is not an "exemption" from a general rule, but it is definitional, an element of the definition of "modification."  It also argues that the EPA bears the burden to prove each of the elements of an alleged violation, including that the projects in question were not RMRR.

---

[11]    This question is also raised in the defendant's motion for summary judgment no. 1 [DE #57], which will be granted in part by the ruling herein.

There are no appellate cases on point that determine this question, but two of the above cases have reached the opposite conclusions.  In Ohio Edison, the district court summarily held as follows:

> As a preliminary matter, the Court considers which party bears the burden of proof as to the routine maintenance exemption.  As the Government contends, the party claiming the benefit of an exemption to compliance with a statute bears the burden of proof as to the exemption.  *See United States v. First City National Bank of Houston*, 386 U.S. 361, 366, 87 S. Ct. 1099, 18 L. Ed.2d 151 (1967) (holding that the general rule is that the party claiming the benefit of exemption to a statute bears the burden of proof).  Thus, it is Ohio Edison's burden to show that the eleven activities are exempt from CAA compliance.

Ohio Edison, 276 F. Supp.2d at 856.  Duke Energy, on the other hand, reached the opposite result:

> As a general proposition, the party claiming the benefit of a statutory or regulatory exception bears the burden of proof [citing First City Nat'l Bank of Houston]. This general proposition is just that; it is not dispositive.  Rather, it is merely an interpretive aid to be used by the court . . . . One court has expressed its view that the issue should be approached by drawing a distinction between an exception to a statutory prohibition and an exclusion from a statutory definition.  *EEOC v. Chicago Club*, 86 F.3d 1423, 1429-31 (7th Cir. 1996) . . . . The court believes this approach to be useful as it allows for the consideration of legislative intent.

Duke Energy, 278 F. Supp.2d at 639.  The Duke Energy court went on to say that the EPA's burden to prove a "physical change" under the regulation was essentially no burden at all and that even the EPA recognized that Congress did not intend for every activity at a source to be subject to NSR requirements.  "In light of the legislative intent not to include in the PSD requirements every activity and the EPA's exclusion of RMRR from the definition of physical change, the EPA should bear the burden of proving that Duke Energy's projects do not fall within this exemption."  Id. (citing Chicago Club).  The court further concluded that to place the burden on Duke Energy would be "to sanction an almost *de facto* presumption of a PSD violation whenever

-31-

a utility performs any type of work. . . . Congress, however, did not provide a presumption or anything approaching a presumption." Id. at 639-40.

The Seventh Circuit's decision in Chicago Club makes a distinction between "an exception to the prohibition of a statute and an exclusion from the definition of entities covered by a statute." Chicago Club, 86 F.3d at 1429. However, the Court does not consider Chicago Club to be on point. In that case, the court defined the issues as follows: "An important distinction exists between exceptions to statutory regimes and exclusions from the *class of entities defined as within the reach of a statutory regime.*" Id. at 1430 (emphasis supplied). The Chicago Club court was struggling to determine whether a private club could, by definition, be subject to Title VII in the first instance. In this case, there is no question that EKPC is subject to the CAA. The only question here is whether EKPC's activities are exempted from the CAA's statutory regime. Thus, this Court concludes that Chicago Club is not as informative as suggested by the Duke Energy court.

Another case has recently held that the burden lies with the party claiming the benefit of the exclusion – the utility company. In United States v. Cinergy Corp., 2006 WL 372726 (S.D. Ind. Feb. 16, 2006), the district court summarily noted that "[t]he party claiming the benefit of an exemption to compliance with a statute bears the burden of proof as to the exemption." Id. at *4 (citing First City Nat'l Bank of Houston).

The Court believes that there is no reason that the general rule should not apply. The EPA will have to prove that there was a "modification" – i.e., a physical change that resulted in a net emissions increase. Once that is proven, the burden shifts to EKPC to prove that its activities

-32-

are exempt from the definition of "modification" because they were routine.  Thus, this portion

of the plaintiff's motion will be granted.

## IV.   CONCLUSION

Accordingly, the Court, being otherwise fully and sufficiently advised, HEREBY

ORDERS that

(1)   the plaintiff's first motion for summary judgment [DE #61] regarding the applicable legal test for the RMRR exclusion is GRANTED IN PART and DENIED IN PART in accordance with this opinion;

(2)   the defendant's motion for partial summary judgment no. 1 [DE #57] regarding the RMRR exclusion is GRANTED in accordance with this opinion;

(3)   the remainder of the defendant's motion for partial summary judgment no. 1 [DE #57] is DISMISSED WITHOUT PREJUDICE to refile same pending final resolution of <u>Environmental Defense v. Duke Energy Corp.</u>, No. 05-848 (argued Nov. 1, 2006); and

(4)   this order is interlocutory in all respects.

This 29th day of March, 2007.



**Signed By:**

**<u>Karl S. Forester</u>** $KSF$

**United States Senior Judge**