UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 04-34-KSF

UNITED STATES OF AMERICA                                        PLAINTIFF

V.                              **OPINION & ORDER**

EAST KENTUCKY POWER COOPERATIVE, INC.                    DEFENDANT

* * * * * * * * * * * * *

This matter is before the Court on the plaintiff's sixth motion for summary judgment:

operating permit violations at Spurlock Unit 2 due to operation at an uprated capacity [DE #71].[1]

In this motion, the plaintiff Environmental Protection Agency ("EPA") asks the Court to enter

summary judgment in its favor because the defendant East Kentucky Power Cooperative, Inc.

("EKPC"), has been operating Spurlock Unit 2 above the 4850 mmBTU/hour maximum heat

input limitation set forth in its state operating permit and its Title V operating permit.

**I.    REGULATORY BACKGROUND**

Title V required the EPA to enact regulations establishing the minimum required in all

state permit programs.  42 U.S.C. § 7661a(b).  Thereafter, each state was required to develop and

submit to the EPA for approval a permit program meeting the requirements of the Clean Air Act

("CAA").  42 U.S.C. § 7661a(d)(1).  If the program met the requirements, it was given final

approval.  Id.  If a program "substantially [met] the requirements" of the CAA, the EPA would

---

[1]        The issues presented herein are also presented in part in the defendant's motion
for partial summary judgment no. 2 (Spurlock claims) [DE #58].

grant "interim approval" and specify the changes the state must make to the program before it could be given full approval.  Id. § 7661a(g).

Kentucky submitted to the EPA for approval its Title V federal operating permit program on January 18, 1994.  Prior to that time, Kentucky had its own state operating permit program as part of its State Implementation Plan ("SIP").  401 KAR § 50:035 (1988) (attached).  The EPA gave interim approval to the Title V program on November 14, 1995, at which point Kentucky began issuing Title V permits.  Clean Air Act Final Interim Approval of Operating Permits Program; Kentucky, 60 Fed. Reg. 57,186 (1995).  The EPA gave full approval to Kentucky's Title V permitting program on October 31, 2001.  Clean Air Act Final Full Approval of Operating Permit Program; Kentucky, 66 Fed. Reg. 54953-01 (2001).

## II.     PERMITTING HISTORY OF SPURLOCK UNIT 2

EKPC began construction on Unit 2 at the Hugh L. Spurlock power station in Mason County, Kentucky (hereinafter "Spurlock Unit 2"), in the mid-1970's.  In its preconstruction permit application pursuant to the Prevention of Significant Deterioration ("PSD") program, EKPC represented that the rated capacity of Spurlock Unit 2 would be approximately 4850 mmBTU per hour, with occasional short-term peak heat input rate of 5120 mmBTU per hour, with the unit operating 8,760 hours per year (or continuously).

This heat input rating represents the amount of energy produced by the combustion of coal, as measured in million British thermal units, per unit of time (here, an hour).  The maximum heat input rate is essentially a measure of the boiler's size or capacity.  Thus, the bigger the heat input rating, the bigger the boiler.  This is not an output – or emissions – rating, although the EPA suggests a relationship between the two.  The parties disagree on what this

measurement means.  The EPA contends that "4850 mmBTU per hr" represents the maximum

hourly heat input level at which the boiler can operate at any given time – i.e., essentially a

"never-to-exceed" limit.  EKPC contends that this represents an *annual* average value – i.e., the

unit may exceed this rating at any given time, so long as the *average annual* hourly heat input

does not exceed 4850 mmBTU per hour.[2]

The EPA used these heat input assumptions, as well as a number of others in its

modeling[3] to determine whether the proposed unit would meet national ambient air quality

standards ("NAAQS") and to develop specific emissions limitations to include in the PSD

permit.  In the PSD permit issued September 1, 1976, the EPA limited emissions of sulfur

dioxide to 1.2 pounds per mmBTU, as specified in the new source performance standards

_____

[2]     According to the Federal Regulations, "[t]he term 'heat input' means the total gross calorific value . . . of all fuels burned."  40 C.F.R. § 52.01(g).  "The term 'total rated capacity' means the sum of the rated capacities of all fuel-burning equipment connected to a common stack.  The rated capacity shall be the maximum guaranteed by the equipment manufacturer or the maximum normally achieved during use, whichever is greater."  Id. § 52.01(h).  In the NSPS regulations for steam generating units, "annual capacity factor" is defined as the "ratio between the actual heat input to a steam generating unit . . . during a calendar year and the potential heat input to the steam generating unit had it been operated for 8,760 hours [or continuously] during a calendar year at the maximum steady state design heat input capacity."  40 C.F.R. § 60.41b (paragraph 2); see also 401 KAR 61:005, Section 3(6)(a) ("Annual average capacity factor means the ratio of the actual annual heat input to the potential annual heat input based on rated capacity.").

Under Kentucky regulations, " '[h]eat input' means the product, in MMBTU per unit of time, of the gross calorific value of the fuel, in BTU per lb, and the fuel feed rate in a combustion devise, in mass of fuel per unit of time . . . ."  401 KAR § 51:001, Section 1(89).  Other Kentucky regulations state that " '[m]aximum rated hourly heat input' means a unit specific maximum hourly heat input (MMBTU) which is the higher of the manufacturer's maximum rated hourly heat input or the highest observed hourly heat input."  Id. Section 1(127).

[3]     These are referred to as "assumptions" because, at this point, the unit has yet to be constructed.

("NSPS").  The permit did not require any specific best available control technology ("BACT"),

but noted the following with respect to sulfur dioxide emission control:

> Although the application states that a 99% efficient ESP [or electrostatic
> precipitator – a device used to remove particulate matter –] and 0.66% sulfur coal
> are to be used (both are acceptable), EPA must determine, from specific plant and
> control device design data, and coal contracts, whether the boiler will in fact meet
> the stated emission rates.  Since no design data is available for the control device,
> EPA cannot make this decision at the present time.  Part of the conditions for
> approval to construct the plant, therefore, require the applicant to submit certain
> design and vendor guarantee information to EPA before purchase of any
> particulate removal devices, and to submit a copy of contracts for delivery of coal
> of the required sulfur content for a sufficient time to allow for installation of
> sulfur removal devices if coal supplies diminish.

(Pl.'s Ex. 6.)  This language suggests that the EPA contemplated that the emissions limitations

could be met either by burning low-sulfur coal or by using a flue gas desulfurization system (or

"scrubbers") or other control technology if high-sulfur coal was burned.

     According to the EPA, EKPC reiterated this maximum heat input rate of 4850

mmBTU/hr in a number of subsequent documents throughout the years.  These included EKPC's

1976 application to the Kentucky Division of Air Quality ("KDAQ")[4] for a state permit to

"construct and operate" the unit and its 1982 application for a state operating permit ("SOP").

The KDAQ issued a SOP for Spurlock Unit 2 in November of 1982, which was amended on

October 7, 1983 (the "1983 SOP").  The 1983 SOP stated the following in relevant part:

> [KDAQ] issues this permit for the operation of the equipment specified herein, in
> accordance with the plans, specifications, and other information submitted with
> your application.  This permit is subject to all conditions and operating limitations
> contained herein.

---

[4]    The name of the agency at that time was actually the Kentucky Division of Air
Pollution Control ("KDAPC"), KDAQ's predecessor.  For ease of reference, any reference to
KDAQ is intended to also refer to KDAPC, unless otherwise noted.

POINT OF
EMISSION    AFFECTED FACILITY    CONDITIONS

. . . .

02    (2)    Indirect Heat Exchanger    4850 mmBTU/hr maximum heat input.
               (Unit 2)

. . . .

No deviation from the plans and specifications submitted with your application or the conditions specified herein is permitted, unless authorized in writing by the [KDAQ].  This permit shall become null and void at any time the terms and conditions contained herein are violated. . . .

GENERAL CONDITIONS

. . . .

4.    Emissions from Unit 2 shall not exceed the following limitation [sic]:

      Particulate          – 0.1 #/mmBTU heat input
      $SO_2$ [sulfur dioxide]   – 1.2 #/mmBTU heat input
      $NO_x$ [nitrogen oxides]– 0.7 #/mmBTU heat input

. . . .

7.    Emissions from Unit 2 shall be monitored and reported in accordance with Regulation 401 KAR 59:015, Section 7, and 59:005, Sections 3 and 4.

. . . .

9.    The previous operating permit (0-82-270) issued on November 10, 1982, is hereby null and void.

(Pl.'s Ex. 14.)

According to the EPA, in the late 1980's, EKPC began investigating whether it could supply approximately 300,000 pounds of steam per hour to the Inland Container Corporation, a box manufacturing facility to be constructed near Spurlock Unit 2.  According to the EPA, the consultants hired by EKPC concluded that NSPS and PSD would not apply to this project

provided that the heat input rate did not exceed the permitted maximum level of 4850 mmBTU per hour. The consultants also prepared a report evaluating the effects of supplying steam to Inland using a reboiler supply system, which indicated that EKPC could expect an increase in the heat input rate to Spurlock Unit 2 in excess of 5120 mmBTU per hour. EKPC also requested a formal "Uprating Study," in which consultants concluded that the unit could be "uprated" to produce 4 million pounds of steam per hour or 200,000 more pounds per hour than its then-existing capacity, but that it would require the boiler to operate at a heat input rate of 5340 mmBTU per hour. EPA contends that EKPC independently calculated that a heat input rate of 5354 mmBTU per hour would be required to produce 4 million pounds per hour of steam.

EKPC wrote to KDAQ in December of 1993 regarding the Inland steam supply project. It indicated that the project could cause Spurlock Unit 2 to exceed the 4850 mmBTU per hour "permitted rate" contained in the SOP and requested that the permitted heat input rate be increased to 5355 mmBTU per hour. While EKPC was waiting to hear KDAQ's response to its request, EKPC formally uprated the Spurlock Unit 2 boiler to 4 million pounds per hour of steam on January 13, 1994.[5] According to EKPC, this was not an increase to the heat input capacity rating of Spurlock Unit 2, but was a re-rating of the unit's maximum hourly *steaming capacity*, which required no change to the boiler. According to the EPA, it is obvious from the Uprating Study quoted above that this required a heat input rate above the permitted limit. KDAQ wrote back the following on February 3, 1994, regarding EKPC's requested heat input capacity change:

---

[5]     A memo to shift supervisors at Spurlock Unit 2 stated that "#2 boiler can now be operated at 4 million lbs./hour main steam flow. (This is up from 3.8 million lbs./hour.)" (Pl.'s Ex. 32.)

> The Permit Review Branch has determined that if the proposed increase in the heat input rate results in a significant net emissions increase, then your proposal would be a major modification, as defined in Regulation 401 KAR 51:017 [Kentucky's SIP].
>
> Therefore, you are required to quantify the emissions from your proposal in order to demonstrate the applicability or non-applicability of Regulation 401 KAR 51:017, Prevention of significant deterioration of air quality.

(Pl.'s Ex. 27.)  After additional correspondence between the two entities, EKPC ultimately withdrew its "proposal to increase the permitted heat input" on January 16, 1995.  (Pl.'s Ex 29.)

EKPC submitted Title V permit applications to KDAQ for its Dale and Spurlock units in 1996 and KDAQ issued draft permits for comment.  In its comments to the Spurlock draft permit, EKPC specifically requested the following:  "Description:  The maximum continuous rating should be increased to 5600 mmBTU/hr."  (Pl.'s Ex. 34.)  KDAQ issued the final Title V permit for the Spurlock plant on December 10, 1999.  The first page of the "AIR QUALITY PERMIT" includes the following:

**Permittee Name:**     East Kentucky Power Cooperative, Inc.
. . . .

**is authorized to operate an
electric power generating plant at Maysville, Kentucky**

**Source Name:**     Hugh L. Spurlock Power Station
. . . .

**Permit Type:**     Federally-Enforceable
. . . .

(Pl.'s Ex. 35 at EKPC R16-000647.)  The remaining pages of the permit contain the following information relevant to the present motion.

**SECTION A - PERMIT AUTHORIZATION**

Pursuant to a duly submitted application . . . the [KDAQ] hereby authorizes the operation of the equipment described herein in accordance with the terms and conditions of this permit. . . .

The permittee shall not construct, reconstruct, or modify any emission units without first having submitted a complete application and receiving a permit for the planned activity from the permitting authority, except [as otherwise provided] . . . .
. . . .

(Id. at EKPC R16-000649.)  Regarding Spurlock Unit 2 specifically, the permit included the

following information relevant to this motion:

**SECTION B - EMISSION POINTS, EMISSIONS UNITS, APPLICABLE REGULATIONS, AND OPERATING CONDITIONS**

**Emissions Unit 02 (02) – Indirect Heat Exchanger (Unit 2)**

**Description:**
Pulverized coal-fired, dry-bottom, tangientally [sic] fired unit equipped with electrostatic precipitator, low $NO_x$ burners and flue gas desulfurization (FGD) system
Number two fuel oil used for startup and stabilization
Maximum continuous rating:  4850 mmBTU/hr
Construction commenced:  1981

**Applicable Regulations:**

. . . .

1. **Operating Limitations:**
   None.

2. **Emission Limitations:**
   . . . .

-8-

c)        Pursuant to Regulation 401 KAR 59:015, Section 5(1)(b), sulfur dioxide emission shall not exceed 1.2 lbs/MMBTU based on a three-hour average.[6]

. . . .

**4.       <u>Specific Monitoring Requirements:</u>**

a) Pursuant to [relevant regulations], continuous emission monitoring systems shall be installed, calibrated, maintained, and operated for measuring the opacity of emissions, sulfur dioxide emissions, nitrogen oxides emissions and either oxygen or carbon dioxide emissions. . . .

. . . .

(Pl.'s Ex. 35 at EKPC R16-000654-56.)  The "Specific Reporting Requirements" required EKPC

to send "a written report of excess emissions to the division."

Nothing in the permit's sections titled "Operating Limitations," "Emission Limitations,"

"Testing Requirements," "Specific Monitoring Requirements," "Specific Record Keeping

Requirements," or "Specific Reporting Requirements" makes reference to the unit's heat input

rating.  However, in "SECTION G - GENERAL CONDITIONS," the permit reads as follows:

**(a)       <u>General Compliance Requirements</u>**

1.        The permittee shall comply with all conditions of this permit. . . .

. . . .

---

[6]       The EPA asserts more than once in its brief that "the Title V Permit included a condition that EKPC not burn coal with more than 1.2 pounds per mmBTU sulfur content," apparently referencing this provision.  It is not obvious to the Court how the EPA reaches this conclusion from the provision cited.  The related regulation, 401 KAR § 59:015, does seem to make a connection between the heat input rate and allowable emissions:  "[T]he ***total rated heat input capacity*** of all affected facilities within a source . . . ***shall be used*** as specified in Sections 4 and 5 of this administrative regulation ***to determine the allowable emission*** in terms of pounds of effluent per million BTU input."  <u>Id.</u> § 59:015, Section 3(1) (emphases supplied).  EKPC, on the other hand, asserts that the permits at issue do not and have never dictated the sulfur content of the coal burned in the unit.

> 8.    Except as identified as state-origin requirements in this permit, all terms and conditions contained herein shall be enforceable by the United States Environmental Protection Agency and citizens of the United States.
>
> . . .
>
> 16.    All previously issued construction and operating permits are hereby ***subsumed*** into this permit.
>
> . . . .

(Id. at EKPC R16-000673-74 (emphasis supplied).)  Also included with the Title V permit was the KDAQ's response to comments, which stated the following:

> Comment ( Maximum continuous rating for Emission Unit 02):  The maximum continuous rating should be increased to 5600 mmBTU/hr)
>
> Response to ( Maximum continuous rating for Emission Unit 02):  As stated in the Division for Air Quality letter dated February 3, 1994, this rating cannot be increased until the demonstration of applicability or non-applicability of Regulation 401 KAR 51:017, Prevention of significant deterioration of air quality.

(Id. at EKPC R16-000693.)

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    EPA's Opening Brief

The EPA claims that EKPC violated its operating permits by "uprating" the Spurlock Unit 2 boiler and by operating the boiler in excess of its rated heat input capacity of 4850 mmBTU per hour.  It also contends that both the 1983 SOP and the Title V permit are federally enforceable and that the EPA has the authority to seek civil penalties for past violations of the permits and to enjoin any continuing violations.

EPA first argues that EKPC's 1983 SOP for Spurlock Unit 2, which was subsequently "subsumed" into the Title V permit, limiting its operation to 4850 mmBTU per hour.  This explicit heat input "condition" in the 1983 SOP was a prior constraint that was subsumed into the

Title V permit.  The 1983 SOP also indicated that no deviation from the plans and specification was permitted.  Because EKPC has violated this condition, it is subject to civil penalties.

EPA argues that both CAA provisions and EPA regulations provide for federal enforcement of any permit limitation or condition contained within an operating permit issued under an EPA-approved program that is incorporated into the SIP.  In the present case, the state operating permit program was approved by the EPA into the Kentucky SIP in July of 1982.  Therefore, the terms in Spurlock's 1983 SOP are enforceable by the EPA.  Further, the Title V permit is indisputably federally enforceable.  Therefore, even if the pre-Title V 1983 SOP had not been enforceable by the EPA, it would have become enforceable when it was incorporated into the Title V permit.

Further, the EPA argues, the Title V permit is federally enforceable in its own right and all terms and conditions are enforceable.  Neither the CAA nor the Title V permit limit compliance to permit "conditions."  EPA regulations require Title V permits to include conditions which are "necessary to assure compliance" with the CAA – the heat input rate of 4850 mmBTU per hour was indisputably used by the KDAQ to "assure compliance" with NAAQS requirements.

Further, the Title V permit only authorizes the operation of the units described in the permit, not just *any* unit of *any* heat input capacity – only the unit with a *specific* heat input capacity.  EKPC is only authorized to operate a unit at that heat input rating.  The EPA argues that this rating is not a meaningless number; it is directly related to the capacity of the boiler to emit pollution.  According to the EPA, the only other limitation on sulfur dioxide emissions in the Title V permit is that the Spurlock Unit 2 may not burn coal with a higher sulfur dioxide

content than 1.2 pounds/mmBTU.  If that were the *only* limitation relating to sulfur dioxide emissions, then there is no real limit on sulfur dioxide emissions from this unit – the greater the capacity of the boiler, the more tons of sulfur dioxide will be emitted into the atmosphere.  Thus, the heat input capacity plays a real, practical role in limiting a source's capacity to emit pollution.  Thus, the EKPC official who testified that the heat input rate is a "meaningless" number is simply wrong.  Further, the heat input rate was a central component or the air quality monitoring performed by KDAQ, and was also a central component of the annual PSD modeling performed on the unit by both EKPC and regulators.

The EPA also points out that the heat input rate is not listed as an "insignificant activity" or emission level in that section of the Title V permit.  In fact, the heat input rate *cannot* be considered insignificant; it is required to be included in a source's Title V application because it is needed to determine and regulate emissions and it is a limitation on the source's operation.  Most telling, however, is that even though EKPC now contends that the heat input rate is merely descriptive and is "meaningless," it is the only operating parameter EKPC has ever sought to change for Spurlock Unit 2.  If this number is so meaningless, why did EKPC request on at least two occasions that the KDAQ increase it?  Why was this the only change to the operating permit that EKPC ever requested?

Finally, EPA contends that EKPC admits operating Spurlock Unit 2 above 4850 mmBTU per hour and that EKPC makes no effort to limit the heat input rate of the unit.

### B.    EKPC's Response

EKPC rejects just about every factual statement made by the EPA, beginning with the meaning of "maximum continuous rating:  4850 mmBTU per hour" – it does not, as EPA argues,

represent a "maximum hourly heat input limit" but rather an "annual average hourly heat input limit." Because EKPC has never, in 25 years, exceeded an annual average 4850 mmBTU per hour heat input, the EPA's motion should be denied. EKPC also argues that the CAA has never been about what goes into a boiler, but only the emissions that come out of it. Thus, the heat input value, regardless of its averaging period, is not a federally enforceable requirement under the CAA.

EKPC argues that the EPA "invites error" by focusing on the annual heat input rating rather than the emissions limits for the unit. The modeling that EPA performed on Spurlock Unit 2 before granting approval for construction was all based on average hourly emissions rates. EPA itself calculated the maximum hourly average assuming an average heat input of 5120 mmBTU/hr and the annual hourly average using a 4850 mmBTU/hr heat input. The modeling also showed that even if the Spurlock Unit 2 operated at 100% capacity factor (i.e., 24/7), it would not interfere with NAAQS or PSD requirements. In fact, Spurlock Unit 2 has always operated at a much lower capacity factor.

EKPC also argues that KDAQ officials have testified that KDAQ has never considered the heat input ratings in operating permits to be an enforceable operational limit in Kentucky. Thus, the maximum continuous rating of 4850 mmBTU/hr in the "Description" portion of the Title V permit is just that – a description. The permit does not require monitoring, testing, reporting, or record-keeping with respect to the heat input rating. Therefore, it cannot be said to regulate heat input as an enforceable limit. In order to be an enforceable limit, the permit must provide both a numerical limit *and* a method for measuring compliance with the numerical limit.

To the extent that the EPA is now trying to enforce the 1983 SOP, EKPC argues that the 1983 SOP was issued pursuant only to state regulations and, therefore, cannot be considered federally enforceable.  In order to be considered federally enforceable, a specific SOP such as the Spurlock permit would have to have been adopted after a public hearing, had to have implemented a requirement of § 110 of the CAA, and would have had to have been approved by the EPA.  Kentucky's SOP program in effect in 1983 did not meet any of these criteria. Therefore, the Spurlock 1983 SOP is not federally enforceable.

EKPC further objects to the heat input rating as a limitation because it is not enforceable as a practical matter.  The EPA's own criteria for assessing whether a permit condition is "enforceable as a practical matter" include "applicability, compliance date, specificity of conduct, any incorporation by reference, recordkeeping requirements, and exemptions and exceptions." 54 Fed. Reg. at 27,283; see also New Source Review Workshop Manual (Oct. 1990) at H.6 (Def.'s Ex. 203).  Neither the SOP nor the Title V permit contain any monitoring or recordkeeping provisions for ensuring or demonstrating compliance with the heat input rating. The only limits on the operation of Spurlock Unit 2 are the emissions rates, which do not restrict heat input.

EKPC also argues that the reference to the heat input was never intended by Kentucky to be an enforceable limit.  The 1983 SOP merely describes Spurlock Unit 2 as a unit with a 4850 mmBTU/hr heat input rating – this description had its inception in EKPC's application for state and federal preconstruction permits.  Nothing in the record indicates that this was ever anything other than an approximate estimate of the *annual average* hourly heat input of this proposed unit.

-14-

The emission limitations in the 1983 SOP imposed no limit on short-term or long-term heat input.

EKPC further argues that the Title V permit did not make the heat input rating a federally-enforceable requirement. The EPA argues that the original 1983 SOP was subsumed into the Title V permit for the Spurlock plant. However, as explained above, even the original 1983 SOP did not impose an enforceable limit on the heat input of Spurlock Unit 2. Because there was no such condition in the earlier 1983 SOP, there can be no such condition "subsumed" into the Title V permit. The heat input rating is simply listed in order to describe the unit. If the EPA intended for the heat input rating to be an enforceable requirement, it could and should have objected to the Title V permit, which it did not do.

### C. EPA's Reply

In reply, the EPA notes that EKPC has admitted that the company uprated and has operated the Spurlock Unit 2 boiler at a heat input rate exceeding 4850 mmBTU per hour. Therefore, there are no genuine disputes of material fact. Further, there is no question that the plain language of the 1983 SOP articulated a maximum heat input as an hour limit in the "Conditions" section, which stated "4850 mmBTU/hr maximum heat input." This language is clear that the 1983 SOP was conditioned upon the operation of Spurlock Unit 2 at a 4850 mmBTU per hour maximum heat input rate. To get around this language, EKPC tries to argue that "maximum" actually means "average" and "hour" actually means "year." The Title V permit likewise identifies 4850 mmBTU/hour as the maximum continuous rating for the unit and permits operation of equipment only as described in the permit. Both the 1983 SOP and the Title V permit are clear that the unit's operating parameter is 4850 mmBTU *per hour*. The reason

-15-

there is no definition of an averaging period is because it is *not an average* at all – it is an upper limit.

EPA contends that the maximum hourly heat input rate is a legally enforceable limit regardless of whether a specific method of measurement is provided.  The 1983 SOP explicitly prohibits deviation from the heat input limit when it prohibits any deviation "from the plans and specifications submitted with your application or the conditions specified" in the permit.  It is clear from the condition in the 1983 SOP that EKPC was not permitted to deviate operation of the unit from the maximum 4850 mmBTU per hour heat input rate.

EPA further argues that the heat input limit is a firmly fixed process equipment parameter, not an emission or operational limitation.  While emission and operational limitations may be required to contain both a numerical limit and a compliance measurement method, the same is not true of an equipment parameter, also referred to as a "surrogate limit."[7]  A surrogate

---

[7]    In the EPA's <u>New Source Review Workshop Manual</u> (Oct. 1990) (Def.'s Ex. 203), the EPA notes the following in its section titled "Elements of an Effective Construction Permit":

>     Where continuous, quantitative measures are infeasible, surrogate parameters must be expressed in the permit.  Examples of surrogate parameters include:  mass emissions/opacity correlations, maintaining pressure drop across a control (e.g., venturi throat of a scrubber), raw material input/mass emissions output ratios, and engineering correlations associated with specific work practices.  These alternate compliance parameters may be used in conjunction with measured test data to monitor continuous compliance or may be independent compliance measures where source testing is not an option and work practice or equipment parameters are specified.  Only those parameters that exhibit a correlation with source emissions should be used.
>
>     . . . . Whenever possible, "never to be exceeded" values should be specified for surrogate compliance parameters.

(Def.'s Ex. 203 at H.6-H.7.)

limit such as heat input is not a number to be measured periodically to confirm compliance. Rather, it is identified at the outset and once included in the permit, is used *in conjunction with* measured test data to monitor continuous compliance. It is clear that the 4850 mmBTU per hour was written as a "never to be exceeded" value. After including this heat input value in the 1983 SOP, the permitting authorities relied on this parameter, as well as subsequently-reported lb/mmBTU measurements of sulfur dioxide to monitor the unit's compliance.

The EPA also argues that EKPC has erroneously conflated the requirements for a SIP and the requirements for permits issued pursuant to those SIPs. EKPC cites to § 110 of the CAA, which requires a SIP to include procedures for monitoring compliance with each of certain selected control measures, and then makes the illogical jump to the conclusion that each permit issued pursuant to a SIP must independently include a method of measuring compliance with each selected control measure. This is an incorrect statement of the law.

EKPC's own actions indicate that the maximum hourly heat input rate is a legally enforceable permit limit. EKPC twice sought to raise the permitted heat input rate identified in the 1983 SOP and in the Title V permit. Thus, EKPC itself recognized that this was an enforceable limit. KDAQ responded that the heat input rate would not be increased without additional information, but EKPC increased the rate anyway.

EPA responds that practical enforceability is not relevant to the claim at issue. The EPA statement cited by EKPC in its response were made in the context of an operational limit that would prevent a "synthetic minor source" from exceeding PSD annual emissions limits, in which

case the practical enforceability concept is relevant.[8]  Because EKPC does not have a synthetic

minor permit for Spurlock Unit 2, the concept of practical enforceability is irrelevant to the

issues presented in this motion.

There is no question that the EPA may enforce both the 1983 SOP and the Title V permit

in this case.  The 1983 SOP was issued pursuant to an EPA-approved SIP program.  This means

that, as a matter of law, EPA has the authority to enforce the terms and conditions of the 1983

SOP.  Both United States v. Louisiana-Pacific Corp., 925 F. Supp. 1484 (D. Colo. 1995), and

Save Our Health Org. v. Recomp of Minn., Inc., 829 F. Supp. 288 (D. Minn. 1993), support the

EPA's position on enforcement.  As for the Title V permit, the 1983 SOP – as well as the 4850

mmBTU per hour condition contained therein – was "subsumed" or incorporated into the Title V

permit.  Because the Title V permit is federally enforceable on its face and by its express terms,

and because the Title V permit does not exempt the heat input limit as a "state-origin

requirement" beyond the reach of federal enforcement, the EPA has authority to enforce the heat

input limit.

### D.  **Discussion**

#### *1.  Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[8]    A source can avoid PSD if it is a "synthetic minor source."  A synthetic minor
permit keeps an otherwise regulated source from having to comply with PSD and other CAA
requirements.  Therefore, according to the EPA, it is critical that the limits in these permits be
enforceable as a practical matter so that the authorities can easily assure compliance.  Synthetic
minor permits, therefore, require additional prerequisites before they can shield a source from
CAA requirements.

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. Id. at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

2.    *Does EPA have the authority to enforce the 1983*
*SOP? I.e., is the 1983 SOP federally enforceable?*

The Court concludes that the EPA has the authority to enforce the 1983 SOP under the language of the CAA and the Kentucky regulations. Congress gave broad enforcement authority to the EPA to bring a civil action whenever it "finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit . . . ." 42 U.S.C. § 7413(a)(1). EPA regulations echo this broad language:

> Failure to comply with . . . any permit limitation or condition contained within an operating permit issued under an EPA-approved program that is incorporated into the State implementation plan, shall render the person or governmental entity so failing to comply in violation of a requirement of an applicable implementation plan and subject to enforcement action under section 113 of the Clean Air Act.

40 C.F.R. § 52.23. At least one other court has recognized this broad enforcement authority under § 113 of the CAA. See, e.g. United States v. Marine Shale Processors, 81 F.3d 1329, 1354 (5th Cir. 1996) ("We are reluctant to construe such language as preventing the agency from exercising the enforcement power [over a state operating permit] that Congress intended it to have."). The permitting scheme at 401 KAR 50:035 was approved by the EPA into the Kentucky SIP in 1982 and the 1983 SOP was issued pursuant to this EPA-approved SIP. Therefore, the Court determines that the 1983 SOP is federally enforceable. Other cases, while not necessarily on point, support this interpretation of the CAA. United States v. Louisiana Pacific Corp., 925 F. Supp. 1484, 1486-87 (D. Colo. 1995); Save Our Health Org. v. Recomp of Minn., Inc., 829 F. Supp. 288, 291 (D. Minn. 1993); United States v. Louisiana-Pacific Corp., 682 F. Supp. 1141, 1159 (D. Colo. 1988) (citing cases).

### 3.    *What effect did the 1999 issuance of the Title V permit have on the pre-existing 1983 SOP?*

The Court finds that the EPA may continue to look to the terms of the 1983 SOP except where those terms were modified in the Title V permit.  In other words, the Title V permit issued on December 10, 1999, did not render the 1983 SOP as a whole a nullity.  Turning to the language of the Title V permit, it states that all prior permits were "subsumed into this permit."  Had KDAQ intended for the 1983 SOP to be rendered null and void upon issuance of the Title V permit, it could have easily said so, as it had in prior permits.  See, e.g., 1983 SOP ("The previous operating permit (0-82-270) issued on November 10, 1982, is hereby null and void.")  Similarly, KDAQ could have just as easily stated that the 1983 SOP was "superceded" by the Title V permit.  However, KDAQ chose to use the word "subsumed," which means "to bring under another; to subjoin, add," Oxford Eng. Dict. (2d ed. 1989), or "to bring (one idea, principle, term, etc.) *under* another, (a case, instance) under a rule; to take up *into*, or include *in*, something larger or higher."  Id.; see also Black's Law Dict. (8th ed. 2004) ("to bring (a case) under a broad rule."); Merriam-Webster Online Dict., http://www.merriam-webster.com (Mar. 16, 2007) ("to include or place within something larger or more comprehensive; encompass as a subordinate or component element").  This suggests that the 1983 SOP survived issuance of the Title V permit.  The 1983 SOP was not eliminated by the Title V permit, but continued as a "subordinate or component element" thereof.

However, to the extent that any term, condition, or description in the 1983 SOP was modified by the Title V permit or is inconsistent with the Title V permit, the later-issued Title V permit must control.  The Court finds that the reference to "4850 mmBTU/hr" in the Title V

permit is just such a term.  Thus, any interpretation that the Court gives to the 1983 SOP with respect to the maximum heat input ceases to control as of December 10, 1999.[9]

> **3.  What is the meaning of "4850 mmBTU/hr maximum heat input," when it appears listed under a heading titled "Conditions" in the 1983 SOP – is it a "never to be exceeded limit" or an "annual average maximum" limit?**

The Court determines that the 1983 SOP clearly limits the "heat input" of Spurlock Unit 2 to a maximum of 4850 mmBTU per hour as a condition of the permit.  This limitation is not merely a "description" of the unit, as it appears in a column titled "Conditions."  The permit expressly states that it is "subject to all *conditions* and operating limitations contained herein." Also, the term "maximum heat input" does not limit itself to any particular time reference – this suggests to the Court that it does not, as argued by EKPC, mean maximum heat input as averaged out over a year's time.  The permit also does not refer to this limitation as a "rating."  Thus, as a "condition" of the permit, EKPC was only permitted to operate the unit with a "4850 mmBTU/hr maximum heat input" every hour that it operated the unit, whether that was one hour per day or 24 hours per day.  In other words, the Court adopts the EPA's argument that the limit is a "never to exceed" maximum with respect to the 1983 SOP and will grant the plaintiff's motion on this point.

---

[9]    Taking into consideration the Court's ruling on the statute of limitations question, as a practical matter, the EPA can only enforce the 1983 SOP from January 28, 1999, which is five years back from the filing of the complaint, through December 9, 1999, which is the last day before the Title V permit became applicable.  At that point, the Title V permit would then become enforceable through its expiration date of December 10, 2004.  The parties do not discuss any of the subsequent Title V permits and their applicability to the present action.

EKPC's argument that this represents simply a description and, further, that it references only an annual average rating number is belied by the language of the permit itself. The plain language of the 1983 SOP limits the operation of Spurlock Unit 2 to a specific "maximum heat input" – not a heat input "rating," not a heat input "average," not a heat input based on a certain number of operating hours per year. Therefore, the Court must reject EKPC's interpretation as contrary to the express language of the permit.

> **4.    Is "Maximum continuous rating: 4850 mmBTU/hr," when it appears in a section titled "Description" in the Title V permit, an enforceable limit? If so, is it a "never to be exceeded limit" or an "annual average maximum" limit?**

The language in the Title V permit is not as clear as the 1983 SOP language. In fact, the Court finds that the language in the Title V permit is not clear at all as to the meaning of "maximum continuous rating: 4850 mmBTU/hr." Therefore, the Court cannot agree with the EPA's argument that the Title V permit limits the total heat input at any given hour to 4850 mmBTU, regardless of how many hours a day or year the boiler is operated.

The Court finds that this is not an enforceable limitation as written. The term "4850 mmBTU/hr" appears only in the "Description" section, indicating that it is not a limitation, but merely a descriptive term. Also, unlike the 1983 SOP, which clearly states that 4850 mmBTU/hr is a "maximum heat input" and a "condition" of the permit, the language of the Title V permit states that 4850 mmBTU/hr is a "maximum continuous *rating*." The term "maximum continuous rating," unlike "maximum heat input," does not have a clear meaning in terms of how it should be measured. Also, unlike "maximum heat input," there is ambiguity as to the time

period reference (if any) intended by the term "rating." Thus, it is not clear at all from the language of the Title V permit that KDAQ intended this to be enforceable as a limit.

Further, if the Court were to accept the EPA's interpretation of the Title V permit, then the permit's use of the word "continuous" does not make any sense. It is the Court's opinion that use of the word "continuous" actually supports EKPC's reading of the limit as an "annual average" limitation. EKPC's argument for an "annual average" limit can be informally stated as follows: Based on the EPA's modeling, the permit allows EKPC to emit a specific amount of pollution in the air *per year* based on running the unit at 4850 mmBTU/hour [4850 mmBTU/hour (the annual average limit) x 8760 hours/yr (24/7 or *continuously*) = 42,486,000 mmBTU/year]. The permit does not mandate how EKPC must divide up these 42.486 million mmBTU/year. It can run the unit at 4850mmBTU/hour continuously at a 100% capacity factor, or it can run the unit at a higher level (such as 9700 mmBTU/hr) for fewer hours over the course of the year (12 hours per day at a 50% capacity factor). The only limit is how much total pollution can emitted. Under this interpretation, the word "continuous" makes at least some sense. Under a "never to be exceeded" interpretation, it makes no sense.

While the Title V permit states that it authorizes only the operation "of the equipment *described* herein in accordance with the terms and conditions of this permit," (Pl.'s Ex. 35 at EKPCR16-000649 (emphasis supplied)), the Court does not consider the "Description" section of the permit to be either a "term" of the permit or a "condition." KDAQ indicated in the 1983 SOP its ability to effectively limit the heat input to the unit as a condition of operation when it desired to do so. However, it did not do so in the Title V permit. Therefore, the Court rejects the EPA's argument that the 4850 mmBTU/hr description in the Title V is an enforceable limit,

particularly when neither the Court nor the parties can determine what it means or what it was intended to measure.

>    **5.     In the 1983 SOP, is the 4850 mmBTU/hr maximum heat input limit unenforceable because it does not contain a method for measuring compliance or because it is not enforceable as a practical matter?**

EKPC also argues that the 4850 mmBTU/hr limit is unenforceable because the permits do not contain a method for measuring compliance or because the limit is not enforceable as a practical matter.  Because the Court has determined that the limit is not enforceable in the Title V permit, it need only consider these arguments with respect to the 1983 SOP.

The Court rejects EKPC's arguments that "4850 mmBTU/hr maximum heat input" is not a measurable limitation or that it is not enforceable as a practical matter.  As noted by the EKPC, the heat input value appears to be a firmly fixed process equipment parameter capable of measurement.  EKPC's own documents demonstrate this.  For example, its "Steam Supply Alternatives Investigation" states that "[i]f the maximum fuel burn rate of Units 1 and 2 as specified in the current state air permit (2,825 Mbtu/h and 4,850 Mbtu/h, respectively) do not increase, there will be no increases in the maximum hourly emission rate of any air pollutant." (Pl.'s Ex. 17 at C-0099871.)  The "Reboiler Supply Study" conducted for EKPC indicates that the fuel burn rates at Spurlock Unit 2 could reach a level of 5197 mmBTU/hr when operating the boiler at 100% maximum continuous rating.  (Id. Ex. 18 at C-0109081.)[10]  EKPC itself calculated

---

[10]     As the maximum continuous rating decreased, so did the expected heat input.  For example, at 80% boiler maximum continuous rating, the heat input would be 4230 mmBTU/hr, while at 30%, the heat input would be 1591 mmBTU/hour.  However, if both the turbine and the boiler were operated at full load, the heat input was estimated to be 5292 mmBTU/hr.  (Pl.'s Ex. 18.)

that if it produced 4 million pounds of steam per hour, the heat input would be 5354 mmBTU/hr. In fact, when EKPC requested an increase in its permitted heat input level, it was at this same level: 5355 mmBTU/hour. (Pl.'s Ex. 26.) Thus, it is clear to the Court that the parties are capable of measuring the heat input of Spurlock Unit 2 at any given hour. Thus, because the limit is a measurable limit, it is not legally unenforceable on this basis. As for the concept of "practical enforceability," this concept appears to be relevant in the context of determining operational limits that will prevent a source in the first instance from exceeding PSD annual emissions limits – e.g., a synthetic minor source. Thus, the Court finds that EKPC's arguments do not render the heat input limit in the 1983 SOP unenforceable.

### 6.     Did EKPC exceed the "4850 mmBTU/hr maximum heat input" limit?

The EPA asserts that EKPC has admitted that it actually operates and continues to operate Spurlock Unit 2 in excess of a level of 4850 mmBTU/hr maximum heat input. EKPC, on the other hand, contends that, when averaged over an annual period, it has never approached 4850 mmBTU/hr, and that the short-term heat input rating used in ambient modeling has only been exceeded "infrequently." The Court cannot, however, determine based upon the current record when and how often EKPC has exceeded the "4850 mmBTU/hr maximum heat input" limit set forth in the 1983 SOP. The EPA has not, to the Court's satisfaction, proven the relationship between EKPC's uprating its boiler to 4 million pounds per hour of steam and an alleged corresponding increase in the heat input to the boiler. Thus, this will remain for the EPA to prove at trial.

IV.    **CONCLUSION**

Accordingly, the Court, being otherwise fully and sufficiently advised, HEREBY

ORDERS that

(1)    the plaintiff's sixth motion for summary judgment:  operating permit violations at Spurlock Unit 2 due to operation at an uprated capacity [DE #71] is GRANTED IN PART and DENIED IN PART in accordance with this opinion;

(2)    the defendant's motion for partial summary judgment no. 2 (Spurlock claims) [DE #58] regarding enforcement of the 1983 SOP and Title V permit is GRANTED IN PART and DENIED IN PART in accordance with this opinion;

(3)    the remainder of the defendant's motion for partial summary judgment no. 2 (Spurlock claims) [DE #58] is DISMISSED WITHOUT PREJUDICE to refile same pending the United States Supreme Court's decision in <u>Environmental Defense v. Duke Energy Corp.</u>, No. 05-848 (argued Nov. 1, 2006); and

(4)    this order is interlocutory in all respects.

This March 30, 2007.



**Signed By:**

**<u>Karl S. Forester</u>** KSF

**United States Senior Judge**